Dennis F. Dunne, Esq.
Andrew M. Leblanc, Esq.
Tyson M. Lomazow, Esq.
Lauren C. Doyle, Esq.
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| OneWeb Global Limited, *et al.* | ) | Case No. 20-22437 (RDD) |
|  | ) |  |
| Debtors.[1] | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF FILING OF SOLICITATION VERSION OF DISCLOSURE**
**STATEMENT RELATING TO THE SECOND AMENDED JOINT CHAPTER**
**11 PLAN OF REORGANIZATION OF ONEWEB GLOBAL LIMITED, ET AL.**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby file the solicitation version of the *Disclosure Statement Relating to the Second Amended Joint Chapter 11 Plan of Reorganization of OneWeb Global Limited, et al.* (the "Solicitation Version Disclosure Statement"), attached hereto as **Exhibit A**. A blackline of the Solicitation Version Disclosure Statement is attached hereto as **Exhibit B**, which reflects changes from the *Disclosure Statement Relating to the First Amended Joint Chapter 11 Plan of Reorganization of OneWeb Global Limited, et al.* [Docket No. 519] filed on August 26, 2020.

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if any, are:  OneWeb Global Limited (N/A); OneWeb Holdings LLC (5429); OneWeb Communications Limited (9487); WorldVu Satellites Limited (7802); WorldVu Development LLC (9067); WorldVu JV Holdings LLC (N/A); 1021823 B.C. LTD (8609); Network Access Associates Limited (8566); OneWeb Limited (8662); WorldVu South Africa (Pty) Ltd. (1867); OneWeb Chile SpA (2336); WorldVu Australia Pty Ltd. (5436); WorldVu Unipessoal Lda. (2455); OneWeb Norway AS (0209); OneWeb ApS (9191); OneWeb Network Access Holdings Limited (8580); OneWeb G.K. (1396); OneWeb Ltd. (8661); WorldVu Mexico S. DE R. L. DE C.V. (1234).  The Debtors' headquarters is located at 195 Wood Lane, West Works Building, 3rd Floor, London, W12 7FQ, UK.

Dated: August 31, 2020
     New York, New York

*/s/ Lauren C. Doyle*

Dennis F. Dunne, Esq.
Andrew M. Leblanc, Esq.
Tyson M. Lomazow, Esq.
Lauren C. Doyle, Esq.
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219
Email:    ddunne@milbank.com
        aleblanc@milbank.com
        tlomazow@milbank.com
        ldoyle@milbank.com

*Counsel for Debtors*
*and Debtors in Possession*

## **Exhibit A**

**Solicitation Version Disclosure Statement**

THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE DISCLOSURE STATEMENT MAY BE REVISED TO REFLECT EVENTS THAT OCCUR AFTER THE DATE HEREOF BUT PRIOR TO THE BANKRUPTCY COURT'S APPROVAL OF THE DISCLOSURE STATEMENT.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| OneWeb Global Limited, *et al.* | Case No. 20-22437 (RDD) |
| Debtors.[1] | (Jointly Administered) |

**DISCLOSURE STATEMENT RELATING TO**
**THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF**
**REORGANIZATION OF ONEWEB GLOBAL LIMITED, ET AL.**

Dennis F. Dunne, Esq.
Andrew M. Leblanc, Esq.
Tyson M. Lomazow, Esq.
Lauren C. Doyle, Esq.
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219
*Counsel to the Debtors*
*and Debtors in Possession*

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if any, are:  OneWeb Global Limited (N/A); OneWeb Holdings LLC (5429); OneWeb Communications Limited (9487); WorldVu Satellites Limited (7802); WorldVu Development LLC (9067); WorldVu JV Holdings LLC (N/A); 1021823 B.C. LTD (8609); Network Access Associates Limited (8566); OneWeb Limited (8662); WorldVu South Africa (Pty) Ltd. (1867); OneWeb Chile SpA (2336); WorldVu Australia Pty Ltd. (5436); WorldVu Unipessoal Lda. (2455); OneWeb Norway AS (0209); OneWeb ApS (9191); OneWeb Network Access Holdings Limited (8580); OneWeb G.K. (1396); OneWeb Ltd (8661); WorldVu Mexico S. DE R. L. DE C.V. (1234).  The Debtors' headquarters is located at 195 Wood Lane, West Works Building, 3rd Floor, London, W12 7FQ, UK.

| IMPORTANT INFORMATION FOR YOU TO READ |
|:---:|

**THE DEADLINE TO VOTE ON THE PLAN IS SEPTEMBER 25, 2020 AT 4:00 P.M. PREVAILING EASTERN TIME, UNLESS EXTENDED BY THE DEBTORS (THE "VOTING DEADLINE").**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE *ACTUALLY RECEIVED* BY THE SOLICITATION AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

**PLEASE BE ADVISED THAT SECTION XI. OF THE PLAN CONTAINS EXCULPATION, RELEASES AND INJUNCTION PROVISIONS. YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE IT MAY AFFECT YOUR RIGHTS.**

You have received this Disclosure Statement (the "Disclosure Statement") from the above-captioned debtors in possession (the "Debtors") because you may be a creditor entitled to vote on the *Second Amended Joint Chapter 11 Plan of Reorganization of OneWeb Global Limited, et al.* dated as August 31, 2020 attached hereto as **Annex A** (as it may be amended, supplemented, or otherwise modified from time to time, the "Plan"). Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Plan.

———————————

The Debtors urge each holder of a Claim to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing the Disclosure Statement and the Plan.

———————————

The Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, certain events in the Debtors' chapter 11 cases, and certain documents related to the Plan. Although the Debtors believe that these summaries are fair and accurate, they are qualified in their entirety to the extent that they do not set forth the entire text, or every detail, of the relevant document or statutory provision. In the event of any inconsistency or discrepancy between a description in the Disclosure Statement and the terms and provisions of the Plan or any document incorporated in the Plan by reference, the Plan or such other document will govern for all purposes. The statements contained herein are made as of the date of this Disclosure Statement, and there can be no assurance that such statements will be correct at any time after such date. Although the Debtors may subsequently update the information in this Disclosure Statement, they have no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise. The Debtors also reserve the right to file an amended or different plan and related amended disclosure statement.

———————————

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and not necessarily in accordance with federal,

state, or foreign securities laws or other non-U.S. laws. This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission, or any securities exchange or association, or foreign equivalent, nor has the SEC, any state securities commission, any securities exchange, or foreign equivalent association passed upon the accuracy or adequacy of the statements contained herein.

_____

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records or that was otherwise been made available to them at the time of such preparation. Although the Debtors believe that the financial information contained herein and in the Plan fairly reflects the financial conditions of the Debtors as of the date hereof, no representations or warranties are made as to the accuracy of the financial information contained herein and in the Plan. Except where specifically noted, the financial information contained in the Plan, this Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States or any other jurisdiction.

_____

This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver. The Debtors may object to Claims before or after the Effective Date irrespective of whether this Disclosure Statement identifies any such objection.

_____

Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described in Section IX of the Plan. There is no assurance that the Plan will be confirmed or, if confirmed, that the material conditions precedent to its effectiveness will be satisfied or waived. You are encouraged to read this Disclosure Statement in its entirety, including, but not limited to, Section VII hereof entitled "Risk Factors," before submitting your vote to accept or reject the Plan.

_____

The Debtors have not authorized any Entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

_____

If the Plan is confirmed and the Effective Date occurs, all holders of Claims and Interests (including those holders of Claims or Interests who are not entitled to vote on the Plan) will be bound by the terms of the Plan.

## QUESTIONS AND ADDITIONAL INFORMATION

**If you would like to obtain copies of this Disclosure Statement or the Plan or have questions about the solicitation and voting process or these cases generally, please contact Omni Agent Solutions, the Claims and Noticing Agent in these cases, by either (i) visiting its website at http://www.omniagentsolutions.com/onewebglobal or (ii) calling (866) 680-8121.**

## TABLE OF CONTENTS

Page

I.  INTRODUCTION AND OVERVIEW OF THE PLAN ...................................................1

    A.  The Adequacy of Disclosure..............................................................................1
    B.  The Plan .............................................................................................................2
    C.  Voting on the Plan .............................................................................................3
    D.  Votes Required for Acceptance .........................................................................4
    E.  Certain Factors to be Considered Prior to Voting.............................................4
    F.  Solicitation Package and Plan Supplement........................................................4
    G.  Voting Procedures..............................................................................................5
    H.  Plan Objection Deadline ...................................................................................5
    I.  Confirmation Hearing ........................................................................................6

II.  DEBTORS' PREPETITION BUSINESS AND CAPITAL STRUCTURE......................6

    A.  The Debtors' Business .......................................................................................6
        1.  Overview of OneWeb's Satellite System Licenses ...................................7
        2.  Overview of OneWeb's Satellite Development and Deployment .............10
    B.  The Debtors Prepetition Organizational Structure and Stockholders'
       Equity...............................................................................................................12
        1.  Organizational Structure .........................................................................12
        2.  Stockholders' Equity...............................................................................13
    C.  Prepetition Funded Indebtedness .....................................................................13

III.  EVENTS LEADING TO THE CHAPTER 11 CASES.....................................................16

    A.  Historical Financing Sources and Increasing Liquidity Needs............................16
    B.  Liquidity Concerns and Discussions with Potential Lenders and Investors ..........16
    C.  Shift to Bankruptcy Preparation.......................................................................16
    D.  The Decision to File for Chapter 11 Protection ...............................................17

IV.  EVENTS DURING THE CHAPTER 11 CASES .............................................................17

    A.  First and Second Day Pleadings ......................................................................17
    B.  Procedural and Administrative Motions ..........................................................18
    C.  Appointment of the Creditors' Committee .......................................................19
    D.  Debtors' Retention of Professionals ................................................................19
    E.  Postpetition Financing .....................................................................................19
    F.  Pending Litigation Proceedings and Claims ....................................................20
    G.  The Marketing and Sale Process ......................................................................21
    H.  The Terms of BidCo's Bid................................................................................23
        1.  Acquisition of All Assets Including Retained Causes of Action &
        Avoidance Actions..................................................................................23
        2.  Cash Consideration and BidCo Equity Consideration..............................24

|  |  | 3. | The Releases .................................................................25 |
|  |  |  | a. | Releases for the Prepetition Secured Parties................................. 25 |
|  |  |  | b. | Releases of the Debtors' Directors & Officers .............................. 27 |
|  | I. | Approval of the Plan Support Agreement and Interim Funding............................29 |
|  | J. | The Committee's Derivative Standing Motion.......................................30 |
|  |  | 1. | The Committee's Recharacterization Claims ............................32 |
|  |  |  | a. | Debtors' Response ................................................................. 32 |
|  |  |  | b. | SoftBank's Response .............................................................. 33 |
|  |  | 2. | The Committee's Equitable Subordination Claims ....................35 |
|  |  |  | a. | Debtors' Response ................................................................. 35 |
|  |  |  | b. | SoftBank's Response .............................................................. 36 |
|  |  | 3. | The Plan Contemplates Releases for the Prepetition Secured Parties......................................................................................36 |
|  |  |  | a. | Debtors' Response ................................................................. 36 |
|  |  |  | b. | SoftBank's Response .............................................................. 36 |

V. | SUMMARY OF THE PLAN ...................................................................37

A. | CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...............................................................................37
  1. | Unclassified Claims .......................................................................37
    a. | Administrative Expense Claims.......................................... 37
    b. | U.S. Trustee Fees .............................................................. 38
    c. | Fee Claims ........................................................................ 38
    d. | Priority Tax Claims........................................................... 38
    e. | DIP Claims ....................................................................... 39
  2. | Classified Claims ...........................................................................39

B. | MEANS OF IMPLEMENTATION.........................................................46
  1. | Deemed Consolidation ..................................................................46
  2. | Comprehensive Settlement ............................................................46
  3. | Sources of Consideration for Plan Distributions ...........................48
    a. | Cash Consideration ........................................................... 48
    b. | Additional Cash Plan Funding .......................................... 48
    c. | Ongoing Trade Claims Recovery Pool ............................... 48
    d. | General Unsecured Claims Settlement Distribution ................... 49
  4. | Issuance of the New Equity Interests, BidCo Equity Interests, and SoftBank Rollover BidCo Equity ................................................49
    a. | New Equity Interests .......................................................... 49
    b. | BidCo Equity Interests ....................................................... 49
    c. | Authorization, Issuance and Delivery of the New Equity Interests .............................................................................. 50
    d. | Authorization, Issuance and Delivery of the BidCo Equity Consideration to Class 1 ...................................................... 50

5. Restructuring Steps Under UK Corporate Law ........................................50
6. The Liquidating Debtors ........................................................................51
7. Plan Administrator ................................................................................51
8. The Wind Down ...................................................................................52
9. Continued Corporate Existence ............................................................52
10. Disbursing Agent .................................................................................53
11. New Board of Directors/Officers ..........................................................53
12. Survival of Indemnification Obligations and D&O Liability
    Insurance ............................................................................................53
    a. Indemnification Obligations ......................................................53
    b. D&O Liability Insurance Policies...............................................53
13. Employee Matters .................................................................................54
14. Retained Causes of Action....................................................................54
15. Release of Avoidance Actions for Holders of Claims in Class 4
    and Class 5 ..........................................................................................55
16. Cancellation and Surrender of Notes, Instruments, Securities and
    Other Documentation............................................................................55
17. Release of Liens ...................................................................................56
18. Effectuating Documents; Further Transactions ......................................56
19. Amended Organizational Documents .....................................................57
20. FCC Communications Consents.............................................................57
21. Section 1146 Exemptions from Certain Taxes and Fees .........................58
C. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
   LEASES....................................................................................................58
   1. Assumption and Rejection of Executory Contracts and Unexpired
      Leases..................................................................................................58
   2. Claims Based on Rejection of Executory Contracts and Unexpired
      Leases..................................................................................................59
   3. Cure Claims .........................................................................................59
   4. Reservation of Rights............................................................................61
D. CONDITIONS PRECEDENT TO CONFIRMATION AND
   CONSUMMATION OF THE PLAN ........................................................61
   1. Conditions to Confirmation ..................................................................61
   2. Conditions to the Effective Date...........................................................61
      a. Confirmation Order....................................................................61
      b. Statutory Fees ...........................................................................62
      c. Documentation ..........................................................................62
      d. Antitrust and Foreign Investment Approvals...............................62
      e. State Aid Approval ....................................................................62
      f. DDTC Notification ....................................................................62
      g. No Injunctions or Restraints ......................................................62
      h. Establishment of Professional Fee Escrow .................................62

i.        Funding of the Ongoing Trade Claims Recovery Pool and the General Unsecured Claims Settlement Distribution .............. 62

j.        Conditions Precedent to the Obligations of the Plan Sponsor ................................................................. 63

i.        Accuracy of Representations and Warranties ................. 63

ii.       Performance of Obligations ............................. 63

iii.      No Termination ....................................... 63

iv.       BidCo Equity Consideration ........................... 63

v.        Officer's Certificate ................................. 63

vi.       Communications Consents.............................. 63

vii.      No Company Material Adverse Effect ................... 64

viii.     Principal Vendor Contracts ........................... 64

ix.       Effective Date Cash Funding Cap...................... 64

k.        Conditions Precedent to the Debtors' Obligations........................ 64

i.        Accuracy of Representations and Warranties ................. 64

ii.       Performance of Obligations ............................. 64

iii.      No Termination ....................................... 64

iv.       Officer's Certificate ................................. 64

3.       Waiver of Conditions to the Effective Date........................65

E.       EXCULPATION, RELEASES AND INJUNCTIONS ..........................65

1.       Discharge of Claims Against and Interest in the Debtors........................65

2.       Exculpation ........................................................65

3.       Releases........................................................66

a.        Releases by the Debtors ................................. 66

b.        Third-Party Releases by Holders of Claims and Interests ........... 67

4.       Injunction ......................................................69

5.       Scope of Discharge, Release, or Injunction With Respect to the United States of America ......................................69

6.       Term of Injunctions or Stays.....................................70

7.       Ipso Facto and Similar Provisions Ineffective ...........................71

VI.    STATUTORY REQUIREMENTS FOR CONFIRMATION ...........................71

A.       Requirements for Confirmation ..........................................71

1.       Acceptance by Impaired Classes ................................71

2.       Best Interests of Creditors........................................72

3.       Feasibility........................................................72

B.       The Debtor Releases, Third Party Releases, Exculpation, and Injunction Provisions.......................................................73

C.       Alternative Plans ....................................................75

D.       Confirmation Hearing ...............................................75

VII.   RISK FACTORS ............................................................75

A.   Certain Bankruptcy Considerations .................................................................75
     1.   The Debtors May Not Be Able to Secure Confirmation...........................75
     2.   Releases, Injunctions and Exculpations Provisions May Not Be
          Approved..................................................................................................76
     3.   Risks Related to Possible Objections to the Plan.....................................76
     4.   Risk of Termination of the Plan Support Agreement ...............................76
     5.   Risk of Nonoccurrence of the Effective Date ..........................................76
B.   Risk Factors that May Affect Recoveries Available to Holders of Allowed
     Claims Under the Plan ...................................................................................77
     1.   Claims May Be Higher Than Projected ...................................................77
     2.   The Debtors Cannot Guarantee Recoveries or the Timing of such
          Recoveries................................................................................................77
C.   Disclosure Statement Disclaimer ...................................................................77
     1.   The Financial Information Contained in this Disclosure Statement
          Has Not Been Audited .............................................................................77
     2.   Information Contained in this Disclosure Statement Is for
          Soliciting Votes........................................................................................77
     3.   The Disclosure Statement May Contain Forward Looking
          Statements ................................................................................................77
     4.   No Legal or Tax Advice is Provided to You by this Disclosure
          Statement..................................................................................................78
     5.   No Admissions Made ...............................................................................78
     6.   Failure to Identify Objections ..................................................................78
     7.   No Waiver of Right to Object or Right to Recover Transfers and
          Assets .......................................................................................................78
     8.   Information was Provided by the Debtors and was Relied Upon by
          the Debtors' Advisors ..............................................................................78
     9.   No Representations Outside this Disclosure Statement are
          Authorized................................................................................................79
D.   Risks Relating to Securities to Be Issued Under the Plan ...............................79
     1.   Market for Securities................................................................................79
     2.   Potential Dilution .....................................................................................79
     3.   Equity Interests Subordinated to Indebtedness ........................................80
     4.   Implied Value of New Equity Interests or BidCo Equity Interests
          Not Intended to Represent Trading Value of New Equity Interests
          and BidCo Equity Interests, Respectively ...............................................80
     5.   No Dividends ............................................................................................80
E.   Risks Related to the Debtors' Businesses ........................................................80
     1.   Macroeconomic Conditions ....................................................................80
     2.   Financial Results May Be Volatile and May Not Reflect Historical
          Trends .......................................................................................................81
     3.   The Debtors' Substantial Liquidity Needs May Impact the Plan .............81

|       | 4.  | The Debtors' Business is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business | 82 |
|       | 5.  | The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases | 82 |
|       | 6.  | The Loss of Key Personnel Could Adversely Affect the Debtors' Operations | 82 |
|       | 7.  | Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Corporate Reputation or Brand Perception, Financial Condition, and Results of Operations | 83 |
|       | 8.  | Recent Global Economic Trends Could Adversely Affect the Debtors' Business, Results of Operations and Financial Condition, Primarily Through Disruption to the Debtors' Customers' Businesses | 83 |
|       | 9.  | Consent Required Relating to FCC and Other Communications Licenses | 83 |
|       | 10. | CFIUS Approval Required | 84 |
|       | 11. | Export Controls Notification to the DDTC | 85 |

VIII.    CERTAIN TAX CONSEQUENCES OF THE PLAN ...................................85

| A. | Certain U.S. Federal Income Tax Consequences of the Plan | | 85 |
|    | 1. | Certain U.S. Federal Income Tax Consequences to the Debtors | 86 |
|    |    | a. Cancellation of Debt and Reduction of Tax Attributes | 87 |
|    |    | b. Limitation of NOL Carryforwards and Other Tax Attributes | 88 |
|    |    |     i. General Section 382 Annual Limitation | 88 |
|    |    |     ii. Special Bankruptcy Exceptions | 89 |
|    | 2. | U.S. Holders of Allowed Secured Notes Claims | 89 |
|    |    | a. Consequences of Receiving BidCo Equity Consideration | 89 |
|    |    | b. Consequences of Owning BidCo Equity Interests | 91 |
|    |    |     i. Distributions on BidCo Equity Interests | 91 |
|    |    |     ii. Sale, Exchange or Other Taxable Disposition of BidCo Equity Interests | 92 |
|    |    |     iii. Possible Treatment of BidCo as a Passive Foreign Investment Company | 92 |
|    | 3. | U.S. Holders of Allowed General Unsecured Claims | 93 |
|    | 4. | U.S. Holders of Allowed Ongoing Trade Claims | 93 |
|    | 5. | Accrued Interest | 94 |
|    | 6. | Market Discount | 94 |
|    | 7. | Information Reporting and Backup Withholding | 95 |
| B. | Certain UK Tax Consequences for Holders of BidCo Equity Interests | | 96 |

IX.    RECOMMENDATION AND CONCLUSION....................................................96

## I.    INTRODUCTION AND OVERVIEW OF THE PLAN[2]

OneWeb Global Limited and its affiliated Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code in connection with solicitation of votes to accept or reject the Plan, which the Debtors are asking the Bankruptcy Court to confirm.  A copy of the Plan is attached hereto as **Annex A**.

The Debtors recommend that all holders of Claims entitled to vote accept the Plan by checking the appropriate box on their Ballots and returning such Ballots so they are actually received by the Claims and Noticing Agent by the Voting Deadline, which is currently set for September 25, 2020, at 4:00 P.M. (prevailing Eastern Time).  Assuming the requisite acceptances of the Plan are obtained, the Debtors will seek Confirmation at the Confirmation Hearing on October 2, 2020, at 10:00 AM (prevailing Eastern Time).  Should they believe it necessary or appropriate to do so, the Debtors may extend or modify one or both of the foregoing dates.

### A.    THE ADEQUACY OF DISCLOSURE

Before soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires the plan proponent to prepare a written disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan.  The Debtors submit this Disclosure Statement in accordance with such requirements.

The Disclosure Statement includes, without limitation, information about:

- the Debtors' organizational structure, business operations, prepetition indebtedness, and assets and liabilities (Section II hereof);

- the events leading to the filing of these cases (Section III hereof);

- the major events during these cases (Section IV hereof);

- the classification and treatment of Claims and Interests under the Plan, including identification of the Claims entitled to vote on the Plan, and the projected recoveries under the plan (Section V.A hereof);

- the means for implementation of the Plan (Section V.B hereof);

- the exculpations, releases and injunctions contemplated by the Plan (Section V.E hereof);

- the statutory requirements for confirming the Plan (Section VI hereof);

---

[2]    Capitalized terms used but not defined herein have the meanings given to them in the Plan, attached hereto as Annex A.

- certain risk factors that holders of Claims should consider before voting on the Plan (Section VII hereof); and

- certain tax consequences of the Plan (Section VIII hereof).

## B.    THE PLAN

In the lead up to the commencement of these cases on March 27, 2020, the Debtors engaged advisors and began evaluating potential strategic alternatives for stabilizing their businesses and maximizing value for their stakeholders.  The Debtors continued to pursue these value-maximizing strategies following the Petition Date, and accordingly obtained approval of the Bidding Procedures[3] pursuant to which they conducted a robust sale process.  This sale process culminated in the selection of BidCo 100 Limited,[4] a private limited company organized under English Law ("BidCo" or "Plan Sponsor"), as the successful bidder pursuant to the Bidding Procedures, and entry into, and Bankruptcy Court approval of that certain Plan Support Agreement, dated as of July 1, 2020 (as amended, supplemented, or otherwise modified from time to time in accordance with the terms therein, the "Plan Support Agreement"), among Company Parties and BidCo.

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates a settlement of, *inter alia*, **the claims asserted by the Committee in the Standing Motion**.  *See* Section V.B.2, *infra*.  Notwithstanding the Settlement in the Plan, the Debtors, the Committee, and SoftBank have requested mediation, which is ongoing at the time of solicitation of the Plan.  Neither the Plan nor the Settlement alter the terms of the successful bid nor do they alter the rights of the parties thereto, nor shall, pending confirmation of the Plan, anything in the Plan or Settlement alter the terms of the Plan Support Agreement Order without further Court approval.

The Debtors view the terms of the Plan, consistent with their agreements in the Plan Support Agreement, as providing the Debtors with a framework to emerge from chapter 11 and make Distributions to creditors that provide them with a higher recovery than they would receive in a liquidation under chapter 7 of the Bankruptcy Code.  Following the Effective Date, the Reorganized Debtors' business will focus on continuing the development of the OneWeb System.  Excluded Assets and Excluded Liabilities will be transferred to the Liquidating Debtors and the Liquidating Debtors will be responsible for administering the Plan post-Effective Date and effectuating the Distributions contemplated in the Plan.

The Plan designates Classes of Claims and Interests and specifies which Classes are (i) Impaired and Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, or (iii) deemed to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

---

[3]   *Order (A) Approving Bidding Procedures, (B) Scheduling an Auction and Sale Hearing and Approving Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures and Form and Manner of Notice Thereof; and (D) Granting Related Relief* [Docket No. 104] (the "Bidding Procedures Order") at Ex. 1 (the "Bidding Procedures").

[4]   BidCo's shareholders are the United Kingdom Secretary of State for Business, Energy and Industrial Strategy ("HMG") and Bharti Global Limited ("Bharti").

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. Solely for purposes of voting on, and receiving Distributions under, the Plan, the Estates are deemed to be substantively consolidated, *i.e.*, (i) all assets and liabilities of the Debtors are deemed to be assets and liabilities, respectively, of a single Estate; (ii) all guarantees by one Debtor of the obligations of any other Debtor are deemed eliminated, (iii) any joint or several liability of any of the Debtors are deemed to be one obligation of the Debtors; and (iv) Proofs of Claim filed against multiple Debtors are deemed to be one Claim against a single Estate. This deemed consolidation will not affect (i) the legal and corporate structures of the Debtors; (ii) the rights of the holders of Allowed Claims to receive Distributions from any insurance policies or proceeds of such policies; (iii) any Liens granted or arising at any time prior to the Effective Date or the priority of those Liens; or (iv) the rights of the Debtors to contest alleged setoff or recoupment rights on the grounds of lack of mutuality under section 553 of the Bankruptcy Code and other applicable law.

This deemed consolidation is appropriate and justified under the circumstances of these chapter 11 cases because it (i) causes no harm to the Debtors' creditors because (a) the DIP Claims may be asserted against each Debtor, (b) the holders of Secured Notes Claims have Secured Claims against the majority of the Debtors, and (c) the DIP Claims and Secured Notes Claims exceed the value of the assets of each Debtor, and (ii) avoids the costs of allocating consideration and litigation-related costs among the Debtors' Estates, thereby avoiding diluting creditor recoveries as a result of increased professional fees, particularly given there has been no allocation of the consideration to be provided by BidCo amongst the various Debtors and their assets. Therefore, all Distributions on account of Claims other than the DIP Claims are carved out from the collateral of the DIP Lenders, and in the absence of such carve-out and the deemed consolidation of the Debtors' Estates, such Claims would receive no recovery.

A summary of the Plan is contained herein at Section V.

Although the Court has approved this Disclosure Statement for solicitation of votes to accept or reject the Plan, the positions taken by the Debtors in this Disclosure Statement are those of the Debtors and/or their advisors and have not been approved by or endorsed by the Bankruptcy Court.

The Committee has asserted its views and positions with respect to the Plan and certain matters described in this Disclosure Statement in a letter (the "Committee Letter") that will be enclosed in the Solicitation Package. Among other things, the Committee disagrees with the Debtors' and SoftBank's characterization of the legal and factual issues described in Sections IV.G, IV.H, IV.I, and IV.J of this Disclosure Statement, and, in this regard, the Committee refers creditors to the Committee Letter.

## C.    VOTING ON THE PLAN

Holders of Claims in Class 1 (Secured Notes Claims), Class 4 (General Unsecured Claims) and Class 5 (Ongoing Trade Claims) are Impaired and entitled to vote on the Plan. Solicitation and tabulation of votes on the Plan will be conducted in accordance with the Disclosure Statement Order that is transmitted concurrently herewith.

Each holder of a General Unsecured Claim in Class 4 or an Ongoing Trade Claim in Class 5 will receive a Ballot that will identify the Class in which such holder is entitled to vote. Ongoing Trade Claims have been identified by the Debtors with the consent of the Plan Sponsor. Each counterparty to an Executory Contract or Unexpired Lease that has timely filed a Proof of Claim will receive a Class 4 Ballot and will be entitled to vote.  If an Executory Contract or Unexpired Lease is assumed (whether under the Plan or otherwise), the vote of such counterparty to such Executory Contract or Unexpired Lease will not be counted with respect to any Claims thereunder.

### D.    VOTES REQUIRED FOR ACCEPTANCE

Pursuant to section 1129(a)(8) of the Bankruptcy Code, for the Plan to be confirmed by the Bankruptcy Court, it must be accepted by at least one voting Class of Impaired Claims – in this case, by Class 1 (Secured Notes Claims), Class 4 (General Unsecured Claims) or Class 5 (Ongoing Trade Claims).  A Class accepts the Plan where: (i) the holders of at least two-thirds in dollar amount of the Claims voting in such Class vote to accept the Plan; and (ii) the holders of more than one-half in number of the Claims voting in such Class vote to accept the Plan.

### E.    CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING

There are a variety of factors that holders of Allowed Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan, including:

- the financial information contained in this Disclosure Statement and the Plan has not been audited and is based on an analysis of data available at the time of the preparation of this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, there is no assurance that the Bankruptcy Court will confirm the Plan; and

- any delays of either Confirmation or consummation could result in, among other things, increased Administrative Expense Claims, including Fee Claims, and jeopardize the Debtors' ability to satisfy the conditions precedent to the effectiveness of the Plan.

### F.    SOLICITATION PACKAGE AND PLAN SUPPLEMENT

In accordance with the Disclosure Statement Order, together with this Disclosure Statement, the holders of Claims entitled to vote to accept or reject the Plan will receive the package of materials (the "Solicitation Package") containing the following (as applicable):

- a cover letter;

- a notice of the Confirmation Hearing (the "Confirmation Hearing Notice");

- the Disclosure Statement Order (excluding exhibits thereto);

-4-

- a Ballot, instructions on how to complete the Ballot, and a pre-paid, pre-addressed return envelope; and

- such other materials as the Bankruptcy Court may direct to include in the Solicitation Package, including the Committee Letter.

The Solicitation Package (except for the Ballots) may also be obtained free of charge from the Claims and Noticing Agent by: (1) visiting http://www.omniagentsolutions.com/onewebglobal; (2) writing to the Solicitation Agent at OneWeb Global Limited, et al. Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367; or (3) calling (866) 680-8121.

**The Debtors will file the Plan Supplement on or before September 18, 2020, which is seven (7) days prior to the Voting Deadline.**

## G.    VOTING PROCEDURES

If you are entitled to vote to accept or reject the Plan, one or more Ballot(s) have been enclosed in your Solicitation Package for the purpose of voting on the Plan.

**The deadline to vote on the Plan is September 25, 2020 at 4:00p.m. (Eastern) (the "Voting Deadline").**

Please vote and return your Ballot(s) to Omni Agent Solutions in its capacity as a solicitation agent (the "Solicitation Agent"), at OneWeb Global Limited, et al. Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367, or by overnight delivery or by hand courier so as to be actually received by the Solicitation Agent by the Voting Deadline. Ballots should not be sent to the Debtors or the Creditors' Committee, or their respective counsel.

In addition to accepting Ballots via first class mail, overnight courier and hand delivery, the Solicitation Agent will accept Ballots via electronic, online transmission, solely through a customized online balloting portal at https://omniagentsolutions.com/OnewebBallotSubmission. Parties entitled to vote may cast an electronic Ballot and electronically sign and submit the Ballot instantly by utilizing the online balloting portal. Instructions for electronic, online transmission of Ballots are set forth on the forms of the Ballots. The encrypted Ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot submitted in this matter, and the creditor's electronic signature will be deemed to be immediately legally valid and effective.

## H.    PLAN OBJECTION DEADLINE

**The deadline to file objections to Confirmation is September 28, 2020, at 4:00 P.M. (prevailing Eastern Time) (the "Plan Objection Deadline").**

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation. All objections to Confirmation must be in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held

by the objector.  Any such objection must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the Disclosure Statement Order so that they are actually received on or before the Plan Objection Deadline.  Parties wishing to reply to any objection to Confirmation shall do so by September 30, 2020.

## I.    CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation.  The Confirmation Hearing will commence on October 2, 2020, at 10:00 AM (prevailing Eastern Time), before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601.  Pursuant to the Bankruptcy Court's General Order M-543, dated March 20, 2020 ("General Order M-543"), the Confirmation Hearing will be conducted telephonically.  Parties wishing to participate in the Confirmation Hearing should review General Order M543 which can be obtained at http://www.nysb.uscourts.gov/news/general-order-m-543-court-operations-under-exigent-circumstances-created-covid-19 for further instructions on how to make a telephonic appearance.

The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the Entities that have filed objections to Confirmation, without further notice to other parties in interest.  The Bankruptcy Court, in its discretion and before the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to the terms of the Plan Support Agreement and the Plan Support Agreement Order, the Plan may be modified, if necessary, before, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

## II.    DEBTORS' PREPETITION BUSINESS AND CAPITAL STRUCTURE

### A.    THE DEBTORS' BUSINESS

Prior to the Petition Date, the Debtors and their non-debtor subsidiaries (collectively, "OneWeb") were in the process of deploying the world's first global satellite communications network to deliver high-throughput, high-speed, low-latency internet connectivity services channeling up to 50 megabits per second, with a latency of less than 50 milliseconds.

Founded in 2012, OneWeb has spent the past eight years developing a low-Earth orbit ("LEO") satellite constellation system (the "Constellation") as well as associated ground infrastructure, including terrestrial gateways ("Satellite Network Portals" or "SNPs") and end-user terminals, to deliver communication services for use by consumers, businesses, governmental entities, and institutions, including schools, hospitals, and other end-users whether on the ground, in the air, or at sea (collectively, the "OneWeb System").  OneWeb's business consists of, first, the design, development, manufacture and integration of the various components of the OneWeb System and, second, maintenance and operation of, and the sale of broadband capacity, on a wholesale and/or retail basis, generated by the OneWeb System.

OneWeb's design, development and manufacturing activities include next generation small satellites and the mass production of these satellites through a strategic joint venture

between OneWeb and certain members of the Airbus family of companies (as described below), which are major players in the European aerospace sector. Through the joint venture, OneWeb also develops ground infrastructure associated with and used for maintaining and operating its Constellation, including operations centers, ground control facilities, SNPs, and various end-user terminals for various markets.

In order to operate the OneWeb System, OneWeb indirectly holds various authorizations and licenses, including for use of Ku-band and Ka-band radio-frequency spectrum on a global basis, and domestic market access/services authorizations necessary for operating ground infrastructure associated with the Constellation in, and for sending and receiving signals into and from, the jurisdictions in which such ground infrastructure is located. Having already completed three successful launches of over 70 satellites between February 2019 and March 2020, OneWeb was well on its way to growing the Constellation to 648 satellites as well as beginning to identify and negotiate with customers, with the goal of commencing customer service demonstrations in late 2020 and providing global commercial coverage by late 2021 or early 2022.

Below, is an illustration of how the OneWeb System operates:



### 1. *Overview of OneWeb's Satellite System Licenses*

OneWeb's most significant assets are its radio-frequency spectrum authorizations (the "Spectrum Licenses") issued by (a) the United Kingdom's Office of Communications ("Ofcom") to Debtor WorldVu Satellites Limited ("WSL"), a company organized under the laws of Jersey, authorizing WSL to operate certain service link radio-frequencies in the 10.7-12.7 GHz Ku-band transmit frequencies and 14.0-14.5 GHz Ku-band receive frequencies of the electromagnetic spectrum, and (b) France's Agence Nationale des Fréquences ("ANFR") to OneWeb Ltd., a company organized under the laws of Malta and affiliated with WSL, for gateway/feeder link frequencies in the 17.8-18.6 and 18.8.-19.3 and 19.7-19.8 GHz Ka-band transmit frequencies and 27.5-29.1 and 29.5-30 GHz Ka-band receive frequencies of the electromagnetic spectrum. The Spectrum Licenses provide that Ofcom and ANFR will represent and defend the interests of

WSL at the International Telecommunication Union (the "ITU"), a specialized agency of the United Nations that establishes standards for international connectivity in communications networks, including the allocation of global wireless radio-frequency spectrum, satellite orbits, and related services, among member state nations.  For example, Ofcom is obligated to represent and defend OneWeb's interests at the ITU with respect to any challenges or disputes relating to the use of the radio-frequencies allocated to OneWeb, including any potential claims of harmful radio-frequency use interference caused by or to the other satellite system operators represented at the ITU by their national telecoms regulatory authorities.

To maintain priority rights to use the radio-frequency allocations authorized under the Spectrum Licenses, OneWeb has successfully launched and operated (in its notified LEO orbit) six satellites with the confirmed capability of transmitting and receiving communications links within the radio-frequency ranges prescribed in the Spectrum Licenses for a continuous period of at least 90 days prior to the regulatory deadline.  Ofcom on October 25, 2019 submitted to the ITU the "bringing into use" notice necessary to confirm and maintain OneWeb's priority rights to use the Ku-band radio-frequencies authorized under its Spectrum License (the "BIU" notice), officially bringing the radio-frequencies into use prior to the required deadline of November 27, 2019.  ANFR also submitted the BIU notice with respect to the Ka-band radio-frequencies to the ITU on October 18, 2019, before the required deadline of December 18, 2019.

OneWeb has additional Spectrum Licenses, which have a BIU regulatory deadline in 2021 or later, as follows:

(a)     Spectrum Licenses issued by Ofcom to WSL for:  (i) Ka-band frequencies for a LEO system to be brought into use before June 22, 2023; (ii) Ku- and Ka-band frequencies for a LEO system to be brought into use before June 22, 2025; (iii) Ku- and Ka-band frequencies for a Medium-Earth orbit ("MEO") system to be brought into use before March 29, 2024; (iv) the 37.5-42.5 GHz V-band transmit frequencies and 42.5-43.5 GHz, 47.2-50.2 GHz and 50.4-51.4 GHz V-band receive frequencies for a LEO system to be brought into use before November 22, 2022; (v) V-band frequencies for a LEO system to be brought into use before November 23, 2026; (vi) V-band frequencies for a MEO system to be brought into use before November 22, 2022; and (vii) the 71-76 GHz and 81-86 GHz E-band transmit and receive frequencies for a MEO system to be brought into use before December 18, 2024;

(b)     Spectrum Licenses issued by ANFR to OneWeb Ltd for:  (i) Ku- and Ka-band frequencies for a MEO system to be brought into use before March 22, 2024; (ii) V-band frequencies for two LEO systems to be brought into use before November 22, 2022; and (iii) V-band frequencies for a LEO system to be brought into use before November 23, 2026;

(c)     Spectrum Licenses issued by Canada's Innovation, Science and Economic Development ("ISED") agency to 1021823 BC Ltd. for Ka-band frequencies for a LEO system in Ka-band to be brought into use before May 27, 2022; and

(d)        Spectrum Licenses issued by Mexico's Instituto Federal de Telecomunicaciones ("IFT") to WorldVu Mexico, S. de R.L. de C.V. for V-band frequencies for a LEO system in V-band to be brought into use before November 23, 2026.

Prior to the Petition Date, OneWeb was also in the process of obtaining market access "landing rights" authorizations in various countries, where such are required.   These authorizations are issued by individual countries and permit the licensee to send signals from satellites into the particular country, to receive uplinks from such country's territory to the satellites, and to provide services to, from, or within such country.   As of the Petition Date, OneWeb has received landing rights in Argentina, Australia, the Bahamas, Canada, Colombia, Mexico, Nigeria, Paraguay, Peru and the United States.   Specifically, WSL holds a landing rights license (called a "market access grant" in the United States) issued by the United States Federal Communications Commission (the "FCC") to provide services to, from, or within the United States as well as a landing rights license issued by the Bahamas.   Debtor Network Access Associates Limited ("NAA"), a company organized under the laws of England and Wales, holds landing rights licenses issued by Australia, Colombia, Nigeria, Paraguay and Peru.   Debtor 1021823 BC Ltd. ("1021823 BC"), a company organized under the laws of the Province of British Columbia, holds a landing rights license issued by Canada.   OneWeb S.A., a company organized under the laws of Argentina, holds a landing rights license issued by Argentina.   Debtor WorldVu Mexico S. de R. L. de C.V., a company organized under the laws of Mexico, holds a landing rights license issued by Mexico.   OneWeb also has landing rights for the Indonesia market via a license held by a local partner.

In addition, prior to the Petition Date, OneWeb was in the process of constructing SNPs for the purpose of transmitting and receiving customer data, as well as telemetry, tracking and control signals ("TT&C Stations") to and from the OneWeb System.   OneWeb has already been granted licenses for SNPs in Italy, Portugal, the United States (Florida and Alaska), Australia, Chile and Norway.   WSL holds licenses issued by the FCC for the operation of the SNPs in the United States.   NAA holds a license for the operation of an SNP in Portugal.   Debtor OneWeb Chile SpA ("OW Chile"), a company organized under the laws of Chile, holds a preliminary/experimental license for the operation of an SNP in Chile.   Debtor WorldVu Australia Pty Ltd., a company organized under the laws of Australia, holds the preliminary/experimental licenses for the operation of SNPs in Australia.   1021823 BC holds licenses for the operation of a TT&C Station in Canada.   Debtor WorldVu Development LLC ("WVD"), a company organized under the laws of Nevada, holds a license for the operation of a ground station located in Svalbard, Norway used primarily as a TT&C Station, but which can also be used as an SNP.

OneWeb has obtained experimental licenses in multiple countries to allow testing of the end-user terminals required to access and use the OneWeb System ("User Terminals").   NAA holds experimental licenses for the operation of User Terminals in Croatia, Italy, and the United Kingdom.   WSL holds experimental licenses for the operation of User Terminals in Sweden and the United States.   OW Chile holds an experimental license for the operation of User Terminals in Chile.

In addition, OneWeb has obtained licenses under the Outer Space Act 1986 from the United Kingdom Space Agency ("UKSA") for the procurement of launch and in-orbit operations

for each of the 74 satellites on its first three launches of the OneWeb System satellites (the "OSA licenses"). The OSA licenses authorize OneWeb to procure the launch of its satellites into orbit from various launch sites located around the globe. The UKSA, as a condition to issuing the OSA Licenses, required OneWeb to set aside funds that the UKSA could use to maintain and, if necessary, deorbit, OneWeb's satellite constellation in the event of OneWeb's insolvency. GLAS Trustees Limited (the "UKSA Trustee"), in its role as trustee of an English Law governed trust established for the benefit of the UKSA, holds £3,955,050.80 (~$5,137,000.00) in a bank account. Pursuant to the Trust Deed establishing such trust, the UKSA may unilaterally direct the release of funds from the trust by sending a payment instruction to the UKSA Trustee.

OneWeb and the UKSA also entered into a Financial Security Agreement to govern the conditions upon which the UKSA may request a release of funds from the trust. The UKSA may request a release of funds following the occurrence of a OneWeb insolvency event if the UKSA considers it appropriate to release such funds to ensure compliance with the conditions of any of OneWeb's UKSA licenses or the international obligations of the United Kingdom. The UKSA is permitted to use such funds to (a) "take control of the operation of the Satellites," (b) "implement a de-orbiting or decommissioning of the Satellites, either in whole or in part" or (c) "pay any additional insurance premiums or renewal premiums as required for third party liability insurance." The UKSA has not requested a release of the funds from the trust.

## 2.   *Overview of OneWeb's Satellite Development and Deployment*

In June of 2015, Debtor WorldVu JV Holdings LLC ("WJVH"), a Delaware limited liability company (an indirect subsidiary of OneWeb), and Airbus DS Satnet LLC ("Airbus Satnet"), a Delaware limited liability company, formed a Delaware company to house the parties' strategic joint venture, Airbus OneWeb Satellites LLC ("AOS"). AOS is owned 50/50 by WJVH and Airbus Satnet. The formation and operation of AOS was to comprise part of OneWeb's and Airbus' comprehensive plan of cooperation and joint development with respect to satellites based on the Constellation and the OneWeb System. AOS was formed in the first instance to design, develop, and manufacture a limited batch of "pilot" satellites to serve as prototypes for future work, after which AOS would incorporate the intellectual property developed in those activities into manufacturing over 600 LEO satellites for the OneWeb System (such satellites forming the OneWeb first generation constellation, the "GEN 1 Constellation"), as well as continuing work on developing and improving the relevant technologies towards next-generation satellites associated ground infrastructure for the OneWeb System and ultimately serve third-party customers with the technology developed along the way.

The satellite production process was divided into two stages. In the first stage, pursuant to a design and development contract between WSL and AOS, AOS focused on performing research, design, development, and testing to validate, confirm and upgrade the initial design of the LEO satellites, and to develop working prototypes of the satellites based on such research and development activities. As the culmination of about three years of research, development and testing, a total of twelve operational prototypes (the "Pilot Satellites") were completed at a production facility owned by AOS in Toulouse, France. The prototypes ultimately reached the required orbit and were able to send and receive the wireless signals required for OneWeb to achieve BIU with respect to the Spectrum Frequencies licensed through Ofcom.

The second, main-run stage of satellite production commenced in July 2019, when AOS completed construction of the world's first state-of-the-art, high-volume satellite manufacturing facility in Exploration Park, Florida, on the land leased to it by Space Florida. With a unique set of proprietary tooling and other high-tech manufacturing equipment, the new facility production capability was up to one satellite per day. The facility had completed production of 68 satellites in two successive batches of 34 satellites each as of the Petition Date.

The satellites in the GEN 1 Constellation were designed to use a cutting-edge technique called "Progressive Pitch™", which allows OneWeb to use its spectrum in a highly efficient manner by gradually and slightly tilting the satellites as they approach the equator to ensure that such satellites do not cause or receive interference with Ku-band satellites operating above the GEN 1 Constellation in geostationary orbit. This is necessary in order to comply with the ITU's rules and procedures protecting satellites operating in the geostationary orbit from receiving harmful interference from non-geostationary orbit satellite systems, such as the OneWeb System. OneWeb's user terminals would provide high-speed connectivity without latency during satellite handovers to ensure excellent voice quality, gaming, and web-based experience. These ground-based terminals would be capable of being self-installed and be small, affordable, and extremely efficient, such that they would operate with optionally included solar panels, battery packs, and Wi-Fi, 2G, 3G, & 4G/LTE, potentially upgradable to 5G capabilities, to provide coverage directly to cellular phones, tablets, and laptops. OneWeb's satellites were designed to comply with the "orbital debris-mitigation" guidelines for removing satellites from orbit.

For the launch and deployment of its satellites in orbit, OneWeb entered into two significant launch services agreements with launch services provider Arianespace S.A. ("Arianespace"). Specifically, OneWeb and Arianespace entered into a launch services agreement for the performance of 21 launch missions, each using the Soyuz launch vehicle and carrying up to 36 satellites per launch mission (the "Soyuz LSA"). The Soyuz LSA contemplates use of three separate launch sites – the Soyuz launch complex at the Baikonur Cosmodrome in Baikonur, Kazakhstan, the Soyuz launch base at the Guiana Space Centre in Kourou, French Guiana, and the Soyuz launch base at the Vostochny Cosmodrome in Vostochny, Russia – in order to support the capacity needs of the OneWeb launch campaign. OneWeb and Arianespace also entered into a launch services agreement for the performance of an additional launch mission using the new (under development) heavy-lift Ariane 6 launch vehicle expected to carry at least 30 satellites per launch mission (the "Ariane 6 LSA"). The Ariane 6 LSA contemplates use of the Ariane 6 launch base at the Guiana Space Centre in Kourou, French Guiana. Certain contracts between Arianespace and certain of the Debtors are designated as Principal Vendor Contracts under the Plan Support Agreement.

On February 27, 2019, OneWeb successfully launched all six Pilot Satellites from the Guiana Space Centre on a Soyuz launch vehicle, marking successful performance of the first launch mission contemplated under the Soyuz LSA. OneWeb then successfully launched, on February 6, 2020, its first batch of 34 GEN 1 Constellation satellites and the following month, on March 21, 2020, a second batch of 34 GEN 1 Constellation satellites, in each case on a Soyuz launch vehicle from the Baikonur Cosmodrome, marking successful performance of two more launch missions under the Soyuz LSA. OneWeb currently operates a total of 74 fully functioning satellites in orbit.

In addition to AOS, OneWeb and Airbus intended to cooperate in the development and monetization of related technologies. Manufacturing the GEN 1 Constellation and, eventually, the GEN 2 Constellation, would continue to be AOS's priority business, but AOS would also pursue third-party design, development and manufacturing opportunities, thereby generating a passive return for OneWeb unrelated to its core business. In addition, OneWeb has and continues to have rights in a portfolio of certain intellectual property developed in the course of the work of AOS and would have the potential opportunity to develop further innovations based on such intellectual property. Certain contracts between AOS and certain of the Debtors are designated as Principal Vendor Contracts under the Plan Support Agreement.

OneWeb has also constructed two Satellite Operation Centers ("SOCs") and two Ground Network Operations Centers ("GNOCs") in Virginia and London. Each of the SOCs can individually manage the entire Constellation through the TT&C Antennas and are responsible for managing ground station visibility, collision avoidance, altitude maneuvers, planning contacts and payload schedules and analyzing telemetry and investigating anomalies. Each of the GNOCs is a redundant data center that can individually manage the entire SNP ground network and is responsible for determining satellite pass schedules, frequency allocations, effective downlink power and monitoring and controlling all SNP sites, equipment and the network connections.

## B.    THE DEBTORS PREPETITION ORGANIZATIONAL STRUCTURE AND STOCKHOLDERS' EQUITY

### 1.    *Organizational Structure*

A chart showing the Debtors' organizational structure as of the Petition Date is attached as Exhibit A to the *Declaration of Thomas Whayne in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 3]. As reflected in that chart, OneWeb owns 100% of the interests in OneWeb Communications Limited ("OWC"), a company organized under the laws of England and Wales.

OWC owns 100% of the interests in WSL, which in turn owns 100% of the interests in WVD, 1021823 BC, NAA, OneWeb Asia Pte. Ltd., a company organized under the laws of Singapore, Debtor OneWeb Limited, a company organized under the laws of Jersey, and OneWeb Communications S.à.r.l., a company organized under the laws of Luxembourg. Each of the companies at this level was established as required by the local laws of the countries in which OneWeb operates to hold spectrum and landing rights, regulatory licenses and authorizations, administer sales, conduct network operations, undertake research and development, and for other corporate, finance, regulatory, contracting, administrative and employment related purposes, as applicable.

WVD owns 100% of the interests in Debtor WJVH, which owns 50% of the interests in AOS. WVD owns 100% of the interests in Debtor OneWeb Holdings LLC, a New York limited liability company, which leases office space and maintains a bank account in White Plains, New York.

NAA owns 100% of Debtor OneWeb Network Access Holdings Ltd. ("ONAH"), a company organized under the laws of England and Wales, which in turn owns 99% (and NAA owns 1%) of Debtor OneWeb Ltd., a company organized under the laws of Malta. Each of the companies owned wholly or partially by NAA was established as required by local laws to hold spectrum and landing rights, regulatory licenses and authorizations, own and operate antennas and other ground segment equipment and communication network assets, and for other corporate and regulatory purposes, as applicable, in the various countries in which OneWeb operates.

ONAH owns 49% (and a local partner owns 51%) of OneWeb LLC, a company organized under the laws of Russia. Each of the companies owned wholly or partially by ONAH were established as required by local laws to hold spectrum and landing rights licenses, own and operate antennas and other ground segment equipment and communication network assets, and for other corporate and regulatory purposes, as applicable, in the various countries in which OneWeb operates.

### 2.    *Stockholders' Equity*

In 2015, OneWeb raised approximately $500 million in equity financing primarily from strategic investors, including certain entities affiliated with Airbus Group, Inc. (collectively, "Airbus"), Hughes Network Systems, LLC, which is producing OneWeb's ground network system and which is a subsidiary of EchoStar Corp., Indian Continent Investment Limited, an associate entity of Bharti, Qualcomm Incorporated, and Virgin Group Ltd. In December 2016, OneWeb raised an additional $1.2 billion in equity financing, consisting of a $1 billion investment from SoftBank Group Corp. ("SoftBank"), a Japanese corporation, thereby making SoftBank OneWeb's largest shareholder, and a $200 million investment from certain of its existing investors.

As of the Petition Date, OneWeb had 6,897,734 ordinary shares and 606,061 preferred shares outstanding. The number of ordinary shares outstanding includes restricted stock units awarded under OneWeb's employee and consultant equity incentive plans. As of June 30, 2018, an aggregate of 417,000 ordinary shares were authorized for issuance pursuant to such plans.

### C.    PREPETITION FUNDED INDEBTEDNESS

On July 12, 2018, OWC entered into a Note Purchase Agreement (the "Original NPA") among OWC, SoftBank, as administrative and collateral agent, and each of the purchasers thereunder from time to time, for the issuance of 13% senior secured promissory notes (the "Bridge Notes"). Between July 2018 and January 2019, OWC issued Bridge Notes to SoftBank under the Original NPA in an aggregate principal amount of $408 million. The obligations under the Original NPA were guaranteed by WSL, WVD, LLC, OneWeb Asia Pte. Ltd., OneWeb Limited, NAA, and 1021823 BC and were secured by substantially all assets of OWC and its key subsidiaries. These assets included the frequency spectrum authorizations, which assets were considered to be valued in excess of the amounts outstanding under the Bridge Notes. PIK interest accrued on the Bridge Notes quarterly. SoftBank did not receive any fees or other special compensation in connection with providing the Bridge Notes.

The Original NPA was structured as a short-term 364-day bridge loan to an anticipated $3 billion export credit agency-guaranteed project financing that was being sourced from various export credit agencies, public financial institutions, lenders guaranteed or supported by export credit agencies and development finance institutions (the "ECA Financing"). Indeed, a number of potential lenders, including International Finance Corporation, part of the World Bank Group, European Bank for Reconstruction and Development and BpiFrance Assurance Credit Export were party to an agreed term sheet that was annexed to the Original NPA. In contemplation of the ECA Financing and its eventual take out of the Bridge Notes, the Original NPA contained financing milestones and other express terms, conditions and accommodations relating to the ECA Financing.

The structuring of a multi-sourced financing such as the ECA Financing is complex, and the internal approval processes of export credit agencies and development finance institutions often require coordination among a number of different teams and, in certain circumstances, with multiple governmental institutions, which results in a time-consuming and lengthy process to get from initial due diligence to credit approval (and thereafter documentation and financial closing). Accordingly, SoftBank agreed to enter into the Original NPA and provide bridge loans to OneWeb thereunder in order to fund OneWeb's needs during the extended process up to the expected completion of the ECA Financing.

As noted above, the Original NPA contemplated that the Bridge Notes would be fully refinanced by the completion and funding of the ECA Financing, and OneWeb's use of proceeds drawn under the Original NPA were restricted to project costs that would be eligible for refinancing under the ECA Financing. Under a separate redeemable preferred shares purchase agreement (the "SPA") entered into in connection with the Original NPA, the Bridge Notes were automatically exchangeable for redeemable shares of OWG upon the occurrence of the initial funding of the ECA Financing. The redeemable shares were in turn either redeemable by OWG (using the ECA Financing proceeds) upon commercial completion or convertible to equity.

The financing structure contemplated by the Original NPA and the ECA Financing (*i.e.*, using bridge loans from a prominent sponsor to ensure continuity of funding for the project while the debt process is being completed) is employed in project financings generally, and has been successfully employed in numerous satellite financings including both for satellite constellations such as O3b Networks, Iridium and Globalstar and geostationary satellite projects such as PSN Enam, Asia Broadcast Satellite ABS-2 and APT Satellite APStar-2.

By the fourth quarter of 2018, it became evident that not all the lenders needed under the ECA Financing would be able to obtain necessary internal approvals prior to the maturity of the Original NPA and the related Bridge Notes. Concurrently, OneWeb decided to restructure the project to reduce the amount of capital needed to secure immediate commitments for less than the full amount of the originally contemplated ECA Financing, with the full expectation that additional senior indebtedness would be required and obtained.

While OneWeb continued to pursue project financing from typical project finance sources such as government agencies and quasi-development finance institutions, OneWeb determined to secure the immediate funding needs from existing stakeholders.

On March 18, 2019, OWC entered into an Amended and Restated Note Purchase Agreement (the "A&R NPA") among OWC, Global Loan Agency Services Limited, as administrative agent, GLAS Trust Corporation Limited ("GLAS"), as collateral agent, and SoftBank, Banco Azteca, S.A., Institución de Banca Múltiple ("Banco Azteca"), Airbus Group Proj B.V. ("Airbus"), Qualcomm Technologies, Inc. and The Government of the Republic of Rwanda as the initial purchasers (collectively, and together with their respective affiliates, the "Prepetition Lenders").

The A&R NPA amended and restated the Original NPA. SoftBank's $408 million in Bridge Notes issued under the Original NPA, together with accrued interest, were converted into a new note under the A&R NPA. Due to the size of SoftBank's existing note holdings together with the additional notes issued in exchange for additional funds it lent under the A&R NPA, SoftBank alone qualified as "Required Holders" under the A&R NPA, and, therefore, as is customary in third-party loans, had the ability to control decisions regarding the exercise of remedies and release of collateral. However, and notably, SoftBank did not have rights to unilaterally alter material terms of the Secured Notes. In addition, due to the fact that SoftBank was no longer the only lender, a third party, GLAS, was appointed to replace SoftBank as collateral agent so that the debt facility would be managed, and benefit from security held by a third party agent with duties to all noteholders (as is customary for debt financing transactions with multiple lenders) and in contemplation of additional future senior secured financing.

Between March 2019 and October 2019, OWC issued 12.5% senior secured promissory notes (the "Secured Notes") in an aggregate principal amount of $1,560,621,949.30. Like the Bridge Notes, the Secured Notes are guaranteed by WSL, WVD, OneWeb Limited, OneWeb Asia Pte. Ltd., NAA, and 1021823 BC, and are secured by substantially all of OneWeb's assets. In order to support the additional loans, OneWeb, in connection with the A&R NPA, provided an enhanced collateral package to secure the additional Secured Notes including local law share pledges with respect to many of OWG's operating subsidiaries worldwide, and also provided a guarantee from ONAH.

The willingness of the Prepetition Lenders to provide the additional indebtedness (or in Qualcomm's case defer payment of amounts then owing) was conditioned on the success of OneWeb's initial launch of the first six prototype satellites (an important step towards successfully bringing OneWeb's radio frequency spectrum into use and thereby maintaining its priority to use the spectrum ahead of its competitors), which OneWeb successfully achieved in February 2019 and which the parties believed would significantly enhance the value of OneWeb's assets.

In conjunction with entering into the A&R NPA, certain of the Prepetition Lenders also entered into a Warrant Purchase Agreement, dated as of March 18, 2019 (the "Warrant Purchase Agreement"), pursuant to which OWG issued warrants, a common equity sweetener for providers of debt financing, with an exercise price of $0.01 per voting or non-voting share of OWG at each drawdown under the A&R NPA, giving such Prepetition Lenders the right to subscribe for a number of shares of OWG in an amount equal to 100% of such Prepetition Lender's funded amount on the drawdown date divided by $300. SoftBank also received warrants at the initial closing to purchase voting and/or non-voting shares of OWG in the amount of $408 million divided by $300/share.

The Committee does not agree with the Debtors' characterizations of the Original NPA, the Bridge Notes, the A&R NPA, or the Senior Secured Notes (collectively, the "Senior Secured Debt"), as described more fully in the Committee Letter. The Committee has asserted that the Senior Secured Debt should be recharacterized as equity or should be equitably subordinated to the Claims of general unsecured creditors, all as set forth more fully in the Standing Motion described in Section IV.J, *infra*, and in the Committee Letter.

As of the Petition Date, there was approximately $1,733,809,254.40 (principal plus accrued interest) of Secured Notes outstanding.

## III.   EVENTS LEADING TO THE CHAPTER 11 CASES

### A.   HISTORICAL FINANCING SOURCES AND INCREASING LIQUIDITY NEEDS

As of the Petition Date, the Debtors were still in the development stage of their business and, notably, did not yet generate revenue. Historically, and throughout the various development stages of the OneWeb System, OneWeb has looked to its key equity and debt investors to provide liquidity for the next stage of its operations. Since 2019, OneWeb has been actively seeking investments from both its existing and new investors to fund its continuing operations and completion of the OneWeb System. In February 2020, OneWeb completed the first launch of 34 satellites for its GEN 1 Constellation, and over the course of 2020 it was anticipated that OneWeb would continue with a monthly launch cadence to deploy the complete GEN 1 Constellation of 648 satellites. At that time, OneWeb had anticipated raising additional capital to meet its launch and constellation implementation schedule.

### B.   LIQUIDITY CONCERNS AND DISCUSSIONS WITH POTENTIAL LENDERS AND INVESTORS

By early 2020, OneWeb continued to face a rapidly deteriorating liquidity position as the cost of building out the OneWeb System exhausted its existing equity and debt financing. OneWeb engaged Guggenheim Securities, LLC ("Guggenheim Securities") in February 2020 to serve as its investment banker and assist the Debtors in their evaluation and pursuit of strategic opportunities.

After several due diligence meetings during the first and second weeks of March 2020, OneWeb believed that it was going to be able to secure a long-term funding arrangement from existing stakeholders. However, on March 12, 2020, as the markets began to feel the impact of COVID-19, OneWeb was notified that its current investors would not commit to a long-term solution. Thereafter, OneWeb entered into a term sheet for bridge financing to be consummated by March 26, 2020, but OneWeb was notified on March 21, 2020 that the bridge financing offer was no longer available. By the end of March, it had become clear that the anticipated funding opportunities OneWeb had been pursuing, as well as the prospect of locating any new sources of financing or strategic partners, were significantly and precipitously impacted by the COVID-19 pandemic and the resulting shuttering of the global economy.

### C.   SHIFT TO BANKRUPTCY PREPARATION

Following notification on March 21, 2020 that the bridge financing offer was no longer available, and due to the near exhaustion of its existing equity and debt financing and the lack of any other financing prospects, OneWeb immediately shifted to bankruptcy preparation and the preservation of its assets for a potential sale. OneWeb, in an effort to conserve liquidity and preserve the value of its existing assets, began shutting down nonessential aspects of its business. OneWeb was forced to pursue a strategic reduction in force of approximately 90% of its workforce and maintain only its existing operations, while halting all further development.

### D.    THE DECISION TO FILE FOR CHAPTER 11 PROTECTION

Ultimately, OneWeb, in consultation with its advisors, determined that the best path forward was to commence chapter 11 cases to preserve the value of its key assets while pursuing strategic alternatives. As such, OneWeb entered into an agreement with its largest equity and debtholder, SoftBank, with respect to the consensual use of its cash collateral to fund the chapter 11 cases.

On March 27, 2020, OWG's board of directors, and the boards of directors or managers of each of its affiliated Debtors, unanimously voted to commence voluntary cases for relief under chapter 11 of the Bankruptcy Code. The Debtors' other subsidiaries, OneWeb S.R.L., a company formed under the laws of Italy, OneWeb Capacidade Satelital Ltda., a Brazilian limited liability company, OneWeb Costa Rica Limitada, a Costa Rican limited liability company (Sociedad de Responsibilidad Limitada), OneWeb Senegal SARL, a Senegal limited liability company, One Web Angola – Serviços De Telecomunicações (SU), LDA., an Angolan limited liability company, OneWeb S.A., an Argentinian sociedad anónima, First Tech Web Company Limited, a Saudi Arabian limited liability company, OneWeb Communications S.a.r.l., a Luxembourg société à responsabilité limitée, OneWeb Asia Pte. Ltd., a Singaporean private company limited by shares, OneWeb Development Ltd., a company incorporated under the laws of England and Wales, and OneWeb Technology Ltd., a Jersey private company, did not commence chapter 11 cases.

## IV.    EVENTS DURING THE CHAPTER 11 CASES

### A.    FIRST AND SECOND DAY PLEADINGS

Immediately after commencing these cases, the Debtors filed a number of motions and other pleadings seeking relief necessary to stabilize their business and ensure a smooth transition into chapter 11. These first and second day motions were granted by the Bankruptcy Court with certain adjustments or modifications.

The Bankruptcy Court entered orders authorized the Debtors to, among other things:

- maintain their existing bank accounts and cash management system, and continue use of existing checks [Docket Nos. 30, 119, and 349];

- pay certain prepetition employee wages, salaries, other compensation, and continue certain compensation and benefits programs [Docket Nos. 37 and 108];

- pay all undisputed, liquidated, prepetition amounts owing on account of claims held by critical vendors [Docket Nos. 38 and 109];

- provide adequate assurance of payment to utility companies and establish procedures for resolving requests by utility companies for additional assurance of payment [Docket Nos. 45 and 111];

- pay certain prepetition taxes and fees and those that will become payable during the pendency of the cases [Docket Nos. 32 and 113];

- continue insurance coverage, workers' compensation programs and surety bond programs entered into prepetition and satisfy payment of those obligations, and continue performance [Docket Nos. 35 and 110];

- establish procedures relating to certain transfers of, or declarations of worthlessness with respect to, common stock or any beneficial ownership interests [Docket Nos. 36 and 112];

- utilize cash collateral [Docket Nos. 17 and 118];

- obtain postpetition financing [Docket No. 121]; and

- approving bidding procedures with respect to the sale of the Debtors' assets [Docket No. 104].

## B.   PROCEDURAL AND ADMINISTRATIVE MOTIONS

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedule of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports* [Docket No. 7] seeking an extension of the time within which the Debtors must file their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules") up to and including 30 days after the meeting of the creditors pursuant to section 341 of the Bankruptcy Code or 44 days from the Petition Date or such later date as agreed to with the U.S. Trustee, which the Bankruptcy Court granted on April 1, 2020 [Docket No. 33]. On May 25, 2020, the Debtors filed the Schedules and their Rule 2015.3 Financial Report.

On June 23, 2020, the Bankruptcy Court entered an order approving: (1) August 11, 2020, at 5:00 p.m., prevailing Eastern Time, as the deadline for all non-governmental units (as defined in section 101(27) of the Bankruptcy Code) to file Claims in the chapter 11 cases; (2) September 24, 2020 at 5:00 p.m., prevailing Eastern Time, as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file Claims in the chapter 11 cases; (3) procedures for filing proofs of Claim; and (4) the form and manner of notice of the applicable bar dates [Docket No. 331] (the "Bar Date Order"). Any creditor whose Claim is not scheduled in the Schedules or whose Claim is scheduled as disputed, contingent, or unliquidated must file a Proof of Claim in accordance with the Bar Date Order.

To facilitate the efficient administration of these chapter 11 cases and to reduce the administrative burden associated therewith, the Debtors also filed and received authorization to implement several further procedural and administrative motions:

- authorizing the joint administration of the chapter 11 cases [Docket No. 29];

- establishing certain notice, case management, and administrative procedures [Docket No. 44];

- allowing the Debtors to prepare a list of creditors in lieu of submitting a formatted mailing matrix and to file a consolidated list of the Debtors' 30 largest creditors [Docket No. 41];

- approving the procedures for the interim compensation and reimbursement of retained Professionals in the chapter 11 cases [Docket No. 106];

- allowing the Debtors to retain and compensate certain Professionals utilized in the ordinary course of business [Docket No. 107]; and

- approving procedures for rejecting executory contracts and unexpired leases [Docket No. 346].

## C.   APPOINTMENT OF THE CREDITORS' COMMITTEE

On April 16, 2020, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code [Docket No. 67]. The Committee retained (a) Paul Hastings, LLP as lead counsel; (b) Cole Schotz, P.C. as conflicts and efficiency counsel; (c) Province, Inc. as financial advisor; and (d) Jefferies LLC as investment banker.

## D.   DEBTORS' RETENTION OF PROFESSIONALS

Upon the Bankruptcy Court's approval, the Debtors retained (1) Milbank LLP as counsel; (2) Omni Agent Solutions as the Claims and Noticing Agent; (3) Guggenheim Securities as investment banker; (4) Choate, Hall & Stewart LLP as special corporate counsel; and (5) FTI Consulting, Inc., as financial advisor.  The Bankruptcy Court also authorized the Debtors to retain and compensate certain Professionals utilized in the ordinary course of the Debtors' business.

## E.   POSTPETITION FINANCING

Following the Petition Date, the Debtors obtained debtor-in-possession financing pursuant to a Senior Secured Debtor-In-Possession Term Loan Credit Agreement, dated as of April 29, 2020 (the "Original DIP Credit Agreement"), among, *inter alios*, OWC as borrower, SoftBank and Grupo Elektra, S.A.B. de C.V., as lenders (the "DIP Lenders"), GLAS USA LLC, as administrative agent (the "DIP Administrative Agent") and GLAS Trust Corporation Limited,

as collateral agent (the "DIP Collateral Agent", and together with the DIP Administrative Agent, the "DIP Agent").

The Original DIP Credit Agreement provided for senior secured superpriority financing consisting of (a) new money term loans of up to $75 million, consisting of a $10 million first tranche, a $20 million second tranche, a $25 million third tranche, and a $20 million fourth tranche (the "New Money DIP Loans") and (b) a "roll-up," consisting of a substitution and exchange of a portion of the Claims of the DIP Lenders or their affiliates under the A&R NPA and the Secured Notes (the "Prepetition Obligations") occurring on each borrowing date under the Original DIP Credit Agreement (except that the roll-up with respect to the New Money DIP Loans extended on the first borrowing date was deemed to occur on the second borrowing date) in an aggregate amount equal to three times the aggregate principal amount of New Money DIP Loans made on the applicable date, up to an aggregate amount of no more than $225 million (the "DIP Facility").

To secure the obligations under the Original DIP Credit Agreement, the Debtors granted the DIP Collateral Agent, for the benefit of the DIP Lenders and the DIP Agent (collectively, the "DIP Secured Parties"), a valid, perfected first priority priming security interest and lien on all of their prepetition and postpetition tangible and intangible property and assets, whether real or personal, other than the Excluded Collateral and the Avoidance Actions (each, as defined in the Original DIP Credit Agreement).

In connection with the bid from the Plan Sponsor to acquire 100% of the equity interests of the Reorganized Company Party (the "New Equity Interests") through a chapter 11 plan of reorganization and to provide an ongoing, material funding commitment to the reorganized business (the "Transaction"), as discussed further herein, the Plan Sponsor agreed to provide $110 million of incremental DIP financing (the "Interim Funding"), by taking assignment of the approximately $45 million of unfunded new-money commitments under the Original DIP Credit Agreement and providing additional new-money commitments of approximately $65 million.

The Debtors filed a motion seeking authority to amend the DIP Facility to allow for the Interim Funding on June 6, 2020 [Docket No. 370] and increasing the size of the DIP Facility from $300 million to $410 million. The Bankruptcy Court entered an order granting the requested relief on July 10, 2020 [Docket No. 398].

## F.    PENDING LITIGATION PROCEEDINGS AND CLAIMS

In the ordinary course of business, certain of the Debtors are party to various lawsuits, legal proceedings, and claims arising out of their businesses. The Debtors cannot predict with certainty the outcome or disposition of these lawsuits, legal proceedings, and claims, although the Debtors do not believe any reasonable outcome of any currently existing proceeding, even if determined adversely, would (a) have a material adverse effect on their businesses, financial condition, or results of operations or (b) interfere with the feasibility of the Plan.

On June 6, 2019, Virgin Orbit, LLC ("Virgin") filed suit against OneWeb in the United States District Court for the Southern District of New York, alleging breach of contract related to the calculation and payment of a termination fee associated with OneWeb's termination of

certain launches under a Launch Services Agreement between the parties in May 2015. Virgin is seeking $46,323,851 in damages, interest, attorney's fees and costs (the "Virgin Litigation").

On September 10, 2019, Intelsat US LLC ("Intelsat") filed suit against OneWeb and SoftBank Group Corporation in the Supreme Court of the State of New York, County of New York, alleging contract and tort claims, including breach of contract under the Amended and Restated Strategic Cooperation Agreement between Intelsat, OneWeb and SoftBank (the "Intelsat Litigation"). On November 8, 2019, OneWeb and SoftBank filed a joint motion to dismiss the complaint in its entirety. On May 13, 2020, Intelsat commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia.

With certain exceptions, the filing of the chapter 11 cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the chapter 11 cases. The Debtors' liability with respect to litigation stayed by the commencement of the chapter 11 cases is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation claims against the Debtors may be subject to discharge in connection with the chapter 11 cases. This may reduce the Debtors' exposure to losses in connection with the adverse determination of such litigation.

### G.    THE MARKETING AND SALE PROCESS

The Debtors, with the assistance of Guggenheim Securities, conducted an extensive outreach effort in connection with the Debtors' marketing and sale process, including, among other things, reaching out to over ninety (90) strategic and financial investors around the world. Over half of those parties executed non-disclosure agreements and received access to a data room supplied with diligence information regarding the Debtors' businesses and operations. Such information included, among other things, a management presentation, regulatory filings, information regarding manufacturing facilities, asset details, technical specifications for SNPs, network, user terminals and satellite design, various business plans, and other commercial agreements. Moreover, the Debtors' management and their advisors participated in numerous calls to address diligence and sale related topics. Through additional information posted to the data room and written answers, the Debtors, with the assistance of their advisors, provided well over one hundred (100) written submissions in response to diligence questions submitted by prospective buyers. Throughout the sale and marketing process, the Debtors regularly informed and consulted with the Committee and SoftBank (together, the "Consultation Parties").

At the original bid deadline of June 26, 2020, the Debtors received three bids, none of which met the definition of a Qualified Bid in the Bidding Procedures Order. Consequently, after discussion with the Consultation Parties (including the Committee), the Debtors extended the bid deadline and continued discussions with the parties that submitted these bids in an attempt to turn their submissions into Qualified Bids. Three additional parties that had conducted due diligence also contacted the Debtors and expressed interest in bidding for the Debtors' assets, although each of these additional parties indicated they were yet to secure the requisite financing and internal approvals. The Debtors, with the assistance of their advisors, continued to interact with these parties following the original bid deadline.

On July 1, 2020, the Debtors received a signed bid from BidCo in the form of a Plan Support Agreement and plan term sheet attached thereto as Exhibit A (the "Plan Term Sheet").

On July 2, 2020, BidCo's bid was submitted to OWG's Board of Directors (the "Board") for consideration. Of the seven Board members, each of SoftBank, Airbus, Grupo Salinas, and Qualcomm have one designee. The other three Board members are: an independent member with no other affiliation to the Debtors or the holders of Secured Notes Claims, the Debtors' CEO, and the founder of OneWeb, who also has no affiliation with the holders of Secured Notes Claims but is a current equity holder. The Board **unanimously** voted to approve BidCo's bid, subject to obtaining certain modifications to be negotiated by the Debtors, with the assistance of their advisors, as the baseline bid. Among the Board members who voted to approve the bid were the unaffiliated independent director and the designees of two significant unsecured creditors—Qualcomm (directly) and Airbus (indirectly through its ownership interests in the AOS joint venture and its significant ownership interest in Arianespace). In approving BidCo's bid, including the Plan Term Sheet, each member of the Board exercised its duties under applicable law, having determined that BidCo's bid preserved the going concern value of the Debtors' business, avoided imminent liquidation, and was the highest and otherwise best bid available. The Board's decision was further supported, as described below, by the Committee, which recognized that BidCo's bid was the highest and best bid and conceded that there were no issues with the sale process, stating as follows in a filing with the Bankruptcy Court:

> The Committee fully supports a going concern sale of the Debtors' business, and it agrees that the selection of BidCo as the proposed buyer in accordance with the sale process is a positive development and a critical first step towards a confirmable chapter 11 plan and a successful reorganization. The Committee is also not second-guessing the sale process run by the Debtors or the purchase price to be paid by BidCo.

*Official Committee of Unsecured Creditors' Limited Objection to (1) Debtors' (I) Supplemental Motion for Entry of an Order (A) Authorizing Debtors to Enter Into and Perform Under Plan Support Agreement With Successful Bidder in Connection With Debtors' Motion to Authorize Sale, Free and Clear of All Liens, Claims, Interests & Encumbrances and (B) Granting Related Relief and (II) Preliminary Reply to Cure, Assumption and Assignment, and Sale Objections, and (2) Debtors' Motion for Authorization to Amend Existing DIP Facility* [Docket No. 386] (the "PSA Objection") at ¶ 1; *see also*, *id*. at ¶¶ 9, 16 (the Committee "has no objection to the Debtors selecting BidCo as the Successful Bidder").

None of the other bids received were Qualified Bids, and no other interested party indicated to the Debtors that it would submit a Qualified Bid competitive with BidCo's bid. BidCo agreed to requested modifications, and in consultation with the Consultation Parties (including the Committee), notified BidCo that the Debtors intended to designate BidCo's bid as the highest and otherwise best bid. The Debtors, in consultation with the Consultation Parties, then cancelled the auction and BidCo was declared the successful bidder.

On July 3, 2020, the Debtors announced that BidCo was the successful bidder and that the terms of the Plan Support Agreement and the going concern sale contemplated thereby constituted the highest and otherwise best bid for the Debtors' business.

The Committee disagrees with the Debtors' characterization of the legal and factual issues described in this Section IV.G and, in this regard, the Committee refers creditors to the Committee Letter.

## H.    THE TERMS OF BIDCO'S BID

### 1.    *Acquisition of All Assets Including Retained Causes of Action & Avoidance Actions*

The Plan Support Agreement and the Plan Term Sheet expressly state that BidCo's offer is for the acquisition of the New Equity Interests and includes "all the assets, properties and rights used or held for use by the Debtor entity that will act as the Reorganized Company Party (in accordance with the terms [of the Plan Support Agreement and the Plan Term Sheet]) and its subsidiaries and affiliated entities in the operation and conduct of the Business as a going concern in connection with the Chapter 11 Cases through the Transactions, subject to the ability to designate Excluded Assets in accordance with the PSA."  Plan Term Sheet at 4 (a schedule of the Excluded Assets is attached as **Annex D** hereto).  All assets necessary for the operation of the Debtors' business as a going concern, among other things, include all Causes of Action, including all Avoidance Actions, except those released pursuant to the Plan.  The Plan Support Agreement and the Plan Term Sheet do not provide for any allocation of the purchase price to specific assets.  Notably, the Committee insisted on striking from the Bidding Procedures the requirement that Proposals (as defined therein) include allocation of the purchase price as part of its comments thereto. *See Notice of Filing of Revised Proposed Order (I)(A) Approving Bidding Procedures, (B) Scheduling an Auction and Sale Hearing and Approving Form and Manner of Notice Thereof, and (C) Approving Assumption and Assignment Procedures and Form and Manner of Notice Thereof; and (II) Authorizing (A) the Sale(s), Free and Clear of All Liens, Claims, Interests, and Encumbrances, and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases* [Docket No. 89]; *cf.* Bidding Procedures Motion, Exhibit 1, Section III.B.2.(c). [Docket No. 57]; Bidding Procedures, Section III.B.2.(c). [Docket No. 104]. The purchase and sale of the Causes of Action is a requirement of the Plan Term Sheet and is a necessary predicate to confirmation of the Plan.

Notwithstanding assertions by the Committee to the contrary, it is standard for a purchaser of a going concern business, including a reorganizing business, to retain all of its causes of action regardless of whether the purchaser is an existing creditor.  In any event, this is not a case where a buyer cherry-picks assets to operate as part of a different business and looks to acquire causes of action unrelated to the existing business.  To the contrary, because the Debtors' business is being acquired as a going concern, it is unremarkable that the Plan Sponsor seeks to acquire all rights associated therewith, including the ability to decide which Claims to pursue and which Claims to release.  To do otherwise would require the Plan Sponsor to relinquish its ability to make critical go-forward business decisions, and/or subject the reorganized business to unquantifiable risks to disruption of its business because its vendors, customers, debt and equity sources and counterparties are being subjected to litigation in the

name of their business.  The acquisition of the Retained Causes of Action ensures that the Debtors' new owners will have the ability to continue to negotiate with existing or former vendors, suppliers, and contract counterparties, without the overhang of the threat of litigation (not controlled by the new owners) that could disrupt operations and management of the business.  It is a requirement of the Plan Term Sheet.

Moreover, while the Debtors have not conducted an independent review of potential Causes of Action and Avoidance Actions, the Debtors are not aware of any valuable Causes of Action or Avoidance Actions that are being retained by the Reorganized Debtors.  Notably, the Debtors believe that any potential preference claims under section 547 of the Bankruptcy Code are likely subject to applicable defenses, including "contemporaneous exchange for value", "new value", or are for payments tied to contracts that will be assumed, and therefore the cost of litigation would far exceed the recoverable value.  Even so, the Bankruptcy Court approved BidCo's bid as the highest and otherwise best option for the Debtors, and the terms of the BidCo bid require the Reorganized Debtors to maintain the Retained Causes of Action.

## 2.     *Cash Consideration and BidCo Equity Consideration*

In exchange for the acquisition of the New Equity Interests, BidCo agreed to provide, among other things, (i) on or before the Effective Date, $150 million cash payment to satisfy Allowed DIP Claims (other than the Interim Funding DIP Claims) and such other claims that were required to be paid in cash under the Plan; and (ii) on or following the Effective Date, the Additional Cash Plan Funding.  In addition, BidCo committed to (i) provide additional DIP financing in the amount of $110 million to fund the Debtors' chapter 11 cases through the Effective Date and (ii) provide for payment of all Allowed Cure Claims.  The Plan Support Agreement and Plan Term Sheet also provides for the issuance of the BidCo Equity Consideration *pro rata* for the holders of Allowed Secured Notes Claims.

These key financial terms of the Plan Support Agreement and the Plan Term Sheet comprise the terms of BidCo's successful bid.  These terms have been in every iteration of the Plan Support Agreement and the Plan Term Sheet delivered by BidCo to the Debtors, as well as the Committee as a Consultation Party under the Bidding Procedures.  BidCo is a private joint venture between HMG and Bharti, established by them for the purpose of acquiring 100% of the equity interests of the Reorganized Company Party in consortium with each other, together with any other selected additional commercial partners that HMG and Bharti may invite to join that consortium.  As with any private consortium, HMG and Bharti will take care in the selection of any third parties that they invite to become consortium partners with them.  In addition, HMG, as a sovereign entity, has additional considerations and approval procedures in relation to the identity and ultimate ownership of any third party with which it enters a commercial partnership.  For the same reasons, HMG and Bharti will limit the transferability of both the legal and beneficial ownership of the equity in BidCo.

Because of these concerns, in deciding to offer the BidCo Equity Consideration as part of the Plan, consideration was given by HMG and Bharti to the identity of those third parties who would receive such consideration.  HMG and Bharti had identified and approved as acceptable shareholders in BidCo the holders of Allowed Secured Notes Claims to whom it is proposed the BidCo Equity Consideration will be issued.  HMG and Bharti have not undertaken, and do not

believe it is appropriate or reasonable to expect them to undertake, this exercise in respect of the much larger pool of holders of General Unsecured Claims.  BidCo, as the Plan Sponsor and DIP Lender and the party funding payment of administrative expenses of these cases, has every incentive to seek to reduce, not increase, the cost of administering these cases.

In addition to any considerations that HMG and Bharti may have over the identity of those third parties unknown to them, HMG and Bharti would also have concerns about any increase in the number of shareholders in BidCo given the private company nature of BidCo and its governance.  HMG and Bharti would also be concerned about any proposed arrangement where a single trustee acts as shareholder for all of the New Equity Interests, given that similar concerns would arise in relation the identity and number of underlying beneficiaries, and where in addition HMG and Bharti would have less visibility into those underlying beneficiaries and less ability to control any transfer or other dealings in BidCo equity.

The Debtors, through their advisors, requested that the BidCo Equity Consideration, like the Cash Consideration, be made available to the Estate generally.  However, the Plan Sponsor would not agree.

Contrary to the Committee's assertions, in the Debtors' view, the Bankruptcy Court has been clear that BidCo would (1) have a reasonable basis for terminating the Plan Support Agreement if the BidCo Equity Consideration was required to be distributed to any party other than the holders of Secured Notes Claims (*see* Tr. of July 10, 2020, Hearing to Approve Plan Support Agreement and DIP Amendment at 67:7-13 ("[T]he point you made about the equity, to me, I understand completely. That would be, certainly, a [case] where consent would be reasonably withheld, if it affects your very ability to do the transaction, get regulatory approval, *et. cetera*.")) and (2) that any challenge brought by the Committee to recharacterize or equitably subordinate the Secured Notes Claims in a manner that could trigger termination rights under the Plan Support Agreement and jeopardize the sale should not be a risk that should be allowed to exist.  *See* Tr. of July 28, 2020 hearing at 111:1-20  ("I believe the committee should ***not*** be permitted to [] pursue litigation that would, by its plain terms, cause a breach of the purchase agreement if the committee succeeded [in its recharacterization and equitable subordination claims] and the order would have to be drafted to preclude that relief and the pursuit of that relief from taking place, which in all likelihood would mean that the remedies that the committee would see would be limited to the other aspect of the consideration provided by BidCo, which is ninety million dollars.") (emphasis added).  And, again, BidCo's successful bid was determined to be the highest and best available to the Debtors.

Contrary to the Committee's assertions, these are critical components to the Plan Support Agreement and Plan Term Sheet, which are further clarified in Sections IV and IX of the Plan.

### 3.    *The Releases*

#### a.    **Releases for the Prepetition Secured Parties**

As part of the Debtors' negotiations to obtain the consensual use of cash collateral and ultimately, DIP financing, the Prepetition Secured Parties insisted, among other things, that the Debtors agree that the Secured Notes Claims be allowed in the full outstanding amount and that a

release will be granted of all claims and Causes of Action against the Prepetition Secured Parties, subject only to the limited challenge rights of other parties in interest.  While the Debtors did not conduct an independent investigation of claims potentially held by them or their estates against the Prepetition Secured Parties at the time of granting the release (the Debtors neither had the time nor the liquidity to do so), the Debtors were not aware of any potential Claims they held against the Prepetition Secured Parties nor did they have any reasonable basis to believe such claims existed.  Ultimately, the Debtors, in the reasonable exercise of their business judgement, agreed to grant the requested releases in exchange for the consensual use of cash collateral and DIP financing, both of which were necessary to allow the Debtors to use chapter 11 to pursue a value maximizing going concern sale for the benefit of all of the Debtors' stakeholders.  Absent the ability to use cash collateral and obtain postpetition financing (which was only available from SoftBank and an affiliate of Banco Azteca), the Debtors would not have been able to pursue the sale process, secure a going concern bid, or otherwise maximize value for their Estates.  Rather, the Debtors would have been forced to liquidate under U.S. or English Law.

After further review of the facts surrounding the Original NPA and the A&R NPA, as detailed more fully above, the Debtors believe that the claims and causes of action alleged by the Committee against the Prepetition Secured Parties are without any merit (as discussed more fully below).  Accordingly, the treatment provided to the Prepetition Secured Parties under the Plan is consistent with the current *status quo* waivers and releases contained in the DIP Order and the Cash Collateral Order.  Until such time as there is a successful challenge of the Secured Notes Claims, there is no basis to treat such claims differently.

The Debtors' decision to agree to the releases in the Plan Term Sheet and the Plan is similarly justified by the Debtors' business judgment as, in connection with finalizing the terms of the Plan Support Agreement and the Plan Term Sheet, the Debtors were required to obtain the consent of the existing DIP Lenders and the largest prepetition secured lenders to the transactions contemplated by BidCo's bid.  They did so for two valid reasons (neither of which is remotely improper).  First, because the Plan proposes to provide the holders of Secured Notes Claims with equity – a treatment that cannot be crammed down on secured debt (and the Secured Notes Claims are presumptively valid secured claims), SoftBank's consent to the Plan was necessary.

Second, it is a "Termination Event" under the Debtors' DIP financing for the Debtors to file or support a plan that is not in form and substance acceptable to SoftBank.  Pursuant to paragraph 24 of the DIP Order, it is a Termination Event (as defined in the DIP Order) with respect to the Debtors' right to use proceeds of any DIP Loans if, among other things, "the Debtors file, propose, or support confirmation of a chapter 11 plan that is not in form and substance acceptable to [SoftBank, as] the Lead Lender."  Similarly, pursuant to paragraph 8 of the Cash Collateral Order, it is a Termination Event (as defined in the Cash Collateral Order) with respect to the Debtors' right to use cash collateral if "the Debtors shall create, incur, or suffer any other claim which is *pari passu* or **senior to** the Notes Superpriority Claim, other than a claim granted in connection with a postpetition financing facility consented to by [SoftBank, as] the Required Holders or under this Final Order."

Whatever rights the Committee may have to challenge the Secured Notes Claims under the Cash Collateral Order, the Committee expressly consented to the foregoing provisions. *Statement of Official Committee of Unsecured Creditors in Support of Debtors' Motions for*

*Orders (A) Authorizing Use of Cash Collateral, (B) Authorizing Postpetition Financing, and (C) Approving Bidding Procedures, Each as Modified*, at ¶ 3 [Docket No. 96].

To obtain SoftBank's consent to the Plan Support Agreement and the Plan Term Sheet, SoftBank required the Debtors to release claims against SoftBank as a DIP Secured Party and Prepetition Secured Party. On July 9, 2020, SoftBank executed a joinder to the Plan Support Agreement which provides that SoftBank's support is contingent on no change in its treatment or the releases to be granted under the Plan Support Agreement and Plan Term Sheet.

In addition, pursuant to the terms of the Settlement embodied in the Plan, SoftBank has agreed to contribute its cash recovery on account of the Allowed SoftBank DIP Claims (approximately $91 million before the consideration of accrued interest) in exchange for the issuance of $87.9 million of equity in BidCo calculated on the same basis as the BidCo Equity Consideration (the "Additional SoftBank Consideration"). In turn, and as a result thereof, and a reduction in the amount of BidCo Equity Consideration distributed to holders of Allowed Senior Secured Claims, BidCo has agreed to fund the General Unsecured Claims Settlement Distribution to provide a recovery to holders of Allowed Claims in Class 4 and holders of Allowed Claims in Class 5 with their *pro rata* share of $6.1 million (which, depending on the ultimate size of the unsecured claims pool, could yield a percentage of recovery the Debtors believe will be greater than, and the Committee asserts may be less than, the percentage of recovery originally contemplated under the Plan Term Sheet for holders of Allowed Secured Notes Claims under the Plan).

### b.   Releases of the Debtors' Directors & Officers

The Plan and the Plan Term Sheet also contemplate the Debtors' and third-party releases of the Debtors' directors and officers ("Directors and Officers") serving in such capacity on and after the Petition Date to the fullest extent permitted by law, including under English Law. Notwithstanding the Committee's entirely baseless accusations, the Debtors are not aware of any valid claims or Causes of Action against any of their Directors and Officers. Leading up to the filing of these cases, the Directors and Officers were faced with extremely challenging circumstances. The Directors and Officers have shepherded these Debtors through extraordinary circumstances, least of which is a global pandemic.

As described more fully above, just weeks before the commencement of these cases, the Debtors believed that they had secured an out-of-court financing transaction that would have funded the build-out of the Debtors' constellation to completion. On the same day the Debtors expected to get the go-ahead with respect to this anticipated financing, the World Health Organization declared COVID-19 a global pandemic, the world financial markets suffered one of the worst days in trading history, and the Debtors were informed that the possibility of a fully funded transaction was no longer available. The Directors and Officers pivoted quickly toward pursuit of an out-of-court bridge financing, which was hoped to bridge the Debtors to a value maximizing sale once the financial markets rebounded. However, just one hour before the Debtors' scheduled launch of their third batch of satellites into orbit, they were informed that the bridge financing was no longer available.

The Directors and Officers had no choice but to turn quickly to preparing for a chapter 11 filing – a process (unlike an insolvency process under English insolvency law) that would give the Debtors the necessary breathing space to pursue a value maximizing sale. The Directors and Officers had to make the difficult decisions to preserve cash, shut down non-essential operations, and implement a significant reduction in work force, all the while managing continuing business operations, maintaining vendor and supplier relationships, and retaining essential and specially skilled employees. In addition, the Debtors had to navigate a "free fall" chapter 11 case, obtain and agree to conditional postpetition financing at a fraction of the Debtors' operating requirements, and pursue a value maximizing sale of their business as a going concern on a shoe-string budget and extremely short timeline – which they have successfully done. Had the Directors and Officers opted to shut down operations and pursue an insolvency process under English Law, the Debtors would have ended up in liquidation with no value available for hundreds of stakeholders.

The Committee intimates that there may be potential claims against the Directors and Officers that are being released but it asserts no basis for these allegations. To the contrary, the Directors and Officers have achieved a home-run going concern sale of the Debtors' business, pursuant to which current employees will keep their jobs, many terminated employees may be rehired, and hundreds of contract counterparties will have their contracts assumed by the Reorganized Debtors. Moreover, even with respect to those contract counterparties whose contracts may be rejected, an opportunity for future engagement with the Reorganized Debtors remains as the Debtors' business will continue as a going concern. The Plan contemplates the retention of Current Employees in their current positions, including Officers. To allow parties to bring meritless claims against these individuals would cause enormous disruption to the Reorganized Debtors' business, would force the Reorganized Debtors to have to expend resources in defending and indemnifying the Directors and Officers, and would risk losing the very same employees who have been so critical to the Debtors' survival and these chapter 11 cases.

Among the baseless allegations made by the Committee is that certain retention payments made to the Debtors' Officers and other remaining employees prior to the commencement of these cases may have been improperly made or improperly approved by the Board. However, as the Committee is well aware from its review of the Debtors' KEIP and KERP, discussions with the Debtors' advisors, informal and formal document production, and voluntary interviews of the Debtors' management, there was absolutely nothing improper about the retention payments made in the week prior to the commencement of these cases. Those payments were made upon the review and advice of outside employment advisors and were considered and unanimously approved by the Board (excluding the Debtors' CEO), including the Debtors' independent director. The Board determined that, in order to successfully operate the Debtors' assets while managing chapter 11 and conducting a sale process, the prepetition retention payments were necessary to retain the Debtors' essential management team and remaining employees in the face of extreme uncertainty. The Board was also informed at that time that the Debtors would likely seek approval of a key employee incentive program tied to the sale process at a future date. Contrary to the Committee's baseless accusations, these payments were approved by the Board before the Debtors received any draft form of order from holders of the Secured Notes Claims authorizing consensual use of cash collateral. Indeed, the Debtors had only a matter of days to pivot from a fully operational satellite venture to "mothballing" their operations. The Directors

and Officers have been and continue to be critical to the success of the sale process and these chapter 11 cases. This was also recognized by the Bankruptcy Court when it approved the Debtors' KEIP. Thus, the releases are appropriate.

The Committee disagrees with the Debtors' characterization of the legal and factual issues described in this Section IV.H, and, in this regard, the Committee refers creditors to the Committee Letter.

## I.    APPROVAL OF THE PLAN SUPPORT AGREEMENT AND INTERIM FUNDING

On July 6, 2020, the Debtors filed a motion seeking authority to enter into the Plan Support Agreement [Docket No. 369] (the "PSA Motion") and a motion seeking authority to amend the existing DIP Facility [Docket No. 370] (the "DIP Amendment Motion"). The Committee filed its PSA Objection (which included an objection to the Interim Funding) on July 9, 2020.

Principally, the PSA Objection raised concerns with: (1) the Plan Support Agreement's allocation of the purchase price; (2) the proposed releases; (3) a $5.5 million exit fee, up to $25 million in expense reimbursements, and automatic acceleration of the Interim Funding if the Plan Support Agreement is terminated; and (4) the Plan Sponsor's right to determine the treatment of General Unsecured Claims under the Plan. *See* PSA Objection at ¶¶ 1, 2, 8, 10. The Debtors, Plan Sponsor, DIP Secured Parties, and the Committee were able to resolve many of these issues consensually, and their agreement was memorialized in the Plan Support Agreement Order and DIP Amendment Order.

As described above, the Committee stated in the PSA Objection that it "fully supports a going concern sale of the Debtors' business, and that it agrees that the selection of BidCo as the proposed buyer in accordance with the sale process is a positive development and a critical first step towards a confirmable chapter 11 plan and a successful reorganization." PSA Objection at ¶ 1; *see also*, *id*. at ¶¶ 9, 16 (the Committee "has no objection to the Debtors selecting BidCo as the Successful Bidder"). The Committee also made clear that it was not second-guessing the sale process run by the Debtors or the purchase price to be paid by BidCo. *Id*.

However, the Debtors, the Plan Sponsor, and the Committee were unable to resolve their disputes over the proposed releases and the allocation of the BidCo Equity Consideration in advance of the hearing on July 10, 2020. The Bankruptcy Court acknowledged on the record of that hearing that it would not be unreasonable for the Plan Sponsor to decline to modify its obligations under the Plan Support Agreement and Plan Term Sheet to allow the BidCo Equity Consideration to be made available to the Estate generally and not just to the holders of the Allowed Secured Notes Claims, as agreed to by the Debtors in the Plan Support Agreement and Plan Term Sheet. *See* Tr. of July 10, 2020, Plan Support Agreement and DIP Amendment hearing at 67:7-13 ("[T]he point you made about the equity, to me, I understand completely. That would be, certainly, a [case] where consent would be reasonably withheld, if it affects your very ability to do the transaction, get regulatory approval, *et. cetera*.").[5]

---

[5]    At a subsequent hearing, the Bankruptcy Court further noted that the "risk that equity goes to other parties

The Bankruptcy Court entered the Plan Support Agreement Order and DIP Amendment Order, as modified, on July 13, 2020 [Docket No. 400] and July 10, 2020 [Docket No. 398], respectively.

The Committee disagrees with the Debtors' characterization of the legal and factual issues described in this Section IV.I, and, in this regard, the Committee refers creditors to the Committee Letter.

## J.   THE COMMITTEE'S DERIVATIVE STANDING MOTION

On July 13, 2020, the Committee filed a motion seeking (a) derivative standing to pursue recharacterization and equitable subordination claims against the holders of Secured Notes Claims and (b) disallowance of the Secured Notes Claims under section 502(b) of the Bankruptcy Code. *See Official Committee of Unsecured Creditors' (I) Motion for Order Granting Derivative Standing to Pursue and, if Appropriate, Settle Claims for Recharacterization and Equitable Subordination against Certain Purported Secured Creditors, and (II) Objection to such Creditors' Claims* [Docket No. 402] (the "Standing Motion").

In the Standing Motion, the Committee alleged that some factors from *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726 (6th Cir. 2001), support recharacterizing the Secured Notes Claims as equity. Standing Motion at ¶ 105. In addition, the Committee alleged the Secured Notes Claims should be equitably subordinated because the holders of Secured Notes Claims used their "insider" position with the Debtors to "engage[] in inequitable conduct for their benefit that harmed the Company's other creditors" while the Debtors were undercapitalized. *Id.* at ¶ 108.

On July 21, 2020, the Debtors filed an objection to the Standing Motion. *Debtors' Objection to the Official Committee of Unsecured Creditors' (I) Motion for Order Granting Committee Derivative Standing to Pursue, and if Appropriate, Settle Claims for Recharacterization and Equitable Subordination Against Certain Purported Secured Creditors, and (II) Objection to Such Creditors' Claims* [Docket No. 430] (the "Debtors' Objection"). The Debtors' Objection argues, among other things, that the Committee's request for derivative standing was improper because (i) such standing would cause more harm than benefit to the Estates and creditors, (ii) the Debtors are justified in not pursuing the alleged claims, and (iii) the Committee's claims are not colorable. *Id.* at ¶¶ 18-49. Other parties, such as SoftBank, Banco Azteca, Airbus Group Proj B.V., Qualcomm Technologies, Inc., and Qualcomm Global Trading Pte. Ltd. also objected to the Standing Motion. *See SoftBank Group Corp.'s Objection to the Official Committee of Unsecured Creditors' (I) Motion for Order Granting Committee Derivative Standing to Pursue, and if Appropriate, Settle Claims for Recharacterization and*

---

because of a recharacterization win by the committee, BidCo could walk from its transaction or at least renegotiate it. I don't believe that that risk should be allowed to even exist." Tr. of July 28, 2020 hearing at 111:1-20; *see also id.* ("I believe the committee should ***not*** be permitted to [] pursue litigation that would, by its plain terms, cause a breach of the purchase agreement [if the committee succeeded [in its recharacterization and equitable subordination claims] and the order would have to be drafted to preclude that relief and the pursuit of that relief from taking place, which in all likelihood would mean that the remedies that the committee would see would be limited to the other aspect of the consideration provided by BidCo, which is ninety million dollars") (emphasis added).

*Equitable Subordination Against Certain Purported Secured Creditors, and (II) Objection to Such Creditors' Claims* [Docket No. 427] ("SoftBank's Objection"); *Joinder and Supplemental Memorandum of Law in Opposition to the Official Committee of Unsecured Creditors' (I) Motion for Order Granting Committee Derivative Standing to Pursue and, if Appropriate, Settle Claims for Recharacterization and Equitable Subordination Against Certain Purported Secured Creditors and (II) Objection to such Creditors' Claims* [Docket No. 428]; *Joinder of Airbus Group Proj B.V. to the SoftBank Group Corp.'s Objection to the Official Committee of Unsecured Creditors' (I) Motion for Order Granting Committee Derivative Standing to Pursue and, if Appropriate, Settle Claims for Recharacterization and Equitable Subordination Against Certain Purported Secured Creditors, and (II) Objection to Such Creditors' Claims* [Docket No. 429]; *Joinder of Qualcomm Technologies, Inc. and Qualcomm Global Trading Pte. Ltd. to the Debtors' and SoftBank Group Corp.'s Objections to the Official Committee of Unsecured Creditors' Motion for Derivative Standing to Pursue Recharacterization and Subordination of Certain Secured Creditors' Claims and Objections Thereto* [Docket No. 440].

On July 24, 2020, the Committee filed its reply to all of the foregoing objections. *Official Committee of Unsecured Creditors' Reply in Support of Motion for Order Granting Committee Derivative Standing to Pursue and, if Appropriate, Settle Claims for Recharacterization and Equitable Subordination Against Certain Purported Secured Creditors* [Docket No. 445].

On July 28, 2020, the Bankruptcy Court held a hearing on the Standing Motion. Following oral argument, the Bankruptcy Court adjourned the matter to the next omnibus hearing date.

The Debtors believe the claims identified in the Standing Motion are meritless and unlikely to succeed. Moreover, the costs of pursuing the causes of action the Committee identified in the Standing Motion will likely be significant. Even if the Committee was permitted to pursue its baseless claims, there is simply no source of funding available to support it, as failure to confirm the Plan could result in both the termination of the Debtors' right to use the proceeds of the DIP Facility and give rise to a termination event under the Plan Support Agreement and Plan Term Sheet, a risk the Bankruptcy Court has acknowledged should not be allowed to exist.[6]

---

[6]   *See* Tr. of July 28, 2020 hearing at 111:1-20 ("I believe the committee should ***not*** be permitted to [] pursue litigation that would, by its plain terms, cause a breach of the purchase agreement if the committee succeeded [in its recharacterization and equitable subordination claims] and the order would have to be drafted to preclude that relief and the pursuit of that relief from taking place, which in all likelihood would mean that the remedies that the committee would see would be limited to the other aspect of the consideration provided by BidCo, which is ninety million dollars.") (emphasis added).

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates a settlement of the claims asserted by the Committee in the Standing Motion. *See* Section V.B.2, *infra*. Notwithstanding the Settlement in the Plan, the Debtors, the Committee, and SoftBank have requested mediation, which is ongoing at the time of solicitation of the Plan. Neither the Plan nor the Settlement alter the terms of the successful bid nor do they alter the rights of the parties thereto, nor shall, pending confirmation of the Plan, anything in the Plan or Settlement alter the terms of the Plan Support Agreement Order without further Court approval.

### 1. *The Committee's Recharacterization Claims*

#### a. **Debtors' Response**

In the Standing Motion, the Committee contends that recharacterization of the Secured Notes Claims is warranted primarily because the Debtors were undercapitalized at the time the Secured Notes were issued and because the holders of the Secured Notes Claims also held equity in the Debtors. As discussed in the Debtors' Objection, the Debtors believe that these facts alone are insufficient to warrant recharacterization.

The Committee has used its Standing Motion to rewrite history, including a version of the facts that are simply not based in reality. The fact that the Debtors were undercapitalized is unremarkable for companies still in the process of capital development; investments made as debt in similar companies are not uncommon. A project the size of the Debtors' contemplated business plan requires years to be fully funded, given the significant capital contributions required, lengthy regulatory approval processes in numerous countries, the time necessary to manufacture and launch satellites, and the challenges in securing presales of capacity on reasonable terms.

It is clear that the version of facts that the Committee relies on to support its claims for recharacterization bear no resemblance to the facts as they actually occurred. Contrary to the Committee's allegations, at the time the Secured Notes were issued, the Debtors were not a moribund start-up company unlikely to generate sufficient revenue to satisfy its debt obligations. To the contrary, by the time the Debtors entered into the A&R NPA, they had already successfully launched the first six prototype satellites into orbit (an important step in bringing its radio frequency spectrum into use and thereby maintaining its priority right to use the spectrum ahead of its competitors). By the time of the filing of these cases, the Debtors, through their joint venture with Airbus, were capable of producing a satellite a day, and the Debtors had commenced a monthly launch cadence of 34 satellites per month.

The Bridge Notes and the Secured Notes were issued pursuant to the agreements clearly evidencing indebtedness in contemplation of additional third-party financing and weighing against recharacterization. In particular, the Debtors believe that if the facts were further examined, the *AutoStyle* factors weigh heavily against the Committee because the Secured Notes contain an explicit fixed maturity date and schedule of payments which are hallmarks of debt and weigh against recharacterization. Further, the Secured Notes have a fixed rate of interest paid in kind ("PIK") and were secured by valuable collateral which are quintessential debt features.

As discussed in Section II.C, *supra*, the Bridge Notes in particular were intended to

function as a short-term bridge loan (364 days) to allow for full funding of the contemplated ECA Financing. And the Bridge Notes were expressly tied to replacement financing milestones. In addition, contrary to the Committee's assertions repayment of the Secured Notes was not contingent on the Debtors' success in generating revenues and signing up customers, instead the Secured Notes were used to fund obligations to vendors and suppliers and in particular were designed to attract additional project financing, consistent with the nature of a bridge loan and thus further evidencing characteristics of debt.

The overlap between the Debtors' equity-holders and debt holders is likewise unremarkable in the project finance space. As noted in the Debtors' Objection, it is common for a start up's existing stakeholders to make loans where third-party financing may not be readily available – especially in the context of bridge loans. Here, contrary to the Committee's bald allegations, the loans were not used by the Debtors' equity holders to "leap frog" the Debtors' unsecured creditors in advance of a chapter 11 filing. Nothing could be further from the truth. The funds were used to fund obligations to the very same unsecured creditors whose official representative now asserts that the loans should be recharacterized. The Debtors' vendors directly benefitted from the issuance of the Secured Notes as they received hundreds of millions of dollars from their proceeds.

Thus, for these reasons, among others, the Debtors believe that the Committee's claims asserted in its Standing Motion have little possibility of success and serve only to imperil the Debtors' ability to confirm the Plan and pursue the value-maximizing transaction contemplated thereby. The Debtors believe that they have justifiably refused to bring the meritless claims that the Committee is seeking to pursue here, with minimal benefit and likely significant expense to the Estates.

### b.      SoftBank's Response

SoftBank believes that the plain terms of the Original NPA and the A&R NPA demonstrate that the Secured Notes were intended, in all respects, to be debt instruments and not equity investments. The Secured Notes and the financing documents themselves have all the hallmarks of debt in that they provided for the issuance of promissory notes with fixed interest rates, maturity dates, repayment terms, events of default, and collateral in the event of default. SoftBank is of the opinion that a trier of fact is unlikely to recharacterize the Secured Notes as equity because the documents themselves clearly evidence an intent to create a creditor-debtor relationship and the economic terms reflected the substantial credit risk of loaning new money to the Debtors. For example, the high interest rates under both Original NPA and the A&R NPA, as well as the consideration provided under the Warrant Purchase Agreement, accounted for the significant risks involved.

In addition, SoftBank is not aware of any case where a bankruptcy court has recharacterized debt that was secured by a valid lien (not to mention a lien on substantially all of a borrower's assets). Nor has the Committee identified any such case in its pleadings before the bankruptcy court. SoftBank believes that it is highly unlikely that the Committee will be able to convince a finder of fact to take unprecedented action and hold that SoftBank (and the other Senior Noteholders) never intended to be paid back on the Secured Notes issued under the A&R NPA (or, as to SoftBank, under the Original NPA).

Furthermore, SoftBank notes that bankruptcy courts in this district look to a number of factors when assessing recharacterization claims.[7]   SoftBank asserts the Committee has acknowledged, however, that only two out of the eleven recharacterization factors could conceivably weigh in favor of recharacterization in this case.   SoftBank is of the opinion this clearly demonstrates that the Committee's recharacterization arguments are weak.   In any event, the factors that the Committee believes weigh in favor of recharacterization are that (i) the Debtors were allegedly undercapitalized and (ii) that SoftBank was an insider that allegedly controlled the other Senior Noteholders.

But even assuming that the Committee could meet its burden of demonstrating the presence of these two factors (SoftBank submits that the Committee cannot), SoftBank believes that recharacterization would otherwise be inappropriate under the facts and circumstances of this case.   This is because courts have overwhelmingly held that undercapitalization is not sufficient, on its own, to justify recharacterization particularly where, as here, a debtor is a startup company rather than a revenue-generating (but distressed) company.[8]   Similarly, courts have recognized that insiders are often the only entities that have both the means and the incentive to lend money to undercapitalized companies and have refused to recharacterize debt in such circumstances.[9]

Finally, SoftBank believes that pursuing claims for recharacterization is not in the best interest of the Debtors' estates because even if successful they are not likely to generate meaningful value for general unsecured creditors.   That is because regardless of the outcome of any challenge against SoftBank for recharacterization (which owns approximately 60% of the Secured Notes), it is unlikely that the Committee could ever prevail in recharacterizing or subordinating the claims of Banco Azteca and Qualcomm.   As the bankruptcy court noted at the July 28, 2020 hearing to consider the Committee's motion for derivative standing, Qualcomm's Secured Notes claims were "rolled over from legitimate debt," while Banco Azteca "is a bank subject to regulation by the Mexican banking authorities" and is "precluded from making an equity investment" in the Debtors.[10]   SoftBank is of the opinion that, putting aside the logical dissonance that would be required for a trier of fact to conclude that Banco Azteca and Qualcomm hold valid debt while the other parties to the exact same instrument somehow invested in equity, the claims of Banco Azteca and Qualcomm alone make the Committee's claims pointless.   Specifically, Banco Azteca and Qualcomm hold over $400 million of Secured Notes Claims so a successful recharacterization challenge against every other holder of the Secured Notes Claims would leave no prospect of any "money [left] over for the unsecured creditors."[11]

---

[7]   *See Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726 (6th Cir. 2001).

[8]   *See, e.g.*, *In re USDigital, Inc.*, 443 B.R. 22, 51–53 (Bankr. D. Del. 2011) (dismissing a recharacterization claim in the context of multiple startups that shared similar management and sources of capital).

[9]   *See, e.g.*, *See In re Rockville Orthopedic Assocs., P.C.*, 377 B.R. 438, 442–43 (Bankr. D. Conn. 2007) ("[I]t [is] important to note that a claimant's insider status and a debtor's undercapitalization alone will normally be insufficient to support the recharacterization of a claim.   In many cases, an insider will be the only party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good-faith loans.") (quoting *In re Dornier Aviation, (N. Am.), Inc.*, 453 F.3d 225, 234 (4th Cir. 2006)).

[10]   *See* Tr. of Hr'g. at 104:21-105:7 (Jul. 28, 2020).

[11]   *See id.*, at 105:23-24.   Although the Committee has suggested that any liens in favor of holder of the Secured Notes Claims whose claims are successfully recharacterized could be preserved for the benefit of the Debtors'

-34-

## 2.    *The Committee's Equitable Subordination Claims*

### a.    Debtors' Response

The Committee also seeks to equitably subordinate the Secured Notes Claims, alleging the holders of the Secured Notes Claims, primarily through SoftBank, controlled the Debtors prepetition and used this control for their own parochial benefit at the expense of other creditors. The Debtors believe this theory to be unfounded.

As with the Committee's recharacterization claims, the Debtors believe that the Committee has failed (and will not be able) to allege a colorable claim for equitable subordination because the Committee has failed to show that holders of the Secured Notes Claims engaged in inequitable conduct, that any such conduct caused injury to the Debtors' creditors or conferred an unfair advantage to the holders of the Secured Notes Claims, or that equitable subordination is consistent with the provisions of the Bankruptcy Code.  Importantly, the Debtors believe that the Committee has failed in its Standing Motion to allege that the holders of the Secured Notes Claims are all insiders that collectively exercised the requisite control over the Debtors or that SoftBank, alone, exercised the requisite control over the Debtors, such that holders of the Secured Notes Claims could orchestrate a complex financing arrangement simply to "leap frog" unsecured creditors who, it should be noted, benefitted from the proceeds of the very same loans.  Further, the Debtors do not believe that the Committee has alleged or can allege any harm to unsecured creditors or any unwarranted benefit to the holders of the Secured Notes Claims.

Specifically, the Committee has alleged that the fact that SoftBank had the right to appoint *one* designee of the Board amounts to control of both the holders of Secured Notes Claims and the Debtors. There are six other members of the Board, three of whom are not affiliated with any of the holders of Secured Notes Claims, including a completely independent and unaffiliated director. Furthermore, not only does the Standing Motion fail to articulate any specific harm that flowed from this alleged control, the ability to designate board members is a common right that lenders bargain for and is not evidence of inequitable conduct.  Nor does SoftBank exert control over the other holders of Secured Notes Claims.  Each lender viewed its investment into the Secured Notes based on its own interest and potential benefits. *See, e.g.*, Banco Azteca Objection at ¶ 15 ("Banco Azteca made its own lending decisions and did not delegate these decisions to any third party.").

Thus, the Debtors do not believe equitable subordination of the Secured Notes Claims is warranted.  Aside from asserting that SoftBank is an insider, the Committee has failed to establish any other basis for the equitable subordination of the Secured Notes Claims.  As noted above, unsecured creditors only benefitted from the issuance of the Secured Notes. Moreover, none of the holders of Secured Notes Claims received any special advantage or benefit as a result of the loans.  The terms of the Bridge Notes and the Secured Notes were market for loans of their type and included terms intended to make additional financings more "bankable."  The Debtors do not believe that there is a legitimate basis to equitably subordinate the Secured Notes Claims.

---

estates—*i.e.*, unsecured creditors would be *pari passu* with Qualcomm and Banco Azteca—the Committee has provided no support for this novel theory, nor has SoftBank identified any.

### b.    SoftBank's Response

SoftBank also believes that the Committee has not demonstrated that it is likely to succeed on a claim for equitable subordination under section 510(c) of the Bankruptcy Code because the facts and circumstances of this case do not warrant it.  As a threshold matter, SoftBank believes it is telling that the Committee has not identified any misconduct that would justify the subordination of claims of either SoftBank or the other Senior Noteholders.  Instead, the Committee appears to rely upon vague and formulaic allegations of undercapitalization and control.  SoftBank believes that these allegations are insufficient to justify equitable subordination, and courts have held that undercapitalization, on its own, is an insufficient justification for subordination.[12]  Finally, SoftBank is of the opinion that the Committee has cited no evidence of inequitable conduct on the part of SoftBank despite have received tens of thousands of pages of documents in these chapter 11 cases, including communications between SoftBank and the other holders of the Secured Notes and after having spent a significant amount of professional fees in these cases.

### 3.    *The Plan Contemplates Releases for the Prepetition Secured Parties*

### a.    Debtors' Response

**The Plan contemplates releases for the holders of the Prepetition Secured Parties, as discussed in Section V.E. below.**  As detailed below, the Debtors believe that the releases in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Second Circuit.  The Debtors have determined, in their business judgment, that all of the Released Parties have made substantial and valuable contributions to the Debtors' restructuring (as described more fully herein) through efforts including providing (i) consensual use to cash collateral; (ii) DIP financing; (iii) standstill agreements, amendments, and accommodations with respect to various executory contracts and other arrangements; (iv) consent to the incurrence of additional *pari passu* Interim Funding; (v) the equitization of the Secured Notes Claims, and (vi) the Additional SoftBank Consideration to facilitate the Settlement and the funding of the General Unsecured Claims Settlement Distribution.

Accordingly, the holders of Secured Notes Claims are entitled to the benefit of the releases contained in the Plan. The Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

### b.    SoftBank's Response

SoftBank believes that the releases contained in the Plan are entirely consistent with and justified under Second Circuit law, which permits a debtor to release claims in a Plan where doing so is in the best interests of the estate and constitutes a reasonable exercise of the debtor's business judgment.  Since the beginning of these chapter 11 cases, SoftBank (along with certain other of the holders of the Secured Notes Claims) has provided significant consideration to the estates, including funding the Debtors' sales and marketing process with tens of millions of dollars in new-money investments; agreeing to subordinate a portion of its recovery under the

---

[12]    *Matter of Lifschultz Fast Freight*, 132 F.3d 339, 345 (7th Cir. 1997).

DIP Facility to facilitate additional funding by the Plan Sponsor; agreeing to contribute a portion of its recoveries on account of its claims to provide a distribution to unsecured creditors; supporting the Debtors' efforts to prosecute and confirm a plan of reorganization, as opposed to the liquidation of its collateral; committing to further support the Plan process by signing a joinder to the Plan Support Agreement; and consenting to receive equity in the reorganized Debtors rather than a cash payment, which it is entitled to as a secured lender under the Bankruptcy Code. This is particularly relevant where, as here, the proposed release was a substantial inducement and ongoing condition for SoftBank to execute the Plan Support Agreement and support the Plan, respectively.

Taken alone, SoftBank is of the opinion that any one of the foregoing would be sufficient to justify the proposed release of claims in favor of SoftBank. But when viewed together, it is clear that SoftBank's contributions to these cases have been substantial and they easily support a finding that the releases are in the best interests of the Debtors' estate and a reasonable exercise of the Debtors' business judgment.

The Committee disagrees with the Debtors' and SoftBank's characterization of the legal and factual issues described in this Section IV.J and, in this regard, the Committee refers creditors to the Committee Letter.

## V.    SUMMARY OF THE PLAN

**THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN SUBSTANTIVE PROVISIONS OF THE PLAN, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN. THE DEBTORS URGE ALL HOLDERS OF CLAIMS AND INTERESTS TO READ AND STUDY CAREFULLY THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS <u>ANNEX A</u>. IN THE EVENT OF ANY CONFLICT BETWEEN THE DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.**

### A.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

#### 1.    *Unclassified Claims*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims and DIP Claims are not classified in the Plan. Such Claims will be satisfied as set forth in the Plan and as summarized herein.

##### a.    **Administrative Expense Claims**

Except to the extent otherwise expressly provided in the Plan, other than Fee Claims, U.S. Trustee Fee Claims, DIP Claims and Administrative Expense Claims that have already been paid by the Debtors during the chapter 11 cases, and except to the extent that a holder of an Allowed Administrative Expense Claim and the applicable Debtor, with the consent of the Plan Sponsor (such consent to not be unreasonably withheld), Reorganized Debtor or Liquidating

Debtor, as applicable, agree to less favorable treatment, each holder of an Allowed Administrative Expense Claim shall be paid 100% of the unpaid Allowed amount of such Claim in Cash by the Reorganized Debtors from the proceeds of the DIP Facility, Cash on hand and/or Cash funded by BidCo on the date that is the later of: (a) the Effective Date; (b) the date such Claim would ordinarily be due and payable in accordance with ordinary business terms; or (c) the date that is fifteen (15) days (or, if such date is not a Business Day, on the next Business Day) after such Claim becomes an Allowed Administrative Expense Claim.

### b.    U.S. Trustee Fees

All fees payable pursuant to 28 U.S.C. § 1930 on or before the Effective Date, shall be paid in full by the Debtors.  Fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date shall be paid by the Liquidating Debtors until the closing of the applicable case pursuant to section 350(a) of the Bankruptcy Code.

### c.    Fee Claims

Professionals asserting Fee Claims for services rendered before the Effective Date must file and serve on the Notice Parties and such other Entities as are designated by the order establishing procedures for compensation and reimbursement of expenses of Professionals entered by the Bankruptcy Court an application for final allowance of such Fee Claims no later than 60 days after the Effective Date; provided, however, that any Professional whose compensation or reimbursement of expenses is authorized pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses pursuant to the Ordinary Course Professionals Order.  Objections to any Fee Claim must be filed and served on the Notice Parties and the requesting party not later than 90 days after the Effective Date or such other period of limitation as may be established by a Bankruptcy Court's Order.

Allowed Fee Claims shall be satisfied from the Professional Fee Escrow.  If the amount in the Professional Fee Escrow is insufficient to pay in full of all Allowed Fee Claims, the deficiency shall be promptly funded by the Reorganized Debtors, without any further action or order of the Bankruptcy Court.

### d.    Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim, each holder of an Allowed Priority Tax Claim, to the extent not previously paid, shall receive, in full and final satisfaction of its Allowed Priority Tax Claim (a) that is due and payable on or before the Effective Date, Cash in an amount equal to the Allowed amount of such Claim, at the option of the Liquidating Debtors and/or the Plan Administrator, (i) on the Effective Date or (ii) in installments over a period of time not to exceed five years after the Petition Date; and (b) that is not due and payable on or before the Effective Date, as it becomes due in the ordinary course; provided, however, that if an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall be treated as an Other Secured Claim.

e.    **DIP Claims**

On the Effective Date, except with respect to Interim Funding DIP Claims, each holder of an Allowed DIP Claim shall receive payment in full in cash. As part of the Settlement set forth in the Plan and described herein, SoftBank shall contribute to BidCo its entitlement to the Cash Distribution on account of SoftBank's Allowed DIP Claims (approximately $91 million before the consideration of accrued interest) in exchange for the issuance of the SoftBank Rollover BidCo Equity.

With respect to the Interim Funding DIP Claims, each holder of an allowed Interim Funding DIP Claim under the DIP Facility shall have such Claims converted into BidCo Equity Interests at the same valuation as the BidCo Equity Consideration.

2.    *Classified Claims*

The following table (i) designates the Classes of Claims and Interests for the purposes of voting on the Plan and receiving Distributions thereunder and (ii) specifies which Classes are (a) Impaired and Unimpaired by the Plan and (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (iii) specifies projected recoveries (if any) of all classified Claims and Interests under the Plan. **Projected recoveries are estimates and actual recoveries may differ based on, among other things, realizable value of the Debtors' remaining assets and the amount of Claims that are actually Allowed.**

| Class | Designation | Voting Status | Treatment | Projected Amount of Claims ($USMM) | Projected Recoveries |
|---|---|---|---|---|---|
| 1 | Secured Notes Claims | Impaired<br><br>Entitled to Vote | On the Effective Date or as soon as practicable thereafter, except to the extent that a holder of an Allowed Secured Notes Claim, and the Debtors, with the consent of the Plan Sponsor, agree to a less favorable treatment, each such holder, in full and final satisfaction, settlement, release and discharge of each Allowed | $1,643.8[13] | 5.9% |

---

[13]    This calculation excludes amounts "rolled up" from the $1,733,809,254.40 of Secured Notes outstanding as of the Petition Date.

| Class | Designation | Voting Status | Treatment | Projected Amount of Claims ($USMM) | Projected Recoveries |
|---|---|---|---|---|---|
| | | | Secured Notes Claim, shall receive its *pro rata* share of the BidCo Equity Consideration for Allowed Secured Notes Claims, and that portion of the Allowed Secured Notes Claims not satisfied with the *pro rata* portion of the BidCo Equity Consideration will be considered as uncollectible accounts, and the obligations of the Debtors thereunder or in any way related thereto will be deemed extinguished and cancelled in full. | | |
| 2 | Other Secured Claims | Unimpaired  Deemed to Accept | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, at the option of the Debtors, with the consent of the Plan Sponsor, or the Reorganized Debtors, as applicable, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other Secured Claim, as applicable: (i) such holder shall receive Cash in an amount equal to the allowed amount of | $0.05 - $0.10 | 100.0% |

| Class | Designation | Voting Status | Treatment | Projected Amount of Claims ($USMM) | Projected Recoveries |
|---|---|---|---|---|---|
| | | | such Claim on the later of the Effective Date and the date that is ten (10) business days after the date such Other Secured Claim becomes an Allowed Claim; (ii) such holder's Allowed Other Secured Claim shall be Reinstated; (iii) such holder shall receive the collateral securing such Claim and payment of interest required under section 506(b) of the Bankruptcy Code; or (iv) such holder shall receive such other treatment as will render its Allowed Other Secured Claim Unimpaired. | | |
| 3 | Priority Non-Tax Claims | Unimpaired<br><br>Deemed to Accept | Except to the extent that a holder of an allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, at the option of the Debtors, with the consent of the Plan Sponsor: (i) such holder shall receive Cash in an amount equal to the allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date that is ten (10) business | $0.00 | 100.0% |

| Class | Designation | Voting Status | Treatment | Projected Amount of Claims ($USMM) | Projected Recoveries |
|---|---|---|---|---|---|
| | | | days after the date such Priority Non-Tax Claim becomes an Allowed Claim; or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | | |
| 4 | General Unsecured Claims | Impaired<br><br>Entitled to Vote | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on or as soon as is reasonably practicable after the Effective Date, each holder thereof, in exchange for full and final satisfaction shall receive its *pro rata* share of the General Unsecured Claims Settlement Distribution. Each holder of an Allowed General Unsecured Claim that votes to accept the Plan shall also receive an Avoidance Action Release. | $66.00 - $79.00[14] | 7.6% - 9.1% |
| 5 | Ongoing | Impaired | Except to the extent | $0.72 - $0.82[15] | 50.3% - |

---

[14]   The projected amount of claims for Class 4 is based on the Debtors' and FTI's review of the scheduled liabilities, filed proofs of claim, and the Debtors' preliminary list of Executory Contracts and Unexpired Leases to be rejected as agreed to by the Plan Sponsor.

[15]   The projected amount of claims for Class 5 is based on the list of holders of Ongoing Trade Claims as agreed to by the Debtors and the Plan Sponsor and based on the Debtors' and FTI's review of the scheduled liabilities and

| Class | Designation | Voting Status | Treatment | Projected Amount of Claims ($USMM) | Projected Recoveries |
|---|---|---|---|---|---|
| | Trade Claims | Entitled to Vote | that a holder of an Allowed Ongoing Trade Claim agrees to less favorable treatment, on or as soon as is reasonably practicable after the Effective Date, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Ongoing Trade Claim, each holder of a Claim in Class 5 shall receive the following treatment:<br><br>**If Class 5 votes to accept the Plan**, each holder of an Allowed Ongoing Trade Claim shall receive its *pro rata* share of both the General Unsecured Claims Settlement Distribution and the Ongoing Trade Claims Recovery Pool. For the avoidance of doubt, a vote in favor of the Plan shall constitute an agreement by each holder of an Allowed Ongoing Trade Claim to continue to provide goods and services to the Reorganized Debtors on terms and | | 57.8% |

filed proofs of claims related thereto.

| Class | Designation | Voting Status | Treatment | Projected Amount of Claims ($USMM) | Projected Recoveries |
|-------|-------------|---------------|-----------|-------------------------------------|----------------------|
| | | | conditions no less favorable than currently provided.<br><br>**If Class 5 votes to reject the Plan**, each holder of an Allowed Claim in Class 5 shall receive its *pro rata* share of the General Unsecured Claims Settlement Distribution.<br><br>Each holder of an Allowed Ongoing Trade Claim that votes to accept the Plan shall also receive an Avoidance Action Release. | | |
| 6 | Intercompany Claims | Impaired OR Unimpaired<br><br>Deemed to Reject OR Accept | On the Effective Date, all Intercompany Claims will be adjusted, continued, settled, Reinstated, discharged, or eliminated, as determined by the Debtors with the consent of the Plan Sponsor. For the avoidance of doubt, the treatment provided for in this paragraph shall extend to all Intercompany Claims as between the Debtors (including any Liquidating Debtor) or between any of the | N/A | 0% to 100% |

| Class | Designation | Voting Status | Treatment | Projected Amount of Claims ($USMM) | Projected Recoveries |
|---|---|---|---|---|---|
| | | | Debtors and any of their non-Debtor affiliates. | | |
| 7 | Intercompany Interests | Impaired OR Unimpaired<br><br>Deemed to Reject OR Accept | On the Effective Date, all Intercompany Interests will be adjusted, continued, settled, Reinstated, discharged, or eliminated, as determined by the Debtors, with the consent of the Plan Sponsor, or the Plan Administrator, as applicable. | N/A | 0% to 100% |
| 8 | Section 510(b) Claims | Impaired<br><br>Deemed to Reject | On the Effective Date, all section 510(b) Claims shall be discharged without any Distribution. | $0.00 | 0.0% |
| 9 | OneWeb Interests | Impaired<br><br>Deemed to Reject | On the Effective Date, all OneWeb Interests shall be deemed cancelled and extinguished and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no Distribution under the Plan to the holders of OneWeb Interests on account of such Interests. | N/A | 0.0% |

## B.    MEANS OF IMPLEMENTATION

### 1.    *Deemed Consolidation*

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor.  Solely for purposes of voting on, and receiving Distributions under, the Plan, the Estates are deemed to be substantively consolidated, *i.e.*, (a) all assets and liabilities of the Debtors are deemed to be assets and liabilities, respectively, of a single Estate; (b) all guarantees by one Debtor of the obligations of any other Debtor are deemed eliminated, (iii) any joint or several liability of any of the Debtors are deemed to be one obligation of the Debtors; and (d) Proofs of Claim filed against multiple Debtors are deemed to be one Claim against a single Estate.  This deemed consolidation will not affect (x) the legal and corporate structures of the Debtors; (y) the rights of the holders of Allowed Claims to receive Distributions from any insurance policies or proceeds of such policies; (z) any Liens granted or arising at any time prior to the Effective Date or the priority of those Liens; or (iv) the rights of the Debtors to contest alleged setoff or recoupment rights on the grounds of lack of mutuality under section 553 of the Bankruptcy Code and other applicable law.

This deemed consolidation is appropriate and justified under the circumstances of these chapter 11 cases because it (i) causes no harm to the Debtors' creditors because (a) the DIP Claims may be asserted against each Debtor, (b) the holders of Secured Notes Claims have Secured Claims against the majority of the Debtors, and (c) the DIP Claims and Secured Notes Claims exceed the value of the assets of each Debtor, and (ii) avoids the costs of allocating consideration and litigation-related costs among the Debtors' Estates, thereby avoiding diluting creditor recoveries as a result of increased professional fees, particularly given there has been no allocation of the consideration to be provided by BidCo amongst the various Debtors and their assets.  Indeed, the Liquidation Analysis demonstrates that, in a liquidation, even the DIP Claims would be massively undersecured, and no junior creditor would be entitled to any recovery.  Therefore, all Distributions on account of Claims other than the DIP Claims are carved out from the collateral of the DIP Lenders, and in the absence of such carve-out and the deemed consolidation of the Debtors' Estates, such Claims would receive no recovery.

### 2.    *Comprehensive Settlement*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration of the Distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases set forth in Section XI.E of the Plan, shall constitute a good-faith compromise and settlement of all Claims, Interests, disputes and controversies relating to the rights of holders of Claims and Interests, including with respect to the claims asserted in the Standing Motion in exchange for, among other things, the Additional SoftBank Consideration and the reduction of BidCo Equity Consideration to be distributed to the holders of Senior Secured Claims which is facilitating the cash funding of the General Unsecured Claims Settlement Distribution (the "Settlement").

The Debtors believe that the Settlement will comply with the requirements that courts in the Second Circuit demand in determining whether a settlement is within the range of

reasonableness.[16]    First, the Debtors are of the opinion that the possibility of success of the Committee's Challenge is extremely low for the reasons set forth in Section IV.J.

Second, the Debtors believe that the likelihood of complex and protracted litigation and the expense and delay associated with litigation will weigh in favor of the Settlement.  The Debtors believe that, even if the Committee were successful in pursuing its claims against the Prepetition Secured Parties, any benefit to the Estates would almost certainly be drastically offset by the expense of pursuing protracted litigation.

Third, the paramount interest of creditors is to achieve confirmation of the Plan which offers the Debtors a chance to survive as a going concern, preserving employees' jobs and maintaining prepetition vendor relationships (not to mention hundreds of millions of dollars of cure payments made and hundreds of contracts assumed).

Fourth, the Debtors, the Plan Sponsor, and SoftBank support the Settlement as an efficient means to achieve the Debtors' successful reorganization.

Fifth, the Debtors believe that the releases to be obtained by the Officers and Directors are similar to those in other large, complex, chapter 11 cases and as detailed herein and will be demonstrated at the Confirmation Hearing are justified and appropriate under the facts of these cases.

The Debtors believe the sixth *Iridium* factor is neutral.

The Debtors believe the last *Iridium* factor will weigh heavily in favor of the Settlement because the Settlement was the result of arm's length bargaining among the Debtors, the Plan Sponsor, and SoftBank.  None of the Prepetition Secured Parties or DIP Secured Parties independently controls the Debtors or the Debtors' management.

Thus, the Debtors believe, in their business judgment, that the Settlement is reasonable and in the best interests of the Debtors' Estates and will maximize and preserve the going-concern value of the Debtors for all parties in interest.  Based on the foregoing, the Debtors believe that they will be able to demonstrate at the Confirmation Hearing that the Settlement is far above the lowest possible point of reasonableness.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of such compromise and settlement and the Bankruptcy Court's

---

[16]    *In re NII Holdings*, 536 B.R. 61, 100 (Bankr. S.D.N.Y. 2015) ("When courts in this Circuit consider whether a settlement is within the range of reasonableness, they apply the following factors:
(1) the balance between the litigation's possibility of success and the settlement's future benefits;
(2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay;
(3) the paramount interests of creditors;
(4) whether other parties in interest support the settlement;
(5) the nature and breadth of releases to be obtained by officers and directors;
(6) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; and
(7) the extent to which the settlement is the product of arm's-length bargaining.")
(citing, *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007)).

determination that such compromise and settlement is in the best interests of the Debtors, their Estates, their creditors, and all other parties in interest, and is fair, equitable and within the range of reasonableness.  If Confirmation of the Plan and/or the Effective Date do not occur, the settlements set forth in the Plan shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

Subject to Section VII, all Distributions Made to Holders of Allowed Claims and Interests in any Class are Intended to be and shall be Final.

### 3.    *Sources of Consideration for Plan Distributions*

Prior to the Effective Date, the Plan Sponsor will be capitalized with cash and commitments sufficient to satisfy the Additional Cash Plan Funding. The Reorganized Debtors shall fund Distributions under the Plan from the proceeds of the (i) DIP Facility including the Interim Funding, (ii) Cash Consideration, (iii) Additional Cash Plan Funding and Cash funded by BidCo to fund (iv) the Ongoing Trade Claims Recovery Pool and (v) as the result of the Settlement to fund the General Unsecured Claims Settlement Distribution, and (vi) BidCo Equity Consideration.

### a.    **Cash Consideration**

On the Effective Date, the Plan Sponsor shall pay the Cash Consideration (less the amount of the Deposit) to the Debtors by wire transfer of immediately available funds to an account or accounts designated in writing by the Debtors before the Effective Date. The Cash Consideration shall be used to pay Allowed DIP Claims (other than the Interim Funding DIP Claims, as set forth above), but subject to the Settlement, as well as other claims to be satisfied in cash hereunder.

### b.    **Additional Cash Plan Funding**

On and following the Effective Date, the Plan Sponsor will provide the Reorganized Debtors with the Additional Cash Plan Funding to fund, as and when due: (i) all Allowed Cure Claims; (ii) all Allowed Administrative Expense Claims, including the Wind-Down Reserve (but excluding Allowed Cure Claims), all Allowed Priority Tax Claims, all Allowed Other Secured Claims required to receive cash payment, and all Allowed Priority Non-Tax Claims required to receive Cash payment, up to an aggregate maximum of $25.9 million (it being agreed that such aggregate maximum excludes any amounts used to satisfy Allowed Administrative Expense Claims that are paid with the Cash Consideration or the Interim Funding) or such greater amount as the Plan Sponsor agrees in its sole discretion; and (iii) the Reorganized Debtors' business going forward.

### c.    **Ongoing Trade Claims Recovery Pool**

On the Effective Date, provided that Class 5 votes to accept the Plan, Cash in the amount of $350,000 shall be funded by BidCo by wire transfer in immediately available funds to an account or accounts designated in writing by the Debtors before the Effective Date to fund the Ongoing Trade Claims Recovery Pool.  For the avoidance of doubt, the Ongoing Trade Claims

Recovery Pool shall be funded from the Additional SoftBank Consideration and shall not be included in the calculation of, or subject to the Effective Date Cash Funding Cap.

### d.    General Unsecured Claims Settlement Distribution

On the Effective Date, cash in the amount of $6.1 million shall be funded by BidCo by wire transfer in immediately available funds to an account or accounts designated in writing by the Debtors before the Effective Date to fund the General Unsecured Claims Settlement Distribution. For the avoidance of doubt, the General Unsecured Claims Settlement Distribution shall be funded from the Additional SoftBank Consideration and shall not be included in the calculation of, or subject to, the Effective Date Cash Funding Cap.

### 4.    *Issuance of the New Equity Interests, BidCo Equity Interests, and SoftBank Rollover BidCo Equity*

On the Effective Date, the Plan Sponsor shall be issued one hundred percent (100%) of the New Equity Interests in Reorganized Company Party in exchange for the consideration set forth herein, SoftBank shall receive the SoftBank Rollover BidCo Equity, each holder of an Allowed Secured Notes Claim shall receive its *pro rata* share of the BidCo Equity Consideration, and that portion of the Allowed Secured Notes Claims not satisfied with the *pro rata* portion of the BidCo Equity Consideration will be considered as uncollectible accounts, and the obligations of the Debtors thereunder or in any way related thereto will be deemed extinguished and cancelled in full.

### a.    New Equity Interests

The offering, issuance, and distribution of the New Equity Interests shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities pursuant to section 4(a)(2) of the Securities Act; provided that, to the extent that such exemption is unavailable, such securities shall be issued pursuant to any other available exemptions from registration.  With respect to the New Equity Interests issued pursuant to section 4(a)(2) of the Securities Act and Regulation D thereunder, such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.  The ability to transfer New Equity Interests will be subject to any restrictions in any applicable securities laws as well as any restrictions in the Reorganized Debtors' Amended Organizational Documents or BidCo's organizational documents, as applicable.  On the Effective Date, the New Equity Interests shall not be registered under the Securities Act, and shall not be listed for public trading on any securities exchange.

### b.    BidCo Equity Interests

Except as otherwise set forth herein, the offering, issuance, and distribution of the BidCo Equity Interests (including the SoftBank Rollover BidCo Equity) shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities in accordance with section 1145 of the Bankruptcy Code, provided that, to the extent

that such exemption is unavailable, such securities shall be issued pursuant to any other available exemptions from registration. In addition, under section 1145 of the Bankruptcy Code, such BidCo Equity Consideration and the SoftBank Rollover BidCo Equity will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of (i) section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, and (iii) any restrictions in the Reorganized Debtors' Amended Organizational Documents or BidCo's organizational documents, as applicable. On the Effective Date, the BidCo Equity Consideration and the SoftBank Rollover BidCo Equity shall not be registered under the Securities Act, and shall not be listed for public trading on any securities exchange.

### c. Authorization, Issuance and Delivery of the New Equity Interests

On the Effective Date, the Reorganized Company Party shall be authorized to issue or cause to be issued and deliver to the Plan Sponsor the New Equity Interests in accordance with the terms of the Amended Organizational Documents without the need for any further corporate or shareholder action subject to Section IV.V of the Plan. The New Equity Interests, when so issued and delivered, shall be duly authorized, validly issued, fully paid and non-assessable.

### d. Authorization, Issuance and Delivery of the BidCo Equity Consideration to Class 1

On the Effective Date, BidCo shall issue or cause to be issued and distributed to holders of Allowed Secured Notes Claims pursuant to Section II.C.1 of the Plan the BidCo Equity Consideration without the need for any further corporate or shareholder action provided that BidCo shall take such actions as may be required under English Law to effectuate the foregoing. The BidCo Equity Consideration when so issued and distributed, shall be duly authorized, validly issued, fully paid and non-assessable. Effective as of the Effective Date, such holders will be subject to transfer restrictions and, in addition to statutory protections for minority shareholders, will receive preemptive rights to purchase ordinary shares of BidCo on a *pro rata* basis in respect of their existing ownership percentage in BidCo in the event of a new issuance of ordinary shares by BidCo, subject to customary exceptions.

### 5. *Restructuring Steps Under UK Corporate Law*

The Transaction contemplated in the Plan shall be effectuated through certain steps and provisions set forth on **Exhibit 1** thereto, or such other steps and provisions as may be agreed to by the Debtors and the Plan Sponsor.

The Debtors and the Plan Sponsor agree that OWC will be the Reorganized Company Party and will implement the transactions contemplated by the Plan. The Debtors and the Plan Sponsor do not believe that it is legally necessary to implement an English Law Scheme of Arrangement (or any alternative process) to effect the acquisition of the New Equity Interests in compliance with English Law.

### 6.    *The Liquidating Debtors*

In order to transfer the Excluded Assets to the Liquidating Debtors, the Debtors may implement one or more restructuring steps to effectuate such transfers, which such steps shall be set for on a schedule to be filed with the Plan Supplement.  The Liquidating Debtors shall continue to exist after the Effective Date for the purposes of making Distributions to the holders of Allowed Claims under the Plan other than those Claims to be satisfied by the Reorganized Debtors and to take any other steps in furtherance thereof or as may be reasonably necessary or appropriate to wind-down the affairs of their Estates.  The principal purposes of the Liquidating Debtors shall be to liquidate, collect and maximize the Cash value of the Excluded Assets, which shall be transferred to the Liquidating Debtors on, or immediately prior to, the Effective Date and make Distributions in respect of Allowed Claims in accordance with the terms of the Plan. The Plan Administrator shall be authorized to merge, consolidate, or dissolve any of the Liquidating Debtors, as the Plan Administrator deems appropriate.

### 7.    *Plan Administrator*

On the Effective Date, the Plan Administrator shall be appointed for the purpose of (and shall have the authority to) (i) conducting the wind down of the Estates of the Liquidating Debtors as expeditiously as reasonably possible; (ii) administering the liquidation or dissolution of the Liquidating Debtors and their Estates; (iii) selling, abandoning (or effecting a similar disposition) of the Excluded Assets; (iv) making Distributions to the holders of Allowed Claims in accordance with the Plan; (v) except to the extent Claims have been previously Allowed, conducting the Claims reconciliation process, including objecting to, seeking to subordinate, compromise or settle any and all Disputed Claims; (vi) retaining professionals to assist in performing its duties under the Plan; (vii) maintaining the books, records, and accounts of the Liquidating Debtors; (viii) completing and filing, as necessary, all final or otherwise required federal, state, local and foreign tax returns for the Liquidating Debtors; (ix) creating and funding reserves provided for in the Plan; (x) investing Cash of the Liquidating Debtors, including any Cash proceeds realized from the liquidation of the Excluded Assets, if any; (xi) obtaining commercially reasonable liability, errors and omissions, directors and officers, or other insurance coverage as the Plan Administrator deems necessary and appropriate; (xii) performing other duties and functions that are consistent with the implementation of the Plan; (xiii) filing the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly reports, and (xiv) cooperating with the Plan Sponsor in any way necessary to fully effectuate the purposes and the benefit of the bargain of the Transaction; provided, that the Liquidating Debtors and the Plan Administrator shall not take any actions that could reasonably be expected to prejudice or would otherwise be adverse to the Reorganized Debtors.

The Plan Administrator shall act for the Liquidating Debtors in the same capacity and shall have the same rights and powers as are applicable to a manager, managing member, board of managers, board of directors or equivalent governing body, as applicable, and to officers, subject to the provisions hereof (and all certificates of formation and limited liability company agreements and certificates of incorporation or by-laws, or equivalent governing documents and all other related documents (including membership agreements, stockholders agreements or other similar instruments), as applicable, are deemed amended pursuant to the Plan to permit and authorize the same).

From and after the Effective Date, the Plan Administrator shall be the sole representative of and shall act for the Liquidating Debtors with the authority set forth in Section IV of the Plan and in the Plan Supplement.

Each of the Liquidating Debtors shall indemnify and hold harmless the Plan Administrator solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's fraud, gross negligence, willful misconduct, or criminal conduct.

### 8.      *The Wind Down*

On and after the Effective Date, the Plan Sponsor shall fund the Wind-Down Reserve and the Liquidating Debtors and the Plan Administrator shall be authorized to implement the Plan and shall have the power and authority to take any reasonable action necessary to implement the wind down of the Estates.

The activities and operations of the Liquidating Debtors and the Plan Administrator shall be funded from the Wind-Down Reserve.  Upon the closing of the chapter 11 cases and the dissolution of the Liquidating Debtors, or such earlier time as it appears, in the reasonable view of the Plan Administrator, that the Wind-Down Reserve is overfunded, the Plan Administrator shall make any excess funds available for Distribution and funding of the other reserves and Distributions in accordance with the terms of the Plan.

Except to the extent necessary to (i) complete the wind down and (ii) effectuate the Transaction, from and after the Effective Date, the Liquidating Debtors (a) for all purposes, shall be deemed to have withdrawn the Debtors' business operations from any state or province or foreign jurisdiction in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action to effectuate such withdrawal and (b) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date; provided, that the above shall not preclude the Plan Administrator from taking any action necessary to dissolve or wind down any Liquidating Debtor pursuant to any dissolution, winding down or similar proceeding.

### 9.      *Continued Corporate Existence*

Except as otherwise provided in the Plan, the Reorganized Debtors and the Liquidating Debtors shall continue to exist after the Effective Date.  At any time after the Effective Date, each Liquidating Debtor or Reorganized Debtor, in its sole and exclusive discretion, may take such action as permitted by applicable law as such Liquidating Debtor or Reorganized Debtor may determine is reasonable and appropriate, including, but not limited to, (i) merging into another Liquidating Debtor or Reorganized Debtor, or a Subsidiary and/or Affiliate of the foregoing, (ii) causing a Liquidating Debtor or Reorganized Debtor to be liquidated and/or dissolved, (iii) changing the legal name of a Liquidating Debtor or Reorganized Debtor, (iv) converting a Liquidating Debtor or Reorganized Debtor to another form of Entity, including from a corporation to a limited liability company, or (v) closing a Liquidating Debtor's or Reorganized Debtor's chapter 11 case.

10.      *Disbursing Agent*

The Debtors, the Reorganized Debtors and the Liquidating Debtors, as applicable, shall designate one or more Entities (which may be the Reorganized Debtors in the case of the Reorganized Debtors and the Plan Administrator in the case of the Liquidating Debtors) to effectuate the Distributions.  If the Disbursing Agent is a third party, the reasonable fees and expenses of the Disbursing Agent shall be paid by the Liquidating Debtors upon submission of statements.  The payment of the reasonable fees and expenses of the Disbursing Agent shall be made in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court.  The Disbursing Agent shall be deemed exculpated and indemnified by the Estates, except for fraud, *ultra vires* actions, willful misconduct, criminal conduct or gross negligence.

11.      *New Board of Directors/Officers*

The member(s) of the boards of directors and the officers of the Reorganized Debtors and the Liquidating Debtors will be identified in the Plan Supplement.  The Reorganized Debtors and the Liquidating Debtors shall purchase an insurance policy (including any "tail policy") for the Reorganized Debtors' and Liquidating Debtors', as applicable, directors and officers that is acceptable to the Reorganized Debtors and Liquidating Debtors, as applicable.  For the avoidance of doubt, the Debtors may extend any or obtain new insurance policies during the chapter 11 cases without the consent of the Plan Sponsor for any period prior to consummation of the Transaction subject to Section IV.T of the Plan.

On the Effective Date, all persons acting as directors, and/or managers of the Debtors that have not been selected as directors and/or managers of the Reorganized Debtors or the Liquidating Debtors shall be deemed to have resigned, their appointments shall be rescinded for all purposes, and their respective authority and power, in their capacities as such, shall be revoked, in each case, without the necessity of taking any further action in connection therewith subject to Section IV.T of the Plan**.**

12.      *Survival of Indemnification Obligations and D&O Liability Insurance*

a.      **Indemnification Obligations**.

Each of the Debtors' Indemnification Obligations shall be reinstated, assumed by the Reorganized Debtors and remain intact and irrevocable, as applicable, and shall not be discharged, impaired, or otherwise affected by the Plan.

b.      **D&O Liability Insurance Policies**.

The D&O Liability Insurance Policies shall be deemed executory contracts and shall be assumed by the Reorganized Debtors, on behalf of the Debtors effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code.  For the avoidance of doubt, coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in the D&O Liability Insurance Policies.  In addition, after the Effective Date, all officers, directors, agents or employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the

full benefits of the D&O Liability Insurance Policies (including any "tail" policy) in effect or purchased as of the Effective Date for the full term of such policy regardless of whether such officers, directors, agents and/or employees remain in such positions after the Effective Date, in each case, to the extent such individuals are covered under the D&O Liability Insurance Policies.

### 13.   *Employee Matters*

On the Effective Date, all Current Employees shall be retained by the Reorganized Debtors in their existing positions. Each Benefit Plan and all other wage, compensation, employee expense reimbursement, and other benefit obligations solely relating to the Current Employees, including without limitation the KEIP and the KERP, shall be assumed by the Reorganized Debtors as of the Effective Date.

For the avoidance of doubt, (i) neither the KEIP nor the KERP shall be included on the Rejection Schedule and such programs will be honored in accordance with their terms, (ii) the consummation of the Plan will constitute a "Sale" under the KEIP and (iii) any Benefit Plan included on the Rejection Schedule shall be replaced by a comparable Benefit Plan that is no less favorable to Current Employees for the benefit of the Current Employees.

The 2018 Equity Incentive Plan of OneWeb Global Limited, the Consultant Equity Incentive Plan of OneWeb Global Limited and any predecessor plans thereof (the "Liquidated Incentive Plans") shall remain with the Liquidating Debtors and wound down by the Plan Administrator. Notwithstanding the foregoing, none of the Plan Sponsor, the Debtors, the Reorganized Debtors or their subsidiaries shall have any payment or other obligation under the Liquidated Incentive Plans or any Awards (as defined therein) issued thereunder upon or following the Effective Date, regardless of whether such Awards or obligations were issued or incurred before or after the Petition Date.

Without limiting or altering any employee's rights under the KEIP or the KERP, execution of the Plan Support Agreement and consummation of the Plan will not constitute a change of control under any other Benefit Plan.

### 14.   *Retained Causes of Action*

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain the Retained Causes of Action that the Debtors or the Estates may hold against any Entity to the extent included on the Retained Causes of Action Schedule and not released under Section XI.E of the Plan or otherwise, including the Avoidance Actions (and all Privilege Rights with respect to any of the foregoing) and may, in their sole discretion, pursue or settle any such Retained Causes of Action, as appropriate, in accordance with the best interests of the Estates. The Retained Causes of Action Schedule shall be included as part of the Plan Supplement. The inclusion or failure to include any Retained Cause of Action in the Plan Supplement shall not be deemed an admission, denial or waiver of any claims, rights or causes of action that any Reorganized Debtor may hold against any Entity. For the avoidance of doubt, the Retained Causes of Action shall not include any claims or Causes of Action against any Released Party or any Avoidance Action released against a holder

of a General Unsecured Claim or Ongoing Trade Claim in accordance with Sections II.C.4.b. and II.C.5.b. of the Plan.

On the Effective Date, the applicable Reorganized Debtors shall be deemed to be substituted as a party to any Retained Causes of Action litigation in which any Debtor is a party, including (but not limited to): (a) pending contested matters or adversary proceedings in the Bankruptcy Court; (b) any appeals of orders of the Bankruptcy Court; and (c) any state court or federal or state administrative proceedings pending as of the Petition Date.  The Reorganized Debtors are not required to, but may, take such steps as are appropriate to provide notice of such substitution.

15.     ***Release of Avoidance Actions for Holders of Claims in Class 4 and Class 5***

On the Effective Date, in connection with the Distributions to the holders of Allowed General Unsecured Claims in accordance with Section II.C of the Plan, the Debtors and the Reorganized Debtors shall grant each holder of an Allowed General Unsecured Claim that individually votes to accept the Plan an Avoidance Action Release.  Also, on the Effective Date, in connection with the Distributions to holders of Allowed Ongoing Trade Claims in accordance with Section II.C of the Plan, the Debtors and the Reorganized Debtors shall grant each holder of an Allowed Ongoing Trade Claim that individually votes to accept the Plan an Avoidance Action Release.

16.     ***Cancellation and Surrender of Notes, Instruments, Securities and Other Documentation***

Except as provided in the Plan Support Agreement, or as otherwise agreed to by the Plan Sponsor, on the Effective Date, all notes, instruments, certificates and other documents evidencing Claims or Interests, that are not otherwise being satisfied by the *pro rata* portion of the BidCo Equity Consideration (collectively, the "Cancelled Agreements") shall be deemed cancelled and will be considered uncollectible accounts and surrendered and of no further force and effect against the Debtors, the Reorganized Debtors or the Liquidating Debtors without any further action on the part of the Debtors, the Reorganized Debtors or the Liquidating Debtors; provided, however, that each of the Cancelled Agreements shall continue in effect solely for the purposes of, (x) allowing holders of Claims or Interests to receive distributions under the Plan on account of such Claims or Interests and (y) allowing and preserving the rights of the DIP Agent and Secured Notes Agent, as applicable, to (1) make distributions on account of such Claims or Interests; (2) maintain, enforce, and exercise their respective Liens, including their charging liens, as applicable, under the terms of the applicable agreements, or any related or ancillary document, instrument, agreement, or principle of law, against any money or property distributed or allocable on account of such Claims under the Plan, as applicable; (3) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in connection with the implementation of the Plan; (4) maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement that the DIP Agent or Secured Notes Agent may have under the applicable credit agreement, note purchase agreement, collateral agreements, or pledge agreements, in each case solely as against the holders of the Secured Notes Claims; (5) appear and raise issues in these

-55-

chapter 11 cases or in any proceeding in the Bankruptcy Court or any other court after the Effective Date on matters relating to the Plan or the applicable credit agreements or note purchase agreement; and (6) execute documents pursuant to Section IV.V of the Plan; provided, further, that the DIP Agent and Secured Notes Agent may take such further action to implement the terms of the Plan as agreed to with the Debtors or the Reorganized Debtors, as applicable, to the extent not inconsistent with the Confirmation Order or the Plan. Nothing herein shall affect the discharge pursuant to section 1141 of the Bankruptcy Code.

### 17.    *Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan or the Transaction, on the Effective Date, subject to receipt of the applicable Distributions, if applicable, all Liens on the property of any Estate, including the New Equity Interests, shall be fully released and discharged.

The DIP Agent and the Secured Notes Agent shall execute and deliver all documents reasonably requested by the Debtors or the Reorganized Debtors to evidence the release of such Liens and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto, at the sole expense of the Debtors or the Reorganized Debtors, as applicable.

### 18.    *Effectuating Documents; Further Transactions*

Following entry of the Confirmation Order, but subject to the occurrence of the Effective Date, and subject to any consents of the Plan Sponsor required by the Plan Support Agreement, in each instance, the Reorganized Debtors and the Liquidating Debtors, as applicable, shall take all actions as may be necessary or appropriate to effectuate, implement and evidence the terms and conditions of the Plan and the restructuring Transaction contemplated thereby, including (i) implementation of any restructuring steps; (ii) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, cancellation, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, (iii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, (iv) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, cancellation, or dissolution pursuant to applicable foreign, state, territorial, provincial, or federal law, (v) the issuance of securities in accordance with the Plan, all of which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule, (vi) taking necessary steps under applicable local law to effectuate the Plan; and (vii) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law or the Plan Support Agreement and the term sheet annexed thereto, as applicable, to fully effectuate the Plan.

Each officer, legal representative or member of the board of directors of the Debtors is authorized to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Plan Documents and the securities issued pursuant to the Plan in the name of and on behalf of the Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including any action by the directors or managers of the Debtors) except for those expressly required pursuant to the Plan.

Each officer, legal representative or member of the board of directors of the Reorganized Debtors is authorized to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Plan Documents and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including any action by the directors or managers of the Debtors) except for those expressly required pursuant to the Plan.

Unless otherwise agreed to by the Debtors and the Plan Sponsor, all matters provided for in the Plan involving the corporate structure of the Debtors or Reorganized Debtors, or any corporate, limited liability company, or related action required by the Debtors or Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect as of the Effective Date, without any requirement of further action by the stockholders, members, board, or directors of the Debtors or Reorganized Debtors, and with like effect as though such action had been taken unanimously by the stockholders, members, directors, or officers, as applicable, of the Debtors or Reorganized Debtors.

## 19.    *Amended Organizational Documents*

On or prior to the Effective Date, the Amended Organizational Documents shall be filed with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation or organization, if necessary under the corporate laws of the respective states, provinces, or countries of incorporation or organization, in accordance with such corporate laws as determined by the Plan Sponsor and the Reorganized Debtors.  The Amended Organizational Documents shall prohibit the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, the Amended Organizational Documents may be amended and restated as permitted by such documents and the laws of their respective states, provinces, or countries of incorporation or organization.

## 20.    *FCC Communications Consents*

No provision in the Plan relieves any Debtor or Reorganized Debtor from its obligation to comply with the Communications Act of 1934, as amended, and the rules, regulations and orders

promulgated thereunder by the FCC.  No transfer of any FCC license or authorization held by any Debtor or transfer of control of an FCC licensee controlled by any Debtor shall take place prior to the issuance of any necessary FCC Communications Consents for such transfer pursuant to applicable FCC regulations.  The FCC's rights and powers to take any action pursuant to its regulatory authority, including but not limited to imposing any regulatory conditions on any of the above-described transfers, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority to the extent provided by law.

### 21.    *Section 1146 Exemptions from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by the Plan; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including, without limitation: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under or pursuant to the Plan.

### C.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

#### 1.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

As of and subject to the occurrence of the Effective Date, all Executory Contracts and Unexpired Leases shall be deemed assumed, together with all amendments agreed to in writing between the Debtor(s) and the Executory Contract or Unexpired Lease counterparty and consented to by the Plan Sponsor, unless such Executory Contract or Unexpired Lease (i) was previously assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (ii) is listed on the Rejection Schedule or (iii) is the subject of a separate motion filed by a Debtor for assumption or rejection under section 365 of the Bankruptcy Code.

The Debtors or Reorganized Debtors, as applicable, shall use reasonable best efforts to obtain all necessary consents required under any Executory Contract or Unexpired Lease assumed as a result of the Transactions.  To the extent the foregoing shall require any action by any Debtor that would, or would continue to, have an adverse effect on the business of the Plan Sponsor or any of its Affiliates after the Effective Date, such action shall require the prior written consent of the Plan Sponsor. These reasonable best efforts shall not require any material payment or other material consideration from the Debtors or the Plan Sponsor (other than the payment of the Cure Claims, by the Plan Sponsor), or any action reasonably likely to delay the Debtors'

emergence from these chapter 11 cases, and any such consent shall contain terms and conditions reasonably acceptable to the Debtors and the Plan Sponsor. For the avoidance of doubt, the term "material" in the prior sentence means material in the context of the relevant assumed Executory Contract or Unexpired Lease.

### 2.    *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by a Bankruptcy Court's order, any Proof of Claim arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be filed with the Claims and Noticing Agent by the Rejection Damages Deadline.  Any Claim arising from the rejection of an Executory Contract or Unexpired Lease, with respect to which no Proof of Claim is timely filed, shall be automatically disallowed without the need for any objection or further notice to or action or approval of the Bankruptcy Court.

Holders of Claims arising from the rejection of Executory Contracts or Unexpired Leases with respect to which no Proof of Claim is timely filed shall be forever barred, estopped, and enjoined from asserting a Claim based on such rejection against the Debtors, the Reorganized Debtors, the Liquidating Debtors, the Estates or the respective property of any of the foregoing, and such Claims shall be discharged as of the Effective Date unless otherwise expressly allowed by the Bankruptcy Court.

The Liquidating Debtors and/or Plan Administrator shall have the right to object to, settle, compromise or otherwise resolve any Claim asserted on account of a rejected Executory Contract or Unexpired Lease.

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of the obligations owed by the counterparty to the applicable Debtor(s) under such Executory Contracts or Unexpired Leases.  Notwithstanding any applicable non-bankruptcy law to the contrary, the Liquidating Debtors and the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnifications or continued maintenance obligations from the counterparties to the rejected Executory Contracts or Unexpired Leases.

### 3.    *Cure Claims*

Any Cure Claims under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, by the Reorganized Debtors or the Plan Sponsor, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Debtors' Estates or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall be satisfied following the entry of a Final Order or Orders resolving the dispute and

approving the assumption. Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Claims whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment. **Any liabilities reflected in the Schedules with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

For the avoidance of doubt, the Debtors served the First and Second Cure Notices to applicable counterparties to the Executory Contracts and Unexpired Leases listed on Schedule I attached to the respective notice. Pursuant to the First and Second Cure Notices, the deadline to file an objection to the proposed assumption of any Executory Contract or Unexpired Lease, including any objection relating to a Cure Claim, other than an objection based solely on the adequate assurance of future performance under such Executory Contract or Unexpired Lease was fourteen days following service of the applicable notice. Prior to the expiration of the First Cure Notice's objection deadline, the Debtors received twenty-five (25) objections asserting Cure Claims [Docket Nos. 250, 254, 256, 259-263, 265, 267-271, 274, 284, 286, 288, 296, 297, 303, 311, 312, 319 and 321]. After the expiration of the objection deadline of the First Cure Notice the Debtors received one objection asserting a Cure Claim [Docket No. 360]. The Debtors received an amended objection asserting Cure Claims after the expiration of the objection deadline to the First Cure Notice [Docket No. 505]. Prior to the expiration of the objection deadline of the Second Cure Notice, the Debtors received one more objection asserting a Cure Claim [Docket No. 377]. Furthermore, five parties filed timely objections regarding the First and Second Cure Notices requesting additional adequate assurance [Docket Nos. 258, 267, 268, 297 and 377].

With respect to Executory Contracts or Unexpired Leases for which no objection was filed or for which no informal comments were received, the amount of the applicable Cure Claim set forth in the First and Second Cure Notices, as applicable is now binding. Upon entry of the Plan Support Agreement Order, all of the objections in connection with the First Cure Notice and the Second Cure Notice not previously consensually resolved were adjourned to the Confirmation Hearing or such other hearing date and time scheduled by the Debtors or Reorganized Debtors with the Bankruptcy Court.

Unless otherwise provided by an order of the Bankruptcy Court, at least seven (7) calendar days before the Voting Deadline, the Debtors shall cause notice of any proposed assumption to the extent of any proposed Cure Claim regarding any Executory Contracts and Unexpired Leases not reflected in the First and Second Cure Notices or otherwise not previously noticed to be sent to the applicable counterparties. Such notice shall contain the proposed Cure Claim and the deadline by which the counterparty may dispute the proposed Cure Claim. Any objection by such newly noticed counterparty must be filed and served on the Debtors no later than the deadline for objecting to Confirmation of the Plan. Any counterparty to an Executory Contract or Unexpired Lease that previously failed or fails to timely object to the proposed assumption or cure amount will be deemed to have assented to such assumption and Cure Claim. Notwithstanding the foregoing, except to the extent an Executory Contract or Unexpired Lease is

set forth on the Rejection Schedule, all Executory Contracts and Unexpired Leases shall be assumed by the Reorganized Debtors on the Effective Date.

To the extent the Debtors or the Reorganized Debtors, as applicable, and the objecting counterparty cannot resolve their dispute consensually, the Bankruptcy Court shall retain jurisdiction to resolve such dispute. Upon the Bankruptcy Court's resolution of the dispute, the Plan Sponsor shall have three (3) business days to determine whether it wishes to assume the applicable Executory Contract or Unexpired Lease. If the Plan Sponsor determines not to assume the applicable Executory Contract or Unexpired Lease, it shall direct the applicable Reorganized Debtor to reject same, and such Executory Contract or Unexpired Lease shall be deemed rejected under the Plan as of the Effective Date, and all procedures set forth in Section VI.B of the Plan shall apply.

### 4.    *Reservation of Rights*

Neither the listing of any contract or lease on the Rejection Schedule, nor the Debtors' delivery of a Notice of Cure and Assumption to the applicable counterparty shall constitute an admission by the Debtors that such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

### D.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1.    *Conditions to Confirmation*

The Bankruptcy Court shall not be requested to enter the Confirmation Order unless and until the following conditions have been satisfied:

- The Bankruptcy Court shall have entered the Disclosure Statement Order.

- The Plan and the Confirmation Order shall be in form and substance acceptable to the Debtors and the Plan Sponsor.

### 2.    *Conditions to the Effective Date*

The Effective Date will not occur, and the Plan will not be consummated unless and until the conditions set forth in Section IX.B of the Plan have been satisfied or duly waived pursuant to Section IX.C of the Plan.

### a.    Confirmation Order

The Confirmation Order shall be in full force and effect, and shall not have been stayed, stayed pending appeal or vacated; provided, however, that even if an appeal, notice of appeal, motion to amend, or make additional findings of fact or motion for a new trial is timely filed, or the Confirmation Order is otherwise challenged in any respect, such Confirmation Order will be deemed a Final Order if it provides that it is effective immediately upon entry on the Bankruptcy Court's docket and not subject to any stay notwithstanding Bankruptcy Rules 6004(h), 6006(d), or 7062 or Rule 62 of the Federal Rules of Civil Procedure.

**b.** **Statutory Fees**

All statutory fees and obligations then due and payable to the U.S. Trustee shall have been paid in full.

**c.** **Documentation**

All documents and agreements necessary to implement the Plan and the Transaction, including such agreements and documents set forth in Section 4 of the Plan Support Agreement, shall have been executed and delivered to the required parties and, to the extent required, filed with the applicable government unit in accordance with applicable laws, and all other actions required to be taken in connection with the Effective Date shall have occurred;

**d.** **Antitrust and Foreign Investment Approvals**

All (A) applicable waiting periods, and any extensions thereof, under the HSR Act and the Antitrust and Foreign Investment Laws, and any commitments by the parties to the Plan Support Agreement not to close before a certain date under a timing agreement entered into with applicable Antitrust and Foreign Investment Authorities, shall have expired or otherwise been terminated and (B) authorizations, consents, orders or approvals under the Antitrust and Foreign Investment Laws, including but not limited to the CFIUS Approval and those authorizations, consents, orders or approvals set forth on Section 9(c)(i) of the disclosures schedules to the Plan Support Agreement, shall have been obtained and shall remain in full force and effect.

**e.** **State Aid Approval**

If required by applicable law, a decision of the European Commission pursuant to Article 4 or Article 9 of Council Regulation (EU) 2015/1589 of 13 July 2015 that the transaction notified to it does not constitute aid or is compatible with the internal market, or such other similar consents or approvals as may be required from the European Commission after December 31, 2020 shall have been obtained.

**f.** **DDTC Notification**

WVD shall have provided to the U.S. Directorate of Defense Trade Controls of the U.S. Department of State the DDTC Notification.

**g.** **No Injunctions or Restraints**

No Governmental Entity (as defined in the Plan Support Agreement) shall have issued, enacted, entered, promulgated, or enforced any Restraint.

**h.** **Establishment of Professional Fee Escrow**

The Professional Fee Escrow shall have been established and fully funded in the amount of the Professional Fee Reserve Amount.

**i.** **Funding of the Ongoing Trade Claims Recovery Pool and the**

**General Unsecured Claims Settlement Distribution**

Each of the Ongoing Trade Claims Recovery Pool and the General Unsecured Claims Settlement Distribution shall have been funded by BidCo in the respective amounts required by the Settlement.

### j.    Conditions Precedent to the Obligations of the Plan Sponsor

### i.    Accuracy of Representations and Warranties

The representations and warranties of the Company Parties as set forth in the Plan Support Agreement in (i) Sections 11(a)(i)-(iv), (b), (e)(i) and (u) shall be true and correct in all material respects and (ii) set forth in Section 11 (other than those described in clause (i)) shall be true and correct (disregarding all qualifications or limitations as to "materiality" or "Company Material Adverse Effect" and words of similar import set forth therein), except where the failure of such representations or warranties to be true and correct has not had and would not reasonably be expected to have a Company Material Adverse Effect (as defined in the Plan Support Agreement), in the case of each of clauses (i) and (ii), at and as of the Effective Date as though made at and as of the Effective Date (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

### ii.    Performance of Obligations

The Debtors shall have performed in all material respects all obligations and agreements contained in Plan Support Agreement required to be performed by them on or prior to the Effective Date.

### iii.    No Termination

The Plan Sponsor shall not have terminated the Plan Support Agreement, in accordance with its terms prior to the occurrence of the Effective Date.

### iv.    BidCo Equity Consideration

The Entities to receive any share of the BidCo Equity Consideration are acceptable to the Plan Sponsor, in its sole discretion, provided that for the avoidance of doubt the holders of Allowed Secured Notes Claims receiving such BidCo Equity Consideration in the term sheet annexed to the Plan Support Agreement are acceptable to the Plan Sponsor.

### v.    Officer's Certificate

The Plan Sponsor shall have received a certificate, dated the Effective Date, of the chief executive officer or the chief financial officer of OneWeb, on behalf of the Debtors, to the effect that the conditions specified in Section 9(a)(i) and Section 9(a)(ii) of the Plan Support Agreement have been fulfilled and/or waived.

### vi.    Communications Consents

All Communications Consents shall have been obtained.

### vii.    No Company Material Adverse Effect

Since the Agreement Date of the Plan Support Agreement (as defined therein), no Company Material Adverse Effect (as defined therein) shall have occurred and be continuing.

### viii.    Principal Vendor Contracts

The applicable Company Parties shall have executed the Amended Principal Vendor Contracts (in accordance with Section 6(c) of the Plan Support Agreement) and such Amended Principal Vendor Contracts shall remain in full force and effect.

### ix.    Effective Date Cash Funding Cap

The Effective Date Cash Funding Reserve Amount, as determined in good faith by the Debtors and delivered to the Plan Sponsor no later than five days before the Effective Date, shall not exceed the Effective Date Cash Funding Cap, unless otherwise agreed to by the Plan Sponsor.

### k.    Conditions Precedent to the Debtors' Obligations

### i.    Accuracy of Representations and Warranties

The representations and warranties of the Plan Sponsor (i) set forth in Sections 12(a), (b) and (e) of the Plan Support Agreement shall be true and correct in all material respects and (ii) set forth in Section 12 of the Plan Support Agreement (other than those described in clause (i)) shall be true and correct (disregarding all qualifications or limitations as to "materiality" or "Plan Sponsor Material Adverse Effect" and words of similar import set forth therein), except where the failure of such representations or warranties to be true and correct has not had and would not reasonably be expected to have a Plan Sponsor Material Adverse Effect (as defined in the Plan Support Agreement), in the case of each of clauses (i) and (ii), at and as of the Effective Date as though made at and as of the Effective Date (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

### ii.    Performance of Obligations

The Plan Sponsor shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it on or prior to the Effective Date.

### iii.    No Termination

The Company Parties shall not have terminated the Plan Support Agreement in accordance with its terms prior to the occurrence of the Effective Date.

### iv.    Officer's Certificate

The Company Parties shall have received a certificate, dated the Effective Date, of a chief executive officer of the Plan Sponsor to the effect that the conditions specified in Section 9(b)(i) and Section 9(b)(ii) of the Plan Support Agreement have been fulfilled and/or waived.

### 3.    *Waiver of Conditions to the Effective Date*

The conditions to consummation of the Plan set forth in Section IX therein may be waived as follows: the conditions set forth in Section IX.B.10 of the Plan may only be waived by the Plan Sponsor; the conditions set forth in Section IX.B.111 of the Plan may be waived by the Debtors; and the conditions set forth in Section IX.B.4-7 of the Plan may be mutually waived by both the Plan Sponsor and the Debtors, as applicable, in their sole discretion, respectively, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan. For the avoidance of doubt, Sections IX.B.8-9 may not be waived by the Plan Sponsor.

### E.    EXCULPATION, RELEASES AND INJUNCTIONS

### 1.    *Discharge of Claims Against and Interest in the Debtors*

Upon the Effective Date and in consideration of the Distributions to be made hereunder, to the fullest extent permitted by applicable law, except as expressly provided herein or in the Confirmation Order, each holder (as well as any trustee and agents on behalf of such holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, Liens, rights, and liabilities that arose prior to the Effective Date, and will be considered waived, released, or discharged as an uncollectible account for tax purposes. Except as otherwise expressly provided herein, upon the Effective Date, all such holders of Claims, Interests, rights and liabilities and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any Claim, Interest, Lien, right or liability in or against the Estates, Debtors, Liquidating Debtors or the Reorganized Debtors or any of their assets or property, whether or not such holder has filed a Proof of Claim and whether or not the facts or legal bases thereof were known or existed prior to or on the Effective Date.

### 2.    *Exculpation*

**EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS RELEASED AND EXCULPATED FROM, ANY LIABILITY FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO OR ARISING OUT OF THE DEBTORS' CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE PLAN SUPPORT AGREEMENT, THE PLAN SUPPORT AGREEMENT ORDER, THE DISCLOSURE STATEMENT, THE PLAN, THE DIP FACILITY, THE DIP AGREEMENT, THE DIP AMENDMENT, THE DIP ORDER, THE DIP AMENDMENT ORDER, THE TRANSACTION OR ANY TRANSACTION, CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN**

CONNECTION WITH THE FOREGOING, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES PURSUANT TO THE PLAN, THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; IN ALL RESPECTS THE EXCULPATED PARTIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES. THE EXCULPATED PARTIES HAVE, AND UPON COMPLETION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN THE SOLICITATION OF VOTES AND DISTRIBUTIONS PURSUANT TO THE PLAN IN GOOD FAITH AND IN COMPLIANCE WITH APPLICABLE LAWS AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH ACTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR DISTRIBUTIONS MADE PURSUANT TO THE PLAN.

NOTWITHSTANDING THE FOREGOING, SOLELY WITH RESPECT TO EXCULPATED PARTIES THAT ARE NOT (A) FIDUCIARY EXCULPATED PARTIES OR (B) THE PLAN SPONSOR AND ITS REPRESENTATIVES, PLAN SECTION XI.D. WILL BIND ONLY ENTITIES THAT ARE RELEASING PARTIES. FOR THE AVOIDANCE OF DOUBT, THIS PARAGRAPH IS NOT INTENDED TO, AND SHALL NOT, IMPAIR OR OTHERWISE LIMIT (I) ANY EXCULPATION RIGHTS OF ANY PERSONS THAT ARE PROVIDED FOR UNDER ANY AGREEMENTS TO WHICH SUCH PERSONS ARE PARTIES OR BENEFICIARIES OR (II) PLAN SECTION XI.D. OR ANY OTHER EXCULPATION RIGHTS (INCLUDING UNDER 11 U.S.C. § 1125(E)) AS APPLIED TO (A) FIDUCIARY EXCULPATED PARTIES OR (B) THE PLAN SPONSOR AND ITS REPRESENTATIVES.

3.    *Releases*

a.    **Releases by the Debtors**

PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION AND FOR THE CONCESSIONS MADE AS SET FORTH IN THE PLAN AND THE OTHER CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS, OR DOCUMENTS TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH THE PLAN, AND THE SERVICE OF THE RELEASED PARTIES IN FACILITATING THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS DEEMED RELEASED AND DISCHARGED BY THE DEBTORS, THEIR ESTATES, THE REORGANIZED DEBTORS, THE LIQUIDATING DEBTORS AND ANY OTHER PERSON OR ENTITY SEEKING TO EXERCISE THE

**RIGHTS OF THE ESTATES FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, LIENS, LOSSES, REMEDIES, CONTRIBUTIONS, INDEMNITIES, COSTS, CAUSES OF ACTION OR LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS OR CAUSES OF ACTION,  THAT THE DEBTORS, THEIR ESTATES, THE REORGANIZED DEBTORS OR THE LIQUIDATING DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR ANOTHER ENTITY, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, BY STATUTE, VIOLATIONS OF FEDERAL, STATE, PROVINCIAL, FOREIGN, OR TERRITORIAL SECURITIES LAWS, OR OTHERWISE THAT THE DEBTORS, THE REORGANIZED DEBTORS, THE LIQUIDATING OR THE ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF A CLAIM OR INTEREST OR OTHER PERSON OR ENTITY, BASED ON, RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS, THE DEBTORS' CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE PLAN SUPPORT AGREEMENT, THE PLAN SUPPORT AGREEMENT ORDER, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE DIP ORDER, THE DIP AMENDMENT ORDER, THE PLAN, THE SECURED NOTE PURCHASE AGREEMENT, THE TRANSACTION AND ANY CONTRACT, INSTRUMENT, RELEASE, OR ANOTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE FOREGOING, AND ANY EXHIBITS OR DOCUMENTS RELATED THERETO, THE FILING OF THESE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, INCLUDING THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE PURCHASE, SALE, ISSUANCE, DISTRIBUTION, OR CANCELLATION OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTIONS UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.  FOR THE AVOIDANCE OF DOUBT, NO RELEASE IN PLAN SECTION XI.E. SHALL BE GIVEN FOR: (I) THE DEBTORS' COUNTERCLAIMS, SETOFFS, OR DEFENSES TO CLAIMS OR (II) ANY OBLIGATIONS OF ANY NON-DEBTOR COUNTERPARTY UNDER ASSUMED CONTRACTS.**

**b.      Third-Party Releases by Holders of Claims and Interests**

**AS OF THE EFFECTIVE DATE, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR, EACH LIQUIDATING**

**DEBTOR, EACH REORGANIZED DEBTOR, AND EACH RELEASED PARTY FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY, INCLUDING ANY DERIVATIVE CLAIMS), BASED ON OR RELATING TO OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS, THE DEBTORS' CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE PLAN SUPPORT AGREEMENT, THE PLAN SUPPORT AGREEMENT ORDER, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE DIP ORDER, THE DIP AMENDMENT ORDER, THE PLAN, THE SECURED NOTE PURCHASE AGREEMENT, THE TRANSACTION AND ANY CONTRACT, INSTRUMENT, RELEASE, OR ANOTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE FOREGOING, AND ANY EXHIBITS OR DOCUMENTS RELATED THERETO, THE FILING OF THESE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, INCLUDING THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE PURCHASE, SALE, ISSUANCE, DISTRIBUTION, OR CANCELLATION OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTIONS UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.**

The Debtors intend to obtain Bankruptcy Court approval of the foregoing third party releases under two alternative bases. First, that the releases are consensual for all those parties who do not opt-out of the third party releases as described in the following paragraph. **Consequently, if you do not want to grant a release, you must opt out as described in the following paragraphs**. Second, the Debtors may seek to demonstrate at the Confirmation Hearing that such third-party releases is warranted on a non-consensual basis as described *infra* in Section VI.B.

**FOR THE AVOIDANCE OF DOUBT, THE ONLY PARTIES THAT ARE BOUND BY THE RELEASE SET FORTH IN SECTION XI.E.2 OF THE PLAN ARE: (A) THE RELEASED PARTIES; (B) PARTIES WHO VOTE IN FAVOR OF THE PLAN <u>AND</u> DO NOT OPT OUT OF THE RELEASE PROVIDED IN SECTION XI.E.2 OF THE PLAN IN A TIMELY AND PROPERLY SUBMITTED BALLOT; (C) PARTIES WHO ARE ENTITLED TO VOTE BUT DO NOT VOTE <u>AND</u> DO NOT OPT OUT OF THE RELEASE PROVIDED IN SECTION XI.E.2 OF THE PLAN IN A TIMELY AND PROPERLY SUBMITTED BALLOT; AND (D) PARTIES WHO ARE DEEMED TO ACCEPT THE PLAN <u>AND</u> DO NOT OPT OUT OF THE RELEASE PROVIDED IN SECTION XI.E.2 OF THE PLAN BY SUBMITTING A DULY COMPLETED OPT-OUT FORM.**

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY INDIVIDUAL FROM ANY CLAIM OR CAUSES OF ACTION RELATED TO AN ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE.

4. *Injunction*

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS OR CAUSES OF ACTION THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION UNDER THE PLAN ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE LIQUIDATING DEBTORS, THE EXCULPATED PARTIES, OR THE RELEASED PARTIES: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH ANY SUCH CLAIMS OR INTERESTS OR CAUSES OF ACTION; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH ANY SUCH CLAIMS OR INTERESTS OR CAUSES OF ACTION; (C) CREATING, PERFECTING, OR ENFORCING AN ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THEIR PROPERTIES ON ACCOUNT OF OR IN CONNECTION WITH SUCH CLAIMS OR INTERESTS OR CAUSES OF ACTION; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH SUCH CLAIMS OR INTERESTS OR CAUSES OF ACTION UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF, NOTWITHSTANDING AN INDICATION IN ANY PROOF OF CLAIM OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS, OR INTENDS TO PRESERVE THE RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (E) COMMENCING OR CONTINUING ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH SUCH CLAIMS OR INTERESTS OR CAUSES OF ACTION.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE INJUNCTION SET FORTH ABOVE SHALL NOT ENJOIN THE PLAN SPONSOR FROM EXERCISING ANY OF ITS RIGHTS UNDER THE PLAN SUPPORT AGREEMENT PRIOR TO THE EFFECTIVE DATE.

5. *Scope of Discharge, Release, or Injunction With Respect to the United States of America*

As to the United States of America, its agencies, departments, or agents (collectively,

the "United States"), nothing in this Plan or the Confirmation Order shall limit or expand the scope of discharge, release or injunction to which the Debtors or Reorganized Debtors are entitled to under the Bankruptcy Code, if any. The discharge, release, and injunction provisions contained in this Plan and the Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Confirmation Order, pursuing any police or regulatory action except to the extent the applicable Bar Date or the discharge, release, exculpation or injunction provisions of the Plan bar a Governmental Unit from pursuing prepetition Claims against the Debtors or Reorganized Debtors.

Accordingly, notwithstanding anything contained herein or in the Confirmation Order to the contrary, nothing herein or the Confirmation Order shall discharge, release, impair or otherwise preclude: (1) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (2) any Claim of the United States arising on or after the Effective Date; or (3) any valid right of setoff or recoupment of the United States against any of the Debtors. Nothing herein or in the Confirmation Order shall: (i) enjoin or otherwise bar the United States from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence; or (ii) divest any court, commission, or tribunal of jurisdiction to determine whether any liabilities asserted by the United States are discharged or otherwise barred by this Plan, the Confirmation Order or the Bankruptcy Code.

Moreover, nothing herein or in the Confirmation Order shall release or exculpate any non-Debtor, including any Released Parties and/or Exculpated Parties that are not Debtors, from any liability to the United States, including but not limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the Released Parties and/or Exculpated Parties, nor shall anything herein or in the Confirmation Order enjoin the United States from bringing any claim, suit, action or other proceeding against any non-Debtor for any liability whatsoever; provided, that the foregoing sentence shall not (x) limit the scope of discharge granted to the Debtors and the Reorganized Debtors under sections 524 and 1141 of the Bankruptcy Code, or (y) diminish the scope of any exculpation to which any party is entitled under section 1125(e) of the Bankruptcy Code.

Without limiting the application of section 1145 of the Bankruptcy Code, nothing contained herein or in the Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the Debtors and the Reorganized Debtors, nor shall this Plan or the Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of this Plan, nor shall anything in this Plan or Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.

## 6.   *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays arising under or entered during the pendency of these cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay; provided, however, that in no event shall the Plan or the

Confirmation Order be construed as enjoining the Plan Sponsor from exercising any of its rights under the Plan Support Agreement prior to the Effective Date.

### 7.    *Ipso Facto and Similar Provisions Ineffective*

Any term of any prepetition policy, contract, or other obligation applicable to a Debtor shall be void and of no further force or effect to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation as a result of, or gives rise to a right of any Entity based on (i) the insolvency or financial condition of a Debtor, (ii) the commencement of these chapter 11 cases, (iii) the confirmation or consummation of the Plan, or (iv) the Transaction.

## VI.    STATUTORY REQUIREMENTS FOR CONFIRMATION

The following is a brief summary of the requirements for Confirmation.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in this Disclosure Statement.

### A.    REQUIREMENTS FOR CONFIRMATION

For the Plan to be confirmed, the Plan (and the Debtors as proponents of the Plan) must comply with section 1129 of the Bankruptcy Code.  Among the requirements for Confirmation pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims, or if rejected by any Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to such rejecting Impaired Class; (2) the Plan is feasible; (3) the Plan is in the "best interests" of holders of Claims and Interests, and (4) the Plan has been proposed in good faith.

The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the requirements of section 1129 of the Bankruptcy Code; and (2) the Debtors have complied, or will have complied, with all of the requirements of section 1129 of the Bankruptcy Code.

### 1.    *Acceptance by Impaired Classes*

For a plan to be confirmable, section 1129(a)(8) of the Bankruptcy Code requires that each "impaired" class of claims and interests accepts the plan.  Any class that is "unimpaired" under a plan is presumed to have accepted the plan.  Pursuant to section 1124 of the Bankruptcy Code, a class is "impaired" unless, with respect to each claim or interest in such class, the plan: (1) leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder of such claim; or (2) cures any default, reinstates the maturity of such claim or interest as such maturity existed before such default and compensates the holder of such claim or interest for any damages incurred.

Under the Plan, the only Classes that are both Impaired and may be entitled to receive a Distribution under the Plan are Classes 1, 4 and 5.  Accordingly, only Class 1, 4 and 5 are entitled to vote to accept or reject the Plan.

### 2.    *Best Interests of Creditors*

Pursuant to section 1129(a)(7), notwithstanding acceptance of the Plan by a voting Impaired Class, to confirm the Plan, the Bankruptcy Court must still independently determine that the Plan is in the best interests of each holder of a Claim in such Class that has not voted to accept the Plan.  The Plan will be deemed to be in the best interests of such claimants if it provides to each such claimant a recovery that is at least equal in value to the recovery that such claimant would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.  Accordingly, if the holders of Claims in Class 1, Class 4 or Class 5 do not unanimously vote to accept the Plan, the Bankruptcy Court will need to determine whether the Plan provides to each rejecting holder a recovery on account of its Claim that has a value, as of the Effective Date, at least equal to the value that each such holder would receive if the Debtors were liquidated under chapter 7 on the Effective Date.  Based on the liquidation analysis attached hereto as **Annex B** (the "Liquidation Analysis"), the Debtors believe that the Plan satisfies the best interests of creditors test.

Recoveries in a chapter 7 case, as compared to the Distribution provided under the Plan, would be further reduced by (i) the delay necessarily resulting from the appointment of a chapter 7 trustee with no familiarity with the Debtors' assets and business, (ii) the fees and expenses of such trustee and any professionals he or she will retain, and (iii) additional Administrative Expense Claims.

Additionally, sales organized under a chapter 7 liquidations will often yield depressed values because the sale is conducted under more or less "fire sale" conditions.  In particular, it is unlikely that a chapter 7 trustee appointed by the Bankruptcy Court and overseen by the United States Trustee's office in the Southern District of New York will continue to operate the Debtors' assets.  Besides logistical concerns, the chapter 7 trustee would not likely be familiar with the intricacies of Debtors' assets, the Debtors' business nor would the chapter 7 trustee be familiar with various regulatory laws related thereto.  Thus, an additional layer of advisors and experts would need to be retained by the chapter 7 trustee, giving rise to additional administrative expenses that would be entitled to priority.

Because recoveries under the Plan exceed those in a hypothetical chapter 7 case, the Plan satisfies the best interests of creditors test.

### 3.    *Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that, to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, unless contemplated by the plan.

To determine whether the Plan meets the feasibility requirement, the Debtors analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors prepared financial projections, attached hereto as **Annex C** (the "Financial Projections").  Based on the Financial Projections, the Debtors believe that the Plan satisfies the feasibility requirement.

## B.   THE DEBTOR RELEASES, THIRD PARTY RELEASES, EXCULPATION, AND INJUNCTION PROVISIONS

It is well-settled that debtors are authorized to settle or release their claims in a chapter 11 plan.[17]   Debtor releases are granted by courts in the Second Circuit where the debtors establish that such releases are in the "best interests of the estate."[18]   Courts often find that releases pursuant to a settlement are appropriate.[19]   Additionally, in the Second Circuit, third party releases are permissible when they are consensual or where "truly unusual circumstances" render the release terms integral to the success of the plan.[20]

"Unusual circumstances" include: (a) the estate received a substantial contribution; (b) the enjoined claims were "channeled" to a settlement fund rather than extinguished; (c) the enjoined claims would indirectly impact the debtors' reorganization by way of indemnity or contribution; (d) the plan otherwise provided for the full payment of the enjoined claims; and (e) the affected creditors consent.[21]   Courts typically allow releases of third party claims against non-debtors where there is the express consent (including pursuant to an opt-out) of the party giving the release or where other circumstances in the case justify giving the release.[22]   Finally, exculpation provisions that extend to prepetition conduct and cover non-estate fiduciaries are regularly approved.[23]   In approving these provisions, courts consider a number of factors, including whether the beneficiaries of the exculpation have participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan.[24]

---

[17]   *See In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 263 n.289, 269 (Bankr. S.D.N.Y. 2007) (debtor may release its own claims); *In re Oneida Ltd.*, 351 B.R. 79, 94 n. 21 (Bankr. S.D.N.Y. 2006) (noting that a debtor's release of its own claims does not raise third party release issues).

[18]   *See In re Charter Commc'ns*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) ("When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate.").

[19]   *See, e.g.*, *In re Spiegel*, 2005 WL 1278094, at *11 (Bankr. S.D.N.Y. May 25, 2005) (approving releases pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a)); *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013) (confirming chapter 11 plan containing releases of members, directors, officers and employees of the debtors as well as prepetition lenders that were party to a restructuring support agreement); *see also In re Bally Total Fitness Holding Corp.*, 2007 WL 2779438, at *12 ("To the extent that a release or other provision in the Plan constitutes a compromise of a controversy, this Confirmation Order shall constitute an order under Bankruptcy Rule 9019 approving such compromise."); *accord In re Adelphia Communications Corp.*, 368 B.R. 140, 263 n. 289 (Bankr. S.D.N.Y. 2007) ("The Debtors have considerable leeway in issuing releases of any claims the Debtors themselves own.").

[20]   *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142-43 (2d Cir. 2005).

[21]   *Id.* at 141.

[22]   *Id.* at 142-43.

[23]   *See, e.g.*, *Oneida*, 351 B.R. at 94 & n.22 (considering an exculpation provision covering a number of prepetition actors with respect to certain prepetition actions, as well as postpetition activity).

[24]   *See In re Bearing Point, Inc.*, 435 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get recoveries they desire; seek vengeance against other parties, or simply wish to second guess the decision makers."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (same), *aff'd*, *In re DBSD N. Am., Inc.*, No. 09-10156, 2010 WL 1223109 (S.D.N.Y. May 24, 2010), *aff'd in part, rev'd in part*, 634 F.3d 79 (2d Cir. 2011); *In re Bally Total Fitness*, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *In re WorldCom, Inc.*, No. 02-13533, 2003 WL 23861928, at *28 (Bankr. S.D.N.Y. Oct. 31, 2003) (approving an exculpation provision where it "was an essential element of the [p]lan formulation process and negotiations"); *Enron*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend

-73-

"Most courts allow consensual [third party] releases to be included in a plan."[25]  Courts in this district have found that parties consent to give releases when they vote in favor of the plan or when they abstain from voting but do not opt out of releases.[26]  Third party releases may also be deemed consensual for unimpaired creditors who are deemed to accept the plan.[27]  Here, the third party releases are consensual with respect to all of the Released Parties.  Importantly, the Ballots to be distributed to holders of Claims entitled to vote on the Plan quote the entirety of the Releases and related provisions and definitions of the Plan, clearly informing holders of Claims entitled to vote of the steps they should take if they disagree with the scope of the Release.[28]  Thus, affected parties are on notice of the third party release and given the express opportunity to opt-out of the third party releases.  As a result, the third party releases are consensual under the majority of precedent in this jurisdiction, and the Bankruptcy Court need not consider the other *Metromedia* factors with respect to such aspects.

The Debtors believe that the Releases contained in the Plan meet the Second Circuit's well established criteria for when such provisions are "important to a debtor's plan" and "where the released party provides substantial consideration" which are present here as more fully described above and as will be demonstrated at the Confirmation Hearing.  Contrary to the assertions made by the Committee, the Releases are an integral component of the Plan and the DIP Secured Parties, the Prepetition Secured Parties, the Debtors' Directors and Officers and all Released Parties have made substantial contributions to these cases to justify the releases.

Moreover, the Debtors are of the view that the Claims that are subject to Release are of, at best, minimal value when compared to the certain value achieved to the Estates through the Plan.  Absent the Releases contemplated in the Plan, the Debtors believe that the parties in interest that both negotiated for, and relied upon, the prospect of the Releases in negotiations would not have otherwise committed to the result reflected in the Plan Support Agreement and the Plan.  In this regard, too, the Releases are an integral part of the Plan.  The Debtors believe

---

to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

[25]  *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007); *see also Indianapolis Downs*, 486 B.R. 286, 305  (Bankr. Del. 2013) ("Courts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected.").

[26]  *See In re Metromedia Fiber Network, Inc.*, 416 F.3d at 142 ("Nondebtor releases may also be tolerated if the affected creditors consent."); *In re Calpine Corp.*, No. 05-60200 BRL, 2007 WL 4565223, at *10 (Bankr. S.D.N.Y. Dec. 19, 2007) ("Such releases by Holders of Claims and Interests provide for the release by Holders of Claims and Interests that vote in favor of the Plan, who abstain from voting and choose not to opt out of the releases, or who have otherwise consented to give a release, and are consensual."); *DBSD N. Am.*, 419 B.R. at 218–19 ("Except for those who voted against the Plan, or who abstained and then opted out, I find the Third Party Release provision consensual and within the scope of releases permitted in the Second Circuit."); *Adelphia*, 368 B.R. at 268 (upholding non-debtor releases for creditors who voted to accept the plan because creditors consented to the releases through their vote to support the plan); *In re Lear Corp.*, No. 09–14326, 2009 WL 6677955, at *7 (Bankr. S.D.N.Y. Nov. 5, 2009) (finding that non-debtor releases for creditors who voted to accept the plan were permissible).

[27]  *See Indianapolis Downs*, 486 B.R. at 306 (finding that the releases, which included releases of unimpaired creditors who were deemed to accept the plan, "may be properly characterized as consensual").

[28]  *See, e.g.*, *In re Crabtree & Evelyn, Ltd.*, No. 09-14267 (BRL), 2010 WL 3638369, at *7 (Bankr. S.D.N.Y. Jan 14. 2010) (finding that where creditors have accepted the plan and the non-debtor releases were appropriately disclosed by the debtors in both the disclosure statement and the ballot, the creditors have expressly consented to the non-debtor releases and therefore, the non-debtor releases satisfy the standards set forth in *Metromedia* for granting non-debtor releases and are fair to the releasing parties).

that the Releases are narrowly tailored and should be approved as an essential part of the Plan.

## C.    ALTERNATIVE PLANS

The Debtors do not believe that there are any alternative plans for their reorganization. The Debtors believe that the Plan, as described therein, enables holders of Claims to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

## D.    CONFIRMATION HEARING

**As set forth in the Disclosure Statement Order, the Bankruptcy Court has scheduled the Confirmation Hearing for October 2, 2020 at 10:00 A.M. (prevailing Eastern Time).** The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the Disclosure Statement Order. **Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court.**

## VII.    RISK FACTORS

Holders of Claims should read and carefully consider the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before reaching their own views prior to voting to accept or reject the Plan. These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation. All of these factors are contingencies which may or may not occur and the Debtors are not in a position to express a view on the likelihood of any such contingency occurring.

## A.    CERTAIN BANKRUPTCY CONSIDERATIONS

### 1.    *The Debtors May Not Be Able to Secure Confirmation*

Although section 1129(b) of the Bankruptcy Code allows, under certain circumstances, confirmation of a plan even where not all Impaired Classes accept the Plan, section 1129(a)(10) requires that at least one Impaired Class has accepted the Plan. There can be no assurance that the requisite acceptances to confirm the Plan will be received. As discussed above, Class 1, 4 or 5 are the only Impaired Classes entitled to vote on the Plan. If none of Class 1, Class 4 and Class 5 vote to accept the Plan, the Plan will not comply with the confirmation requirements of section 1129.

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. The Bankruptcy Court may find that the statutory requirements for Confirmation have not been met, including the best interest of creditors test.

The Debtors, subject to the terms and conditions of the Plan and the Plan Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for

Confirmation.  Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan.  Such a less favorable treatment may include a Distribution of a lesser value than currently provided in the Plan.

In the event the Plan is not confirmed, the Debtors may seek to pursue another strategy to reorganize the Debtors, such as an alternative chapter 11 plan (which, as described above the, Debtor does not believe is available), a dismissal of these cases and an out-of-court dissolution, an assignment for the benefit of creditors, a conversion to a chapter 7 cases or other strategies. There can be no assurance that the terms of any such alternative strategies would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

### 2. Releases, Injunctions and Exculpations Provisions May Not Be Approved

Section XI of the Plan provides for certain releases, injunctions, and exculpations, for claims and Causes of Action that may otherwise be asserted against the Debtors, the Reorganized Debtors, the exculpated parties, or the Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or exculpated parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

### 3. Risks Related to Possible Objections to the Plan

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection. An objection that is sustained and is contrary to the terms of the Plan Support Agreement could lead to a failure of a condition to effectiveness of the Plan.

### 4. Risk of Termination of the Plan Support Agreement

The Plan Support Agreement contains certain provisions that give the Plan Sponsor the ability to terminate the Plan Support Agreement if various conditions are satisfied or not satisfied (as applicable), including, among others, (i) if the Debtors lose the exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code, (ii) a trustee or an examiner with expanded powers is appointed in any of these chapter 11 cases, (iii) any of these chapter 11 cases are dismissed or converted to a case under chapter 7 of the Bankruptcy Code, (iv) failure of the Debtors to meet certain milestones, and (v) the Debtors' pursuit of a Plan inconsistent with the terms of the Plan Support Agreement and Plan Term Sheet.  Termination of the Plan Support Agreement could result in protracted chapter 11 cases, have a negative impact on the Debtors' ability to consummate the Transaction and implement the Plan, and could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and major customers.

### 5. Risk of Nonoccurrence of the Effective Date

The Plan Support Agreement contains numerous conditions that must be met by the Effective Date. There can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur as there can be no assurance of the satisfaction of certain conditions precedent to the Effective Date, including consummation of the Transaction.

## B. RISK FACTORS THAT MAY AFFECT RECOVERIES AVAILABLE TO HOLDERS OF ALLOWED CLAIMS UNDER THE PLAN

### 1. *Claims May Be Higher Than Projected*

There can be no assurance that the estimated Allowed number of certain Claims will not be significantly more than projected, which could cause the value of *pro rata* Distributions to be reduced substantially. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.

### 2. *The Debtors Cannot Guarantee Recoveries or the Timing of such Recoveries*

Although the Debtors have made commercially reasonable efforts to project recoveries to the holders of Allowed Claims, it is possible that the amount of Allowed Claims will be materially higher than any range the Debtors have considered to date, and thus recoveries could be materially reduced or eliminated. In addition, the timing of actual Distributions to holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guarantee the timing of any recovery on an Allowed Claim.

## C. DISCLOSURE STATEMENT DISCLAIMER

### 1. *The Financial Information Contained in this Disclosure Statement Has Not Been Audited*

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from the Debtors' books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, and although the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to represent or warrant that the financial information contained herein and in the Plan, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

### 2. *Information Contained in this Disclosure Statement Is for Soliciting Votes*

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

### 3. *The Disclosure Statement May Contain Forward Looking Statements*

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue" or the negative thereof or comparable terminology. All forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein and in the Plan is an estimate only, based upon information currently available to the Debtors.

### 4.    *No Legal or Tax Advice is Provided to You by this Disclosure Statement*

*This Disclosure Statement is not legal advice to you*. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of a Claim or an Interest should consult his or her own legal counsel, accountant or other applicable advisor with regard to any legal, tax and other matters concerning his, her or its Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine (i) how to vote on the Plan, (ii) whether or not to opt-out of the Releases as set forth in Section XI.E of the Plan, and (iii) whether or not object to Confirmation.

### 5.    *No Admissions Made*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Allowed Interests or any other parties in interest.

### 6.    *Failure to Identify Objections*

No reliance should be placed on the fact that a projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Reorganized Debtors and/or Liquidating Debtors, as applicable, may object to Claims after the Effective Date irrespective of whether this Disclosure Statement identifies objections to such Claims.

### 7.    *No Waiver of Right to Object or Right to Recover Transfers and Assets*

The vote by a holder of a Claim for or against the Plan does not constitute a waiver or release of any claims, causes of action or rights of the Debtors (or any other Entity, as the case may be) to object to that holder's Claim, or recover any preferential, fraudulent or other voidable transfer, regardless of whether any Claims or Causes of Action of the Debtors or their Estates are specifically or generally identified in this Disclosure Statement.

### 8.    *Information was Provided by the Debtors and was Relied Upon by the Debtors' Advisors*

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this

Disclosure Statement, they have not independently verified the information contained in the Plan and in this Disclosure Statement.

9.      *No Representations Outside this Disclosure Statement are Authorized*

No representations concerning or relating to the Debtors, these cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement and the Committee Letter.  Any representations or inducements made to secure your acceptance or rejection of the Plan other than as contained in this Disclosure Statement and the Committee Letter should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to counsel to the Debtors and the U.S. Trustee.

## D.      RISKS RELATING TO SECURITIES TO BE ISSUED UNDER THE PLAN

1.      *Market for Securities*

There is currently no market for the New Equity Interests or BidCo Equity Consideration, and the Reorganized Debtors are under no obligation to list any securities on any securities exchange.  Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date.  If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in the Disclosure Statement depending upon many factors including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for the Reorganized Debtors and BidCo.  Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

2.      *Potential Dilution*

The ownership percentage represented by the New Equity Interests or BidCo Equity Consideration distributed on the Effective Date under the Plan may be subject to dilution from the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued postemergence, including, as a result of the conversion of the Interim Funding Claims into BidCo Equity Interests on the Effective Date.  In the future, similar to all companies, additional equity financings or other share issuances by the Reorganized Debtors or BidCo could adversely affect the value of the New Equity Interests and the BidCo Equity Interests.  The amount and dilutive effect of any of the foregoing could be material.

The ownership percentage represented by the New Equity Interests or BidCo Equity Consideration distributed on the Effective Date under the Plan may be subject to dilution from the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued postemergence, including, as a result of the conversion of the Interim Funding Claims into BidCo Equity Interests on the Effective Date.  In the future, similar to all companies, additional equity financings or other share issuances by the Reorganized Debtors or BidCo could adversely affect the value of the New Equity Interests and the BidCo Equity Interests. The amount and dilutive effect of any of the foregoing could be material

### 3.    *Equity Interests Subordinated to Indebtedness*

In any subsequent liquidation, dissolution, or winding down of the Reorganized Debtors, the New Equity Interests would rank below all debt claims against the Reorganized Debtors.  As a result, holders of the New Equity Interests will not be entitled to receive any payment or other Distribution of assets upon the liquidation, dissolution, or winding down of the Reorganized Debtors until after all the applicable entity's obligations to their debt holders have been satisfied.

### 4.    *Implied Value of New Equity Interests or BidCo Equity Interests Not Intended to Represent Trading Value of New Equity Interests and BidCo Equity Interests, Respectively*

The implied value of the Reorganized Debtors is not intended to represent the trading value of New Equity Interests or BidCo Equity Interests in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things:  (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities of creditors receiving New Equity Interests or BidCo Equity Interests under the Plan, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities.  The actual market price of the New Equity Interests and BidCo Equity Interests are likely to be volatile.  Many factors, including factors unrelated to the actual operating performance of the Reorganized Debtors and BidCo, and other factors not possible to predict, could cause the market price of the New Equity Interests or BidCo Equity Interests to rise and fall.  Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Equity Interests or BidCo Equity Interests in the public or private markets.

### 5.    *No Dividends*

The Reorganized Debtors may not pay any dividends on the New Equity Interests and may instead retain any future cash flows for debt reduction and to support operations.  Similarly, BidCo may not pay any dividends on the BidCo Equity Interests and may instead retain any future cash flows for debt reduction and to support its operations.  As a result, the success of an investment in the New Equity Interests or BidCo Equity Interests may depend entirely upon any future appreciation in the value of the New Equity Interests or BidCo Equity Interests, as applicable.  There is no guarantee that the New Equity Interests or BidCo Equity Interests will appreciate in value or even maintain their initial value.

## E.    RISKS RELATED TO THE DEBTORS' BUSINESSES

### 1.    *Macroeconomic Conditions*

On March 11, 2020, the spread of COVID-19 (also known as coronavirus) was declared a "pandemic" by the World Health Organization.  The situation with respect to COVID-19 continues to evolve rapidly.  The extent to which COVID-19 may impact the Debtors' operational and financial performance is uncertain.

2. ***Financial Results May Be Volatile and May Not Reflect Historical Trends***

The Financial Projections attached hereto as **<u>Annex C</u>** are based on assumptions that are an integral part of the projections, including Confirmation and implementation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations. These variations may be material and may adversely affect the value of the New Equity Interests and the ability of the Debtors to make payments with respect to their indebtedness. Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the chapter 11 cases, the Debtors' financial results may be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date. In addition, if the Debtors emerge from the chapter 11 cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Lastly, the business plan was developed by the Debtors with the assistance of their advisors. There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan. Any deviations from the Debtors' existing business plan would necessarily cause a deviation in the Financial Projections.

3. ***The Debtors' Substantial Liquidity Needs May Impact the Plan***

The Debtors operate in a capital-intensive industry. The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources. In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the chapter 11 cases and expect to continue to incur significant professional fees and costs throughout the chapter 11 cases. The Debtors cannot guarantee that Cash on hand, Cash paid provided by the Plan Sponsor and Cash provided by the DIP Agreement will be sufficient to continue to fund their operations and allow the Debtors to

satisfy obligations related to the chapter 11 cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to comply with the terms and condition of the DIP Agreement, the DIP Order, the DIP Amendment Order, and the Cash Collateral Order in connection with the chapter 11 cases; (b) their ability to maintain adequate cash on hand; (c) their ability to develop, confirm, and consummate the Plan; and (d) the cost, duration, and outcome of the chapter 11 cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that Cash on hand, Cash provided by the sale of the New Equity Interests, and Cash provided under the DIP Agreement are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all.

### 4. The Debtors' Business is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business

The Debtors' operations are subject to extensive foreign, federal, state and local laws and regulations, including complex telecommunication and satellite laws and regulations. The Debtors may be required to make large expenditures to comply with such laws and regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Reorganized Debtors to administrative, civil and criminal penalties. These liabilities and costs could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Reorganized Debtors.

### 5. The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

The Reorganized Debtors may become parties to future litigation. Litigation can be expensive and time consuming to prosecute or defend. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

### 6. The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base. The Debtors' recent liquidity issues and the

chapter 11 cases have created distractions and uncertainty for key management personnel and employees. Because competition for experienced personnel can be significant, the Debtors may be unable to find adequate replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

7.    ***Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Corporate Reputation or Brand Perception, Financial Condition, and Results of Operations***

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arose prior to the Petition Date or before Confirmation (a) would be subject to compromise and/or treatment under the Plan and/or (b) would be discharged in accordance with the terms of the Plan. Any Claims not ultimately discharged through the Plan could be asserted against the Reorganized Debtors and harm the Reorganized Debtors' reputations and/or damage their brands, which may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

8.    ***Recent Global Economic Trends Could Adversely Affect the Debtors' Business, Results of Operations and Financial Condition, Primarily Through Disruption to the Debtors' Customers' Businesses***

Recent global economic conditions, including disruption of financial markets, could adversely affect the Debtors' business, results of operations and financial condition, primarily through disrupting their customers' businesses. Higher rates of unemployment and lower levels of business activity generally adversely affect the level of demand for certain of the Debtors' products and services. In addition, continuation or worsening of general market conditions in the U.S. economy, the departure of the U.K. from the EU single market and customs union or other national economies important to the Debtors' businesses may adversely affect the Debtors' customers' level of spending, ability to obtain financing for purchases and ability to make timely payments to the Debtors for their products and services.

9.    ***Consent Required Relating to FCC and Other Communications Licenses***

A change in control of the OneWeb entities that hold Spectrum Licenses, market access "landing rights" licenses or authorizations, SNP and/or TT&C Station licenses or authorizations, User Terminal experimental licenses or authorizations for launch and in-orbit operations of satellites will, depending on the type of license, permit, consent or authorization, involve either a notification requirement to, or alternatively a requirement to obtain consent from, the relevant national regulatory authority.

FCC approval will be required to assign the Debtors' FCC SNP and experimental licenses to the Reorganized Debtors pursuant to the Plan. Applications requesting such FCC

approval will have to detail the change in control of the Reorganized Debtors in order to account for the New Equity Interests acquired by the Plan Sponsor. Similarly, certain of Debtors' other radio-frequency spectrum authorizations, market access licenses and other communications services related authorizations or licenses may also require disclosure of details associated with the change in control the Reorganized Debtors. Timing of FCC and other communications regulatory authority approvals associated with emergence will be difficult to predict.

The Debtors can provide no assurance that the required regulatory and governmental consents in connection with the Transaction under the Plan will be obtained. In addition, even if all required regulatory and other governmental consents are obtained and the closing conditions are satisfied, no assurance can be given as to the terms, conditions, and timing of the approvals or clearances.

### 10.    *CFIUS Approval Required*

The Committee on Foreign Investment in the United States, through powers conferred by legislation and delegated by the President of the United States, is authorized to conduct investigations of any investment, acquisition, merger, takeover or other transaction that could result in a foreign person acquiring (A) control of a U.S. business or (B) with respect to U.S. businesses that deal with "critical technology," "critical infrastructure" or "sensitive personal data" of U.S. citizens, rights to hold or obtain a board of directors voting seat or observer seat, rights to access certain information or rights to participate in substantive decision-making relating to critical technology, critical infrastructure, or sensitive personal data of U.S. citizens. If CFIUS determines that such a transaction could threaten to impair the national security of the United States, it may work with the transaction parties to mitigate the perceived national security risk. If CFIUS determines that risk mitigation is not possible and the parties decline to abandon the transaction voluntarily, then CFIUS may refer the matter to the President for a decision whether to suspend or prohibit the transaction. In 2016, OneWeb and SoftBank voluntarily notified CFIUS of SoftBank's indirect acquisition of a 38.11% voting interest in OneWeb. CFIUS concluded its review of the transaction in 2017 with a finding that it had no outstanding concerns of risk to U.S. national security. As a condition to reaching that conclusion, CFIUS required OneWeb and SoftBank to enter into a National Security Agreement with the U.S. Department of Defense to address and mitigate concerns relating to U.S. national security. Given that the Transaction contemplated by the Plan involves non-U.S. parties acquiring control of OneWeb, and given that OneWeb's business involves "critical technologies" as defined in the CFIUS regulations utilized in connection with activities of OneWeb of a kind enumerated in those regulations, it will be necessary for OneWeb and the acquirer(s) of the New Equity Interests to formally notify the transaction to CFIUS. It is highly recommended that the Parties make conclusion of review by CFIUS with an affirmative finding of no national security concerns a precondition to emergence from chapter 11. When CFIUS formally accepts a notice for review, it has 45 days in which to complete a first-stage "review." This may be followed by an additional 45-day period for second-stage "investigation." But even before a notice is accepted, time is required for CFIUS staff to examine a draft notice and verify its completeness, and more often than not parties are required to revise a draft notice to address comments from CFIUS staff. These additional steps before a notice is accepted make it difficult to assess the length of the CFIUS review process. From the date the parties begin drafting a notice to the date CFIUS concludes its review ordinarily will be four to six months. As a condition to approving

the notified transaction, CFIUS or its member agencies may require OneWeb and BidCo to enter into mitigation measures to address concerns relating to U.S. national security.

## 11.   *Export Controls Notification to the DDTC*

WVD is registered with the Directorate of Defense Trade Controls of the U.S. Department of State ("DDTC") as an exporter of defense articles and defense services. Under the International Traffic in Arms Regulations administered by DDTC, WVD is required to provide notification to DDTC of any change in the ownership or control of WVD and any change in the information provided in WVD's annual DDTC registration statement, including changes in WVD's senior management or board of directors. In connection with implementation of the Plan, WVD will have to provide a notification to DDTC detailing any such changes that would result from such implementation. As the purchaser(s) of the New Equity Interests include foreign persons, and implementation of the Plan will result in foreign ownership or control of WVD, then WVD will have to submit such notification to DDTC no later than 60 days prior to implementation of the Plan.

## VIII.   CERTAIN TAX CONSEQUENCES OF THE PLAN

### A.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a general discussion based upon present law of certain U.S. federal income tax consequences relevant to the implementation of the Plan to the Debtors, the Reorganized Debtors and U.S. Holders (as defined below) of Allowed Secured Notes Claims, Allowed General Unsecured Claims, Allowed Ongoing Trade Claims and BidCo Equity Interests. This summary is limited to U.S. Holders of Allowed Secured Notes Claims, Allowed General Unsecured Claims, Allowed Ongoing Trade Claims and BidCo Equity Interests who hold their Claims or BidCo Equity Interests, as applicable, as capital assets for purposes of the Internal Revenue Code of 1986, as amended (the "Code"). This discussion does not address rules relating to special categories of holders, including financial institutions, insurance companies, regulated investment companies, real estate investment trusts, broker-dealers, tax-exempt organizations, traders in securities that elect to mark-to-market, persons subject to special accounting rules under section 451(b) of the Code, U.S. expatriates, investors that hold Claims or BidCo Equity Interests as part of a straddle, hedging, constructive sale or conversion transaction, holders whose functional currency is not the U.S. dollar or holders who will actually or constructively own 5% or more of the BidCo Equity Interests (by either vote or value). The discussion does not address any state, local or foreign taxes, the Medicare tax on net investment income, the federal alternative minimum tax or any other federal tax other than the federal income tax. The discussion of U.S. federal income tax consequences below is based on the Code, Treasury Regulations, judicial authorities, published positions of the U.S. Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. Holders should note that no rulings from the IRS have been sought with respect to any of the U.S. federal income tax consequences discussed below, and no assurance can be given that the IRS or a court will not

take contrary positions.   This discussion does not address the U.S. federal income tax consequences to holders of Claims or Interests who are Unimpaired, or who are not entitled to vote because they are deemed to accept or reject the Plan.

This summary is not a comprehensive description of all of the U.S. federal tax consequences that may be relevant with respect to the Plan.  U.S Holders are urged to consult their own tax advisors regarding their particular circumstances and the U.S. federal tax consequences with respect to the Plan, as well as any tax consequences arising under the laws of any state, local or foreign tax jurisdiction and the possible effects of changes in U.S. federal or other tax laws.

As used herein, the term "U.S. Holder" means a beneficial owner of Allowed Secured Notes Claims, Allowed General Unsecured Claims, Allowed Ongoing Trade Claims, or BidCo Equity Interests, as applicable, that for U.S. federal income tax purposes is any of the following:

- an individual citizen or resident of the United States;

- a corporation or any other entity treated as a corporation for U.S. federal income tax purposes created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if it (1) is subject to the primary supervision of a court within the United States and one or more U.S. persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If an entity or arrangement treated as a partnership for U.S. federal income tax purposes holds Allowed Secured Notes Claims, Allowed General Unsecured Claims, Allowed Ongoing Trade Claims, or BidCo Equity Interests, the U.S. federal income tax treatment of a partner therein generally will depend upon the status of the partner and the activities of the partnership and accordingly, this summary does not apply to partnerships.  A partner of a partnership exchanging Allowed Secured Notes Claims, Allowed General Unsecured Claims or Allowed Ongoing Trade Claims pursuant to the Plan should consult its own tax advisor regarding the U.S. federal income tax consequences to the partner of exchanging Allowed Secured Notes Claims, Allowed General Unsecured Claims or Allowed Ongoing Trade Claims

### 1.    *Certain U.S. Federal Income Tax Consequences to the Debtors*

Only one of the Debtors, WVD, which has elected to be treated as a corporation for U.S. federal income tax purposes, is required to file a U.S. federal income tax return.  WJVH and OneWeb Holdings LLC are each treated as disregarded entities of WVD for U.S. federal income tax purposes.  As of January 1, 2020, WVD estimates that it has net operating loss ("NOL") carryforwards in excess of $45 million and certain other favorable tax attributes, including general business credit carryforwards, in excess of $28 million.  As discussed below, if WVD is

one of the Reorganized Debtors, any NOLs and other tax attributes may be reduced or otherwise subject to limitation as a result of or following the implementation of the Plan.

### a.        Cancellation of Debt and Reduction of Tax Attributes

In general, absent an exception, a debtor that is a U.S. taxpayer will realize and recognize cancellation of debt income ("CODI") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (x) the adjusted issue price of any new indebtedness of the taxpayer issued and (y) the fair market value of any stock or other consideration given in satisfaction of such indebtedness at the time of the exchange.  The amount of CODI for WVD, if any, arising in connection with the implementation of the Plan and the amount of WVD's tax attributes potentially subject to reduction (as described below), will generally depend on the amount of any Cash and the fair market value of any other consideration received (or treated as received) by holders of General Unsecured Claims and Ongoing Trade Claims under the Plan and the amount of General Unsecured Claims and Ongoing Trade Claims against WVD and its subsidiaries, and may also be impacted by the manner in which the Plan is implemented.  These factors are not known at this time and may not be known with certainty until after the Effective Date and, as a result, the total amount of CODI for WVD arising as a result of the implementation of the Plan cannot be determined until after the Effective Date.

A debtor generally will not, however, be required to include any amount of CODI in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding, as would be the case if the Plan were approved.  Instead, as a consequence of such exclusion, a debtor generally must reduce certain of its tax attributes by the amount of CODI that it excluded from gross income pursuant to section 108 of the Code.  In general, tax attributes are reduced in the following order:   (a) NOLs and NOL carryforwards; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the reorganized company remains subject immediately after the discharge); (e) passive activity loss and credit carryovers; and (f) foreign tax credits.  Alternatively, a debtor with CODI may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Code. Although not free from doubt, it is expected that carryovers of disallowed business interest expense are not tax attributes subject to such reduction.  If the amount of excluded CODI exceeds available tax attributes, the excess generally is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

WVD may realize CODI as a result of the implementation of the Plan.  As noted above, the amount of CODI will not be determinable until after the Effective Date.  Any such amount, however, is expected to be excluded from WVD's gross income and reduce WVD's NOLs and/or other tax attributes.   In addition, as discussed below under "Limitation of NOL Carryforwards and Other Tax Attributes," WVD's ability to utilize those reduced NOLs and/or other tax attributes is expected to be subject to limitation as a result of the implementation of the Plan.  Any changes in the direct or indirect ownership of equity interests in WVD following the Effective Date may further limit WVD's ability to utilize any NOLs and/or other tax attributes.

### b.    Limitation of NOL Carryforwards and Other Tax Attributes

Under sections 382 and 383 of the Code, if a corporation undergoes an "ownership change," the amount of any NOLs, interest expense carryforwards, tax credit carryforwards, net unrealized built-in losses, and possibly certain other tax attributes of the corporation allocable to periods prior to the ownership change (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation. For purposes of this discussion, it is assumed that WVD has not already undergone an "ownership change" during the pendency of these chapter 11 cases. The implementation of the Plan is expected to result in an "ownership change" of WVD for these purposes if WVD is one of the Reorganized Debtors. As a result, if WVD is one of the Reorganized Debtors, WVD's use of its Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Code applies. For this purpose, if a corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. In general, a corporation's net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. On September 9, 2019, the IRS issued proposed regulations that would significantly modify the calculation and treatment of net unrealized built-in gains and losses; however, the IRS recently amended the proposed effective date provision of those regulations to exempt from the new regulations ownership changes pursuant to chapter 11 cases filed prior to the regulations becoming effective. Thus, if the proposed regulations are finalized in their current form, the proposed regulations are not expected to apply to WVD and the remainder of this discussion assumes they will not apply.

### i.    General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the three-calendar-month period ending with the calendar month in which the ownership change occurs, *e.g.* 0.89% for ownership changes occurring in July 2020). The section 382 limitation may be increased if the company has a net unrealized built-in gain in its assets as of the ownership change date and the company recognizes certain built-in gains in their assets during the five-year period following the ownership change or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Section 383 of the Code applies a similar limitation to capital loss carryforwards and tax credits. Any portion of the annual limitation that is not used in a given year may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

If the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual

-88-

limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the 'corporation's Pre-Change Losses (absent any increases due to recognized built-in gains).

### ii.     Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" and/or shareholders of a debtor corporation in chapter 11 receive, in respect of their claims or equity interests, respectively, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, the amount of the debtor's Pre-Change Losses is re-determined as if no interest deductions were allowable during the three taxable years preceding the ownership change, and during the part of the taxable year prior to and including the ownership change, in respect of all debt converted into stock in the reorganization.   If the 382(l)(5) Exception applies and the company undergoes another "ownership change" within two years after the first change, then the company's Pre-Change Losses thereafter would be effectively eliminated in their entirety unless there is a net unrealized built-in gain in the company's assets.  Any future ownership change after such two-year period would subject WVD to the general limitations under sections 382 and 383 of the Code.  Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception").  Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (a) the value of the debtor corporation's stock (with certain adjustments) immediately after the ownership change and (b) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to re-determine the amount of its Pre-Change Losses as if no interest deductions were allowable with respect to the debt exchanged for stock in the manner described above, and the debtor may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses.  The resulting limitation would be determined under the regular rules for ownership changes.

WVD is not expected to qualify for the 382(l)(5) Exception under the Plan.

### 2.     *U.S. Holders of Allowed Secured Notes Claims*

### a.     Consequences of Receiving BidCo Equity Consideration

Pursuant to the Plan, each holder of Allowed Secured Notes Claims will receive its *pro rata* share of the BidCo Equity Consideration in satisfaction of its Allowed Secured Notes Claims.  The U.S. federal income tax consequences of the Plan to U.S. Holders of Allowed Secured Notes Claims will depend on whether the exchange of the Allowed Secured Notes Claims pursuant to the Plan constitutes a taxable transaction or a tax-deferred transaction, such

as an exchange governed by section 351 of the Code and/or section 368 of the Code. Whether the exchange constitutes a taxable transaction or a tax-deferred transaction will depend on the manner in which the transactions undertaken pursuant to the Plan (including the transaction steps set forth in **Exhibit 1** of the Plan) are consummated and may also depend on whether the Allowed Secured Notes Claims are treated as "securities" for U.S. federal income tax purposes.

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. The A&R NPA under which the Secured Notes were issued was entered into on March 18, 2019, which was five years before the stated maturity date for the Secured Notes. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor at the time of issuance, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current or accrued basis. A U.S. Holder of Allowed Secured Notes Claims should consult its own tax advisor to determine whether its Allowed Secured Notes Claims should be treated as securities for U.S. federal income tax purposes.

If the exchange of Allowed Secured Notes Claims for the BidCo Equity Consideration constitutes a taxable transaction, each U.S. Holder of an Allowed Secured Notes Claim generally will recognize gain or loss in an amount equal to the difference between (i) the fair market value of the BidCo Equity Interests received (other than any BidCo Equity Interests treated as received for accrued but unpaid interest and accrued original issue discount ("<u>OID</u>"), if any) and (ii) the U.S. Holder's adjusted tax basis in its Allowed Secured Notes Claim immediately prior to the exchange (other than any tax basis attributable to accrued but unpaid interest and accrued OID, if any). The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Allowed Secured Notes Claim in such U.S. Holder's hands, whether the Allowed Secured Notes Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Allowed Secured Notes Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Allowed Secured Notes Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations. To the extent that a portion of the BidCo Equity Interests received is allocable to accrued but unpaid interest or OID, the U.S. Holder may recognize ordinary income. *See* "Accrued Interest" and "Market Discount" below. A U.S. Holder's tax basis in the BidCo Equity Interests received should be equal to the fair market value of such BidCo Equity Interests. A U.S. Holder's holding period in such BidCo Equity Interests received should begin on the day following the Effective Date.

If the exchange of Allowed Secured Notes Claims for the BidCo Equity Consideration constitutes a tax-deferred transaction, subject to the discussion below under "Accrued Interest," U.S. Holders of Allowed Secured Notes Claims could be required to recognize gain, but not loss,

upon the exchange. In such case, a U.S. Holder's tax basis in the BidCo Equity Interests received (other than any BidCo Equity Interests treated as received in satisfaction of accrued but unpaid interest and accrued OID, if any) should be equal to the tax basis in the Allowed Secured Notes Claims exchanged therefor increased by the amount of any gain recognized upon the exchange, and the holding period for such BidCo Equity Interests should include the holding period for the exchanged Allowed Secured Notes Claims.

Regardless of whether the exchange is treated as a taxable transaction or a tax-deferred transaction, a U.S. Holder will have taxable interest income to the extent of any consideration allocable to accrued but unpaid interest or OID not previously included in income, as more fully described below under "Accrued Interest," which amounts will not be included in the amount realized with respect to a U.S. Holder's Allowed Secured Notes Claim.

### b.    Consequences of Owning BidCo Equity Interests

### i.    Distributions on BidCo Equity Interests

Subject to the discussion below under "Possible Treatment of BidCo as a Passive Foreign Investment Company," any distributions with respect to the BidCo Equity Interests (including any amounts withheld in respect of taxes thereon) generally will be treated as taxable dividends to the extent paid out of BidCo's current or accumulated earnings and profits (as determined under U.S. federal income tax principles). To the extent the amount of any distribution exceeds BidCo's current and accumulated earnings and profits for a taxable year (as determined under U.S. federal income tax principles), the distribution will first be treated as a tax-free return of capital to the extent of the U.S. Holder's adjusted tax basis in the BidCo Equity Interests, and thereafter as capital gain, subject to the discussion below under "Market Discount." The Debtors do not know whether BidCo will keep record of its earnings and profits in accordance with U.S. federal income tax principles. Therefore, U.S. Holders should expect that any distribution on the BidCo Equity Interests generally will be treated as a dividend unless otherwise noted.

Any such taxable dividends received by a corporate U.S. Holder will not be eligible for the "dividends received deduction." Any such taxable dividends will be eligible for reduced rates of taxation as "qualified dividend income" for non-corporate U.S. Holders if the following conditions are met: (i) either (1) BidCo is eligible for the benefits of a comprehensive income tax treaty with the United States that the Secretary of the U.S. Treasury has determined is satisfactory and that includes an exchange of information program (which includes, as of the date hereof, the Convention between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income and Capital Gains) or (2) the BidCo Equity Interests are readily tradable on an established securities market in the United States (including, *e.g.*, the NYSE or NASDAQ); (ii) the U.S. Holder meets the holding period requirement for the BidCo Equity Interests (generally more than 60 days during the 121-day period that begins 60 days before the ex-dividend date); and (iii) BidCo was not in the year prior to the year in which the dividend was paid (with respect to a U.S. Holder that held BidCo Equity Interests), and is not in the year in which the dividend is paid, a passive foreign investment company ("PFIC"). Otherwise, such taxable dividends will not be eligible for reduced rates of taxation as "qualified dividend income."

No assurance can be given that BidCo will qualify for the benefits of a comprehensive income tax treaty, and it is not expected that the BidCo Equity Interests will be considered readily tradable on an established securities market in the United States as described above. In addition, as discussed below under "Possible Treatment of BidCo as a Passive Foreign Investment Company," no assurance can be given that BidCo will not be treated as a PFIC. Accordingly, each non-corporate U.S. Holder is urged to consult its tax advisor regarding whether taxable dividends received by such U.S. Holder will be eligible for qualified dividend income treatment.

### ii.    Sale, Exchange or Other Taxable Disposition of BidCo Equity Interests

Subject to the discussion below under "Possible Treatment of BidCo as a Passive Foreign Investment Company," a U.S. Holder generally will recognize gain or loss on a sale, exchange or other taxable disposition of BidCo Equity Interests equal to the difference between the amount realized on the disposition and the U.S. Holder's adjusted tax basis in the BidCo Equity Interests. Subject to the discussion below under "Market Discount" and the following sentence, this gain or loss generally will be capital gain or loss and generally will be long-term capital gain or loss if the U.S. Holder has held the BidCo Equity Interests for more than one year. A U.S. Holder that previously claimed a bad debt deduction with respect to its Allowed Secured Notes Claims or that is a cash-method taxpayer may be required to treat some or all of this gain as ordinary income. Generally, for U.S. Holders who are individuals, long-term capital gains are subject to U.S. federal income tax at a maximum rate of 20%. For foreign tax credit limitation purposes, gain or loss recognized upon a disposition generally will be treated as from sources within the United States. The deductibility of capital losses is subject to limitations for U.S. federal income tax purposes.

### iii.    Possible Treatment of BidCo as a Passive Foreign Investment Company

BidCo may be classified as a PFIC for U.S. federal income tax purposes. In general, a foreign corporation will be classified as a PFIC if (i) 75% or more of its gross income in a taxable year is passive income, or (ii) 50% or more of its assets in a taxable year, averaged quarterly over the year, produce, or are held for the production of, passive income. Passive income for this purpose generally includes, among other items, interest, dividends, royalties, rents and annuities. For purposes of these PFIC tests, if BidCo directly or indirectly owns at least 25% (by value) of the stock of another corporation, BidCo will be treated as owning its proportionate share of such other corporation's gross assets and receiving its proportionate share of such other corporation's gross income. The Debtors cannot provide any assurances that BidCo will not be treated as a PFIC in the current or future taxable years, especially in light of the fact that the Debtors are still in the development stage of their business.

Under the PFIC rules, if BidCo is a PFIC for any taxable year during which a U.S. Holder holds BidCo Equity Interests, BidCo will continue to be treated as a PFIC with respect to such U.S. Holder for all succeeding years during which the U.S. Holder holds the BidCo Equity Interests unless (i) BidCo ceases to be a PFIC and (ii) the U.S. Holder makes a "deemed sale" election under the PFIC rules. In general, if BidCo is a PFIC for any taxable year during which a

U.S. Holder holds BidCo Equity Interests, any gain recognized by the U.S. Holder on a sale or other taxable disposition of BidCo Equity Interests, as well as the amount of any "excess distribution" (defined below) received by such U.S. Holder, would be allocated ratably over the U.S. Holder's holding period for the BidCo Equity Interests. The amounts allocated to the taxable year of the sale or other disposition (or the taxable year of receipt, in the case of an excess distribution) and to any year before BidCo became a PFIC would be taxed as ordinary income. The amounts allocated to each other taxable year would be subject to tax at the highest rate in effect for that taxable year, and an interest charge would be imposed. For purposes of these rules, an excess distribution is the amount by which any distribution received by a U.S. Holder on its BidCo Equity Interests in a taxable year exceeds 125% of the average of the annual distributions on the BidCo Equity Interests received during the preceding three years or the U.S. Holder's holding period, whichever is shorter. Certain elections may be available that would result in alternative treatments (such as mark-to-market treatment or "qualified electing fund" treatment) of the BidCo Equity Interests. It is not known whether BidCo will make available the information necessary for U.S. Holders to make a "qualified electing fund" election with respect to their BidCo Equity Interests.

The rules relating to PFICs are complex. Each U.S. Holder is urged to consult its tax advisor regarding whether BidCo will constitute a PFIC and, if so, the U.S. federal income tax consequences of holding the BidCo Equity Interests.

### 3.    *U.S. Holders of Allowed General Unsecured Claims*

In general, a U.S. Holder of an Allowed General Unsecured Claim will recognize gain or loss in an amount equal to the difference between (i) the sum of any Cash and the fair market value of any other consideration received in satisfaction of its Claim (other than any Cash or other consideration received in respect of a Claim for accrued but unpaid interest and accrued OID, if any), and (ii) the U.S. Holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest and accrued OID, if any). A U.S. Holder will have ordinary interest income to the extent of any Cash or other consideration received that is allocable to accrued but unpaid interest or OID not previously included in income, as described under "Accrued Interest." In the event of the subsequent disallowance of any General Unsecured Claims, a U.S. Holder of a previously Allowed General Unsecured Claim may receive additional post-Effective Date Distributions. Accordingly, it is possible that any loss, or a portion of any gain, realized by a U.S. Holder may be deferred until all General Unsecured Claims are Allowed or disallowed. In addition, a U.S. Holder may have imputed interest income with respect to any such post-Effective Date Distributions. U.S. Holders are urged to consult their own tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting any gain that may be recognized by them in respect of their General Unsecured Claims due to the receipt of consideration in a taxable year subsequent to the taxable year in which the Effective Date occurs. The discussion herein assumes that the installment method does not apply.

### 4.    *U.S. Holders of Allowed Ongoing Trade Claims*

In general, a U.S. Holder of an Allowed Ongoing Trade Claim will recognize gain or loss in an amount equal to the difference between (i) the sum of any Cash and the fair market value of

any other consideration received in satisfaction of its Claim (other than any Cash or other consideration received in respect of a Claim for accrued but unpaid interest and accrued OID, if any), and (ii) the U.S. Holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest and accrued OID, if any). A U.S. Holder will have ordinary interest income to the extent of any Cash or other consideration received that is allocable to accrued but unpaid interest or accrued OID not previously included in income, as described under section "Accrued Interest." In the event of the subsequent disallowance of any Ongoing Trade Claims, a U.S. Holder of a previously Allowed Ongoing Trade Claim may receive additional post-Effective Date Distributions subject to the treatment discussed above. *See* Section VIII.A.3., "U.S. Holders of Allowed General Unsecured Claims", *supra*.

### 5. *Accrued Interest*

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Secured Notes Claim, Allowed General Unsecured Claim or Allowed Ongoing Trade Claim is attributable to accrued but unpaid interest or OID, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder, and subject to a special exception that may be available to cash-method U.S. Holders in certain circumstances). Conversely, a U.S. Holder of an Allowed Secured Notes Claim, Allowed General Unsecured Claim or Allowed Ongoing Trade Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest or OID was previously included in the U.S. Holder's gross income but was not paid in full. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Secured Notes Claim, Allowed General Unsecured Claim or Allowed Ongoing Trade Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid interest, if any, that accrued on such Claims before the Petition Date. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by a U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Allowed Secured Notes Claims, Allowed General Unsecured Claims and Allowed Ongoing Trade Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### 6. *Market Discount*

Under the "market discount" provisions of the Code, some or all of any gain realized by a U.S. Holder of an Allowed Secured Notes Claim, Allowed General Unsecured Claim or Allowed Ongoing Trade Claim who receives consideration pursuant to the Plan in satisfaction of its Allowed Secured Notes Claim, Allowed General Unsecured Claim or Allowed Ongoing Trade Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of

market discount on the Claim.  In general, a debt instrument is considered to have been acquired with market discount if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in either case, by at least a statutorily defined de minimis amount.

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Secured Notes Claim, Allowed General Unsecured Claim or Allowed Ongoing Trade Claim acquired with market discount should generally be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Secured Notes Claim, Allowed General Unsecured Claim or Allowed Ongoing Trade Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

To the extent that Allowed Secured Notes Claims acquired with market discount are exchanged in a tax-deferred transaction, any market discount that accrued on the Allowed Secured Notes Claims (*i.e.*, up to the time of the exchange) but was not recognized by the U.S. Holder may carry over to the BidCo Equity Interests received in exchange therefor, in which case any gain recognized on the subsequent sale or other taxable disposition of the BidCo Equity Interests shall be treated as ordinary income to the extent of the accrued, but not recognized, market discount with respect to the Allowed Secured Notes Claims.

U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of the exchange of Allowed Secured Notes Claims, Allowed General Unsecured Claims or Allowed Ongoing Trade Claims acquired with market discount pursuant to the Plan.

## 7.    *Information Reporting and Backup Withholding*

The Debtors and the Reorganized Debtors will withhold all amounts required by law to be withheld and will comply with all applicable reporting requirements of the Code.  In general, information reporting requirements may apply to Distributions or payments made to a holder under the Plan or with respect to their BidCo Equity Interests.  In addition, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%) if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding.  Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a U.S. taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds.  U.S. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**The U.S. federal income tax consequences of the Plan are complex. The foregoing summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular U.S. Holder in light of such U.S. Holder's circumstances and income tax situation. All holders of Claims and Interests should consult with their tax advisors as to the particular tax consequences to them of the transactions contemplated by the Plan, including the applicability and effect of any state, local, or foreign tax laws, and of any change in applicable tax laws.**

**B.      CERTAIN UK TAX CONSEQUENCES FOR HOLDERS OF BIDCO EQUITY INTERESTS**

The mere subscription of new share capital in BidCo will have no immediate UK taxation consequence for the new shareholder. A shareholder acquiring existing shares by transfer (as opposed to new shares by subscription) will be liable for UK stamp duty at the rate of 0.5% on the consideration paid for those shares. The acquisition of shares in the Reorganized Company Party should not result in any UK tax consequences for the holders of shares in BidCo.

The holder of shares in BidCo receiving dividends on those shares will not, under current UK law, suffer any withholding on account of UK tax on such dividends.

Indebtedness of the Reorganized Debtors which is released under the Plan in a way that gives rise, prima facie, to a taxable credit in the hands of the Reorganized Debtors, should not, of itself, result in a shareholder of BidCo incurring any charge to UK taxation. A ruling has been obtained from HM Revenue and Customs which confirms that any income so arising shall be treated as statutorily exempt from UK tax in the Reorganized Debtors' hands.

**Shareholders should consult their own tax advisers of any non-UK taxation consequences to them arising as a result of the conversion or exchange of any indebtedness of the Debtors and/or the holding of the share capital of BidCo (or any affiliate thereof).**

**This analysis may not apply to a shareholder who holds its investment in BidCo as a trading or dealing asset of a financial trade or business carried on in the United Kingdom or through a branch or permanent establishment there, and such persons are advised to seek their own professional tax and accounting advice on the consequences of any exchange of indebtedness for equity under the Plan.**

**IX.      RECOMMENDATION AND CONCLUSION**

The Debtors believe that the Confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all parties entitled to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline established by the Disclosure Statement Order.

Dated:  August 31, 2020

Respectfully submitted,

OneWeb Global Limited,
on behalf of itself and each of the other Debtors

By:  _/s/    *Thomas Whayne*_____
      Name:  Thomas Whayne
      Title:   Chief Financial Officer
                OneWeb Global Limited

## <u>ANNEX A</u>

**Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OneWeb Global Limited, *et al.* | ) | Case No. 20-22437 (RDD) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

---

## SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF ONEWEB GLOBAL LIMITED, ET AL.

---

Dated: August 31, 2020

Dennis F. Dunne, Esq.
Andrew M. Leblanc, Esq.
Tyson M. Lomazow, Esq.
Lauren C. Doyle, Esq.
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219

*Counsel to the Debtors*
*and Debtors in Possession*

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if any, are:  OneWeb Global Limited (N/A); OneWeb Holdings LLC (5429); OneWeb Communications Limited (9487); WorldVu Satellites Limited (7802); WorldVu Development LLC (9067); WorldVu JV Holdings LLC (N/A); 1021823 B.C. LTD (8609); Network Access Associates Limited (8566); OneWeb Limited (8662); WorldVu South Africa (Pty) Ltd. (1867); OneWeb Chile SpA (2336); WorldVu Australia Pty Ltd. (5436); WorldVu Unipessoal Lda. (2455); OneWeb Norway AS (0209); OneWeb ApS (9191); OneWeb Network Access Holdings Limited (8580); OneWeb G.K. (1396); OneWeb Ltd (8661); WorldVu Mexico S. DE R. L. DE C.V. (1234).  The Debtors' headquarters is located at 195 Wood Lane, West Works Building, 3rd Floor, London, W12 7FQ, UK.

# TABLE OF CONTENTS

I.    DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION
OF TIME ........................................................................................................1

    A.    Defined Terms .......................................................................................1

    B.    Rules of Interpretation and Computation of Time ..............................18

          1.    Rules of Interpretation ............................................................18

          2.    Computation of Time ..............................................................18

          3.    Reference to Monetary Figures ...............................................18

II.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .................18

    A.    Unclassified Claims ............................................................................19

          1.    Administrative Expense Claims ...............................................19

                a.    Treatment of Administrative Expense Claims ..............19

                b.    Administrative Expense Claims Bar Date ....................19

                c.    U.S. Trustee Fees .........................................................20

                d.    Fee Claims ...................................................................20

                e.    Professional Fee Escrow ..............................................20

          2.    Priority Tax Claims .................................................................21

          3.    DIP Claims ..............................................................................21

          4.    DIP Agent Fees and Expenses .................................................21

    B.    Classification of Claims and Interests .................................................21

          1.    Classes of Claims and Interests ...............................................21

    C.    Treatment of Claims and Interests ......................................................22

          1.    Class 1 – Secured Notes Claims ..............................................22

          2.    Class 2 – Other Secured Claims ...............................................22

          3.    Class 3 – Priority Non-Tax Claims ..........................................23

          4.    Class 4 – General Unsecured Claims ........................................23

          5.    Class 5 – Ongoing Trade Claims ..............................................24

          6.    Class 6 – Intercompany Claims ...............................................24

          7.    Class 7 – Intercompany Interests .............................................25

          8.    Class 8 – Section 510(b) Claims ..............................................25

          9.    Class 9 – OneWeb Interests .....................................................25

    D.    Reservation of Rights Regarding Claims .............................................25

    E.    Postpetition Interest on Claims ...........................................................26

| | | |
|---|---|---|
| F. | Insurance | 26 |

**III. ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY INTERESTS** ... 26

| | | |
|---|---|---|
| A. | Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code | 26 |
| B. | Elimination of Vacant Classes | 26 |
| C. | Voting Classes | 26 |

**IV. MEANS OF IMPLEMENTATION** ... 26

| | | | |
|---|---|---|---|
| A. | Deemed Consolidation | | 26 |
| B. | The Settlement | | 27 |
| C. | Sources of Consideration for Plan Distributions | | 27 |
| | 1. | Cash Consideration | 28 |
| | 2. | Additional Cash Plan Funding | 28 |
| D. | Ongoing Trade Claims Recovery Pool | | 28 |
| E. | General Unsecured Claims Settlement Distribution | | 28 |
| F. | Issuance of New Equity Interests, BidCo Equity Interests, and SoftBank Rollover BidCo Equity | | 28 |
| | 1. | New Equity Interests | 29 |
| | 2. | BidCo Equity Interests | 29 |
| | 3. | Authorization, Issuance and Delivery of the New Equity Interests | 30 |
| | 4. | Issuance and Delivery of the BidCo Equity Consideration to Class 1 | 30 |
| G. | Restructuring Steps Under UK Corporate Law | | 30 |
| H. | The Liquidating Debtors | | 30 |
| I. | Plan Administrator | | 31 |
| J. | The Wind Down | | 32 |
| K. | Continued Corporate Existence. | | 32 |
| L. | Disbursing Agent | | 32 |
| M. | New Board of Directors/Officers | | 33 |
| N. | Survival of Indemnification Obligations and D&O Liability Insurance | | 33 |
| | 1. | Indemnification Obligations | 33 |
| | 2. | D&O Liability Insurance Policies | 33 |
| O. | Employee Matters | | 34 |
| P. | Retained Causes of Action | | 34 |

Q.   Release of Avoidance Actions for Holders of Claims in Class 4 and Class 5.................................................................................................................35

R.   Cancellation and Surrender of Notes, Instruments, Securities and Other Documentation...........................................................................................35

S.   Release of Liens..........................................................................................36

T.   Effectuating Documents; Further Transactions ..........................................36

U.   Amended Organizational Documents ..........................................................37

V.   FCC Communications Consents ..................................................................37

W.   Section 1146 Exemption from Certain Taxes and Fees...............................38

V.   SECURED NOTES AGENT FEES AND EXPENSES .........................................38

VI.   TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .........38

A.   Assumption and Rejection of Executory Contracts and Unexpired Leases .........38

B.   Claims Based on Rejection of Executory Contracts and Unexpired Leases .........39

C.   Cure Claims .................................................................................................39

D.   Reservation of Rights...................................................................................41

VII.   PROVISIONS GOVERNING DISTRIBUTIONS .................................................41

A.   Method of Distributions to Holders of Claims ............................................41

B.   Undeliverable Distributions and Time Bar to Cash Payments. ...................42

C.   Distribution Record Date .............................................................................42

D.   Minimum Distributions................................................................................42

E.   Compliance with Tax Requirements............................................................43

F.   Setoffs..........................................................................................................43

G.   Allocation Between Principal and Accrued Interest....................................43

H.   Claims Paid or Payable by Third Parties .....................................................44

    1.   Claims Paid by Third Parties...........................................................44

    2.   Claims Payable by Insurance ..........................................................44

VIII.   DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS ...........................44

A.   Allowance of Claims....................................................................................44

B.   Prosecution of Objections to Claims............................................................44

    1.   Authority to Prosecute and Settle Claims ......................................44

    2.   Omnibus Objections........................................................................45

    3.   Authority to Amend Schedules .......................................................45

C.   Estimation of Claims....................................................................................45

D.    Claims Subject to Pending Actions..........................................................46

E.    Distributions to Holders of Disputed Claims.............................................46

F.    Partitioning of Authority With Respect to Claims......................................46

IX.   CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION
      OF THE PLAN ...........................................................................................46

A.    Conditions to Confirmation ....................................................................46

B.    Conditions to the Effective Date..............................................................47

      1.    Confirmation Order.......................................................................47

      2.    Statutory Fees..............................................................................47

      3.    Documentation .............................................................................47

      4.    Antitrust and Foreign Investment Approvals....................................47

      5.    State Aid Approval ........................................................................47

      6.    DDTC Notification ........................................................................47

      7.    No Injunctions or Restraints ..........................................................48

      8.    Establishment of Professional Fee Escrow .......................................48

      9.    Funding of the Ongoing Trade Claims Recovery Pool and the
            General Unsecured Claims Settlement Distribution ...........................48

      10.   Conditions Precedent to the Obligations of the Plan Sponsor. .............48

            a.    Accuracy of Representations and Warranties ..............................48

            b.    Performance of Obligations ....................................................48

            c.    No Termination ....................................................................48

            d.    BidCo Equity Consideration. ..................................................48

            e.    Officer's Certificate .............................................................49

            f.    Communications Consents......................................................49

            g.    No Company Material Adverse Effect ........................................49

            h.    Principal Vendor Contracts ....................................................49

            i.    Effective Date Cash Funding Cap.............................................49

      11.   Conditions Precedent to the Debtors' Obligations.............................49

            a.    Accuracy of Representations and Warranties ..............................49

            b.    Performance of Obligations ....................................................49

            c.    No Termination ....................................................................50

            d.    Officer's Certificate .............................................................50

C.    Waiver of Conditions to the Effective Date................................................50

X.    WITHDRAWAL AND MODIFICATION OF THE PLAN ...........................................50

    A.    Withdrawal of the Plan ...................................................................................50

    B.    Modification of the Plan .................................................................................50

XI.    EFFECT OF CONFIRMATION ...................................................................................51

    A.    Binding Effect .................................................................................................51

    B.    Vesting of Assets ............................................................................................51

    C.    Discharge of Claims Against and Interests in the Debtors .............................51

    D.    Exculpation .....................................................................................................52

    E.    Releases ...........................................................................................................53

        1.    Releases by the Debtors ......................................................................53

        2.    Releases by Holders of Claims ...........................................................54

    F.    Injunction ........................................................................................................55

    G.    Scope of Discharge, Release, or Injunction With Respect to the United States of America ...........................................................................................56

    H.    Term of Injunctions or Stays ..........................................................................57

    I.    Ipso Facto and Similar Provisions Ineffective ...............................................57

XII.    RETENTION OF JURISDICTION ..............................................................................57

XIII.    MISCELLANEOUS PROVISIONS .............................................................................59

    A.    Dissolution of Creditors' Committee ..............................................................59

    B.    Inconsistency ...................................................................................................59

    C.    Exhibits / Schedules ........................................................................................59

    D.    Severability .....................................................................................................59

    E.    Governing Law ................................................................................................60

    F.    Successors and Assigns ...................................................................................60

    G.    Service of Documents ......................................................................................60

        1.    The Debtors .........................................................................................60

        2.    DIP Agent ...........................................................................................60

        3.    Creditors' Committee ..........................................................................61

        4.    The U.S. Trustee .................................................................................61

        5.    Plan Sponsor .......................................................................................61

        6.    SoftBank Group Corp. ........................................................................62

XIV.    CONFIRMATION REQUEST .....................................................................................62

## INTRODUCTION

OneWeb Global Limited, OneWeb Holdings LLC, OneWeb Communications Limited, WorldVu Satellites Limited, WorldVu Development LLC, WorldVu JV Holdings LLC, 1021823 B.C. LTD, Network Access Associates Limited, OneWeb Limited, WorldVu South Africa (Pty) Ltd., OneWeb Chile SpA, WorldVu Australia Pty Ltd., WorldVu Unipessoal Lda., OneWeb Norway AS, OneWeb ApS, OneWeb Network Access Holdings Limited, OneWeb G.K., OneWeb Ltd, and WorldVu Mexico S. DE R. L. DE C.V. propose this joint chapter 11 plan pursuant to section 1129 of the Bankruptcy Code.  The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court. The Plan constitutes a separate Plan for each Debtor and does not effectuate a substantive consolidation of the Debtors or their Estates.

**ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE DISCLOSURE STATEMENT ACCOMPANYING THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  SUBJECT TO CERTAIN RESTRICTIONS AND REQUIREMENTS SET FORTH IN SECTION 1127 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3019 AND THE PLAN, THE DEBTORS RESERVE THE RIGHT TO ALTER, AMEND, MODIFY, REVOKE OR WITHDRAW THE PLAN PRIOR TO ITS SUBSTANTIAL CONSUMMATION.**

## I.    DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

### A.    Defined Terms

Capitalized terms used in the Plan and not otherwise defined herein have the meanings set forth below.  Any term that is not defined in the Plan, but that is defined in the Bankruptcy Code or the Bankruptcy Rules, has the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.    **"Additional Cash Plan Funding"** means the amount, up to $850 million, that the Plan Sponsor will provide, less the amount of the Interim Funding, to the Reorganized Company Party on or following the Effective Date to fund, as and when due:  (a) all Allowed Cure Claims; (b) all Administrative Expense Claims, including those necessary to fund the Wind-Down Reserve (but excluding Cure Claims), Allowed Priority Tax Claims, Allowed Other Secured Claims, and all Allowed Priority Non-Tax Claims, in each case, to the extent required to receive cash payment, up to the Effective Date Cash Funding Cap (excluding any Administrative Expense Claims that are being paid from the Cash Consideration or the Interim Funding) or such greater amount as the Plan Sponsor agrees in its sole discretion; and (c) the Reorganized Company Party's business going forward.

2.    **"Additional SoftBank Consideration"** means contribution of  SoftBank's Cash recovery on account of SoftBank's Allowed DIP Claims in exchange for the SoftBank Rollover BidCo Equity.

3.    **"Administrative Expense Claims Bar Date"** means the deadline for filing requests for payment of Administrative Expense Claims (other than Fee Claims and Section

503(b)(9) Claims), which shall be the first Business Day that is thirty (30) days after the Effective Date; provided, however that the deadline for filing requests for payment of Section 503(b)(9) Claims is the Claims Bar Date.

4.     **"Administrative Expense Claim"** means any Claim for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority or superpriority pursuant to sections 364(c)(1), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the estates and operating the businesses of the Debtors, (b) Fee Claims, (c) any request for compensation or expense reimbursement for making a substantial contribution in the chapter 11 cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code, (d) U.S. Trustee Fees, and (e) in respect of any obligations under the KEIP or the KERP; provided that for the avoidance of doubt U.S. Trustee Fees and Fee Claims shall receive the treatment set forth in section II.A(1)(c) and section II.A(1)(d), respectively.

5.     **"Affiliate"** means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified, where "control" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through ownership of voting securities or rights, by contract, as trustee, executor or otherwise; provided that, for purposes of the Plan, Airbus OneWeb Satellites LLC shall not be deemed to be an Affiliate of OneWeb or any of its Subsidiaries.

6.     **"Allowed"** means, with respect to a Claim or Interest, (a) any Claim or Interest arising on or before the Effective Date (i) as to which a Proof of Claim has been timely filed on or before the applicable Bar Date, (ii) as to which no objection to allowance, priority, or secured status, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed prior to the Effective Date, (iii) identified in the Schedules as of the Effective Date as not disputed, not contingent and not unliquidated, and for which no Proof of Claim has been timely filed, or (iv) as to which an objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder unless subject to another pending objection, (b) any Claim or Interest that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or Reorganized Debtors (including pursuant to any stipulation or settlement agreement approved by the Bankruptcy Court), (c) any Claim or Interest as to which the liability of the Debtors or Reorganized Debtors, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, (d) any Claim or Interest expressly allowed by a Final Order of the Bankruptcy Court (including, but not limited to, the Cash Collateral Order and DIP Order), or (e) any Claim or Interest expressly allowed hereunder; provided that the Claims described in the foregoing clauses shall not include any Section 510(b) Claims.  Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.

7.     **"Allowed Secured Notes Claims Equity Amount"** means the amount of the Allowed Secured Notes Claims which will be converted into BidCo Equity Interests, being an amount equal to the BidCo Equity Consideration.

8.      **"Amended Organizational Documents"** means the form of the amended certificates or articles of incorporation, bylaws, or such other applicable formation or governance documents of the Reorganized Debtors and the Liquidating Debtors, to the extent required to be amended under the Bankruptcy Code as agreed to between the Debtors and the Plan Sponsor, the forms of which shall be included in the Plan Supplement.

9.      **"Amended Principal Vendor Contracts"** means the Principal Vendor Contracts as amended in accordance with section 6(c) of the Plan Support Agreement.

10.     **"Antitrust and Foreign Investment Authority"** means the U.S. Federal Trade Commission, the Antitrust Division of the U.S. Department of Justice, CFIUS, any attorney general of any state of the United States, or any other Governmental Entity (as defined in the Plan Support Agreement) of any jurisdiction with responsibility for enforcing any Antitrust and Foreign Investment Laws.

11.     **"Antitrust and Foreign Investment Laws"** means any Law (as defined in the Plan Support Agreement) of any jurisdiction or any country designed to prohibit, restrict, or regulate actions for the purpose or effect of monopolization, lessening of competition, restraining trade, or abusing a dominant position, or direct or indirect foreign investment, including the HSR Act, the Sherman Antitrust Act of 1890, the Clayton Antitrust Act of 1914, the Federal Trade Commission Act of 1914, Section 721 of the DPA (as defined in the Plan Support Agreement), and any other Law requiring parties to submit any notification or filing to an Antitrust and Foreign Investment Authority regarding any investment transaction, merger, acquisition, or joint venture.

12.     **"Assumed Contracts"** means all Executory Contracts and Unexpired Leases, other than those listed on the Rejection Schedule.

13.     **"Assumed Liabilities"** means any Actions against or Liabilities of any Debtor expressly assumed by the Reorganized Debtors hereunder, including without limitation the Cure Claims.

14.     **"Avoidance Actions"** means any and all avoidance, recovery, subordination or other actions or remedies that have been or may be brought on behalf of the Debtors or the Estates under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code.

15.     **"Avoidance Action Release"** means the release by the Debtors and the Reorganized Debtors of any Avoidance Action against the holder of an Allowed General Unsecured Claim or an Allowed Ongoing Trade Claim that votes to accept the Plan.

16.     **"Ballot"** means the applicable form of ballot distributed to holders of Claims entitled to vote on the Plan and on which the acceptance or rejection of the Plan is to be indicated.

17.     **"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§101-1532, as now in effect or hereafter amended, as applicable to these cases.

18.     **"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York.

19.     **"Bankruptcy Rules"** means, collectively, the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

20.     **"Bar Date"** means the deadlines for asserting Claims established by the Plan or the Bankruptcy Court, as applicable, including the Claims Bar Date, the Rejection Damages Deadline, and the Administrative Expense Claims Bar Date.

21.     **"Base Funding Amount"** means the $1 billion of funding that Bharti Global Limited and the Secretary of State for Business, Energy and Industrial Strategy have agreed to provide Plan Sponsor in order to consummate the Transaction and address the funding requirements of the Company Parties and Reorganized Company Party on the Effective Date and going forward as it may be increased by any further equity subscriptions to BidCo on or prior to the Effective Date.

22.     **"Benefit Plan"** means any employee benefit plan (as defined in section 3(3) of ERISA) and any deferred compensation, bonus, pension, retirement, profit sharing, savings, incentive compensation, stock purchase, stock option or other equity or equity-linked compensation, disability, death benefit, hospitalization, medical, dental, life, employment, retention, change in control, termination, severance, separation, vacation, sick leave, holiday pay, paid time off, leave of absence, fringe benefit, compensation, incentive, insurance, welfare or any similar plan, program, policy, practice, agreement or arrangement (including any funding mechanism therefor), written or oral, whether or not subject to ERISA, and whether funded or unfunded, in each case that is adopted, sponsored, maintained, entered into, contributed to, or required to be maintained or contributed to, by any Company Party for the benefit of any Current Employee other than as set forth on the Rejection Schedule.

23.     **"BidCo"** means BidCo 100 Limited, a private limited company organized under the laws of England and Wales.

24.     **"BidCo Equity Interests"** means the equity interests in BidCo.

25.     **"BidCo Equity Consideration"** means the portion of the equity interests in BidCo having a value of $97 million calculated on a BidCo value of the Base Funding Amount plus additional $97 million notional amount and $87.9 million notional amount attributable to the SoftBank Rollover BidCo Equity.

26.     **"Business Day"** means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

27.     **"Cash"** means the lawful currency of the United States of America and equivalents thereof.

28.     **"Cash Collateral Order"** means the *Final Order (I) Authorizing Debtors to Use Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Certain Protections to Prepetition Noteholders Pursuant to 11 U.S.C. §§ 361, 362, 363, and 507, and (III) Granting Related Relief* [Docket No. 118], as modified from time to time.

29.     **"Cash Consideration"** means $150 million cash.

30.     **"Causes of Action"** means any action, Claim, cause of action, controversy, demand, right, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  Cause of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any Avoidance Action, (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any state law fraudulent transfer claim.

31.     **"CFIUS"** means the Committee on Foreign Investment in the United States.

32.     **"CFIUS Approval"** means (a) a written notice issued by CFIUS providing, with respect to a CFIUS Notice, that CFIUS (i) has determined that the transaction notified to CFIUS under the CFIUS Notice is not subject to review by CFIUS as a covered transaction under section 721 of the DPA (as defined in the Plan Support Agreement), or (ii) it has concluded a review (and any applicable investigation) of the transaction notified to CFIUS under the CFIUS Notice and has determined that there are no unresolved national security concerns arising therefrom and terminated all action under Section 721 of the DPA, or (b) if CFIUS has sent a report to the President of the United States of America (the "<u>President</u>") requesting the President's decision regarding the CFIUS Notice, then (i) a written notice received from CFIUS announcing the President's decision not to take any action to suspend or prohibit the transaction notified to CFIUS under the CFIUS Notice, or (ii) the President has not taken any action, within fifteen (15) days after the date the President received such report from CFIUS, to suspend or prohibit the transaction notified to CFIUS under the CFIUS Notice.

33.     **"CFIUS Notice"** means a notice jointly prepared and submitted to CFIUS by the Debtors and the Plan Sponsor, either in the form of a declaration or a joint voluntary notice, as applicable, with respect to the transactions contemplated hereby.

34.     **"Claim"** means a "claim," as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor.

35.     **"Claims and Noticing Agent"** means Omni Agent Solutions, in its capacity as claims and noticing agent appointed in these cases.

36.     **"Claims Bar Date"** means: (a) with respect to all Claims other than those specified in sub-clauses (b) and (c) of this definition, 5:00 p.m. (Eastern Time) on August 11, 2020; (b) with respect to Claims held by Governmental Units, 5:00 p.m. (Eastern Time) on September 24, 2020; and (c) with respect to Claims arising from the rejection of an Executory Contract or Unexpired Lease, the later of August 11, 2020 or the Rejection Damages Deadline.

37.     **"Claims Objection Deadline"** means, for all Claims, including Section 503(b)(9) Claims and Administrative Expense Claims, the later of: (a) 180 days after the Effective Date and

(b) such other period of limitation for objecting to particular Claims as may be established by the Plan, the Confirmation Order, or another order of the Bankruptcy Court.

38.     **"Class"** means a class of Claims or Interests, as set forth in section II of the Plan.

39.     **"Communications Consent"** means any and all filings, consents, licenses notices, reports, registrations, approvals, permits, expirations of waiting periods, exemptions or authorizations of Governmental Entities required to be obtained or made under any Communications Law in connection with the execution, delivery and performance of this Agreement, the consummation of the Transactions and the conduct of the Business as conducted on the Agreement Date or during the Support Period, including any Communications Permits necessary to conduct the Business in such manner and any other Communication Permits held by OneWeb and each of OneWeb's Subsidiaries.[2]

40.     **"Company Parties"** shall mean OneWeb and OneWeb's Subsidiaries.

41.     **"Confirmation"** means the entry of the Confirmation Order on the docket of the Bankruptcy Court.

42.     **"Confirmation Date"** means the date on which the Bankruptcy Court enters the Confirmation Order on its docket.

43.     **"Confirmation Hearing"** means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

44.     **"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

45.     **"Creditors' Committee"** means the official committee of unsecured creditors appointed in these cases pursuant to section 1102 of the Bankruptcy Code.

46.     **"Cure Claim"** means a Claim of a counterparty to an Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to sections 365 and/or 1123 of the Bankruptcy Code on account of monetary defaults under such Executory Contract or Unexpired Lease.

47.     **"Current Employees"** means the Debtors' employees as of the date immediately preceding the Effective Date.

48.     **"D&O Liability Insurance Policies"** means each insurance policy, including director and officer liability insurance policies, to which the Debtors are a party as of the date immediately prior to the Effective Date.

---

[2]     Defined terms used in this definition that are not otherwise defined shall have the meaning ascribed thereto in the Plan Support Agreement.

49.     **"DDTC Notification"** means the notification to the U.S. Directorate of Defense Trade Controls of the U.S. Department of State required by the International Traffic in Arms Regulations, 22 CFR § 122.4.

50.     **"Debtors"** means, collectively, OneWeb Global Limited, OneWeb Holdings LLC, OneWeb Communications Limited, WorldVu Satellites Limited, WorldVu Development LLC, WorldVu JV Holdings LLC, 1021823 B.C. LTD, Network Access Associates Limited, OneWeb Limited, WorldVu South Africa (Pty) Ltd., OneWeb Chile SpA, WorldVu Australia Pty Ltd., WorldVu Unipessoal Lda., OneWeb Norway AS, OneWeb ApS, OneWeb Network Access Holdings Limited, OneWeb G.K., OneWeb Ltd, and WorldVu Mexico S. DE R. L. DE C.V., as debtors in possession in these cases.

51.     **"Deficiency Claim"** means the unsecured portion of any Secured Notes Claims arising under section 506(a) of the Bankruptcy Code.

52.     **"DIP Agent"** means, jointly, GLAS USA LLC, as the administrative agent, and GLAS Trust Corporation Limited, as collateral agent, under the DIP Agreement.

53.     **"DIP Agent Fees and Expenses"** means the compensation, fees, expenses, disbursements, and indemnity claims incurred by the DIP Agent, including, without limitation, attorneys' and agents' fees, expenses, disbursements, and noncontingent indemnification obligations incurred by the DIP Agent, in each case as and to the extent payable or reimbursable under the DIP Agreement and the DIP Order. For the avoidance of doubt, the DIP Agent Fees and Expenses shall include, but are not limited to, the reasonable and documented fees, expenses, and disbursements of counsel.

54.     **"DIP Agreement"** means that certain Senior Secured Debtor-in-Possession Term Loan Credit Agreement, dated as of April 29, 2020, among OneWeb Communications Limited, as borrower, OneWeb, the DIP Agent, and the DIP Lenders [Docket No. 121, Exh. A] as amended as of July 10, 2020 pursuant to the DIP Amendment.

55.     **"DIP Amendment"** means that certain amendment to the DIP Agreement authorized by the DIP Amendment Order dated as of July 10, 2020.

56.     **"DIP Amendment Order"** means the *Order Authorizing the Debtors to Amend the Existing DIP Facility* [Docket No. 398].

57.     **"DIP Claims"** means all Claims of the DIP Secured Parties under the DIP Order and the DIP Agreement, including all Claims of the Plan Sponsor under the Interim Funding.

58.     **"DIP Facility"** means the superpriority senior secured delayed-draw debtor-in-possession credit facility pursuant to the DIP Agreement.

59.     **"DIP Lenders"** means the lenders from time to time under the DIP Agreement.

60.     **"DIP Order"** means the *Order (I) Authorizing Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense*

*Claims, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 121], as modified from time to time, including as set forth in the DIP Amendment Order.

61.      **"DIP Secured Parties"** means, collectively, the DIP Agent and the DIP Lenders.

62.      **"Disbursing Agent"** means an Entity appointed to make the distributions required by the Plan after the Effective Date, which may be the Liquidating Debtors and/or Plan Administrator.

63.      **"Disclosure Statement"** means the *Disclosure Statement for Second Amended Joint Chapter 11 Plan of OneWeb Global Limited et al.* with respect to the Plan (including all exhibits and schedules thereto or referenced therein) approved by the Disclosure Statement Order.

64.      **"Disclosure Statement Order"** means the order of the Bankruptcy Court dated [●] [Docket No. ●], approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code.

65.      **"Disputed Claim"** means any Claim or a portion of a Claim: (a) that is neither an Allowed Claim nor a disallowed Claim; (b) that is listed as disputed, contingent or unliquidated in the Schedules or that is otherwise subject to an objection; or (c) for which a Proof of Claim has been timely filed or a written request for payment has been made, but (i) the Debtors (or any other party in interest entitled to do so) have interposed a timely objection or request for estimation with respect thereto, which objection or request for estimation has not been withdrawn or determined by a Final Order or (ii) such Proof of Claim has been asserted in an amount that is greater than the undisputed, non-contingent or liquidated amount listed for such Claim in the Schedules.

66.      **"Distribution"** means any distribution of property to a holder of an Allowed Claim on account of such Claim in accordance with sections II and VII of the Plan.

67.      **"Distribution Date"** means the Initial Distribution Date, any Periodic Distribution Dates, or the Final Distribution Date.  Whenever the Plan provides that a Distributions must be made on a particular Distribution Date it shall be deemed made on such Distribution Date if made as promptly thereafter as practicable.

68.      **"Distribution Record Date"** means the date for determining which holders of Allowed Claims are eligible to receive Distributions hereunder, which, unless otherwise specified, shall be the Confirmation Date or such other date as designated by the Bankruptcy Code.

69.      **"Effective Date"** means the date, as determined by the Debtors, on which: (a) no stay of the Confirmation Order is in effect, and (b) all conditions precedent set forth in section IX.B hereof have been satisfied or waived in accordance with the terms hereof.

70.      **"Effective Date Cash Funding Cap"** means the amount, up to $25.9 million or such greater amount as the Plan Sponsor agrees in its sole discretion, of the Additional Cash Plan Funding that Plan Sponsor will fund, either directly or to the Reorganized Debtors on the Effective Date to satisfy Administrative Expense Claims, including those necessary to fund the Wind-Down Reserve (but excluding Cure Claims), Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Priority Non-Tax Claims, in each case, to the extent required to receive cash

payment, provided that such cap will not apply to any Administrative Expense Claims that are being paid from the Cash Consideration or the Interim Funding or the Ongoing Trade Claims Recovery Pool.  For the avoidance of doubt, the Ongoing Trade Claims Recovery Pool and the General Unsecured Claims Settlement Distribution amount are in addition to and shall not be subject to the Effective Date Cash Funding Cap.

71.    **"Effective Date Cash Funding Reserve Amount"** means the estimated total amount of all outstanding Administrative Expense Claims, including those necessary to fund the Wind-Down Reserve (but excluding Cure Claims), Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Priority Non-Tax Claims, in each case, to the extent required to receive cash payment, excluding any Administrative Expense Claims that are being paid from the Cash Consideration or the Interim Funding, through and including the Effective Date, in each case as determined in good faith by the Debtors and delivered to Plan Sponsor no later than five days before the Effective Date.

72.    **"English Law"** means all laws, rules, regulations and statutes of the legal system of England and Wales.

73.    **"Entity"** means an individual, firm, corporation, partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization or government or any political subdivision thereof.

74.    **"Estate"** means, as to each Debtor, the estate created for such Debtor pursuant to section 541 of the Bankruptcy Code.

75.    **"Exculpated Parties"** means, collectively and individually, (a) the Debtors; (b) the Plan Sponsor; (c) the Creditors' Committee and its members, (d) the DIP Secured Parties; (e) the Prepetition Secured Parties; and (f) the Representatives of each of the foregoing, solely in their respective capacities as such.

76.    **"Executory Contract and/or Unexpired Lease"** means a contract or a lease to which a Debtor is a party or with respect to which a Debtor may be liable that is capable of being assumed, assumed and assigned or rejected under section 365 of the Bankruptcy Code, including any modifications, amendments, addenda or supplements thereto.

77.    **"Excluded Assets"** means any of the Debtors' assets designated by the Plan Sponsor to be transferred to the Liquidating Debtors and identified as "Excluded Assets" on Annex D to the Disclosure Statement.

78.    **"Excluded Liabilities"** means any Causes of Actions against or Liabilities of any Debtor that are not Assumed Liabilities, including, for the avoidance of doubt, any rejection damages arising from the rejection of any Executory Contract or Unexpired Lease.

79.    **"FCC"** means the U.S. Federal Communications Commission, or any successor agency.

80.    **"Fee Claim"** means a Claim under sections 328, 330(a) or 331 of the Bankruptcy Code for compensation of a Professional for services rendered and expenses incurred in connection with these cases prior to the Effective Date.

81.    **"Fiduciary Exculpated Parties"** means Exculpated Parties that are fiduciaries of any of the Estates or that are such fiduciaries' current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, investment managers, investment advisors, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such.

82.    **"Final Distribution Date"** means, for a particular Class of Claims, the Distribution Date upon which final Distributions to the holders thereof are to be made.

83.    **"Final Order"** means an order or judgment of the Bankruptcy Court or another court of competent jurisdiction, entered on the docket of the applicable court, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a vacatur, new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or a proceeding for a vacatur, new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the vacatur, new trial, reargument or rehearing shall have been denied or resulted in no modification of such order; <u>provided that</u> no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

84.    **"First and Second Cure Notices"** means the *Notice of Potential Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Sale* [Docket No. 232] and the *Supplemental Notice of Potential Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection with Sale* [Docket No. 323].

85.    **"General Unsecured Claim"** means any Claim that is not a Secured Claim, an Ongoing Trade Claim, an Intercompany Claim, a Section 510(b) Claim or a Claim entitled to priority under the Bankruptcy Code, but includes, for the avoidance of doubt, the Deficiency Claims which shall be treated as a Class 1 Claim.

86.    **"General Unsecured Claims Settlement Distribution"** means $6.1 million in Cash to be funded by BidCo to the Debtors to fund distributions to holders of Allowed General Unsecured Claims and Allowed Ongoing Trade Claims.

87.    **"GLAS"** means, collectively, Global Loan Agency Services Limited and GLAS Trust Corporation Limited.

88.    **"Governmental Unit"** shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

89.    **"HM Revenue and Customs"** means Her Majesty's Revenue and Customs.

90.    **"HSR Act"** means the Hart-Scott-Rodino Antitrust Improvements Act of 1976 and the rules and regulations promulgated thereunder, and any successor to such statute, rules, or regulations.

91.    **"Impaired"** means "impaired," as such term is defined in section 1124 of the Bankruptcy Code.

92.    **"Indemnification Obligations"** means each of the Debtors' indemnification obligations (whether in charters, bylaws, limited liability company agreements, or other organizational documents) in place immediately prior to the Effective Date to indemnify officers and directors of the Debtors serving in such capacities as of the Petition Date with respect to all present and future actions, suits, and proceedings against the Debtors or such officers or directors based upon any act or omission for or on behalf of the Debtors.

93.    **"Initial Distribution Date"** means the Effective Date or the date occurring as soon as reasonably practicable after the Effective Date when Distributions commence.

94.    **"Intercompany Claim"** means any Claim held by a Debtor or an Affiliate of a Debtor against another Debtor or an Affiliate of a Debtor, whether or not such Claim is reflected in intercompany book entries.

95.    **"Intercompany Interest"** means any Interest in a Debtor held by another Debtor. For the avoidance of doubt, an Intercompany Interest shall exclude the OneWeb Interests.

96.    **"Interest"** means any common or preferred stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership or profit interest in a Debtor, whether or not certificated, transferable, or voting.

97.    **"Interim Funding"** means $110 million of additional new-money financing provided by the Plan Sponsor to the Debtors pursuant to the DIP Amendment and the DIP Amendment Order.

98.    **"Interim Funding DIP Claim"** means a DIP Claim held by the Plan Sponsor in connection with the Interim Funding.

99.    **"KEIP"** means the Debtors' Key Employee Incentive Plan, as approved by the *Order (I) Approving Key Employee Incentive Program and Key Employee Retention Program; (II) Authorizing Payments Thereunder; and (III) Granting Related Relief* [Docket No. 235].

100.    **"KERP"** means the Debtors' Key Employee Retention Plan, as approved by the *Order (I) Approving Key Employee Incentive Program and Key Employee Retention Program; (II) Authorizing Payments Thereunder; and (III) Granting Related Relief* [Docket No. 235].

101.    **"Liabilities"** means, as to any Person, all debts, adverse Claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct or indirect, absolute or contingent, whether accrued or unaccrued, vested or otherwise, liquidated or

unliquidated, whether known or unknown, and whether or not actually reflected, or required to be reflected, in such Person's balance sheet or other books and records.

102.    **"Lien"** means "lien" as defined in section 101(37) of the Bankruptcy Code.

103.    **"Liquidating Debtors"** means that Debtor or those Debtors whose stock interests are not transferred directly or indirectly to the Plan Sponsor as part of the Transaction, which Debtor or Debtors shall remain in existence after the Effective Date for the purpose of winding down the estates and effectuating the Distributions under the Plan, and the interests of such Debtor or Debtors shall be identified as Excluded Assets.

104.    "**New Equity Interests"** means 100% of the equity interests in the Reorganized Company Party.

105.    **"Notice Parties"** means the Debtors, the Reorganized Debtors, the Liquidating Debtors and the Plan Administrator, as applicable, as well as the Secured Notes Agent, the DIP Agent, the Plan Sponsor, Creditors' Committee and the U.S. Trustee.

106.    **"OneWeb"** means OneWeb Global Limited.

107.    **"OWC"** means OneWeb Communications Limited.

108.    **"OneWeb Interests"** means the Interests in OneWeb, including any Awards (as defined in the Liquidated Incentive Plans).

109.    **"Ongoing Trade Claimant"** means those ongoing trade vendors that will continue after the Effective Date to provide goods and services to the Reorganized Debtors and which hold Ongoing Trade Claims.

110.    **"Ongoing Trade Claims"** means unsecured Claims that are fixed, liquidated, and undisputed payment obligations to third-party providers of goods and services to the Debtors that facilitate the Debtors' operations in the ordinary course of business and will continue to do so after the Effective Date, as determined by the Debtors with the consent of the Plan Sponsor; for the avoidance of doubt, each holder of an Ongoing Trade Claim shall receive a Ballot for Class 5 as part of the Solicitation Package (as defined in the Disclosure Statement Order).

111.    **"Ongoing Trade Claims Recovery Pool"** means $350,000 in Cash if Class 5 (Ongoing Trade Claims) is an Accepting Class.

112.    **"Opt-out Form"** means the form provided to all holders of Claims and Interests deemed to have accepted or rejected the Plan allowing such holders to elect to opt out of the releases provided in section XI.E of the Plan in accordance with the Disclosure Statement Order.

113.    "**Ordinary Course Professionals Order"** means the *Order Authorizing Debtors to Employ and Pay Professionals Utilized in the Ordinary Course of Business* [Docket No. 107] entered by the Bankruptcy Court on April 30, 2020.

114.    **"Other Secured Claim"** means a Secured Claim other than an Administrative Expense Claim, a DIP Claim, a Priority Tax Claim, or a Secured Notes Claim.

115.    **"Periodic Distribution Date"** means, unless otherwise ordered by the Bankruptcy Court, (a) the first Business Day that is 180 days after the Initial Distribution Date and (b) thereafter, the first Business Day that is 180 days after the immediately preceding Periodic Distribution Date.

116.    **"Person"** means an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Entity (as defined in the Plan Support Agreement), or any other entity.

117.    **"Petition Date"** means March 27, 2020.

118.    **"Plan"** means this *Second Amended Joint Chapter 11 Plan for OneWeb Global Limited, et al.* and all exhibits, appendices, and schedules thereto, including all documents and instruments contained in the Plan Supplement, as the same may be amended, modified or supplemented in accordance with its terms.

119.    **"Plan Administrator"** means a person appointed by the Liquidating Debtors to administer Claims reconciliation and oversee the wind-down of their respective Estates after the Effective Date.  The identity, role, and compensation of the Plan Administrator will be disclosed in the Plan Supplement.

120.    **"Plan Document"** means any of the documents, other than this Plan, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, including the documents to be included in the Plan Supplement, all of which shall be in form and substance as provided herein and reasonably acceptable to the Debtors and Plan Sponsor.

121.    **"Plan Sponsor"** means BidCo 100 Limited.

122.    **"Plan Supplement"** means the compilation of documents and forms of documents that constitute exhibits, appendices, and schedules to the Plan that will be filed before the Voting Deadline including, without limitation: (a) the Amended Organizational Documents; (b) details regarding the Plan Administrator's role and compensation; (c) the Rejection Schedule; (d) the identity and affiliations of the Reorganized Debtors' directors and officers to the extent known at the time of filing; and (e) Retained Causes of Action Schedule. Subject to the provisions of the Plan Support Agreement, the Debtors will have the right to alter, amend, modify, or supplement the documents contained in the Plan Supplement through the Effective Date.

123.    **"Plan Support Agreement"** means that certain Plan Support Agreement dated as of July 1, 2020 as amended, supplemented, or otherwise modified from time to time, among OneWeb, OneWeb's Subsidiaries listed as signatories thereto, and the Plan Sponsor.

124.    **"Plan Support Agreement Order"** means the Order authorizing the Debtors to enter into the Plan Support Agreement [Docket No. 400].

- 13 -

125.    **"Prepetition Secured Parties"** means the holders of the Secured Notes and the Secured Notes Agent.

126.    **"Principal Vendor Contracts"** means those contracts listed on Section 1(eeee) of the disclosure schedules to the Plan Support Agreement.

127.    **"Priority Non-Tax Claim"** means a Claim entitled to priority under section 507(a) of the Bankruptcy Code, other than an Administrative Expense Claim or a Priority Tax Claim.

128.    **"Privilege Rights"** means, collectively, any attorney-client privilege, attorney work-product protection or any other similar privilege or protection from disclosure belonging to or operating in favor of the Debtors and their Estates.

129.    **"Priority Tax Claim"** means a Claim that is entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

130.    **"Professional"** means any professional person employed in these cases pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code, including any Entity employed pursuant to the Ordinary Course Professionals Order.

131.    **"Professional Fee Escrow"** means an escrow account to be established and funded on the Effective Date in an amount equal to the Professional Fee Reserve Amount in accordance with section II.A.1.e hereof.

132.    **"Professional Fee Reserve Amount"** means the total amount of unpaid compensation and unreimbursed expenses incurred by Professionals retained by the Debtors or any official committee through and including the Effective Date, in ease case as determined in good faith by the applicable professional.

133.    **"Proof of Claim"** means a proof of Claim filed with the Bankruptcy Court or the Claims and Noticing Agent in accordance with the applicable order of the Bankruptcy Court.

134.    **"Reinstated"** means, with respect to a Claim, that such Claim is accorded treatment provided in section 1124(1) of the Bankruptcy Code.

135.    **"Rejection Damages Deadline"** means the deadline by which a Proof of Claim on account of damages resulting from rejection of an Executory Contract and Unexpired Lease must be filed, which shall be such date specified by any order of the Bankruptcy Court or 30 days after notice of such rejection if not otherwise specified.

136.    **"Rejection Schedule"** means a list of Executory Contracts and Unexpired Leases that shall not be assumed and shall be rejected pursuant to the Plan, which list shall be filed as part of the Plan Supplement, as may be amended from time to time consistent with last paragraph of Section VI.C.  Notwithstanding anything in Section I.A.122, following the deadline for filing the Plan Supplement, the Rejection Schedule may only be amended in accordance with the preceding sentence.

137.   **"Released Parties"**  means each of the following, in each case in their capacity as such:  (a) the Creditors' Committee and its members, (b) the DIP Secured Parties (excluding the Plan Sponsor); (c) the Prepetition Secured Parties; (d) each of the Debtors, Reorganized Debtors and Liquidating Debtors; and (e) with respect to the foregoing, each such Entity's Representatives; provided that, if any Entity objects to Confirmation of, or votes to reject, the Plan, such Entity and such Entity's Representatives shall not be Released Parties.

138.   **"Releasing Parties"** means each of the following, in each case, in their capacity as such:  (a) each of the Released Parties, (b) the Debtors; (c) the Reorganized Debtors; (d) the Liquidating Debtors; (e) all holders of Claims that vote to accept the Plan; (f) all holders of Claims that are entitled to vote on the Plan, but abstain from voting and do not affirmatively opt out of the releases provided by the Plan by checking the appropriate box on the applicable Ballot; (g) all holders of Claims and Interests deemed to have accepted the Plan who do not affirmatively opt out of the releases provided by the Plan by submitting a duly completed Opt-out Form; and (h) with respect to each of the foregoing, such Entity's Representatives.

139.   **"Reorganized Company Party"** means, on or after the Effective Date, (a) OneWeb, as reorganized pursuant to the Plan, (b) OneWeb Communications Limited, as reorganized pursuant to the Plan, (c) any successor to either of the foregoing, or (d) one or more newly-formed entity or entities to hold the equity interests in either of the Entities described in clause (a) or clause (b) above, in each case as reasonably agreed by the Debtors and the Plan Sponsor.

140.   **"Reorganized Debtors"** means, on and after the Effective Date, all Debtors that are not Liquidating Debtors, including the Reorganized Company Party.

141.   **"Representatives"** means, with respect to any Entity, solely in their respective capacities as such, (a) such person's or Entity's successors, predecessors, Affiliates, current and former officers, directors, employees, partners, limited partners, general partners, principals, managers, members, management companies, advisory board members, investment managers, employees, equity holders (regardless of whether interests are held directly or indirectly), agents, attorneys, investment bankers, financial advisors, accountants or other professionals, and (b) such person's or Entity's Affiliates' current and former directors, managers, officers, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, and other professionals.

142.   **"Restraints"** means, collectively, any Law or Order (each as defined in the Plan Support Agreement) restraining, enjoining, preventing or prohibiting the Transactions (as defined in the Plan Support Agreement) or otherwise making the Transactions illegal.

143.   **"Retained Causes of Action"** means all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities, arising on, prior to or after the Petition Date, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising in law, equity or otherwise, including Avoidance Actions, asserted, or which may be asserted, by or on behalf of any of the Debtors or the Estates, based in law or equity, including, without limitation, whether asserted or unasserted as of the Effective Date, that are retained by the Reorganized Debtors; which

for the avoidance of doubt shall not include any Avoidance Action released pursuant to the Avoidance Action Release or any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities against any Released Party.

144.  **"Retained Causes of Action Schedule"** means the schedule listing all Retained Causes of Action to be included with the Plan Supplement.

145.  **"Schedules"** means, collectively, the (a) schedules of assets and liabilities and (b) statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as each may be amended and supplemented from time to time.

146.  **"Scheme of Arrangement"** means a scheme, compromise or arrangement under Part 26 or 26A of the English Companies Act 2006.

147.  **"Section 503(b)(9) Claim"** means an Administrative Expense Claim arising under section 503(b)(9) of the Bankruptcy Code.

148.  **"Section 510(b) Claim"** means any option, warrant, right, or other security or agreement to obtain an Interest, whether or not arising under or in connection with any employment agreement, subject to subordination pursuant to section 510(b) of the Bankruptcy Code.

149.  **"Secured Claim"** means a Claim secured by a valid and perfected Lien on property in which an Estate has an interest or that is subject to a valid right of setoff under section 553 of the Bankruptcy Code, to the extent of the value of its holder's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

150.  **"Secured Note Purchase Agreement"** means that certain Amended and Restated Note Purchase Agreement, dated as of March 18, 2019, among the Secured Notes Agent, OneWeb Communications Limited, as issuer, WorldVu Satellites Ltd. and certain of its Subsidiaries as guarantors, and the parties identified as "Purchaser" thereunder.

151.  **"Secured Notes"** means the promissory notes issued pursuant to the Secured Note Purchase Agreement.

152.  **"Secured Notes Agent"** means, collectively, Global Loan Agency Services Limited, as administrative agent, and GLAS Trust Corporation Limited, as collateral agent, under the Secured Note Purchase Agreement.

153.  **"Secured Notes Agent Fees and Expenses"** means the compensation, fees, expenses, disbursements, and indemnity claims incurred by GLAS, solely in its capacity as the Secured Notes Agent, including, without limitation, attorneys' and agents' fees, expenses, disbursements, and noncontingent indemnification obligations incurred by GLAS, solely in its capacity as the Secured Notes Agent, in each case as and to the extent payable or reimbursable under the Secured Note Purchase Agreement or any other Transaction Document (as defined in the Secured Note Purchase Agreement), as applicable. For the avoidance of doubt, the Secured Notes Agent Fees and Expenses shall include, but are not limited to, the reasonable and documented fees, expenses, and disbursements of counsel.

154. **"Secured Notes Claims"** means Secured Claims on account of the Secured Notes and the Secured Note Purchase Agreement and the Deficiency Claims.

155. **"Secured Tax Claim"** means any Secured Claim that, absent its secured status, would be entitled to priority under section 507(a)(8) of the Bankruptcy Code.

156. **"Securities Act"** means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

157. **"Settlement"** has the meaning set forth in Section IV.B.

158. **"SoftBank"** means SoftBank Group Corp.

159. **"SoftBank Rollover BidCo Equity"** means $87.9 million of BidCo Equity Interests, to be valued on the same basis as the BidCo Equity Consideration, having the same rights and restrictions as the BidCo Equity Consideration to be issued to SoftBank in exchange for its entitlement to a Cash recovery of approximately $91 million on account of its Allowed DIP Claims.

160. **"Standing Motion"** means the *Official Committee of Unsecured Creditors' (I) Motion for Order Granting Derivative Standing to Pursue and, if Appropriate, Settle Claims for Recharacterization and Equitable Subordination against Certain Purported Secured Creditors, and (II) Objection to such Creditors' Claims* [Docket No. 402].

161. **"Subsidiary"** means, with respect to any Person (a) a corporation, a majority of whose capital stock with voting power, under ordinary circumstances, to elect directors is at the time, directly or indirectly, owned by such Person, by a subsidiary of such Person, or by such Person and one or more subsidiaries of such Person, (b) a partnership in which such Person or a subsidiary of such Person is, at the date of determination, a general partner of such partnership, or (c) any other Person (other than a corporation) in which such Person, a subsidiary of such Person or such Person and one or more subsidiaries of such Person, directly or indirectly, at the date of determination thereof, has (i) at least a majority ownership interest thereof or (ii) the power to elect or direct the election of a majority of the directors or other governing body of such Person, provided that, for purposes of this Agreement, neither Airbus OneWeb Satellites LLC nor OneWeb Limited Liability Company shall be deemed to be a Subsidiary of OneWeb or any of its Subsidiaries.

162. **"Transaction"** means the transfer of the New Equity Interests to the Plan Sponsor on the terms, and subject to the conditions as set forth in the Plan.

163. **"Unimpaired"** means, with respect to a Claim, a Claim that is not Impaired.

164. **"United Kingdom"** means, collectively, the United Kingdom, its agencies, departments, agents, arm's length bodies, Governmental Entities (as defined in the Plan Support Agreement), and Governmental Units.

165. **"Unsecured"** means, with respect to a Claim, a Claim that is not a Secured Claim.

166. **"U.S. Trustee"** means the Office of the United States Trustee for Region 2.

167. **"U.S. Trustee Fees"** means all fees payable pursuant to 28 U.S.C. § 1930(a), together with any interest thereon pursuant to 31 U.S.C. § 3717.

168. **"Voting Deadline"** means the deadline for submitting Ballots to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, which is 4:00 p.m. (prevailing Eastern Time) on [●], 2020.

169. **"Wind-Down Reserve"** means $3 million allocated to the winding down of the Liquidating Debtors to be funded by the Plan Sponsor from the Additional Cash Plan Funding.

## B.    Rules of Interpretation and Computation of Time

### 1.    Rules of Interpretation

For purposes of the Plan, unless otherwise provided herein: (a) whenever it is appropriate from the context, each term, whether stated in the singular or the plural, includes both the singular and the plural; (b) unless otherwise provided in the Plan, any reference to a contract, agreement, release or another instrument or document being in a particular form or on particular terms means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference to a document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented pursuant to the Plan, Confirmation Order or otherwise; (d) any reference to a holder of a Claim or Interest includes that holder's successors, assigns and affiliates; (e) all references to sections, articles and exhibits are references to sections, articles and exhibits of or to the Plan; (f) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (g) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; and (h) the rules of construction set forth in section 102 of the Bankruptcy Code (other than subsection (5) thereof) shall apply to the extent not inconsistent with any other provision of this Section I.B.1.

### 2.    Computation of Time

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) apply.

### 3.    Reference to Monetary Figures

All references in the Plan to monetary figures refer to the lawful currency of the United States of America, unless otherwise expressly provided.

## II.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

All Claims and Interests, except for the Claims set forth in subsection A below, are classified for voting and Distribution purposes as set forth below.  A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest fits within the description of that

Class and is classified in another Class to the extent that another portion of such Claim or Interest fits within the description of such other Class.

Solely for the purposes of voting on the Plan and Distributions hereunder, the Estates shall be deemed substantively consolidated, so that a holder of a Claim that may be asserted against more than one Debtor shall be entitled to a single Distribution as if such holder had a single Claim against the consolidated Estates.

## A.    Unclassified Claims

### 1.    Administrative Expense Claims

#### a.    Treatment of Administrative Expense Claims

Except to the extent otherwise expressly provided herein, other than Fee Claims, U.S. Trustee Fee Claims, DIP Claims and Administrative Expense Claims that have already been paid by the Debtors during the chapter 11 cases, and except to the extent that a holder of an Allowed Administrative Expense Claim and the applicable Debtor, with the consent of the Plan Sponsor (such consent to not be unreasonably withheld), Reorganized Debtor or Liquidating Debtor, as applicable, agree to less favorable treatment, each holder of an Allowed Administrative Expense Claim shall be paid 100% of the unpaid Allowed amount of such Claim in Cash by the Reorganized Debtors from the proceeds of the DIP Facility, Cash on hand and/or Cash funded by BidCo on the date that is the later of: (a) the Effective Date; (b) the date such Claim would ordinarily be due and payable in accordance with ordinary business terms; or (c) the date that is fifteen (15) days (or, if such date is not a Business Day, on the next Business Day) after such Claim becomes an Allowed Administrative Expense Claim.

#### b.    Administrative Expense Claims Bar Date

Unless previously filed or as otherwise governed by an order of the Bankruptcy Court, requests for payment of Administrative Expense Claims (other than Fee Claims and Section 503(b)(9) Claims) that accrued on or before the Effective Date must be filed and served on the Notice Parties no later than the Administrative Expense Claims Bar Date. Holders of Section 503(b)(9) Claims shall continue to be subject to the Claims Bar Date. Holders of Administrative Expense Claims that are required to file and serve a request for payment and that do not timely file and serve such a request shall be forever barred from asserting such Administrative Expense Claims against the Debtors, the Reorganized Debtors, the Liquidating Debtors or their respective property, and such Administrative Expense Claims shall be automatically discharged as of the Effective Date; provided, that, notwithstanding the foregoing in section II.A.1, in the event the Plan Sponsor is entitled to the expense reimbursement as contemplated by the Plan Support Agreement, such expense reimbursement will be owed in accordance with the terms of the Plan Support Agreement and the Plan Support Agreement Order. Objections to requests for payment of Administrative Expense Claims (other than Fee Claims) must be filed and served on the Notice Parties and the requesting party no later than the Claims Objection Deadline.

**HOLDERS OF ADMINISTRATIVE EXPENSE CLAIMS THAT ARE REQUIRED TO, BUT DO NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE EXPENSE CLAIMS BY THE ADMINISTRATIVE EXPENSE**

**CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE EXPENSE CLAIMS AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, THE ESTATES, OR THE ASSETS OR PROPERTY OF ANY OF THE FOREGOING, AND SUCH ADMINISTRATIVE EXPENSE CLAIMS SHALL BE DISCHARGED AS OF THE EFFECTIVE DATE.**

### c.    U.S. Trustee Fees

All fees payable pursuant to 28 U.S.C. § 1930 on or before the Effective Date, shall be paid in full by the Debtors.  Fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date shall be paid by the Liquidating Debtors until the closing of the applicable case pursuant to section 350(a) of the Bankruptcy Code.

### d.    Fee Claims

Professionals asserting Fee Claims for services rendered before the Effective Date must file and serve on the Notice Parties and such other Entities as are designated by the order establishing procedures for compensation and reimbursement of expenses of Professionals entered by the Bankruptcy Court an application for final allowance of such Fee Claims no later than 60 days after the Effective Date; provided, however, that any Professional whose compensation or reimbursement of expenses is authorized pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses pursuant to the Ordinary Course Professionals Order.  Objections to any Fee Claim must be filed and served on the Notice Parties and the requesting party not later than 90 days after the Effective Date or such other period of limitation as may be established by a Bankruptcy Court's Order.

Allowed Fee Claims shall be satisfied from the Professional Fee Escrow. If the amount in the Professional Fee Escrow is insufficient to pay in full all Allowed Fee Claims, the deficiency shall be promptly funded by the Reorganized Debtors, without any further action or order of the Bankruptcy Court.

### e.    Professional Fee Escrow

Professionals shall reasonably estimate their unpaid Fee Claims as of the Effective Date, and shall deliver such estimates to the Debtors no later than five days before the Effective Date; provided, however, that such estimates shall not be deemed to limit the amount of the Fee Claims that are the subject of each Professional's final request for payment in these cases.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

On or before the Effective Date, the Debtors shall establish the Professional Fee Escrow and shall fund such reserve with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow and the funds therein shall be used for the sole purpose of paying the Allowed Fee Claims and shall not constitute property of the Debtors, their Estates, the Liquidating Debtors or the Reorganized Debtors; provided, that the Reorganized Debtors shall hold a residual interest in the Professional Fee Escrow and, upon the satisfaction of all Allowed Fee Claims, any funds remaining in the Professional Fee Escrow shall re-vest in the Reorganized Debtors.

- 20 -

2.      **Priority Tax Claims**

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim, each holder of an Allowed Priority Tax Claim, to the extent not previously paid, shall receive, in full and final satisfaction of its Allowed Priority Tax Claim (a) that is due and payable on or before the Effective Date, Cash in an amount equal to the Allowed amount of such Claim, at the option of the Liquidating Debtors and/or Plan Administrator, (i) on the Effective Date or (ii) in installments over a period of time not to exceed five years after the Petition Date; and (b) that is not due and payable on or before the Effective Date, as it becomes due in the ordinary course; provided, that if an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall be treated as an Other Secured Claim.

3.      **DIP Claims**

On the Effective Date, except with respect to Interim Funding DIP Claims, each holder of an Allowed DIP Claim shall receive payment in full in cash. As part of the Settlement, SoftBank shall contribute to BidCo its entitlement to the Cash Distribution on account of SoftBank's Allowed DIP Claims (approximately $91 million before the consideration of accrued interest) in exchange for the issuance of the SoftBank Rollover BidCo Equity.

With respect to the Interim Funding DIP Claims, each holder of an Allowed Interim Funding DIP Claim under the DIP Facility shall have such claims converted into BidCo Equity Interests at the same valuation as the BidCo Equity Consideration.

4.      **DIP Agent Fees and Expenses**

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall pay in Cash all DIP Agent Fees and Expenses without the need for the DIP Agent to file fee applications or any other applications or motions with the Bankruptcy Court, and from and after the Effective Date, the Reorganized Debtors shall pay in Cash all DIP Agent Fees and Expenses incurred. For the avoidance of doubt, nothing herein shall be deemed to impair, waive, discharge, or negatively impact or affect the rights of the DIP Agent to exercise its charging liens pursuant to the terms of the DIP Agreement.

B.      **Classification of Claims and Interests**

1.      **Classes of Claims and Interests**

The following table (a) designates the Classes of Claims and Interests for the purposes of voting on the Plan and receiving Distributions hereunder and (b) specifies which Classes are (i) Impaired and Unimpaired by the Plan, and (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

| Class | Designation | Treatment | Voting Status |
|---|---|---|---|
| 1 | Secured Notes Claims | Impaired | Entitled to Vote |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | Priority Non-Tax Claims | Unimpaired | Deemed to Accept |

| Class | Designation | Treatment | Voting Status |
|---|---|---|---|
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Ongoing Trade Claims | Impaired | Entitled to Vote |
| 6 | Intercompany Claims | Impaired OR Unimpaired | Deemed to Reject or Accept |
| 7 | Intercompany Interests | Impaired OR Unimpaired | Deemed to Reject or Accept |
| 8 | Section 510(b) Claims | Impaired | Deemed to Reject |
| 9 | OneWeb Interests | Impaired | Deemed to Reject |

**C.    Treatment of Claims and Interests**

    **1.    Class 1 – Secured Notes Claims**

        **a.**    *Classification.*   Class 1 consists of all Secured Notes Claims including all Deficiency Claims.

        **b.**    *Treatment.*   On the Effective Date or as soon as practicable thereafter, except to the extent that a holder of an Allowed Secured Notes Claim, and the Debtors, with the consent of the Plan Sponsor, agree to a less favorable treatment, each such holder, in full and final satisfaction, settlement, release and discharge of each Allowed Secured Notes Claim, shall receive its *pro rata* share of the BidCo Equity Consideration for Allowed Secured Notes Claims, and that portion of the Allowed Secured Notes Claims not satisfied with the *pro rata* portion of the BidCo Equity Consideration will be considered as uncollectible accounts, and the obligations of the Debtors thereunder or in any way related thereto will be deemed extinguished and cancelled in full.

        **c.**    *Voting.* Claims in Class 1 are Impaired.  Each holder of an Allowed Claim in Class 1 is entitled to vote to accept or reject the Plan.

        **d.**    *Allowance*: All Secured Notes Claims (including any Deficiency Claims) shall be deemed Allowed as of the Effective Date in an amount not less than $1,643,809,254.40.

    **2.    Class 2 – Other Secured Claims**

        **a.**    *Classification.*  Class 2 consists of all Other Secured Claims.

        **b.**    *Treatment.*  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, at the option of the Debtors, with the consent of the Plan Sponsor, or the Reorganized Debtors, as applicable, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed

Other Secured Claim, as applicable: (i) such holder shall receive Cash in an amount equal to the allowed amount of such Claim on the later of the Effective Date and the date that is ten (10) business days after the date such Other Secured Claim becomes an Allowed Claim; (ii) such holder's Allowed Other Secured Claim shall be Reinstated; (iii) such holder shall receive the collateral securing such Claim and payment of interest required under section 506(b) of the Bankruptcy Code; or (iv) such holder shall receive such other treatment as will render its Allowed Other Secured Claim Unimpaired.

c.  *Voting.*  Claims in Class 2 are Unimpaired.  Each holder of an Allowed Claim in Class 2 is conclusively presumed to have accepted the Plan and is, therefore, not entitled to vote on the Plan.

3.  **Class 3 – Priority Non-Tax Claims**

a.  *Classification.*  Class 3 consists of all Priority Non-Tax Claims.

b.  *Treatment.*  Except to the extent that a holder of an allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, at the option of the Debtors, with the consent of the Plan Sponsor: (i) such holder shall receive Cash in an amount equal to the allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date that is ten (10) business days after the date such Priority Non-Tax Claim becomes an Allowed Claim; or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

c.  *Voting.*  Claims in Class 3 are Unimpaired.  Each holder of an Allowed Claim in Class 3 is conclusively presumed to have accepted the Plan and is, therefore, not entitled to vote on the Plan.

4.  **Class 4 – General Unsecured Claims**

a.  *Classification*.  Class 4 consists of all General Unsecured Claims.

b.  *Treatment*.  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on or as soon as is reasonably practicable after the Effective Date, each holder thereof, in exchange for full and final satisfaction shall receive its *pro rata* share of the General Unsecured Claims Settlement Distribution.  Each holder of an Allowed General Unsecured Claim that votes to accept the Plan shall receive an Avoidance Action Release.

c.  *Voting*.  Claims in Class 4 are Impaired.  Each holder of an Allowed Claim in Class 4 is entitled to vote to accept or reject the Plan.

5.       **Class 5 – Ongoing Trade Claims**

    a.    *Classification*.  Class 5 consists of all Ongoing Trade Claims.

    b.    *Treatment*.  Except to the extent that a holder of an Allowed Ongoing Trade Claim agrees to less favorable treatment, on or as soon as is reasonably practicable after the Effective Date, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Ongoing Trade Claim, each holder of a Claim in Class 5 shall receive the following treatment:

        (i)    **If Class 5 votes to accept the Plan**, each holder of an Allowed Ongoing Trade Claim shall receive its *pro rata* share of both the General Unsecured Claims Settlement Distribution and the Ongoing Trade Recovery Pool.  For the avoidance of doubt, a vote in favor of the Plan shall constitute an agreement by each holder of an Allowed Ongoing Trade Claim to continue to provide goods and services to the Reorganized Debtors on terms and conditions no less favorable than currently provided.

        (ii)    **If Class 5 votes to reject the Plan**, each holder of an Allowed Claim in Class 5 shall receive its *pro rata* share of the General Unsecured Claims Settlement Distribution.

            Each holder of an Allowed Ongoing Trade Claim that votes to accept the Plan shall receive an Avoidance Action Release.

    c.    *Voting*.  Claims in Class 5 are Impaired.  Each holder of an Allowed Claim in Class 5 is entitled to vote to accept or reject the Plan.

6.       **Class 6 – Intercompany Claims**

    a.    *Classification.*  Class 6 consists of all Intercompany Claims.

    b.    *Treatment.*  On the Effective Date, all Intercompany Claims will be adjusted, continued, settled, Reinstated, discharged, or eliminated, as determined by the Debtors with the consent of the Plan Sponsor.  For the avoidance of doubt, the treatment provided for in this paragraph shall extend to all Intercompany Claims as between the Debtors (including any Liquidating Debtor) or between any of the Debtors and any of their non-Debtor Affiliates.

    c.    *Voting.*  Class 6 Claims are either (i) Unimpaired, in which case each holder of an Allowed claim in Class 6 is deemed to accept the Plan, or (ii) Impaired, and not receiving any distribution under the Plan, in which case each holder of an Allowed claim in Class 5 is deemed

to reject the Plan.

7. **Class 7 – Intercompany Interests**

    a.    *Classification.* Class 7 consists of all Intercompany Interests.

    b.    *Treatment.* On the Effective Date, all Intercompany Interests will be adjusted, continued, settled, Reinstated, discharged, or eliminated, as determined by the Debtors, with the consent of the Plan Sponsor, or the Plan Administrator, as applicable.

    c.    *Voting.* Class 7 Interests are either (i) Unimpaired, in which case each holder of an Allowed Interest in Class 7 is deemed to accept the Plan, or (ii) Impaired, and not receiving any distribution under the Plan, in which case each holder of an Allowed Interest in Class 7 is deemed to reject the Plan.

8. **Class 8 – Section 510(b) Claims**

    a.    *Classification.* Class 8 consists of all Section 510(b) Claims.

    b.    *Treatment.* On the Effective Date, all Section 510(b) Claims shall be discharged without any Distribution.

    c.    *Voting.* Class 8 is Impaired. Each holder of a Claim in Class 8 is conclusively presumed to have rejected the Plan and is, therefore, not entitled to vote on the Plan.

9. **Class 9 – OneWeb Interests**

    a.    *Classification.* Class 9 consists of all OneWeb Interests.

    b.    *Treatment.* On the Effective Date, all OneWeb Interests shall be deemed cancelled and extinguished and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distributions under the Plan to the holders of OneWeb Interests on account of such Interests.

    c.    *Voting.* Class 9 is Impaired. Each holder of a Class 9 Interest is conclusively presumed to have rejected the Plan and is, therefore, not entitled to vote on the Plan.

**D.    Reservation of Rights Regarding Claims**

Except as otherwise provided in the Plan or in any Final Order of the Bankruptcy Court, nothing herein shall affect the Debtors, Reorganized Debtors' or Liquidating Debtors' rights and defenses, whether legal or equitable, with respect to any Claim.

### E.      Postpetition Interest on Claims

Except as required by the Bankruptcy Code, postpetition interest shall not accrue or be payable on account of any Claim.

### F.      Insurance

Notwithstanding anything to the contrary herein, if any Allowed Claim is covered by an insurance policy, such Claim shall be paid from the proceeds of such insurance policy, with the balance, if any, treated in accordance with the provisions of this Plan.

## III.     ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY INTERESTS

### A.      Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code

The Debtors are seeking Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to such Classes that are deemed to reject or that otherwise vote to reject the Plan, and the Plan constitutes a motion for such non-consensual Confirmation. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any other rejecting Class(es).

### B.      Elimination of Vacant Classes

Any Class of Claims or Interests that does not have a holder of a Claim or Interest as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

### C.      Voting Classes

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the holders of such Claims or Interests in such Class.

## IV.     MEANS OF IMPLEMENTATION

### A.      Deemed Consolidation

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor.  Solely for purposes of voting on, and receiving Distributions under, the Plan, the Estates are deemed to be substantively consolidated, *i.e.*, (i) all assets and liabilities of the Debtors are deemed to be assets and liabilities, respectively, of a single Estate; (ii) all guarantees by one Debtor of the obligations of any other Debtor are deemed eliminated, (iii) any joint or several liability of any of the Debtors are deemed to be one obligation of the Debtors; and (iv) Proofs of Claim filed against multiple Debtors are deemed to be one Claim against a single Estate.  This deemed consolidation will not affect (i) the legal and corporate structures of the Debtors; (ii) the rights of

- 26 -

the holders of Allowed Claims to receive Distributions from any insurance policies or proceeds of such policies; (iii) any Liens granted or arising at any time prior to the Effective Date or the priority of those Liens; or (iv) the rights of the Debtors to contest alleged setoff or recoupment rights on the grounds of lack of mutuality under section 553 of the Bankruptcy Code and other applicable law.

This deemed consolidation is appropriate and justified under the circumstances of these chapter 11 cases because it (i) causes no harm to the Debtors' creditors because (a) the DIP Claims may be asserted against each Debtor, (b) the holders of Secured Notes Claims have Secured Claims against the majority of the Debtors, and (c) the DIP Claims and Secured Notes Claims exceed the value of the assets of each Debtor, and (ii) avoids the costs of allocating consideration and litigation-related costs among the Debtors' Estates, thereby avoiding diluting creditor recoveries as a result of increased professional fees, particularly given there has been no allocation of the consideration to be provided by BidCo amongst the various Debtors and their assets. Therefore, all Distributions on account of Claims other than the DIP Claims are carved out from the collateral of the DIP Lenders, and in the absence of such carve-out and the deemed consolidation of the Debtors' Estates, such Claims would receive no recovery.

Subject to section VII, all Distributions made to holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

## B.    The Settlement

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration of the Distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases set forth in section XI.E hereof, shall constitute a good-faith compromise and settlement of all Claims, Interests, disputes and controversies relating to the rights of holders of Claims and Interests including with respect to the claims asserted in the Committee's Standing Motion in exchange for, among other things, the Additional SoftBank Consideration, and the reduction of BidCo Equity Consideration to be distributed to the holders of Senior Secured Claims which is facilitating the cash funding of the General Unsecured Claims Settlement Distribution (the "Settlement").

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of such compromise and settlement and the Bankruptcy Court's determination that such compromise and settlement is in the best interests of the Debtors, their Estates, their creditors, and all other parties in interest, and is fair, equitable and within the range of reasonableness. If the Effective Date does not occur, the settlements set forth herein shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

## C.    Sources of Consideration for Plan Distributions

Prior to the Effective Date, the Plan Sponsor will be capitalized with cash and commitments sufficient to satisfy the Additional Cash Plan Funding. The Reorganized Debtors shall fund distributions under the Plan from the proceeds of the (i) DIP Facility, including Interim Funding, (ii) Cash Consideration, (iii) Additional Cash Plan Funding, and Cash funded by BidCo to fund

(iv) the Ongoing Trade Claims Recovery Pool, and (v) as the result of the Settlement to fund the General Unsecured Claims Settlement Distribution, and (vi) BidCo Equity Consideration.

### 1.    Cash Consideration

On the Effective Date, the Plan Sponsor shall pay the Cash Consideration (less the amount of the Deposit) to the Debtors by wire transfer of immediately available funds to an account or accounts designated in writing by the Debtors before the Effective Date.  The Cash Consideration shall be used to pay Allowed DIP Claims (other than the Interim Funding DIP Claims, as set forth above) as well as other claims to be satisfied in cash hereunder.

### 2.    Additional Cash Plan Funding

On and following the Effective Date, the Plan Sponsor will provide the Reorganized Debtors with the Additional Cash Plan Funding to fund, as and when due: (i) all Allowed Cure Claims; (ii) all Allowed Administrative Expense Claims, including the Wind-Down Reserve (but excluding Allowed Cure Claims), all Allowed Priority Tax Claims, all Allowed Other Secured Claims required to receive Cash payment, and all Allowed Priority Non-Tax Claims required to receive Cash payment, up to an aggregate maximum of $25.9 million (it being agreed that such aggregate maximum excludes any amounts used to satisfy Allowed Administrative Expense Claims that are paid with the Cash Consideration or the Interim Funding) or such greater amount as Plan Sponsor agrees in its sole discretion; and (iii) the Reorganized Debtors' business going forward.

### D.    Ongoing Trade Claims Recovery Pool

On the Effective Date, provided that Class 5 votes to accept the Plan, Cash in an amount of $350,000 shall be funded by BidCo by wire transfer in immediately available funds to an account or accounts designated in writing by the Debtors before the Effective Date to fund the Ongoing Trade Claims Recovery Pool.  For the avoidance of doubt, the Ongoing Trade Claims Recovery Pool shall be funded from the Additional SoftBank Consideration and shall not be included in the calculation of, or subject to, the Effective Date Cash Funding Cap.

### E.    General Unsecured Claims Settlement Distribution

On the Effective Date, cash in the amount of $6.1 million shall be funded by BidCo by wire transfer in immediately available funds to an account or accounts designated in writing by the Debtors before the Effective Date to fund the General Unsecured Claims Settlement Distribution.  For the avoidance of doubt, the General Unsecured Claims Settlement Distribution shall be funded from the Additional SoftBank  Consideration and shall not be included in the calculation of, or subject to, the Effective Date Cash Funding Cap.

### F.    Issuance of New Equity Interests, BidCo Equity Interests, and SoftBank Rollover BidCo Equity

On the Effective Date, the Plan Sponsor shall be issued one hundred percent (100%) of the New Equity Interests in Reorganized Company Party in exchange for the consideration set forth herein, SoftBank shall receive the SoftBank Rollover BidCo Equity, and each holder of an

Allowed Secured Notes Claim shall receive its *pro rata* share of the BidCo Equity Consideration, and that portion of the Allowed Secured Notes Claims not satisfied with the *pro rata* portion of the BidCo Equity Consideration will be considered as uncollectible accounts, and the obligations of the Debtors thereunder or in any way related thereto will be deemed extinguished and cancelled in full.

1. **New Equity Interests.**  The offering, issuance, and distribution of the New Equity Interests shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities pursuant to section 4(a)(2) of the Securities Act; provided that, to the extent that such exemption is unavailable, such securities shall be issued pursuant to any other available exemptions from registration. With respect to the New Equity Interests issued pursuant to section 4(a)(2) of the Securities Act and Regulation D thereunder, such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.  The ability to transfer New Equity Interests will be subject to any restrictions in any applicable securities laws as well as any restrictions in the Reorganized Debtors' Amended Organizational Documents or BidCo's organizational documents, as applicable.  On the Effective Date, the New Equity Interests shall not be registered under the Securities Act, and shall not be listed for public trading on any securities exchange.

2. **BidCo Equity Interests.**  Except as otherwise set forth herein, the offering, issuance, and distribution of the BidCo Equity Interests (including the SoftBank Rollover BidCo Equity) shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities in accordance with section 1145 of the Bankruptcy Code, provided that, to the extent that such exemption is unavailable, such securities shall be issued pursuant to any other available exemptions from registration.  In addition, under section 1145 of the Bankruptcy Code, such BidCo Equity Consideration and the SoftBank Rollover BidCo Equity will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of (i) section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, and (iii) any restrictions in the Reorganized Debtors' Amended Organizational Documents or BidCo's organizational documents, as applicable.  On the Effective Date, the BidCo Equity Consideration and the SoftBank Rollover BidCo Equity shall not be registered under the Securities

Act, and shall not be listed for public trading on any securities exchange.

3. **Authorization, Issuance and Delivery of the New Equity Interests**.  On the Effective Date, the Reorganized Company Party shall be authorized to issue or cause to be issued and deliver to the Plan Sponsor the New Equity Interests in accordance with the terms of the Amended Organizational Documents without the need for any further corporate or shareholder action subject to section IV.U.  The New Equity Interests, when so issued and delivered, shall be duly authorized, validly issued, fully paid and non-assessable.

4. **Issuance and Delivery of the BidCo Equity Consideration to Class 1**.  On the Effective Date, BidCo shall issue or cause to be issued and distributed to holders of Allowed Secured Notes Claims pursuant to section II.C.1 the BidCo Equity Consideration without the need for any further corporate or shareholder action provided that BidCo shall take such actions as may be required under English Law to effectuate the foregoing.  The BidCo Equity Consideration when so issued and distributed, shall be duly authorized, validly issued, fully paid and non-assessable.  Effective as of the Effective Date, such holders will be subject to transfer restrictions and, in addition to statutory protections for minority shareholders, will receive preemptive rights to purchase ordinary shares of BidCo on a *pro rata* basis in respect of their existing ownership percentage in BidCo in the event of a new issuance of ordinary shares by BidCo, subject to customary exceptions.

G. **Restructuring Steps Under UK Corporate Law**

The Transaction contemplated herein shall be effectuated through certain steps and provisions set forth on **Exhibit 1** hereto, or such other steps and provisions as may be agreed to by the Debtors and the Plan Sponsor.

The Debtors and the Plan Sponsor agree that OWC will be the Reorganized Company Party and will implement the transactions contemplated by the Plan.  The Debtors and the Plan Sponsor do not believe that it is legally necessary to implement an English Law Scheme of Arrangement (or any alternative process) to effect the acquisition of the New Equity Interests in compliance with English Law.

H. **The Liquidating Debtors**

In order to transfer the Excluded Assets to the Liquidating Debtors, the Debtors may implement one or more restructuring steps to effectuate such transfers, which such steps shall be set forth on a schedule to be filed with the Plan Supplement.  The Liquidating Debtors shall continue to exist after the Effective Date for the purposes of making Distributions to the holders of Allowed Claims under the Plan other than those Claims to be satisfied by the Reorganized Debtors and to take any other steps in furtherance thereof or as may be reasonably necessary or appropriate to wind-down the affairs of their Estates.  The principal purposes of the Liquidating Debtors shall be to liquidate, collect and maximize the Cash value of the Excluded Assets, which

shall be transferred to the Liquidating Debtors on, or immediately prior to, the Effective Date and make distributions in respect of Allowed Claims in accordance with the terms of the Plan. The Plan Administrator shall be authorized to merge, consolidate, or dissolve any of the Liquidating Debtors, as the Plan Administrator deems appropriate.

### I.    Plan Administrator

On the Effective Date, the Plan Administrator shall be appointed for the purpose of (and shall have the authority to) (i) conducting the wind down of the Estates of the Liquidating Debtors as expeditiously as reasonably possible; (ii) administering the liquidation or dissolution of the Liquidating Debtors and their Estates; (iii) selling, abandoning (or effecting a similar disposition) of the Excluded Assets; (iv) making Distributions to the holders of Allowed Claims in accordance with the Plan; (v) except to the extent Claims have been previously Allowed, conducting the Claims reconciliation process, including objecting to, seeking to subordinate, compromise or settle any and all Disputed Claims; (vi) retaining professionals to assist in performing its duties under the Plan; (vii) maintaining the books, records, and accounts of the Liquidating Debtors; (viii) completing and filing, as necessary, all final or otherwise required federal, state, local and foreign tax returns for the Liquidating Debtors; (ix) creating and funding reserves provided for in the Plan; (x) investing Cash of the Liquidating Debtors, including any Cash proceeds realized from the liquidation of the Excluded Assets, if any; (xi) obtaining commercially reasonable liability, errors and omissions, directors and officers, or other insurance coverage as the Plan Administrator deems necessary and appropriate; (xii) performing other duties and functions that are consistent with the implementation of the Plan; (xiii) filing the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly reports, and (xiv) cooperating with the Plan Sponsor in any way necessary to fully effectuate the purposes and the benefit of the bargain of the Transaction; provided, that the Liquidating Debtors and the Plan Administrator shall not take any actions that could reasonably be expected to prejudice or would otherwise be adverse to the Reorganized Debtors.

The Plan Administrator shall act for the Liquidating Debtors in the same capacity and shall have the same rights and powers as are applicable to a manager, managing member, board of managers, board of directors or equivalent governing body, as applicable, and to officers, subject to the provisions hereof (and all certificates of formation and limited liability company agreements and certificates of incorporation or by-laws, or equivalent governing documents and all other related documents (including membership agreements, stockholders agreements or other similar instruments), as applicable, are deemed amended pursuant to the Plan to permit and authorize the same).

From and after the Effective Date, the Plan Administrator shall be the sole representative of and shall act for the Liquidating Debtors with the authority set forth in this section IV and in the Plan Supplement.

Each of the Liquidating Debtors shall indemnify and hold harmless the Plan Administrator solely in its capacity as such for any losses incurred in such capacity, except to the extent such

losses were the result of the Plan Administrator's fraud, gross negligence, willful misconduct, or criminal conduct.

### J.    The Wind Down

On and after the Effective Date, the Plan Sponsor shall fund the Wind-Down Reserve and the Liquidating Debtors and the Plan Administrator shall be authorized to implement the Plan and shall have the power and authority to take any reasonable action necessary to implement the wind down of the Estates.

The activities and operations of the Liquidating Debtors and the Plan Administrator should be funded from the Wind-Down Reserve.  Upon the closing of the chapter 11 cases and the dissolution of the Liquidating Debtors, or such earlier time as it appears, in the reasonable view of the Plan Administrator, that the Wind-Down Reserve is overfunded, the Plan Administrator shall make any excess funds available for distribution and funding of the other reserves and Distributions in accordance with the terms of this Plan.

Except to the extent necessary to (i) complete the wind down and (ii) effectuate the Transaction, from and after the Effective Date, the Liquidating Debtors (a) for all purposes, shall be deemed to have withdrawn the Debtors' business operations from any state or province or foreign jurisdiction in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action to effectuate such withdrawal and (b) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date; provided, that the above shall not preclude the Plan Administrator from taking any action necessary to dissolve or wind down any Liquidating Debtor pursuant to any dissolution, winding down or similar proceeding.

### K.    Continued Corporate Existence.

Except as otherwise provided in this Plan, the Reorganized Debtors and the Liquidating Debtors shall continue to exist after the Effective Date.  At any time after the Effective Date, each Liquidating Debtor or Reorganized Debtor, in its sole and exclusive discretion, may take such action as permitted by applicable law as such Liquidating Debtor or Reorganized Debtor may determine is reasonable and appropriate, including, but not limited to, (i) merging into another Liquidating Debtor or Reorganized Debtor, or a Subsidiary and/or Affiliate of the foregoing, (ii) causing a Liquidating Debtor or Reorganized Debtor to be liquidated and/or dissolved, (iii) changing the legal name of a Liquidating Debtor or Reorganized Debtor, (iv) converting a Liquidating Debtor or Reorganized Debtor to another form of Entity, including from a corporation to a limited liability company, or (v) closing a Liquidating Debtor's or Reorganized Debtor's chapter 11 case.

### L.    Disbursing Agent

The Debtors, the Reorganized Debtors and the Liquidating Debtors, as applicable, shall designate one or more Entities (which may be the Reorganized Debtors in the case of the Reorganized Debtors and the Plan Administrator in the case of the Liquidating Debtors) to effectuate the Distributions.  If the Disbursing Agent is a third party, the reasonable fees and

expenses of the Disbursing Agent shall be paid by the Liquidating Debtors upon submission of statements. The payment of the reasonable fees and expenses of the Disbursing Agent shall be made in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court. The Disbursing Agent shall be deemed exculpated and indemnified by the Estates, except for fraud, *ultra vires* actions, willful misconduct, criminal conduct or gross negligence.

## M.    New Board of Directors/Officers

The member(s) of the boards of directors and the officers of the Reorganized Debtors and the Liquidating Debtors will be identified in the Plan Supplement. The Reorganized Debtors and the Liquidating Debtors shall purchase an insurance policy (including any "tail policy") for the Reorganized Debtors' and Liquidating Debtors', as applicable, directors and officers that is acceptable to the Reorganized Debtors and Liquidating Debtors, as applicable. For the avoidance of doubt, the Debtors may extend any or obtain new insurance policies during the chapter 11 cases without the consent of the Plan Sponsor for any period prior to consummation of the Transaction subject to section IV.T.

On the Effective Date, all persons acting as directors and/or managers of the Debtors that have not been selected as directors and/or managers of the Reorganized Debtors or the Liquidating Debtors shall be deemed to have resigned, their appointments shall be rescinded for all purposes, and their respective authority and power, in their capacities as such, shall be revoked, in each case, without the necessity of taking any further action in connection therewith subject to section IV.T.

## N.    Survival of Indemnification Obligations and D&O Liability Insurance

1. **Indemnification Obligations**. Each of the Debtors' Indemnification Obligations shall be reinstated, assumed by the Reorganized Debtors and remain intact and irrevocable, as applicable, and shall not be discharged, impaired, or otherwise affected by the Plan.

2. **D&O Liability Insurance Policies**. The D&O Liability Insurance Policies shall be deemed executory contracts and shall be assumed by the Reorganized Debtors on behalf of the applicable Debtors effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code. For the avoidance of doubt, coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in the D&O Liability Insurance Policies. In addition, after the Effective Date, all officers, directors, agents or employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies (including any "tail" policy) in effect or purchased as of the Effective Date for the full term of such policy regardless of whether such officers, directors, agents and/or employees remain in such positions after the Effective Date, in each case, to the extent such individuals are

covered under the D&O Liability Insurance Policies.

## O.    Employee Matters

On the Effective Date, all Current Employees shall be retained by the Reorganized Debtors in their existing positions. Each Benefit Plan and all other wage, compensation, employee expense reimbursement, and other benefit obligations solely relating to the Current Employees, including without limitation the KEIP and the KERP, shall be assumed by the Reorganized Debtors as of the Effective Date.

For the avoidance of doubt, (i) neither the KEIP nor the KERP shall be included on the Rejection Schedule and such programs will be honored in accordance with their terms, (ii) the consumption of the Plan will constitute a "Sale" under the KEIP and (iii) any Benefit Plan included on the Rejection Schedule shall be replaced by a comparable Benefit Plan that is no less favorable to Current Employees for the benefit of the Current Employees.

The 2018 Equity Incentive Plan of OneWeb Global Limited, the Consultant Equity Incentive Plan of OneWeb Global Limited and any predecessor plans thereof (the "Liquidated Incentive Plans") shall remain with the Liquidating Debtors and wound down by the Plan Administrator. Notwithstanding the foregoing, none of the Plan Sponsor, the Debtors, the Reorganized Debtors or their subsidiaries shall have any payment or other obligation under the Liquidated Incentive Plans or any Awards (as defined therein) issued thereunder upon or following the Effective Date, regardless of whether such Awards or obligations were issued or incurred before or after the Petition Date.

Without limiting or altering any employee's rights under the KEIP or the KERP, execution of the Plan Support Agreement and consummation of the Plan will not constitute a change of control under any other Benefit Plan.

## P.    Retained Causes of Action

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain the Retained Causes of Action that the Debtors or the Estates may hold against any Entity to the extent included on the Retained Causes of Action Schedule and not released under section XI.E hereof or otherwise, including the Avoidance Actions (and all Privilege Rights with respect to any of the foregoing) and may, in their sole discretion, pursue or settle any such Retained Causes of Action, as appropriate, in accordance with the best interests of the Estates. The Retained Causes of Action Schedule shall be included as part of the Plan Supplement. The inclusion or failure to include any Retained Cause of Action in the Plan Supplement shall not be deemed an admission, denial or waiver of any claims, rights or causes of action that any Reorganized Debtor may hold against any Entity. For the avoidance of doubt, the Retained Causes of Action shall not include any Claims or Causes of Action against any Released Party or any Avoidance Action released against a holder of a General Unsecured Claim or Ongoing Trade Claim in accordance with sections II.C.4.b and II.C.5.b hereof.

On the Effective Date, the applicable Reorganized Debtors shall be deemed to be substituted as a party to any Retained Causes of Action litigation in which any Debtor is a party,

including (but not limited to):  (a) pending contested matters or adversary proceedings in the Bankruptcy Court; (b) any appeals of orders of the Bankruptcy Court; and (c) any state court or federal or state administrative proceedings pending as of the Petition Date.  The Reorganized Debtors are not required to, but may, take such steps as are appropriate to provide notice of such substitution.

### Q.    Release of Avoidance Actions for Holders of Claims in Class 4 and Class 5

On the Effective Date, in connection with the Distributions to the holders of Allowed General Unsecured Claims in accordance with section II.C of this Plan, the Debtors, and the Reorganized Debtors shall grant each holder of an Allowed General Unsecured Claim that individually votes to accept the Plan an Avoidance Action Release.  Also, on the Effective Date, in connection with the Distributions to holders of Allowed Ongoing Trade Claims in accordance with section II.C of this Plan, the Debtors and the Reorganized Debtors shall grant each holder of an Allowed Ongoing Trade Claim an Avoidance Action Release if, and only if, Class 5 votes to accept the Plan.

### R.    Cancellation and Surrender of Notes, Instruments, Securities and Other Documentation

Except as provided in the Plan Support Agreement, or as otherwise agreed to by the Plan Sponsor, on the Effective Date, all notes, instruments, certificates and other documents evidencing Claims or Interests that are not otherwise being satisfied by the *pro rata* portion of the BidCo Equity Consideration (collectively, the "Cancelled Agreements") shall be deemed canceled and will be considered uncollectible accounts and surrendered and of no further force and effect against the Debtors, the Reorganized Debtors or the Liquidating Debtors without any further action on the part of the Debtors, the Reorganized Debtors or the Liquidating Debtors; provided, however, that each of the Cancelled Agreements shall continue in effect solely for the purposes of, (x) allowing holders of Claims or Interests to receive distributions under the Plan on account of such Claims or Interests and (y) allowing and preserving the rights of the DIP Agent and Secured Notes Agent, as applicable, to (1) make distributions on account of such Claims or Interests; (2) maintain, enforce, and exercise their respective Liens, including their charging liens, as applicable, under the terms of the applicable agreements, or any related or ancillary document, instrument, agreement, or principle of law, against any money or property distributed or allocable on account of such Claims under this Plan, as applicable; (3) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in connection with the implementation of the Plan; (4) maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement that the DIP Agent or Secured Notes Agent  may have under the applicable credit agreement, note purchase agreement, collateral agreements, or pledge agreements, in each case solely as against the holders of the Secured Notes Claims; (5) appear and raise issues in these chapter 11 cases or in any proceeding in the Bankruptcy Court or any other court after the Effective Date on matters relating to the Plan or the applicable credit agreements or note purchase agreement; and (6) execute documents pursuant to section IV.U of the Plan; provided, further, that the DIP Agent and Secured Notes Agent may take such further action to implement the terms of the Plan as agreed to with the Debtors or the Reorganized Debtors, as applicable, to the extent not inconsistent with the Confirmation Order or the Plan.  Nothing herein shall affect the discharge pursuant to section 1141 of the Bankruptcy Code.

**S.      Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan or the Transaction, on the Effective Date, subject to receipt of the applicable Distributions, if applicable, all Liens on the property of any Estate, including the New Equity Interests, shall be fully released and discharged.

The DIP Agent and the Secured Notes Agent shall execute and deliver all documents reasonably requested by the Debtors or the Reorganized Debtors to evidence the release of such Liens and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto, at the sole expense of the Debtors or the Reorganized Debtors, as applicable.

**T.      Effectuating Documents; Further Transactions**

Following entry of the Confirmation Order, but subject to the occurrence of the Effective Date, and subject to any consents of the Plan Sponsor required by the Plan Support Agreement, in each instance, the Reorganized Debtors and the Liquidating Debtors, as applicable, shall take all actions as may be necessary or appropriate to effectuate, implement and evidence the terms and conditions of the Plan and the restructuring Transaction contemplated thereby, including (i) implementation of any restructuring steps (ii) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, cancellation, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, (iii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, (iv) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, cancellation, or dissolution pursuant to applicable foreign, state, territorial, provincial, or federal law, (v) the issuance of Securities in accordance with the Plan, all of which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule, (vi) taking necessary steps under applicable local law to effectuate the Plan; and (vii) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law or the Plan Support Agreement and the term sheet annexed thereto, as applicable, to fully effectuate the Plan.

Each officer, legal representative or member of the board of directors of the Debtors is authorized to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Plan Documents and the securities issued pursuant to the Plan in the name of and on behalf of the Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable

law, regulation, order, or rule (including any action by the directors or managers of the Debtors) except for those expressly required pursuant to the Plan.

Each officer, legal representative or member of the board of directors of the Reorganized Debtors is authorized to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Plan Documents and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including any action by the directors or managers of the Debtors) except for those expressly required pursuant to the Plan.

Unless otherwise agreed to by the Debtors and the Plan Sponsor, all matters provided for herein involving the corporate structure of the Debtors or Reorganized Debtors, or any corporate, limited liability company, or related action required by the Debtors or Reorganized Debtors in connection herewith shall be deemed to have occurred and shall be in effect as of the Effective Date, without any requirement of further action by the stockholders, members, board, or directors of the Debtors or Reorganized Debtors, and with like effect as though such action had been taken unanimously by the stockholders, members, directors, or officers, as applicable, of the Debtors or Reorganized Debtors.

## U.    Amended Organizational Documents

On or prior to the Effective Date, the Amended Organizational Documents shall be filed with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation or organization, if necessary under the corporate laws of the respective states, provinces, or countries of incorporation or organization, in accordance with such corporate laws as determined by the Plan Sponsor and the Reorganized Debtors.  The Amended Organizational Documents shall prohibit the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, the Amended Organizational Documents may be amended and restated as permitted by such documents and the laws of their respective states, provinces, or countries of incorporation or organization.

## V.    FCC Communications Consents

No provision in the Plan relieves any Debtor or Reorganized Debtor from its obligation to comply with the Communications Act of 1934, as amended, and the rules, regulations and orders promulgated thereunder by the FCC.  No transfer of any FCC license or authorization held by any Debtor or transfer of control of an FCC licensee controlled by any Debtor shall take place prior to the issuance of any necessary FCC Communications Consents for such transfer pursuant to applicable FCC regulations.  The FCC's rights and powers to take any action pursuant to its regulatory authority, including but not limited to imposing any regulatory conditions on any of the above-described transfers are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority to the extent provided by law.

### W.    Section 1146 Exemption from Certain Taxes and Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by this Plan; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including, without limitation: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under or pursuant to the Plan.

## V.    SECURED NOTES AGENT FEES AND EXPENSES

On the Effective Date, and without any further notice to, or action, order, or approval of, the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, shall distribute Cash to the Secured Notes Agent in an amount equal to the Secured Notes Agent Fees and Expenses; provided that the Secured Notes Agent shall provide the Debtors with summary invoices for the Secured Notes Agent Fees and Expenses (including, without limitation, attorneys' fees and expenses) for which they seek payment no later than five (5) days prior to the Effective Date. Such summary invoices may (but are not required to) include estimates for the Secured Notes Agent Fees and Expenses anticipated through the Effective Date and the release of any Liens required under the Plan. For the avoidance of doubt, nothing herein shall be deemed to impair, waive, discharge, or negatively impact or affect the rights of the Secured Notes Agent to exercise its charging liens pursuant to the terms of the Secured Note Purchase Agreement or any other Transaction Documents (as defined in the Secured Note Purchase Agreement), as applicable.

## VI.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

As of and subject to the occurrence of the Effective Date, all Executory Contracts and Unexpired Leases shall be deemed assumed, together with all amendments agreed to in writing between the Debtor(s) and the Executory Contract or Unexpired Lease counterparty and consented to by the Plan Sponsor unless such Executory Contract or Unexpired Lease (i) was previously assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (ii) is listed on the Rejection Schedule or (iii) is the subject of a separate motion filed by a Debtor for assumption or rejection under section 365 of the Bankruptcy Code.

The Debtors or Reorganized Debtors, as applicable, shall use reasonable best efforts to obtain all necessary consents required under any Executory Contract or Unexpired Lease assumed as a result of the Transactions. To the extent the foregoing shall require any action by any Debtor that would, or would continue to, have an adverse effect on the business of the Plan Sponsor or

any of its Affiliates after the Effective Date, such action shall require the prior written consent of the Plan Sponsor. These reasonable best efforts shall not require any material payment or other material consideration from the Debtors or the Plan Sponsor (other than the payment of the Cure Claims, by the Plan Sponsor), or any action reasonably likely to delay the Debtors' emergence from these chapter 11 cases, and any such consent shall contain terms and conditions reasonably acceptable to the Debtors and the Plan Sponsor. For the avoidance of doubt, the term "material" in the prior sentence means material in the context of the relevant assumed Executory Contract or Unexpired Lease.

### B.    Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by a Bankruptcy Court's order, any Proof of Claim arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be filed with the Claims and Noticing Agent by the Rejection Damages Deadline. Any Claim arising from the rejection of an Executory Contract or Unexpired Lease, with respect to which no Proof of Claim is timely filed, shall be automatically disallowed without the need for any objection or further notice to or action or approval of the Bankruptcy Court.

Holders of Claims arising from the rejection of Executory Contracts or Unexpired Leases with respect to which no Proof of Claim is timely filed shall be forever barred, estopped, and enjoined from asserting a Claim based on such rejection against the Debtors, the Reorganized Debtors, the Liquidating Debtors, the Estates or the respective property of any of the foregoing, and such claims shall be discharged as of the Effective Date unless otherwise expressly allowed by the Bankruptcy Court.

The Liquidating Debtors and/or Plan Administrator shall have the right to object to, settle, compromise or otherwise resolve any Claim asserted on account of a rejected Executory Contract or Unexpired Lease.

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of the obligations owed by the counterparty to the applicable Debtor(s) under such Executory Contracts or Unexpired Leases. Notwithstanding any applicable non-bankruptcy law to the contrary, the Liquidating Debtors and the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnifications or continued maintenance obligations from the counterparties to the rejected Executory Contracts or Unexpired Leases.

### C.    Cure Claims

Any Cure Claims under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, by the Reorganized Debtors or the Plan Sponsor, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Debtors' Estates or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the

Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall be satisfied following the entry of a Final Order or Orders resolving the dispute and approving the assumption.  Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Claims whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment.  **Any liabilities reflected in the Schedules with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

For the avoidance of doubt, the Debtors served the First and Second Cure Notices to applicable counterparties to the Executory Contracts and Unexpired Leases listed on Schedule I attached to the respective notice.  Pursuant to the First and Second Cure Notices, the deadline to file an objection to the proposed assumption of any Executory Contract or Unexpired Lease, including any objection relating to a Cure Claim, other than an objection based solely on the adequate assurance of future performance under such Executory Contract or Unexpired Lease was fourteen days following service of the applicable notice.  Prior to the expiration of the First Cure Notice's objection deadline, the Debtors received twenty-five (25) objections asserting Cure Claims [Docket Nos. 250, 254, 256, 259-263, 265, 267-271, 274, 284, 286, 288, 296, 297, 303, 311, 312, 319 and 321].  After the expiration of the objection deadline of the First Cure Notice the Debtors received one objection asserting a Cure Claim [Docket No. 360].  The Debtors received an amended objection asserting Cure Claims after the expiration of the objection deadline to the First Cure Notice [Docket No. 505].  Prior to the expiration of the objection deadline of the Second Cure Notice, the Debtors received one more objection asserting a Cure Claim [Docket No. 377].  Furthermore, five parties filed timely objections regarding the First and Second Cure Notices requesting additional adequate assurance [Docket Nos. 258, 267, 268, 297 and 377].

With respect to Executory Contracts or Unexpired Leases for which no objection was filed or for which no informal comments were received, the amount of the applicable Cure Claim set forth in the First and Second Cure Notices, as applicable is now binding.  Upon entry of the Plan Support Agreement Order, all of the objections in connection with the First Cure Notice and the Second Cure Notice not previously consensually resolved were adjourned to the Confirmation Hearing or such other hearing date and time scheduled by the Debtors or Reorganized Debtors with the Bankruptcy Court.

Unless otherwise provided by an order of the Bankruptcy Court, at least seven (7) calendar days before the Voting Deadline, the Debtors shall cause notice of any proposed assumption to the extent of any proposed Cure Claim regarding any Executory Contracts and Unexpired Leases not reflected in the First and Second Cure Notices or otherwise not previously noticed to be sent to the applicable counterparties.  Such notice shall contain the proposed Cure Claim and the deadline by which the counterparty may dispute the proposed Cure Claim. Any objection by such newly noticed counterparty must be filed and served on the Debtors no later than the deadline for objecting to Confirmation of the Plan.  Any counterparty to an Executory Contract or Unexpired Lease that previously failed or fails to timely object to the proposed assumption or cure amount

will be deemed to have assented to such assumption and Cure Claim. Notwithstanding the foregoing, except to the extent an Executory Contract or Unexpired Lease is set forth on the Rejection Schedule, all Executory Contracts and Unexpired Leases shall be assumed by the Reorganized Debtors on the Effective Date.

To the extent the Debtors or the Reorganized Debtors, as applicable, and the objecting counterparty cannot resolve their dispute consensually, the Bankruptcy Court shall retain jurisdiction to resolve such dispute. Upon the Bankruptcy Court's resolution of the dispute, the Plan Sponsor shall have three (3) business days to determine whether it wishes to assume the applicable Executory Contract or Unexpired Lease. If the Plan Sponsor determines not to assume the applicable Executory Contract or Unexpired Lease, it shall direct the applicable Reorganized Debtor to reject same, and such Executory Contract or Unexpired Lease shall be deemed rejected under the Plan as of the Effective Date, and all procedures set forth in section VI.B above shall apply.

### D.    Reservation of Rights

Neither the listing of any contract or lease on the Rejection Schedule, nor the Debtors' delivery of a Notice of Cure and Assumption to the applicable counterparty shall constitute an admission by the Debtors that such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

## VII.    PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Method of Distributions to Holders of Claims

All Distributions to be made under the Plan shall be made by the Disbursing Agent to the applicable holders of Allowed Claims in accordance with the terms of this Plan; provided, however, that all Distributions to the holders of Secured Notes Claims shall be made to the Secured Notes Agent. The Secured Notes Agent shall hold or direct such Distributions for the benefit of the holders of Secured Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this section VII, the Secured Notes Agent shall arrange to deliver such Distributions to or on behalf of such holders of Secured Notes Claims, at the sole expense of the Debtors or the Reorganized Debtors, as applicable. Such distributions shall be subject in all respects to the right of the Secured Notes Agent, as applicable, to assert its applicable charging liens against such distributions. The Secured Notes Agent shall not incur any liability on account of any distributions under the Plan.

Unless a holder of an Allowed Claim and the Disbursing Agent otherwise agree, any Distribution to be made in Cash shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank. Unless a holder of an Allowed Claim and the Disbursing Agent otherwise agree, Cash Distributions shall be made in U.S. Dollars. Cash payments to foreign creditors may, in addition to the foregoing, be made at the option of the Disbursing Agent in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

Except as otherwise provided in the Plan, Distributions shall be made to the holders of record of Allowed Claims as of the Distribution Record Date at the last known address, as

identified in: (i) the most recently filed Proof of Claim; (ii) at the address set forth in any written notice of address change delivered to the Debtors after the date of the most recently filed Proof of Claim or where no Proof of Claim was filed; (iii) at the address reflected in the Schedules if no Proof of Claim has been filed and the Debtors have not received a written notice of a change of address; or (iv) if clauses (i) through (iii) are not applicable, at the last address directed by such holder.

### B.      Undeliverable Distributions and Time Bar to Cash Payments.

In the event a Distribution is returned as undeliverable, or no address for a particular holder is found in the Debtors' records, no further Distributions to such holder shall be made unless and until the Disbursing Agent is notified in writing of such holder's then-current address, at which time a Distribution shall be made to such holder on the next Periodic Distribution Date. The Disbursing Agent in its sole discretion may, but shall have no obligation to, attempt to locate the holders entitled to receive undeliverable Distributions. Any Distributions returned to the Disbursing Agent as undeliverable shall remain in the possession of the Liquidating Debtors until such time as a Distribution becomes deliverable; provided that any Distribution that remains undeliverable for six months or is represented by a voided check shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code, shall re-vest in the Reorganized Debtors automatically without need for any Bankruptcy Court order, notwithstanding any federal or state escheat laws to the contrary.

Checks issued on account of Allowed Claims shall be null and void if not negotiated within 180 days after the date of issuance. Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the Entity to whom such check was originally issued. Any claim in respect of a voided check shall be made within thirty (30) days after the date upon which such check was deemed void. If no request is made as provided in the preceding sentence, any claims in respect of such voided check shall be discharged and forever barred.

Neither the Disbursing Agent nor the Liquidating Debtors shall incur any liability whatsoever on account of any Distribution.

### C.      Distribution Record Date

As of 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date, the transfer registers for Claims shall be closed. The Disbursing Agent shall have no obligation to recognize the transfer or sale of any Claim that occurs after such time on the Distribution Record Date and shall be entitled for all purposes to recognize and make Distributions only to those holders who are holders of Claims as of 5:00 p.m. on the Distribution Record Date.

### D.      Minimum Distributions

No Distribution of less than one hundred dollars ($100.00) shall be made by the Disbursing Agent. Each such Distribution shall vest in the Liquidating Debtors and become available for Distribution to the holders of other Allowed Claims in the applicable Class.

### E.    Compliance with Tax Requirements

To the extent applicable, in connection with making Distributions, the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on the Reorganized Debtors, Liquidating Debtors, or the Plan Administrator, as applicable, by any Governmental Unit, and all Distributions shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements (with any amount so withheld and paid over to the applicable Governmental Unit treated as having been paid to and received by the Person in respect of which such withholding was made for all purposes of the Plan).  The Disbursing Agent shall be authorized to require each holder of an Allowed Claim to provide it with an executed Form W-9, applicable Form W-8 or other appropriate tax form or documentation as a condition precedent to being sent a Distribution. The Disbursing Agent shall provide advance written notice of such requirement to each holder of an Allowed Claim.  The notice shall provide each holder with a specified time period after the date of mailing of such notice to provide an executed Form W-9, applicable Form W-8 or other tax form or documentation to the Disbursing Agent.  If a holder of an Allowed Claim does not provide the Disbursing Agent with an executed Form W-9, applicable Form W-8 or other tax form or documentation within the time period specified in such notice, or such later time period agreed to by the Disbursing Agent in writing in its discretion, then the Disbursing Agent, in its sole discretion, may (a) make a Distribution net of any applicable withholding or (b) determine that such holder shall be deemed to have forfeited the right to receive any Distribution, in which case, any such Distribution shall revert to the Reorganized Debtors or Liquidating Debtors (as applicable) for Distribution on account of other Allowed Claims in the applicable Class, and the Claim of the holder originally entitled to such Distribution shall be waived, discharged and forever barred without further order of the Bankruptcy Court. The Disbursing Agent shall have the right to allocate all Distributions in compliance with applicable wage garnishments, alimony, child support and other spousal awards, Liens and encumbrances.

### F.    Setoffs

Except with respect to Claims released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disbursing Agent and/or the Reorganized Debtors, Liquidating Debtors, or the Plan Administrator, as applicable, may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim (and the Distributions to be made on account of such Claim), all counterclaims, rights and causes of action of any nature that the applicable Debtor may have held against the holder of such Claim; provided, however, that the failure to effectuate such a setoff shall not constitute a waiver or release by the applicable Debtor, Liquidating Debtor, or the Disbursing Agent of any Cause of Action against any holder of a Claim.

### G.    Allocation Between Principal and Accrued Interest

Except as otherwise provided in the Plan, the aggregate consideration paid to holders with respect to their Allowed Claims (including for tax purposes) shall be allocated first to the principal amount of such Allowed Claims (to the extent thereof) with any excess allocated to unpaid interest, if any, accrued before the Petition Date.

### H.    Claims Paid or Payable by Third Parties

#### 1.    Claims Paid by Third Parties

To the extent that a holder of an Allowed Claim receives a payment from a third party, the Disbursing Agent shall be authorized to reduce, for the purposes of Distribution, the Allowed amount of such Claim by the amount of such payment, and such Claim shall be disallowed or deemed satisfied to the extent of the third party payment received without an objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

#### 2.    Claims Payable by Insurance

No Distributions shall be made on account of any Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that any of the Debtors' insurers agrees to satisfy in full or in part an Allowed Claim, then, immediately upon such insurer's agreement, the applicable portion of such Claim may be expunged without an objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court.

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## VIII.    DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS

### A.    Allowance of Claims

After the Effective Date, the Reorganized Debtors and the Liquidating Debtors shall have any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, except with respect to any Claim deemed Allowed or released under the Plan. All settled Claims approved prior to the Effective Date by a Final Order of the Bankruptcy Court pursuant to Bankruptcy Rule 9019 or otherwise shall be binding on all parties.

Any Claim that has been listed in the Schedules as disputed, contingent or unliquidated, and for which no Proof of Claim has been timely filed, shall be expunged without further action and without any further notice to or action, order or approval of the Bankruptcy Court.

### B.    Prosecution of Objections to Claims

#### 1.    Authority to Prosecute and Settle Claims

Except as otherwise specifically provided in the Plan, the Debtors, with the consent of the Plan Sponsor (not to be unreasonably withheld), prior to the Effective Date, and, after the Effective Date, the Reorganized Debtors, Liquidating Debtors and Plan Administrator, as applicable shall have the sole authority to: (i) file, withdraw or litigate to judgment, objections to Claims; (ii) settle

or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (iii) direct the Claims and Noticing Agent to adjust the claims register to reflect any resolutions of Disputed Claims, in each case with respect to claims against the applicable Debtor, and without any further notice to or action, order or approval by the Bankruptcy Court.  To the extent that the Debtors have filed objections to Claims that remain pending as of the Effective Date, the Liquidating Debtors shall be substituted as the objecting party without further action of the parties or order of the Court.

### 2.      Omnibus Objections

To facilitate the efficient resolution of Disputed Claims, Reorganized Debtors and Liquidating Debtors shall, notwithstanding Bankruptcy Rule 3007(c), be permitted to file omnibus objections to Claims, with such limitations as imposed by the Court after due notice and opportunity for to be heard.

### 3.      Authority to Amend Schedules

The Debtors, with the consent of the Plan Sponsor (not to be unreasonably withheld), prior to the Effective Date, and the Reorganized Debtors, the Liquidating Debtors and/or Plan Administrator, after the Effective Date, shall have the authority to amend the Schedules with respect to any Claim against the applicable Debtor (other than Claims Allowed or released hereunder) and to make Distributions based on such amended Schedules (if no Proof of Claim is timely filed in response to such amendment) without approval of the Bankruptcy Court.  If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim that was previously scheduled as undisputed, liquidated and not contingent, the Reorganized Debtors, the Liquidating Debtors and/or Plan Administrator, as applicable, shall provide the holder of such Claim with notice of such amendment and the opportunity to file a Proof of Claim.

### C.      Estimation of Claims

The Debtors, with the consent of the Plan Sponsor (not to be unreasonably withheld), prior to the Effective Date, and the Reorganized Debtors, the Liquidating Debtors and/or Plan Administrator, as applicable, after the Effective Date, as applicable, may at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim, including during the litigation of any objection to such Claim or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of Distributions), and the relevant Debtor, Reorganized Debtor, Liquidating Debtor or Plan Administrator, as the case may be, may elect to pursue any supplemental proceedings to object to any Distribution on such Claim in excess of the estimated amount.

**D.      Claims Subject to Pending Actions**

Except as otherwise provided herein or in a Final Order of the Bankruptcy Court, including pursuant this section VIII of the Plan, any Claim held by an Entity against which a Debtor, a Reorganized Debtor, a Liquidating Debtor or another party pursues an Avoidance Action or an action to recover property under sections 542, 543, 550 or 553 of the Bankruptcy Code, shall be deemed a Disputed Claim pursuant to section 502(d) of the Bankruptcy Code, and the holder of such Claim shall not receive any Distributions on account of such Claim until such time as such Causes of Action have been resolved and, to the extent applicable, all sums due from such holder have been turned over to the Reorganized Debtors.

**E.      Distributions to Holders of Disputed Claims**

Notwithstanding any other provision of the Plan: (1) no Distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim, if ever; and (2) except as otherwise agreed to by the relevant parties, no partial Distributions will be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, any Distributions will be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  On the Distribution Date that is at least 30 days after a Disputed Claim becomes an Allowed Claim (or such lesser period as the Disbursing Agent may determine), the holder of such Claim will receive any Distribution to which such holder would have been entitled under the Plan as of the Effective Date (including any Distribution such holder would have been entitled to on the Distribution Date on which such holder is receiving its initial Distribution) if such Claim had been Allowed as of the Effective Date, without any interest to be paid on account of such Claim.

**F.      Partitioning of Authority With Respect to Claims**

Notwithstanding the provisions of section VIII.A-E, the Reorganized Debtors will not have authority with respect to the Claims against the Liquidating Debtors, and the Liquidating Debtors and the Plan Administrator will not have authority with respect to the Claims against the Reorganized Debtors.

**IX.    CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

**A.      Conditions to Confirmation**

The Bankruptcy Court shall not be requested to enter the Confirmation Order unless and until the following conditions have been satisfied:

1.      The Bankruptcy Court shall have entered the Disclosure Statement Order.

2.      The Plan and the Confirmation Order shall be in form and substance acceptable to the Debtors and the Plan Sponsor.

**B.      Conditions to the Effective Date**

The Effective Date shall not occur, and the Plan shall not be consummated unless and until the following conditions have been satisfied or duly waived pursuant to section IX.C:

1.    **Confirmation Order**.  The Confirmation Order shall be in full force and effect, and shall not have been stayed, stayed pending appeal or vacated; <u>provided</u>, however, that even if an appeal, notice of appeal, motion to amend, or make additional findings of fact or motion for a new trial is timely filed, or the Confirmation Order is otherwise challenged in any respect, such Confirmation Order will be deemed a Final Order if it provides that it is effective immediately upon entry on the Bankruptcy Court's docket and not subject to any stay notwithstanding Bankruptcy Rules 6004(h), 6006(d), or 7062 or Rule 62 of the Federal Rules of Civil Procedure.

2.    **Statutory Fees.**  All statutory fees and obligations then due and payable to the U.S. Trustee shall have been paid in full.

3.    **Documentation**.  All documents and agreements necessary to implement the Plan and the Transaction, including such agreements and documents set forth in section 4 of the Plan Support Agreement, shall have been executed and delivered to the required parties and, to the extent required, filed with the applicable government unit in accordance with applicable laws, and all other actions required to be taken in connection with the Effective Date shall have occurred;

4.    **Antitrust and Foreign Investment Approvals.**  All (A) applicable waiting periods, and any extensions thereof, under the HSR Act and the Antitrust and Foreign Investment Laws, and any commitments by the parties to the Plan Support Agreement not to close before a certain date under a timing agreement entered into with applicable Antitrust and Foreign Investment Authorities, shall have expired or otherwise been terminated and (B) authorizations, consents, orders or approvals under the Antitrust and Foreign Investment Laws, including but not limited to the CFIUS Approval and those authorizations, consents, orders or approvals set forth on section 9(c)(i) of the disclosures schedules to the Plan Support Agreement, shall have been obtained and shall remain in full force and effect.

5.    **State Aid Approval.**  If required by applicable law, a decision of the European Commission pursuant to Article 4 or Article 9 of Council Regulation (EU) 2015/1589 of 13 July 2015 that the transaction notified to it does not constitute aid or is compatible with the internal market, or such other similar consents or approvals as may be required from the European Commission after December 31, 2020 shall have been obtained.

6.    **DDTC Notification.**  WorldVu Development LLC shall have provided to the U.S. Directorate of Defense Trade Controls of the U.S. Department of

State the DDTC Notification.

7. **No Injunctions or Restraints**. No Governmental Entity (as defined in the Plan Support Agreement) shall have issued, enacted, entered, promulgated, or enforced any Restraint.

8. **Establishment of Professional Fee Escrow.** The Professional Fee Escrow shall have been established and fully funded in the amount of the Professional Fee Reserve Amount.

9. **Funding of the Ongoing Trade Claims Recovery Pool and the General Unsecured Claims Settlement Distribution.** Each of the Ongoing Trade Claims Recovery Pool and the General Unsecured Claims Settlement Distribution shall have been funded by BidCo in the respective amounts required by the Settlement.

10. **Conditions Precedent to the Obligations of the Plan Sponsor.**

   a. **Accuracy of Representations and Warranties**. The representations and warranties of the Company Parties as set forth in the Plan Support Agreement in (i) sections 11(a)(i)-(iv), (b), (e)(i) and (u) shall be true and correct in all material respects and (ii) set forth in section 11 (other than those described in clause (i)) shall be true and correct (disregarding all qualifications or limitations as to "materiality" or "Company Material Adverse Effect" and words of similar import set forth therein), except where the failure of such representations or warranties to be true and correct has not had and would not reasonably be expected to have a Company Material Adverse Effect (as defined in the Plan Support Agreement), in the case of each of clauses (i) and (ii), at and as of the Effective Date as though made at and as of the Effective Date (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

   b. **Performance of Obligations**. The Company Parties shall have performed in all material respects all obligations and agreements contained in the Plan Support Agreement required to be performed by them on or prior to the Effective Date.

   c. **No Termination**. The Plan Sponsor shall not have terminated the Plan Support Agreement in accordance with its terms prior to the occurrence of the Effective Date.

   d. **BidCo Equity Consideration.** The Entities to receive any share of the BidCo Equity Consideration are acceptable to the Plan Sponsor, in its sole discretion, provided that for the avoidance of doubt the holders of Allowed Secured Notes Claims receiving such BidCo Equity Consideration in the term sheet annexed to Plan Support

- 48 -

Agreement are acceptable to the Plan Sponsor.

e.    **Officer's Certificate**. The Plan Sponsor shall have received a certificate, dated the Effective Date, of the chief executive officer or the chief financial officer of OneWeb, on behalf of the Company Parties, to the effect that the conditions specified in section 9(a)(i) and section 9(a)(ii) of the Plan Support Agreement have been fulfilled and/or waived.

f.    **Communications Consents**. All Communications Consents shall have been obtained.

g.    **No Company Material Adverse Effect**. Since the Agreement Date of the Plan Support Agreement (as defined therein), no Company Material Adverse Effect (as defined therein) shall have occurred and be continuing.

h.    **Principal Vendor Contracts**. The applicable Company Parties shall have executed the Amended Principal Vendor Contracts (in accordance with section 6(c) of the Plan Support Agreement) and such Amended Principal Vendor Contracts shall remain in full force and effect.

i.    **Effective Date Cash Funding Cap.**  The Effective Date Cash Funding Reserve Amount, as determined in good faith by the Debtors and delivered to Plan Sponsor no later than five days before the Effective Date, shall not exceed the Effective Date Cash Funding Cap, unless otherwise agreed to by the Plan Sponsor.

11.    **Conditions Precedent to the Debtors' Obligations.**

a.    **Accuracy of Representations and Warranties**.    The representations and warranties of the Plan Sponsor (i) set forth in sections 12(a), (b) and (e) of the Plan Support Agreement shall be true and correct in all material respects and (ii) set forth in section 12 of the Plan Support Agreement (other than those described in clause (i)) shall be true and correct (disregarding all qualifications or limitations as to "materiality" or "Plan Sponsor Material Adverse Effect" and words of similar import set forth therein), except where the failure of such representations or warranties to be true and correct has not had and would not reasonably be expected to have a Plan Sponsor Material Adverse Effect (as defined in the Plan Support Agreement), in the case of each of clauses (i) and (ii), at and as of the Effective Date as though made at and as of the Effective Date (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

b.    **Performance of Obligations**. The Plan Sponsor shall have

performed in all material respects all obligations and agreements contained in the Plan Support Agreement required to be performed by it on or prior to the Effective Date.

    **c.**      **No Termination**. The Company Parties shall not have terminated the Plan Support Agreement in accordance with its terms prior to the occurrence of the Effective Date.

    **d.**      **Officer's Certificate**. The Company Parties shall have received a certificate, dated the Effective Date, of a chief executive officer of the Plan Sponsor to the effect that the conditions specified in section 9(b)(i) and section 9(b)(ii) of the Plan Support Agreement have been fulfilled and/or waived.

## C.    Waiver of Conditions to the Effective Date

The conditions to consummation of the Plan set forth in section IX may be waived as follows: the conditions set forth in section IX.B.10 may only be waived by the Plan Sponsor; the conditions set forth in section IX.B.11 may be waived by the Debtors; and the conditions set forth in sections IX.B.4-7 may be mutually waived by both the Plan Sponsor and the Debtors, as applicable, in their sole discretion, respectively, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan. For the avoidance of doubt, sections IX.B. 8-9 may not be waived by the Plan Sponsor.

## X.    WITHDRAWAL AND MODIFICATION OF THE PLAN

### A.    Withdrawal of the Plan

Subject to the rights of the Plan Sponsor under the Plan Support Agreement, the Debtors reserve the right to seek to withdraw the Plan at any time prior to the Effective Date. If the Plan is withdrawn: (1) each of the Plan and the Confirmation Order shall be null and void in all respects; and (2) nothing contained in the Plan or the Confirmation Order shall (i) constitute a waiver or release of any Claims or Interest, or any claim the Debtors have against any Entity or (ii) prejudice in any manner the rights of the Debtors or any other Entity.

### B.    Modification of the Plan

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right, with the consent of the Plan Sponsor, to alter, amend or modify the Plan before the Effective Date. Notwithstanding the foregoing, the Debtors may make appropriate technical adjustments and modifications to the Plan without the consent of the Plan Sponsor or further order or approval of the Bankruptcy Court; provided that any such adjustments or modifications do not adversely affect the rights, interests or treatment of the Plan Sponsor under the Plan Support Agreement or the Plan. Holders of Claims that have accepted the Plan shall be deemed to have accepted the Plan, as amended, modified, or supplemented, if the proposed amendment, modification, or supplement does not materially and adversely change the treatment of their Claims; provided, however, that the holders of Claims who were deemed to accept the Plan because their Claims were Unimpaired shall continue to be deemed to accept the Plan only

if, after giving effect to such amendment, modification or supplement, such Claims continue to be Unimpaired.

## XI.    EFFECT OF CONFIRMATION

### A.    Binding Effect

Subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in the Debtors and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether any such holders (i) were Impaired or Unimpaired under the Plan, (ii) were deemed to accept or reject the Plan, (iii) failed to vote to accept or reject the Plan, (iv) voted to reject the Plan, or (v) received any distribution under the Plan.

### B.    Vesting of Assets

Except as otherwise provided in the Plan or the Plan Support Agreement, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets of the Debtors or their Estates, including all Claims, rights, defenses, and Causes of Action and any property or assets acquired by the Debtors under or in connection with the Plan, shall vest in each Reorganized Debtor free and clear of all Claims, Causes of Action against the Debtors or their Estates, Liens, encumbrances, charges, and other interests of any and every type, kind, or nature whatsoever; provided, however, that the foregoing excludes the Excluded Assets and the Excluded Liabilities, which shall be transferred to and vest in the Liquidating Debtor as provided for herein. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for the Debtors' Professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### C.    Discharge of Claims Against and Interests in the Debtors

Upon the Effective Date and in consideration of the Distributions to be made hereunder, to the fullest extent permitted by applicable law, except as expressly provided herein or in the Confirmation Order, each holder (as well as any trustee and agents on behalf of such holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, Liens, rights, and liabilities that arose prior to the Effective Date, and will be considered waived, released, or discharged as an uncollectible account for tax purposes.  Except as otherwise expressly provided herein, upon the Effective Date, all such holders of Claims, Interests, rights and liabilities and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any Claim, Interest, Lien, right or liability in or against the Estates, Debtors, Liquidating Debtors or the Reorganized Debtors or any of their assets or property, whether or not such holder

has filed a proof of claim and whether or not the facts or legal bases thereof were known or existed prior to or on the Effective Date.

### D.    Exculpation

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS RELEASED AND EXCULPATED FROM, ANY LIABILITY FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO OR ARISING OUT OF THE DEBTORS' CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE PLAN SUPPORT AGREEMENT, THE PLAN SUPPORT AGREEMENT ORDER, THE DISCLOSURE STATEMENT, THE PLAN, THE DIP FACILITY, THE DIP AGREEMENT, THE DIP AMENDMENT, THE DIP ORDER, THE DIP AMENDMENT ORDER, THE TRANSACTION OR ANY TRANSACTION, CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE FOREGOING, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES PURSUANT TO THE PLAN, THE DISTRIBUTION OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; IN ALL RESPECTS THE EXCULPATED PARTIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES. THE EXCULPATED PARTIES HAVE, AND UPON COMPLETION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN THE SOLICITATION OF VOTES AND DISTRIBUTIONS PURSUANT TO THE PLAN IN GOOD FAITH AND IN COMPLIANCE WITH APPLICABLE LAWS AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH ACTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR DISTRIBUTIONS MADE PURSUANT TO THE PLAN.

NOTWITHSTANDING THE FOREGOING, SOLELY WITH RESPECT TO EXCULPATED PARTIES THAT ARE NOT (A) FIDUCIARY EXCULPATED PARTIES OR (B) THE PLAN SPONSOR AND ITS REPRESENTATIVES, THIS SECTION XI.D. WILL BIND ONLY ENTITIES THAT ARE RELEASING PARTIES. FOR THE AVOIDANCE OF DOUBT, THIS PARAGRAPH IS NOT INTENDED TO, AND SHALL NOT, IMPAIR OR OTHERWISE LIMIT (I) ANY EXCULPATION RIGHTS OF ANY PERSONS THAT ARE PROVIDED FOR UNDER ANY AGREEMENTS TO WHICH SUCH PERSONS ARE PARTIES OR BENEFICIARIES OR (II) THIS SECTION XI.D. OR ANY OTHER EXCULPATION RIGHTS (INCLUDING UNDER 11 U.S.C. § 1125(E))

**AS APPLIED TO (A) FIDUCIARY EXCULPATED PARTIES OR (B) THE PLAN SPONSOR AND ITS REPRESENTATIVES.**

E.    Releases

    1.    **Releases by the Debtors**

PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION AND FOR THE CONCESSIONS MADE AS SET FORTH IN THIS PLAN AND THE OTHER CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS, OR DOCUMENTS TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH THIS PLAN, AND THE SERVICE OF THE RELEASED PARTIES IN FACILITATING THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS DEEMED RELEASED AND DISCHARGED BY THE DEBTORS, THEIR ESTATES, THE REORGANIZED DEBTORS, THE LIQUIDATING DEBTORS AND ANY OTHER PERSON OR ENTITY SEEKING TO EXERCISE THE RIGHTS OF THE ESTATES FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, LIENS, LOSSES, REMEDIES, CONTRIBUTIONS, INDEMNITIES, COSTS, CAUSES OF ACTION OR LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS OR CAUSES OF ACTION, THAT THE DEBTORS, THEIR ESTATES, THE REORGANIZED DEBTORS OR THE LIQUIDATING DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR ANOTHER ENTITY, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, BY STATUTE, VIOLATIONS OF FEDERAL, STATE, PROVINCIAL, FOREIGN, OR TERRITORIAL SECURITIES LAWS, OR OTHERWISE THAT THE DEBTORS, THE REORGANIZED DEBTORS, THE LIQUIDATING OR THE ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF A CLAIM OR INTEREST OR OTHER PERSON OR ENTITY, BASED ON, RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS, THE DEBTORS' CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE PLAN SUPPORT AGREEMENT, THE PLAN SUPPORT AGREEMENT ORDER, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE DIP ORDER, THE DIP AMENDMENT  ORDER, THE PLAN, THE SECURED NOTE PURCHASE AGREEMENT, THE TRANSACTION AND ANY CONTRACT, INSTRUMENT, RELEASE, OR ANOTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE FOREGOING, AND ANY EXHIBITS OR DOCUMENTS RELATED THERETO, THE FILING OF THESE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, INCLUDING THE

**SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE PURCHASE, SALE, ISSUANCE, DISTRIBUTION, OR CANCELLATION OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTIONS UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.  FOR THE AVOIDANCE OF DOUBT, NO RELEASE IN SECTION XI.E. SHALL BE GIVEN FOR:  (I) THE DEBTORS' COUNTERCLAIMS, SETOFFS, OR DEFENSES TO CLAIMS OR (II) ANY OBLIGATIONS OF ANY NON-DEBTOR COUNTERPARTY UNDER ASSUMED CONTRACTS.**

2.  **Releases by Holders of Claims**

**AS OF THE EFFECTIVE DATE, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR, EACH LIQUIDATING DEBTOR, EACH REORGANIZED DEBTOR, AND EACH RELEASED PARTY FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY, INCLUDING ANY DERIVATIVE CLAIMS), BASED ON OR RELATING TO OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS, THE DEBTORS' CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE PLAN SUPPORT AGREEMENT, THE PLAN SUPPORT AGREEMENT ORDER, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE DIP ORDER, THE DIP AMENDMENT  ORDER, THE PLAN, THE SECURED NOTE PURCHASE AGREEMENT, THE TRANSACTION AND ANY CONTRACT, INSTRUMENT, RELEASE, OR ANOTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE FOREGOING, AND ANY EXHIBITS OR DOCUMENTS RELATED THERETO, THE FILING OF THESE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, INCLUDING THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE PURCHASE, SALE, ISSUANCE, DISTRIBUTION, OR CANCELLATION OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTIONS UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.**

**FOR THE AVOIDANCE OF DOUBT, THE ONLY PARTIES THAT ARE BOUND BY THE RELEASE SET FORTH IN SECTION XI.E.2 ARE: (A) THE RELEASED PARTIES; (B) PARTIES WHO VOTE IN FAVOR OF THE PLAN <u>AND</u> DO NOT OPT OUT OF THE RELEASE PROVIDED IN SECTION XI.E.2 OF THE PLAN IN A TIMELY AND PROPERLY SUBMITTED BALLOT; (C) PARTIES WHO ARE ENTITLED TO**

VOTE BUT DO NOT VOTE **AND** DO NOT OPT OUT OF THE RELEASE PROVIDED IN SECTION XI.E.2 OF THE PLAN IN A TIMELY AND PROPERLY SUBMITTED BALLOT; AND (D) PARTIES WHO ARE DEEMED TO ACCEPT THE PLAN **AND** DO NOT OPT OUT OF THE RELEASE PROVIDED IN SECTION XI.E.2 OF THE PLAN BY SUBMITTING A DULY COMPLETED OPT-OUT FORM.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY INDIVIDUAL FROM ANY CLAIM OR CAUSES OF ACTION RELATED TO AN ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE.

F.    **Injunction**

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS OR CAUSES OF ACTION THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION UNDER THE PLAN ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE LIQUIDATING DEBTORS, THE EXCULPATED PARTIES, OR THE RELEASED PARTIES: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH ANY SUCH CLAIMS OR INTERESTS OR CAUSES OF ACTION; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH ANY SUCH CLAIMS OR INTERESTS OR CAUSES OF ACTION; (C) CREATING, PERFECTING, OR ENFORCING AN ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THEIR PROPERTIES ON ACCOUNT OF OR IN CONNECTION WITH SUCH CLAIMS OR INTERESTS OR CAUSES OF ACTION; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH SUCH CLAIMS OR INTERESTS OR CAUSES OF ACTION UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF, NOTWITHSTANDING AN INDICATION IN ANY PROOF OF CLAIM OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS, OR INTENDS TO PRESERVE THE RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (E) COMMENCING OR CONTINUING ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH SUCH CLAIMS OR INTERESTS OR CAUSES OF ACTION.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE INJUNCTION SET FORTH ABOVE SHALL NOT ENJOIN THE

**PLAN SPONSOR FROM EXERCISING ANY OF ITS RIGHTS UNDER THE PLAN SUPPORT AGREEMENT PRIOR TO THE EFFECTIVE DATE.**

### G.   Scope of Discharge, Release, or Injunction With Respect to the United States of America

As to the United States of America, its agencies, departments, or agents (collectively, the "United States"), nothing in this Plan or the Confirmation Order shall limit or expand the scope of discharge, release or injunction to which the Debtors or Reorganized Debtors are entitled to under the Bankruptcy Code, if any. The discharge, release, and injunction provisions contained in this Plan and the Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Confirmation Order, pursuing any police or regulatory action except to the extent the applicable Bar Date or the discharge, release, exculpation or injunction provisions of the Plan bar a Governmental Unit from pursuing prepetition Claims against the Debtors or Reorganized Debtors.

Accordingly, notwithstanding anything contained herein or in the Confirmation Order to the contrary, nothing herein or the Confirmation Order shall discharge, release, impair or otherwise preclude:  (1) any liability to the United States that is not a "claim" within the meaning of Section 101(5) of the Bankruptcy Code; (2) any Claim of the United States arising on or after the Effective Date; or (3) any valid right of setoff or recoupment of the United States against any of the Debtors. Nothing herein or in the Confirmation Order shall: (i) enjoin or otherwise bar the United States from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence; or (ii) divest any court, commission, or tribunal of jurisdiction to determine whether any liabilities asserted by the United States are discharged or otherwise barred by this Plan, the Confirmation Order or the Bankruptcy Code.

Moreover, nothing herein or in the Confirmation Order shall release or exculpate any non-Debtor, including any Released Parties and/or Exculpated Parties that are not Debtors, from any liability to the United States, including but not limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the Released Parties and/or Exculpated Parties, nor shall anything herein or in the Confirmation Order enjoin the United States from bringing any claim, suit, action or other proceeding against any non-Debtor for any liability whatsoever; provided, that the foregoing sentence shall not (x) limit the scope of discharge granted to the Debtors and the Reorganized Debtors under sections 524 and 1141 of the Bankruptcy Code, or (y) diminish the scope of any exculpation to which any party is entitled under section 1125(e) of the Bankruptcy Code.

Without limiting the application of section 1145 of the Bankruptcy Code, nothing contained herein or in the Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the Debtors and the Reorganized Debtors, nor shall this Plan or the Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of this Plan, nor shall anything in this Plan or Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.

### H.    Term of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays arising under or entered during the pendency of these cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay; provided, however, that in no event shall the Plan or the Confirmation Order be construed as enjoining Plan Sponsor from exercising any of its rights under the Plan Support Agreement prior to the Effective Date.

### I.    Ipso Facto and Similar Provisions Ineffective

Any term of any prepetition policy, contract, or other obligation applicable to a Debtor shall be void and of no further force or effect to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation as a result of, or gives rise to a right of any Entity based on (i) the insolvency or financial condition of a Debtor, (ii) the commencement of these chapter 11 cases, (iii) the Confirmation or consummation of the Plan, or (iv) the Transaction.

## XII.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over these cases after the Effective Date to the fullest legally permissible extent, including jurisdiction to:

1.    Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, and establish the priority or secured or unsecured status of any Claim, including any Administrative Expense Claim;

2.    Adjudicate any Retained Cause of Action, including any Avoidance Action;

3.    Resolve any disputes relating to the Transaction;

4.    Grant or deny any applications for allowance of Fee Claims;

5.    Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Claims;

6.    Ensure that Distributions are accomplished pursuant to the provisions of the Plan;

7.    Decide or resolve any motions, adversary proceedings, contested matters and any other matters that may be pending on the Effective Date or brought thereafter in these cases;

8.    Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other

agreements or documents entered into or delivered in connection with the Plan, the Confirmation Order, or the Transaction;

9.  Resolve any controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Confirmation Order or any contract, instrument, release or other agreement or document that is entered into or delivered in connection with the Plan and any Entity's rights arising from or obligations incurred in connection with the Plan;

10.  Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, or remedy any defect or omission or reconcile any inconsistency in any order entered in the Debtors' cases, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, in such manner as may be necessary or appropriate to consummate the Plan and the transactions contemplated hereby;

11.  Hear and determine any matter, case, controversy, suit, dispute, or Cause of Action regarding the existence, nature and scope of the releases, injunctions, and exculpation provided in the Plan, and issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order;

12.  Enter and implement orders or take such other actions as may be necessary or appropriate to implement, enforce or restrain interference by any Entity with the consummation, implementation or enforcement of the Plan or the Confirmation Order;

13.  Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated, or if Distributions are enjoined or stayed;

14.  Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement, or the Confirmation Order;

15.  Grant, under section 505(b) of the Bankruptcy Code, an expedited determination with respect to tax returns filed, or to be filed, on behalf of the Debtors for any and all taxable periods ending after the Petition Date through, and including, the Effective Date;

16.  Enforce, clarify or modify any orders previously entered in the Debtors' cases;

17.  Enter final decrees closing the Debtors' cases;

18.  Determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for taxes;

19.     Assist in recovery of all assets of the Debtors and their Estates, wherever located; and

20.     Hear any other matter over which the Bankruptcy Court has jurisdiction.

21.     If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, the provisions of this section XII shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## XIII.   MISCELLANEOUS PROVISIONS

### A.     Dissolution of Creditors' Committee

Except to the extent provided herein, upon the Effective Date:  (i) the Creditors' Committee shall be dissolved and shall have no further role in these chapter 11 cases except to (a) prepare, file and, if necessary, litigate final applications for compensation; and (b) object to final fee applications filed by other Professionals; (ii) the current and former members of the Creditors' Committee and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with these cases; and (iii) the Professionals retained by the Creditors' Committee will not be entitled to assert any Fee Claims for any services rendered or expenses incurred after the Effective Date in their capacity as Professionals for the Creditors' Committee, except with regard to the services specifically delineated in clauses (i)(a) and (b), above.

### B.     Inconsistency

In the event of any inconsistency between the Plan and the Disclosure Statement (including any exhibit or schedule to the Disclosure Statement), the provisions of the Plan shall govern.  In the event of any inconsistency between the Plan and any document or agreement filed in the Plan Supplement, such document or agreement shall control.  In the event of any inconsistency between the Plan or any document or agreement filed in the Plan Supplement, on the one hand, and the Confirmation Order, on the other hand, the Confirmation Order shall control.  Notwithstanding the foregoing, the Debtors remain subject to all of their obligations under the Plan Support Agreement to the extent the terms of the Plan Support Agreement are not explicitly modified by this Plan.

### C.     Exhibits / Schedules

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and constitute a part of the Plan.

### D.     Severability

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court may, at the request of the Debtors, alter and interpret such term or provision to the extent necessary to render it valid or enforceable to the maximum extent practicable, consistent with the original

- 59 -

purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### E.    Governing Law

Except to the extent that (1) the Bankruptcy Code or other federal law is applicable or (2) a document or agreement filed in the Plan Supplement provides otherwise (in which case the governing law specified therein shall be applicable to such document or agreement), the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws that would require or permit application of the laws of another jurisdiction.

### F.    Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### G.    Service of Documents

To be effective, any pleading, notice or other document required by the Plan or the Confirmation Order to be served on or delivered to counsel to the Debtors, the DIP Agent, the Creditors' Committee and the U.S. Trustee must be sent by email and overnight delivery service, courier service, first class mail or messenger to:

**1.    The Debtors**

**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219
Email: ddune@milbank.com
        aleblanc@milbank.com
        tlomazow@milbank.com
        ldoyle@milbank.com

**2.    DIP Agent**

**ARNOLD & PORTER KAYE SCHOLER LLP**
250 West 55th Street
New York, NY 10019
Attn: Jonathan Levine

Telephone: (212) 836-8000
Facsimile: (212) 836-8689
Email: jonathan.levine@arnoldporter.com

3.      **Creditors' Committee**

**PAUL HASTINGS LLP**
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6000
Facsimile: (212) 319-4090
Email: lucdespins@paulhastings.com
        pedrojimenez@paulhastings.com
        alexbongartz@paulhastings.com
        shlomomaza@paulhastings.com

4.      **The U.S. Trustee**

201 Varick Street, Room 1006
New York, NY 10014
Attn: Richard C. Morrissey
Telephone: (212) 510-0500 ext. 206
Facsimile: (212) 668-2255
Email: morrissey@usdoj.gov

5.      **Plan Sponsor**

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Attn.:   Garrett A. Fail
        Gabriel A. Morgan
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
E-mail:  Garrett.Fail@weil.com
        Gabriel.Morgan@weil.com

    - and –

**CRAVATH, SWAINE & MOORE LLP**
825 Eighth Avenue
New York, New York 10019
Attn.: Paul H. Zumbro
 George E. Zobitz
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
E-mail: PZumbro@cravath.com

JZobitz@cravath.com

6.      **SoftBank Group Corp.**

**MORRISON & FOERSTER LLP**
250 W. 55th Street
New York, New York 10019
Attn: Gary S. Lee
        Todd M. Goren
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
E-mail: GLee@mofo.com
        TGoren@mofo.com

## XIV.  CONFIRMATION REQUEST

The Debtors respectfully request Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

Dated:  August 31, 2020                    Respectfully submitted,

On behalf of each of the Debtors

By:  */s/ Thomas Whayne*
        Name:  Thomas Whayne
        Title:   Chief Financial Officer
                OneWeb Global Limited

## **Exhibit 1**

**Restructuring Steps Under UK Corporate Law**

## **Exhibit 1 to the Plan**

In accordance with the provisions of section IV.G of the Plan, the Plan Sponsor and the Debtors may supplement, modify and/or revise the actions and matters set out in this Schedule under certain circumstances, and to the extent the Debtors and the Plan Sponsor agree to supplement, modify and/or revise this Schedule the Plan shall be implemented in a manner consistent with this Schedule as may be so supplemented, modified and/or revised.

Subject to the aforementioned the Parties contemplate that the Reorganized Company Party shall be OneWeb Communications Limited.

Subject to the aforementioned the following steps shall be undertaken by way of the following implementation of the Plan actions and matters:

1.  The Plan Sponsor will on the Effective Date acquire all of the issued and outstanding shares in and any other Interests as may exist and are held by OneWeb in OneWeb Communications Limited, from OneWeb, in consideration of $1.

2.  The actions and matters set out in section IV.C of the Plan shall be implemented on the Effective Date through the Plan Sponsor subscribing for new ordinary shares in OneWeb Communications Limited, or through the Plan Sponsor advancing funds to OneWeb Communications Limited by way of a loan or loans, or through a combination of both a subscription for new ordinary shares and the advancing of funds by way of a loan or loans, as the Plan Sponsor may determine provided that any shares which may be subscribed by the Plan Sponsor for this purpose may be fully paid up on subscription or alternatively at the discretion of the Plan Sponsor partly paid only and any balance not paid up at the Effective Date will be paid up as may be required in order to comply with the provisions of the Plan.

3.  The actions and matters set out in section II.C.1 of the Plan shall, so far as dealt with in the following sub-paragraphs, be implemented as follows:

    3.1. The holders of Allowed Secured Notes Claims will convert when required to do so by the Plan Sponsor, and if not required to do so within one business day of the Effective Date then when such holders choose to convert, the Allowed Secured Notes Claims Equity Amount of the principal amount of the aggregate amount of their Allowed Secured Notes Claims in consideration for ordinary shares in OneWeb Communications Limited, on the basis that such conversion of Allowed Secured Notes Claims shall be made pro rata to the amount of Allowed Secured Notes Claims held by each such holder.

    3.2. Following the issue of such ordinary shares in OneWeb Communications Limited to the holders as is mentioned in paragraph 3.1 above, the Plan Sponsor calling upon such holders to transfer such shares to the Plan Sponsor in consideration for the issue by the Plan Sponsor to such holder of their *pro rata* share of the BidCo Equity Consideration, provided that if the Plan Sponsor does not so call on the holders to so transfer their shares in OneWeb Communications Limited to the Plan Sponsor within one business day of the issue of such shares then such holders shall have the right to transfer such shares to the Plan Sponsor in consideration for which the Plan Sponsor shall issue to such holders their pro rata share of the BidCo Equity Consideration.

    3.3. Alternatively to the actions set out at paragraphs 3.1 and 3.2 above and at the discretion of the Plan Sponsor, the Plan Sponsor shall have the right to call upon

the holders of the Allowed Secured Notes Claims to sell to the Plan Sponsor the Allowed Secured Notes Claims Equity Amount of such Allowed Secured Notes Claims, in the case of each holder of such claims pro rata to the amount of such claims held by such holder, in consideration for which the Plan Sponsor shall issue to such holders their pro rata share of the BidCo Equity Consideration.

3.4. If applicable, the Plan Sponsor shall within 60 days of the acquisition mentioned in paragraph 3.3 above shall irrevocably release OWG for no consideration the Allowed Secured Notes Claims Equity Amount owed to it by OneWeb Communications Limited following such acquisition.

3.5. Immediately following the issue of such ordinary shares in OneWeb Communications Limited to the holders as is mentioned in paragraph 3.1 above, and the matters set out in paragraph 3.2 or alternatively the matters set out in paragraph 3.3 (as the case may be), the remaining claims of the holders of the Allowed Secured Notes Claims shall be irrevocably released for no consideration.

# ANNEX B

## Liquidation Analysis

**OneWeb Global Ltd. et. al.**
**Summary Table - Best Interests Test**

Below is a summary, prepared by the Debtors and their professionals, of the proposed recoveries by Holders of Allowed Claims against, and Allowed Interests in, the Debtors pursuant to the Joint Chapter 11 Plan of Reorganization of OneWeb Global Limited et. al. (the "Plan") as compared to potential recoveries in a hypothetical Chapter 7 liquidation.

Because recoveries under the Plan exceed those in a hypothetical chapter 7 case, the Plan satisfies the best interests of creditors test.

| Class | Claim Type | Plan Consideration | Plan Recovery | Chapter 7 Recovery |
|---|---|---|---|---|
| Unclassified | New Money DIP Loan Claims[1] | Cash[2] | 100.0% | 0% to 21.0% |
| Unclassified | Roll-up Loan Claims | Cash | 100.0% | 0.0% |
| Unclassified | Ch. 11 Administrative Expense Claims | Cash | 100.0% | 0.0% |
| 1 | Secured Notes Claims[3] | Equity | 6.1% | 0.0% |
| 2 | Other Secured Claims | Cash | 100.0% | 0.0% |
| 3 | Priority Non-Tax Claims | Cash | 100.0% | 0.0% |
| 4 | General Unsecured Claims | N/A | 0.0% | 0.0% |
| 5 | Ongoing Trade Claims | [ ] | [ ] | 0.0% |
| 6 | Intercompany Claims | N/A | 0% to 100% | 0.0% |
| 7 | Intercompany Interests | N/A | 0% to 100% | 0.0% |
| 8 | Section 510(b) Claims | N/A | 0.0% | 0.0% |
| 9 | OneWeb Interests | N/A | 0.0% | 0.0% |

[1] New money DIP Claims represent $30 million of initial new money DIP loans provided by the initial DIP Lenders and $110 million of additional new money DIP loans provided by the Plan Sponsor (the "New Money DIP Loan Claims"). Chapter 7 recovery percentage reflects the range of the high-case and low-case recovery scenarios.

[2] On the Effective Date, except with respect to Interim Funding DIP Claims, each holder of an Allowed DIP Claim shall receive payment in full in cash under the Plan. With respect to the Interim Funding DIP Claims under the Plan, each holder of an allowed Interim Funding DIP Claim under the DIP Facility shall have such claims converted into BidCo Equity Interests at the same valuation as the BidCo Equity Consideration. In a Chapter 7 liquidation, all New Money DIP Loan Claims will receive payment, if any, in cash.

[3] Plan percentage recovery reflects equity distribution value of $100 million.

1

**OneWeb Global Ltd. et. al.**
**Liquidation Analysis Assumptions**

*Introduction*

Section 1129(a)(7) of the Bankruptcy Code₁ requires that each holder of an impaired Allowed Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors' assets were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. To demonstrate that the Plan satisfies this standard, the Debtors, in consultation with their legal and financial advisors, have prepared the Liquidation Analysis, which (a) estimates the realizable value of the Debtors (the "**Chapter 7 Debtors**") under a hypothetical Chapter 7 liquidation (the "**Liquidation Analysis**") and (b) estimates the distribution to creditors resulting from the liquidation.

The Liquidation Analysis is a hypothetical exercise based on a number of estimates and assumptions that are subject to significant uncertainties and contingencies. Proceeds generated in a hypothetical Chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale. Further, Allowed Claims against the Chapter 7 Debtors' estates could vary materially from the estimates set forth in the Liquidation Analysis. Accordingly, while the information contained in the Liquidation Analysis is presented with numerical specificity, the Debtors make no assurances that the asset values and Claim amounts presented in the Liquidation Analysis would not vary materially from actual amounts in the event of an actual Chapter 7 liquidation.

Following is a summary of certain assumptions used in the Liquidation Analysis. The notes to the Liquidation Analysis provide additional assumptions and should be read in conjunction with the Liquidation Analysis. Additional factors not enumerated herein were also considered in connection with the formulation of the Liquidation Analysis.

*General Assumptions*

The Liquidation Analysis assumes that the Debtors' Chapter 11 cases are converted to liquidation cases under Chapter 7 of the Bankruptcy Code effective October 1, 2020. The Bankruptcy Court-appointed Chapter 7 trustee would proceed to liquidate as soon as possible all assets of the Chapter 7 Debtors in both the high recovery and low recovery scenarios.

In the high-recovery scenario, assets are assumed liquidated over a nine-month liquidation period and the Chapter 7 cases would conclude on June 30, 2021. The assumed nine-month wind-down period reflects the requirement for regulatory approvals for a sale transaction. The high-recovery scenario assumes that the Debtors' spectrum rights, seventy-four (74) in-orbit satellites, satellite control equipment and certain related contracts and other operating assets located at its UK-based satellite operations center and its $5 million cash fund pledged to the United Kingdom Space Agency (the "**Spectrum Asset Package**") would be sold in the aggregate as a pool of assets to maximize liquidation value. The hypothetical sales assume that the Debtors' existing business

would not be sold as a going concern, which severely limits the potential value to be derived from the spectrum and other assets.

In the low-recovery scenario, assets are assumed liquidated over a twelve-month liquidation period and the Chapter 7 cases would conclude on September 30, 2021. A twelve-month liquidation period is estimated based on the assumption that the spectrum is not able to be sold given the distressed nature of the sale and the limited time to market the assets in a hypothetical Chapter 7 liquidation and, therefore, a period of time would be required to de-orbit the satellites currently in operation within the necessary regulatory guidelines and requirements.

This Liquidation Analysis incorporates, *inter alia*, (a) information included in the Debtors' Plan, (b) amounts presented in the Debtors' books and records and (c) analyses performed by the Debtors.

The Liquidation Analysis reflects the possibility that the applicable liquidation period may not provide sufficient time to maximize value during the sale of assets of the Chapter 7 Debtors and that the Chapter 7 Debtors' negotiation position will be very weak.  The assets would likely be valued and, if sold, sold at "deeply distressed" price levels. Liquidation values were derived by estimating proceeds from a "deeply distressed" sale of assets that a Chapter 7 trustee might achieve.

The Liquidation Analysis assumes that liquidation proceeds (net of the expenses incurred by the Chapter 7 trustee) will be distributed in accordance with the Bankruptcy Code and that no distributions will be made to junior creditors or equity holders until all senior creditors are paid in full.

The Liquidation Analysis assumes an Ongoing Trade Claims class is not established and that the Ongoing Trade Claims are treated as General Unsecured Claims.

Upon conversion of the Chapter 11 cases to Chapter 7 liquidation, it is assumed that the Chapter 7 trustee will be permitted the use of Cash Collateral (as defined in the DIP Order)[1] and sale proceeds for solely the purposes of managing a wind-down and liquidation of assets, however, there is no guarantee that funding beyond the Carve-Out (as defined in the DIP Order) will be available to a Chapter 7 trustee absent consent of the DIP Lenders to use Cash Collateral.

While the Liquidation Analysis assumes liquidation over a nine- to twelve-month period due to the time required obtain regulatory approval in the high-recovery scenario or to de-orbit the satellites in the low-recovery scenario or it is possible that the disposition and recovery from certain assets could take longer and cost more to realize. The potential impact of litigation and actions by other creditors could increase the amount of time required to realize recoveries assumed in this analysis. Such events, including if the Chapter 7 trustee were not granted consensual use of Cash Collateral and could not obtain alternate financing for costs incurred to realize on assets,

---

[1] *Order (I) Authorizing Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 121] (the "DIP Order").

could add costs to the liquidation in the form of higher legal and professional fees to resolve these potential events or shorten the time available to realize on the assets.

The table herein summarizes the estimated proceeds that would be available for distribution to the Debtors' creditors in a hypothetical liquidation of the Debtors' estates under Chapter 7 of the Bankruptcy Code. Additional assumptions with respect to the Liquidation Analysis are provided below.

### Cash and Equivalents

The "Cash and Equivalents" balances are the projected unrestricted Debtor cash balances as of October 1, 2020 based on the Debtors' consolidated cash forecast. OneWeb Communications Limited is projected to hold the majority of the cash as of October 1, 2020. Cash balances at each entity are projected based on allocation of the consolidated cash balance projected at October 1, 2020 and expected cash needs for wind-down and other administrative expenses. It is assumed that the Chapter 7 Debtors maintain the existing cash management system currently in place. The Liquidation Analysis assumes that, to the extent necessary to fund operations, the Debtors will first use cash currently reflected on the books of OneWeb Communications Limited.

The Liquidation Analysis assumes zero cash balance at each of the non-debtor entities as of October 1, 2020. Existing cash balances at June 30, 2020 are projected to be utilized to partly fund liabilities at the non-debtor entities. Non-debtor liabilities are projected to exceed the existing cash-on-hand.

Restricted cash includes cash held by third parties, including approximately $5 million held by the United Kingdom Space Agency as collateral in the event that the Debtors are no longer able to operate or safely de-orbit the satellites in operation. The low-recovery scenario assumes this cash collateral is returned to the Debtors in full at the conclusion of the de-orbiting process. The high-recovery scenario assumes the collateral remains in place and is transferred to the buyer as part of the Spectrum Asset Package.

### Intercompany Receivables

For purposes of this analysis, intercompany receivables have not been included. In both scenarios, gross proceeds available are insufficient to cover the projected administrative expenses and carve-out expense at most of the Debtor entities. Local, third-party liabilities of non-US debtors may have to be paid in priority to intercompany payables to other OneWeb-related entities. As a result, the intercompany receivables are assumed to have no realizable value.

### Prepaid Expenses and Other Current Assets

Prepaid and other current assets consist mainly of prepaid rent, prepaid insurance, advances to suppliers, and security deposits. The Liquidation Analysis assumes these assets will either be consumed during the liquidation period or are not realizable and therefore no proceeds will be realized from prepaid expenses.

4

*Income Tax Receivable*

The Liquidation Analysis assumes no proceeds are realized from any income tax receivable.

*Satellites, Ground, and Other Property and Equipment*

The Company's property and equipment includes costs for the design, development, manufacture, test, and launch of a constellation of LEO satellites (referred to as the "**Space Component**") and the acquisition, installation, and activation of primary and backup control centers, gateway, and other ground facilities (referred to as the "**Ground Component**").

The Liquidation Analysis assumes in the high-recovery scenario that the Space Component and Ground Component assets are included in the Spectrum Asset Package and are sold together as a pool of assets at deeply distressed values. See the "Spectrum Rights" section below for discussion of the estimated gross proceeds.

*Intangible Assets*

Intangible assets consist of intangibles with determinable or indefinite lives, website and computer software costs. A portion of the Company's intangible assets are spectrum licenses, priority rights, and trademarks, which are indefinite-lived intangible assets.

The Liquidation Analysis assumes no proceeds are realized from the intangible assets except for the spectrum rights included in the Spectrum Asset Package.

*Spectrum Rights*

OneWeb has various spectrum authorizations and licenses, including for the use of Ku-band and Ka-band radio-frequency spectrum on a global basis, and domestic market access/services authorizations in jurisdictions in which its ground infrastructure is located.

The global Ku-band and Ka-band authorizations are issued by the ITU for a specific set of satellites, frequencies, and orbits to be used in a planned constellation and contain certain milestones for the number of in-orbit satellites, which are assumed to be at risk in a hypothetical liquidation sale. The high-recovery scenario assumes that the Debtors' Spectrum Asset Package would be sold as a pool of assets at deeply distressed value for gross proceeds of no more than $50 million.

In the low-recovery scenario, assets are assumed liquidated over a twelve (12) month period based on the assumption that the spectrum is not able to be sold during the hypothetical liquidation sale period, thus the satellites currently in operation must be de-orbited within the necessary regulatory guidelines and requirements. It is assumed that the Debtors' remaining assets in the Spectrum Asset Package, separate and independent from the spectrum rights, are not able to be sold in either scenario.

The assumption of a range of zero to $50 million in gross proceeds for the Spectrum Asset Package reflects the bids, indications of interest, and other information regarding value received during the Debtors' sale process (as adjusted to account for the both the significant risk of getting regulatory approval of such sales and the additional risks associated with an asset sale in a liquidation environment) as well as key characteristics of the spectrum assets, namely that the majority of its value is derived from the operation of a LEO constellation as contemplated under the Debtors' authorizations and licenses. These authorizations and licenses include certain future milestone dates regarding the deployment of satellites. The hypothetical liquidation analysis assumes that the Spectrum Asset Package is sold as assets separate and apart from a going concern business.

The Liquidation Analysis assumes that 80% of the gross liquidation value would be attributable to the spectrum rights and 20% attributable to the other assets comprising the Spectrum Asset Package. OneWeb's Ku-band authorization is the forward channel and provides higher priority use than its Ka-band authorization and, therefore, comprises most of the estimated spectrum rights liquidation value. The Liquidation Analysis assumes 90% allocation of the estimated spectrum rights liquidation value to the Ku-band and 10% allocation to the Ka-band.

While there may be some hypothetical value in the domestic market access licenses the realizable value for any particular market is highly uncertain. There would also be significant costs to negotiate with governments for approval of the transfer of such licenses.  Accordingly, the Liquidation Analysis assumes that any value realized from sales of the domestic market access licenses is included in the gross liquidation value.

*Other Non-Current Assets*

The Liquidation Analysis assumes no proceeds are realized from the other non-current assets.

*Investment in Affiliates*

Assets at non-debtor subsidiaries have limited to no realizable value on a standalone basis. Certain non-debtors have liabilities, including the potential obligations under long-term site leases.  The Liquidation Analysis assumes cash available in aggregate at the non-debtor entities is used to pay the non-debtors' obligations and that cash at non-debtor entities is insufficient to fund all existing and projected liabilities as of October 1, 2020. As a result, the Liquidation Analysis assumes no proceeds are available to provide any realization on the Debtors' investment in affiliates.

*Deferred Tax Assets*

The Liquidation Analysis assumes no proceeds are realized from the other deferred tax assets.

*Costs Associated with Liquidation*

Estimated amounts for corporate payroll and certain operating costs during the nine-month liquidation period are based upon the assumption that certain corporate functions would be retained to oversee the liquidation process. Some staff would also be needed to maintain and

close the accounting records and to complete certain administrative tasks, including payroll, tax forms, and records. Certain minimum staff would be required at the physical locations to complete the closure of the facilities, disassemble the equipment, and oversee the sale process of the spectrum and equipment.

Operating costs are expected to include staff and facilities costs to maintain and manage the fleet of satellites during the nine-month liquidation period in the high-recovery scenario where the Spectrum Asset Package is sold. In the low-recovery scenario where a buyer for the Spectrum Asset Package is not found, costs will be required to de-orbit the seventy-four (74) in-orbit satellites. This is expected to take twelve (12) months. The Liquidation Analysis assumes the $5 million of restricted cash held by the United Kingdom Space Agency is returned to the Debtors at the end of this period.

Chapter 7 trustee fees include those fees associated with the appointment of a Chapter 7 trustee in accordance with section 326 of the Bankruptcy Code. Chapter 7 professional fees include legal, appraisal, broker and accounting fees expected to be incurred during the liquidation period and not already deducted from liquidation values.

*Carve-Out for US Trustee, Chapter 7 Trustee and Estate Professional Fees*

The Carve-Out represents proceeds of the secured lenders' collateral allocated under the DIP Order to pay certain US Trustee fees, Chapter 7 trustee fees, and fees and expenses of the Debtors' and the Creditors' Committee's professionals.  The estimates incorporated in the Liquidation Analysis include: (i) estimated accrued and unpaid professional fees associated with the Chapter 11 Cases as of October 1, 2020, (ii) estimated US Trustee fees owing as of October 1, 2020, (iii) all reasonable fees and expenses up to $100,000 incurred by a Chapter 7 trustee, and (iv) up to $3,000,000 of fees and expenses of the Debtors' and the Creditors' Committee's professionals incurred after October 1, 2020.

*New Money DIP Loan Claims*

New Money DIP Loan Claims in the Liquidation Analysis are comprised of the $30 million aggregate amount of the first two tranches of the initial DIP funding and $110 million of Interim Funding DIP Claims, plus interest accrued on each principal balance.

*Senior Secured Prepetition Claims*

The Liquidation Analysis assumes $94 million of the Secured Notes Claims, which includes accrued interest, and is reflected as Roll-up Loan Claims.

*Other Secured Claims*

Other Secured Claims are estimated for purposes of this Liquidation Analysis at zero based on the Debtors' books and records as of the Petition Date. The final amount of Other Secured Claims is subject to change based on continued reconciliation of proofs of claim filed through the bar date of August 11, 2020. The debtors have not analyzed potential Other Secured Claims

7

in detail and this estimate is not an admission that any asserted Claim qualifies for secured treatment. No assurance can be given that the total amount of actual Allowed Other Secured Claims will ultimately be in the estimated amount and actual results could be greater or less than this estimate.

*503(b)(9) Claims*

The 503(b)(9) Claims reflect estimated amounts based on the Debtors' preliminary review of proof of claims filed through July 15, 2020 as well as the Debtors' books and records. The final amount of 503(b)(9) is subject to change based on potential additional proofs of claims filed through the bar date of August 11, 2020 and upon the debtors' full legal review of filed claims. The debtors have not analyzed potential 503(b)(9) Claims in detail and this estimate is not an admission that any asserted claim qualifies for 503(b)(9) treatment.  No assurance can be given that actual allowed 503(b)(9) Claims will ultimately be in the estimated amount and actual results could be greater or less than this estimate.

*Priority Tax Claims*

Priority Tax Claims are estimated for purposes of this Liquidation Analysis at zero based on the Debtors' books and records. The final amount of Priority Tax Claims is subject to change based on continued reconciliation against proof of claims and potential additional proofs of claims filed through the governmental bar date of September 24, 2020 and upon the debtors' full legal review of filed claims.  The debtors have not analyzed potential priority tax Claims in detail and this estimate is not an admission that any asserted Claim qualifies for priority tax treatment. No assurance can be given that the total actual amount of Allowed Priority Tax Claims will ultimately be in the estimated amount and actual results could be greater or less than this estimate.

8

In Re:  OneWeb Global Limited, et al. (the "Debtors")
**Liquidation Analysis - Conversion Effective October 1, 2020**
*$ USD*
*Analysis Current as of August 10, 2020*

| | OneWeb Global Limited | | OneWeb Communications Limited | | WorldVu Satellites Limited | |
|---|---|---|---|---|---|---|
| | Low Recovery | High Recovery | Low Recovery | High Recovery | Low Recovery | High Recovery |
| Unrestricted Cash on Hand [1] | 1,576 | 1,576 | 702,572 | 702,572 | - | - |
| Restricted Cash | - | - | - | - | - | - |
| Gross Proceeds from Sale [2] [3] | - | - | - | - | - | 36,797,329 |
| **Total Gross Proceeds Available** | **1,576** | **1,576** | **702,572** | **702,572** | **-** | **36,797,329** |
| | | | | | | |
| **Ch. 7 Administrative Expenses** | | | | | | |
| Chapter 7 Trustee Fees [4] | 35 | 35 | 15,808 | 15,808 | - | 827,940 |
| Chapter 7 Professional Fees [5] | 16 | 16 | 7,026 | 7,026 | - | 367,973 |
| Transaction Fee - Spectrum Sale | - | - | - | - | - | 1,500,000 |
| Estate Wind-down Expenses [6] | 2,137 | 1,503 | 952,919 | 670,368 | 253,460 | 178,306 |
| **Total Priority Administrative Costs** | **2,188** | **1,555** | **975,753** | **693,202** | **253,460** | **2,874,219** |
| | | | | | | |
| **Carve-out [7]** | | | | | | |
| Ch. 11 US Trustee Fees (Q3 2020) | 21 | 21 | 9,371 | 9,371 | 2,492 | 2,492 |
| Accrued Professional Fees at Conversion Date | - | - | - | - | - | 10,069,500 |
| Post-Conversion Ch. 11 Prof Fees @ Carve Out Cap | - | - | - | - | - | 3,100,000 |
| **Total Carve-Out** | **21** | **21** | **9,371** | **9,371** | **2,492** | **13,171,992** |
| | | | | | | |
| **Net Estimated Proceeds Available (by Entity)** | (634) | 0 | (282,551) | 0 | (255,952) | 20,751,118 |
| | | | | | | |
| **Proceeds Available for Distribution to Creditors** | **-** | **0** | **-** | **0** | **-** | **20,751,118** |
| | | | | | | |
| **Less New Money DIP Loan Claims** | | | | | | |
| Total New Money DIP Loan Claims | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 |
| Hypothetical Recovery to Holders of New Money DIP Loan Claims | - | 0 | - | 0 | - | 20,751,118 |
| **Net Proceeds Available after Distributions to New Money DIP Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Roll-up Loan Claims** | | | | | | |
| Total Roll-up Loan Claims | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 |
| Hypothetical Recovery to Holders of Roll-up Loan Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Roll-up Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Ch. 11 Administrative Expenses** | | | | | | |
| 503(b)(9) | 3,720 | 3,720 | - | - | - | - |
| Priority Tax Claims | - | - | - | - | 2,000 | 2,000 |
| Hypothetical Recovery to Holders of Ch. 11 Administrative Expenses | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Ch. 11 Administrative Expenses** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Secured Notes Claims** | | | | | | |
| Total Secured Debt [8] | - | - | 1,639,267,588 | 1,639,267,588 | 1,639,267,588 | 1,639,267,588 |
| Hypothetical Recovery to Holders of Secured Notes Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Secured Notes Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Other Secured Claims** | | | | | | |
| Other Secured Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Other Secured Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Other Secured Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Priority Non-Tax Claims** | | | | | | |
| Priority Non-Tax Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Priority Non-Tax Claims | - | - | - | - | - | - |
| **Net Proceeds Available for General Unsecured Creditors and OneWeb Interests** | **-** | **-** | **-** | **-** | **-** | **-** |

In Re:  OneWeb Global Limited, et al. (the "Debtors")
**Liquidation Analysis - Conversion Effective October 1, 2020**
*$ USD*
*Analysis Current as of August 10, 2020*

| | OneWeb Holdings LLC | | WorldVu Development LLC | | 1021823 BC Ltd. | |
|---|---|---|---|---|---|---|
| | Low Recovery | High Recovery | Low Recovery | High Recovery | Low Recovery | High Recovery |
| Unrestricted Cash on Hand [1] | 672 | 672 | 14,231,706 | 14,231,706 | 16,176 | 16,176 |
| Restricted Cash | - | - | - | - | - | - |
| Gross Proceeds from Sale [2] [3] | - | - | - | - | - | - |
| **Total Gross Proceeds Available** | **672** | **672** | **14,231,706** | **14,231,706** | **16,176** | **16,176** |
| **Ch. 7 Administrative Expenses** | | | | | | |
| Chapter 7 Trustee Fees [4] | 15 | 15 | 320,213 | 320,213 | 364 | 364 |
| Chapter 7 Professional Fees [5] | 7 | 7 | 142,317 | 142,317 | 162 | 162 |
| Transaction Fee - Spectrum Sale | - | - | - | - | - | - |
| Estate Wind-down Expenses [6] | 912 | 641 | 19,302,867 | 13,579,360 | 21,940 | 15,435 |
| **Total Priority Administrative Costs** | **933** | **663** | **19,765,398** | **14,041,891** | **22,466** | **15,960** |
| **Carve-out [7]** | | | | | | |
| Ch. 11 US Trustee Fees (Q3 2020) | 9 | 9 | 189,815 | 189,815 | 216 | 216 |
| Accrued Professional Fees at Conversion Date | - | - | - | - | - | - |
| Post-Conversion Ch. 11 Prof Fees @ Carve Out Cap | - | - | - | - | - | - |
| **Total Carve-Out** | **9** | **9** | **189,815** | **189,815** | **216** | **216** |
| **Net Estimated Proceeds Available (by Entity)** | (270) | (0) | (5,723,507) | (0) | (6,505) | 0 |
| **Proceeds Available for Distribution to Creditors** | **-** | **-** | **-** | **-** | **-** | **0** |
| **Less New Money DIP Loan Claims** | | | | | | |
| Total New Money DIP Loan Claims | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 |
| Hypothetical Recovery to Holders of New Money DIP Loan Claims | - | - | - | - | - | 0 |
| **Net Proceeds Available after Distributions to New Money DIP Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Roll-up Loan Claims** | | | | | | |
| Total Roll-up Loan Claims | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 |
| Hypothetical Recovery to Holders of Roll-up Loan Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Roll-up Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Ch. 11 Administrative Expenses** | | | | | | |
| 503(b)(9) | - | - | 63,362 | 63,362 | 960,000 | 960,000 |
| Priority Tax Claims | - | - | 60,154 | 60,154 | - | - |
| Hypothetical Recovery to Holders of Ch. 11 Administrative Expenses | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Ch. 11 Administrative Expenses** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Secured Notes Claims** | | | | | | |
| Total Secured Debt [8] | - | - | 1,639,267,588 | 1,639,267,588 | 1,639,267,588 | 1,639,267,588 |
| Hypothetical Recovery to Holders of Secured Notes Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Secured Notes Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Other Secured Claims** | | | | | | |
| Other Secured Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Other Secured Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Other Secured Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Priority Non-Tax Claims** | | | | | | |
| Priority Non-Tax Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Priority Non-Tax Claims | - | - | - | - | - | - |
| **Net Proceeds Available for General Unsecured Creditors and OneWeb Interests** | **-** | **-** | **-** | **-** | **-** | **-** |

In Re:  OneWeb Global Limited, et al. (the "Debtors")
**Liquidation Analysis - Conversion Effective October 1, 2020**
*$ USD*
*Analysis Current as of August 10, 2020*

| | OneWeb Ltd | | Network Access Associates Limited | | OneWeb Norway AS | |
|---|---|---|---|---|---|---|
| | Low Recovery | High Recovery | Low Recovery | High Recovery | Low Recovery | High Recovery |
| Unrestricted Cash on Hand [1] | - | - | 30,837 | 30,837 | - | - |
| Restricted Cash | - | - | 5,000,000 | | - | - |
| Gross Proceeds from Sale [2] [3] | - | - | - | 9,202,671 | - | - |
| **Total Gross Proceeds Available** | **-** | **-** | **5,030,837** | **9,233,507** | **-** | **-** |
| | | | | | | |
| **Ch. 7 Administrative Expenses** | | | | | | |
| Chapter 7 Trustee Fees [4] | - | - | 113,194 | 207,754 | - | - |
| Chapter 7 Professional Fees [5] | - | - | 50,308 | 92,335 | - | - |
| Transaction Fee - Spectrum Sale | - | - | - | - | - | - |
| Estate Wind-down Expenses [6] | - | - | 4,748,587 | 3,340,580 | - | - |
| **Total Priority Administrative Costs** | **-** | **-** | **4,912,089** | **3,640,669** | **-** | **-** |
| | | | | | | |
| **Carve-out [7]** | | | | | | |
| Ch. 11 US Trustee Fees (Q3 2020) | - | - | 46,695 | 46,695 | - | - |
| Accrued Professional Fees at Conversion Date | - | - | 10,069,500 | | - | - |
| Post-Conversion Ch. 11 Prof Fees @ Carve Out Cap | - | - | 3,100,000 | | - | - |
| **Total Carve-Out** | **-** | **-** | **13,216,195** | **46,695** | **-** | **-** |
| | | | | | | |
| **Net Estimated Proceeds Available (by Entity)** | **-** | **-** | **(13,097,448)** | **5,546,143** | **-** | **-** |
| | | | | | | |
| **Proceeds Available for Distribution to Creditors** | **-** | **-** | **-** | **5,546,143** | **-** | **-** |
| | | | | | | |
| **Less New Money DIP Loan Claims** | | | | | | |
| Total New Money DIP Loan Claims | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 |
| Hypothetical Recovery to Holders of New Money DIP Loan Claims | - | - | - | 5,546,143 | - | - |
| **Net Proceeds Available after Distributions to New Money DIP Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Roll-up Loan Claims** | | | | | | |
| Total Roll-up Loan Claims | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 |
| Hypothetical Recovery to Holders of Roll-up Loan Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Roll-up Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Ch. 11 Administrative Expenses** | | | | | | |
| 503(b)(9) | - | - | - | - | - | - |
| Priority Tax Claims | - | - | 300 | 300 | 200 | 200 |
| Hypothetical Recovery to Holders of Ch. 11 Administrative Expenses | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Ch. 11 Administrative Expenses** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Secured Notes Claims** | | | | | | |
| Total Secured Debt [8] | 1,639,267,588 | 1,639,267,588 | 1,639,267,588 | 1,639,267,588 | | |
| Hypothetical Recovery to Holders of Secured Notes Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Secured Notes Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Other Secured Claims** | | | | | | |
| Other Secured Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Other Secured Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Other Secured Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Priority Non-Tax Claims** | | | | | | |
| Priority Non-Tax Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Priority Non-Tax Claims | - | - | - | - | - | - |
| **Net Proceeds Available for General Unsecured Creditors and OneWeb Interests** | **-** | **-** | **-** | **-** | **-** | **-** |

In Re:  OneWeb Global Limited, et al. (the "Debtors")
**Liquidation Analysis - Conversion Effective October 1, 2020**
*$ USD*
*Analysis Current as of August 10, 2020*

| | OneWeb ApS | | WorldVu Australia Pty Ltd | | OneWeb Network Access Holdings Limited | |
|---|---|---|---|---|---|---|
| | Low Recovery | High Recovery | Low Recovery | High Recovery | Low Recovery | High Recovery |
| Unrestricted Cash on Hand [1] | 1,088 | 1,088 | 470,425 | 470,425 | 3,240 | 3,240 |
| Restricted Cash | - | - | - | - | - | - |
| Gross Proceeds from Sale [2] [3] | - | - | - | - | - | - |
| **Total Gross Proceeds Available** | **1,088** | **1,088** | **470,425** | **470,425** | **3,240** | **3,240** |
| | | | | | | |
| **Ch. 7 Administrative Expenses** | | | | | | |
| Chapter 7 Trustee Fees [4] | 24 | 24 | 10,585 | 10,585 | 73 | 73 |
| Chapter 7 Professional Fees [5] | 11 | 11 | 4,704 | 4,704 | 32 | 32 |
| Transaction Fee - Spectrum Sale | - | - | - | - | - | - |
| Estate Wind-down Expenses [6] | 1,475 | 1,038 | 638,051 | 448,862 | 4,394 | 3,091 |
| **Total Priority Administrative Costs** | **1,510** | **1,073** | **653,339** | **464,151** | **4,500** | **3,197** |
| | | | | | | |
| **Carve-out [7]** | | | | | | |
| Ch. 11 US Trustee Fees (Q3 2020) | 15 | 15 | 6,274 | 6,274 | 43 | 43 |
| Accrued Professional Fees at Conversion Date | - | - | - | - | - | - |
| Post-Conversion Ch. 11 Prof Fees @ Carve Out Cap | - | - | - | - | - | - |
| **Total Carve-Out** | **15** | **15** | **6,274** | **6,274** | **43** | **43** |
| | | | | | | |
| **Net Estimated Proceeds Available (by Entity)** | **(437)** | **-** | **(189,189)** | **0** | **(1,303)** | **(0)** |
| | | | | | | |
| **Proceeds Available for Distribution to Creditors** | **-** | **-** | **-** | **0** | **-** | **-** |
| | | | | | | |
| **Less New Money DIP Loan Claims** | | | | | | |
| Total New Money DIP Loan Claims | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 |
| | | | | | | |
| Hypothetical Recovery to Holders of New Money DIP Loan Claims | - | - | - | 0 | - | - |
| **Net Proceeds Available after Distributions to New Money DIP Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Roll-up Loan Claims** | | | | | | |
| Total Roll-up Loan Claims | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 |
| | | | | | | |
| Hypothetical Recovery to Holders of Roll-up Loan Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Roll-up Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Ch. 11 Administrative Claims** | | | | | | |
| 503(b)(9) | - | - | - | - | - | - |
| Priority Tax Claims | - | - | - | - | - | - |
| | | | | | | |
| Hypothetical Recovery to Holders of Ch. 11 Administrative Expenses | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Ch. 11 Administrative Expenses** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Secured Notes Claims** | | | | | | |
| Total Secured Debt [8] | - | - | - | - | 1,639,267,588 | 1,639,267,588 |
| | | | | | | |
| Hypothetical Recovery to Holders of Secured Notes Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Secured Notes Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Other Secured Claims** | | | | | | |
| Other Secured Claims | | | | | | |
| | | | | | | |
| Hypothetical Recovery to Holders of Other Secured Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Other Secured Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Priority Non-Tax Claims** | | | | | | |
| Priority Non-Tax Claims | - | - | - | - | - | - |
| | | | | | | |
| Hypothetical Recovery to Holders of Priority Non-Tax Claims | - | - | - | - | - | - |
| **Net Proceeds Available for General Unsecured Creditors and OneWeb Interests** | **-** | **-** | **-** | **-** | **-** | **-** |

12

In Re:  OneWeb Global Limited, et al. (the "Debtors")
**Liquidation Analysis - Conversion Effective October 1, 2020**
$ USD
*Analysis Current as of August 10, 2020*

| | OneWeb Limited | | WorldVu Unipessoal Lda | | OneWeb GK | |
|---|---|---|---|---|---|---|
| | Low Recovery | High Recovery | Low Recovery | High Recovery | Low Recovery | High Recovery |
| Unrestricted Cash on Hand [1] | - | - | | | 21,903 | 21,903 |
| Restricted Cash | | | | | - | - |
| Gross Proceeds from Sale [2] [3] | - | 4,000,000 | - | - | - | - |
| **Total Gross Proceeds Available** | **-** | **4,000,000** | **-** | **-** | **21,903** | **21,903** |
| | | | | | | |
| **Ch. 7 Administrative Expenses** | | | | | | |
| Chapter 7 Trustee Fees [4] | - | 90,000 | - | - | 493 | 493 |
| Chapter 7 Professional Fees [5] | - | 40,000 | - | - | 219 | 219 |
| Transaction Fee - Spectrum Sale | - | - | - | - | - | - |
| Estate Wind-down Expenses [6] | - | - | - | - | 29,707 | 20,899 |
| **Total Priority Administrative Costs** | **-** | **130,000** | **-** | **-** | **30,419** | **21,610** |
| | | | | | | |
| **Carve-out [7]** | | | | | | |
| Ch. 11 US Trustee Fees (Q3 2020) | - | - | - | - | 292 | 292 |
| Accrued Professional Fees at Conversion Date | - | - | - | - | - | - |
| Post-Conversion Ch. 11 Prof Fees @ Carve Out Cap | - | - | - | - | - | - |
| **Total Carve-Out** | **-** | **-** | **-** | **-** | **292** | **292** |
| | | | | | | |
| **Net Estimated Proceeds Available (by Entity)** | **-** | **3,870,000** | **-** | **-** | **(8,808)** | **-** |
| | | | | | | |
| **Proceeds Available for Distribution to Creditors** | **-** | **3,870,000** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less New Money DIP Loan Claims** | | | | | | |
| Total New Money DIP Loan Claims | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 |
| | | | | | | |
| Hypothetical Recovery to Holders of New Money DIP Loan Claims | - | 3,870,000 | - | - | - | - |
| **Net Proceeds Available after Distributions to New Money DIP Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Roll-up Loan Claims** | | | | | | |
| Total Roll-up Loan Claims | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 |
| | | | | | | |
| Hypothetical Recovery to Holders of Roll-up Loan Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Roll-up Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Ch. 11 Administrative Expenses** | | | | | | |
| 503(b)(9) | 9,090 | 9,090 | - | - | - | - |
| Priority Tax Claims | - | - | - | - | - | - |
| | | | | | | |
| Hypothetical Recovery to Holders of Ch. 11 Administrative Expenses | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Ch. 11 Administrative Expenses** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Secured Notes Claims** | | | | | | |
| Total Secured Debt [8] | - | - | - | - | - | - |
| | | | | | | |
| Hypothetical Recovery to Holders of Secured Notes Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Secured Notes Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Other Secured Claims** | | | | | | |
| Other Secured Claims | - | - | - | - | - | - |
| | | | | | | |
| Hypothetical Recovery to Holders of Other Secured Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Other Secured Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Priority Non-Tax Claims** | | | | | | |
| Priority Non-Tax Claims | - | - | - | - | - | - |
| | | | | | | |
| Hypothetical Recovery to Holders of Priority Non-Tax Claims | - | - | - | - | - | - |
| **Net Proceeds Available for General Unsecured Creditors and OneWeb Interests** | **-** | **-** | **-** | **-** | **-** | **-** |

13

In Re: OneWeb Global Limited, et al. (the "Debtors")
**Liquidation Analysis - Conversion Effective October 1, 2020**
$ USD
*Analysis Current as of August 10, 2020*

| | WorldVu South Africa (Pty) Ltd | | WorldVu Mexico S. De R.L. de CV | | OneWeb Chile SpA | |
|---|---|---|---|---|---|---|
| | Low Recovery | High Recovery | Low Recovery | High Recovery | Low Recovery | High Recovery |
| Unrestricted Cash on Hand [1] | 27,780 | 27,780 | 1,530 | 1,530 | 40,556 | 40,556 |
| Restricted Cash | - | - | - | - | - | - |
| Gross Proceeds from Sale [2] [3] | - | - | - | - | - | - |
| **Total Gross Proceeds Available** | **27,780** | **27,780** | **1,530** | **1,530** | **40,556** | **40,556** |
| | | | | | | |
| **Ch. 7 Administrative Expenses** | | | | | | |
| Chapter 7 Trustee Fees [4] | 625 | 625 | 34 | 34 | 913 | 913 |
| Chapter 7 Professional Fees [5] | 278 | 278 | 15 | 15 | 406 | 406 |
| Transaction Fee - Spectrum Sale | - | - | - | - | - | - |
| Estate Wind-down Expenses [6] | 37,679 | 26,507 | 2,075 | 1,460 | 55,008 | 38,697 |
| **Total Priority Administrative Costs** | **38,582** | **27,410** | **2,125** | **1,510** | **56,326** | **40,015** |
| | | | | | | |
| **Carve-out [7]** | | | | | | |
| Ch. 11 US Trustee Fees (Q3 2020) | 371 | 371 | 20 | 20 | 541 | 541 |
| Accrued Professional Fees at Conversion Date | - | - | - | - | - | - |
| Post-Conversion Ch. 11 Prof Fees @ Carve Out Cap | - | - | - | - | - | - |
| **Total Carve-Out** | **371** | **371** | **20** | **20** | **541** | **541** |
| | | | | | | |
| **Net Estimated Proceeds Available (by Entity)** | **(11,172)** | **0** | **(615)** | **-** | **(16,310)** | **0** |
| | | | | | | |
| **Proceeds Available for Distribution to Creditors** | **-** | **0** | **-** | **-** | **-** | **0** |
| | | | | | | |
| **Less New Money DIP Loan Claims** | | | | | | |
| Total New Money DIP Loan Claims | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 |
| Hypothetical Recovery to Holders of New Money DIP Loan Claims | - | 0 | - | - | - | 0 |
| **Net Proceeds Available after Distributions to New Money DIP Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Roll-up Loan Claims** | | | | | | |
| Total Roll-up Loan Claims | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 |
| Hypothetical Recovery to Holders of Roll-up Loan Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Roll-up Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Ch. 11 Administrative Expenses** | | | | | | |
| 503(b)(9) | - | - | - | - | - | - |
| Priority Tax Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Ch. 11 Administrative Expenses | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Ch. 11 Administrative Expenses** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Secured Notes Claims** | | | | | | |
| Total Secured Debt [8] | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Secured Notes Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Secured Notes Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Other Secured Claims** | | | | | | |
| Other Secured Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Other Secured Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Other Secured Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Priority Non-Tax Claims** | | | | | | |
| Priority Non-Tax Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Priority Non-Tax Claims | - | - | - | - | - | - |
| **Net Proceeds Available for General Unsecured Creditors and OneWeb Interests** | **-** | **-** | **-** | **-** | **-** | **-** |

14

**In Re: OneWeb Global Limited, et al. (the "Debtors")**
**Liquidation Analysis - Conversion Effective October 1, 2020**
*$ USD*
*Analysis Current as of August 10, 2020*

| | WorldVu JV Holdings LLC | | Total | |
| --- | --- | --- | --- | --- |
| | Low Recovery | High Recovery | Low Recovery | High Recovery |
| Unrestricted Cash on Hand [1] | - | - | 15,550,060 | 15,550,060 |
| Restricted Cash | - | - | 5,000,000 | - |
| Gross Proceeds from Sale [2] [3] | - | - | - | 50,000,000 |
| **Total Gross Proceeds Available** | **-** | **-** | **20,550,060** | **65,550,060** |
| | | | | |
| **Ch. 7 Administrative Expenses** | | | | |
| Chapter 7 Trustee Fees [4] | - | - | 462,376 | 1,474,876 |
| Chapter 7 Professional Fees [5] | - | - | 205,501 | 655,501 |
| Transaction Fee - Spectrum Sale | - | - | - | 1,500,000 |
| Estate Wind-down Expenses [6] | - | - | 26,051,211 | 18,326,748 |
| **Total Priority Administrative Costs** | **-** | **-** | **26,719,088** | **21,957,125** |
| | | | | |
| **Carve-out [7]** | | | | |
| Ch. 11 US Trustee Fees (Q3 2020) | - | - | 256,175 | 256,175 |
| Accrued Professional Fees at Conversion Date | - | - | 10,069,500 | 10,069,500 |
| Post-Conversion Ch. 11 Prof Fees @ Carve Out Cap | - | - | 3,100,000 | 3,100,000 |
| **Total Carve-Out** | **-** | **-** | **13,425,675** | **13,425,675** |
| | | | | |
| **Net Estimated Proceeds Available (by Entity)** | **-** | **-** | **(19,594,702)** | **30,167,261** |
| | | | | |
| **Proceeds Available for Distribution to Creditors** | **-** | **-** | **-** | **30,167,261** |
| | | | | |
| **Less New Money DIP Loan Claims** | | | | |
| Total New Money DIP Loan Claims | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 |
| | | | | |
| Hypothetical Recovery to Holders of New Money DIP Loan Claims | - | - | - | 30,167,261 |
| **Net Proceeds Available after Distributions to New Money DIP Loan Claims** | **-** | **-** | **-** | **-** |
| | | | | |
| **Less Roll-up Loan Claims** | | | | |
| Total Roll-up Loan Claims | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 |
| | | | | |
| Hypothetical Recovery to Holders of Roll-up Loan Claims | - | - | - | - |
| **Net Proceeds Available after Distributions to Roll-up Loan Claims** | **-** | **-** | **-** | **-** |
| | | | | |
| **Less Ch. 11 Administrative Expenses** | | | | |
| 503(b)(9) | - | - | 1,036,172 | 1,036,172 |
| Priority Tax Claims | - | - | 62,654 | 62,654 |
| | | | | |
| Hypothetical Recovery to Holders of Ch. 11 Administrative Expenses | - | - | - | - |
| **Net Proceeds Available after Distributions to Ch. 11 Administrative Expenses** | **-** | **-** | **-** | **-** |
| | | | | |
| **Less Secured Notes Claims** | | | | |
| Total Secured Debt [8] | - | - | 1,639,267,588 | 1,639,267,588 |
| | | | | |
| Hypothetical Recovery to Holders of Secured Notes Claims | - | - | - | - |
| **Net Proceeds Available after Distributions to Secured Notes Claims** | **-** | **-** | **-** | **-** |
| | | | | |
| **Less Other Secured Claims** | | | | |
| Other Secured Claims | - | - | - | - |
| | | | | |
| Hypothetical Recovery to Holders of Other Secured Claims | - | - | - | - |
| **Net Proceeds Available after Distributions to Other Secured Claims** | **-** | **-** | **-** | **-** |
| | | | | |
| **Less Priority Non-Tax Claims** | | | | |
| Priority Non-Tax Claims | - | - | - | - |
| | | | | |
| Hypothetical Recovery to Holders of Priority Non-Tax Claims | - | - | - | - |
| **Net Proceeds Available for General Unsecured Creditors and OneWeb Interests** | **-** | **-** | **-** | **-** |

**Liquidation Analysis Footnotes**

1. Projected Unrestricted Cash on Hand balance of $15.5M reflects the DIP forecast as at October 1, 2020.

2. Gross estimated proceeds from liquidation do not include any potential recovery from lawsuits that the Debtors have filed or could file or any value related to Net Operating Losses at any of the Debtor entities.

3. Spectrum Asset Package proceeds estimated at $0 to $50 million.  See "*Spectrum Rights.*"

4. The Chapter 7 trustee's fees are calculated at 2.25% of distributable assets as a proxy for 11 U.S.C. § 326(a).

5. Chapter 7 professional fees are assumed to be 1% of distributable assets.

6. Wind-down costs include operating expense required to keep satellites in-orbit for nine (9) months under the high-recovery scenario or to de-orbit the satellites over a twelve (12) month period in the low-recovery scenario as well as payroll costs for reduced staff to shutter all other operations.

7. Carve-out amount includes (i) estimated unpaid professional fees projected in the DIP Budget to be incurred through to September 30, 2020, (ii) $0.26 million for Q3-2020 accrued US Trustee fees, (iii) $100,000 for fees and expenses of a trustee appointed in the Debtors' cases under section 726(b) of the Bankruptcy Code, and (iv) $3 million capped amount of professional fees of the Debtors' and the Creditors' Committee professionals after conversion to a Chapter 7 proceeding. In the high-recovery scenario, the carve-out amount also includes an assumed $1.5 million transaction fee earned for the sale of the Spectrum Asset Package.

8. Secured Notes Claims are reflected in full at each Debtor that is an obligor under the prepetition loan agreement.

## **ANNEX C**

**Financial Projections**

## **Financial Projections**

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH THEIR BUSINESS PLANS, BUDGETS OR STRATEGIES OR MAKE EXTERNAL PROJECTIONS OR FORECASTS OF THEIR ANTICIPATED FINANCIAL POSITIONS OR RESULTS OF OPERATIONS. ACCORDINGLY, THE DEBTORS DO NOT ANTICIPATE THAT THEY WILL, AND DISCLAIM ANY OBLIGATION TO, FURNISH UPDATED BUSINESS PLANS, BUDGETS OR PROJECTIONS PRIOR TO THE EFFECTIVE DATE OR OTHERWISE MAKE SUCH INFORMATION PUBLICLY AVAILABLE.

The Debtors prepared the financial projections set forth herein (the "Financial Projections") based on, among other things, the anticipated future financial condition and results of operations of the Debtors in the Transaction. The following forecast was not prepared with a view toward compliance with published guidelines of the SEC or the American Institute of Certified Public Accountants regarding forecasts. The Debtors' independent auditor has not audited, reviewed, compiled or otherwise applied procedures to the forecast and consequently, does not express an opinion or any other form of assurance with respect to the forecast. The forecast data are not measured on a basis consistent with generally accepted accounting principles ("GAAP") or International Financial Reporting Standards ("IFRS") as applied to the Debtors' historical financial statements and should not be relied upon as such.

THE FINANCIAL PROJECTIONS HEREIN HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR AS TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

Risks Associated with Forward-Looking Statements

The Financial Projections are, by their nature, forward-looking and are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future results of the Reorganized Debtors may differ from those set forth from the Financial Projections. The Financial Projections reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may

not materialize, including, without limitation, assumptions concerning: (a) the timing of confirmation and consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; and (e) the Debtors' ability to receive vendor support.

|  | Q4 2020E[1] | 2021E | 2022E | 2023E |
|---|---|---|---|---|
| **EBITDA** | **($45)** | **($144)** | **$20** | **$232** |
| Less: Capex | (373) | (1,215) | (200) | (74) |
| Less: Working Capital & Other | -- | (27) | (26) | (8) |
| **Unlevered Free Cash Flow** | **($419)** | **($1,386)** | **($206)** | **$149** |
| Plus: New Financing (BidCo Emergence)[2] | 740 | -- | -- | -- |
| Plus: New Financing (New Offering / Commitments)[3] | -- | 1,300 | -- | -- |
| **Net Cash Flow** | **$321** | **($86)** | **($206)** | **$149** |
| **Ending Cash Balance** | **$344** | **$258** | **$52** | **$201** |

**Notes:**

Figures may not tie due to rounding.

1  The Financial Projections assume an effective date of October 2, 2020 and this column includes pre-emergence expenses.

2  Represents $850 million of Additional Cash Plan Funding less $110 million of Interim Funding. Approximately $83 million of the $740 million of new financing will be used to fund administrative claims, cure costs and other expenses prior to emergence and are included in the EBITDA and capex figures above.

3  Per the table above, the Debtors' business plan contemplates post-close financing of $1.3BN in order to fund operational and capital expenditure needs. With a de-leveraged balance sheet as a result of the emergence from chapter 11 cases; the already existing commitment to fund up to $850 million to fund expenses and operations on and after the Effective Date; and the rebound in financial markets since the inception of COVID-19, the Debtors believe that they will be able to raise additional funding and that the Plan is feasible.

## <u>ANNEX D</u>

### Excluded Assets

## Excluded Entities

- OneWeb Global Ltd (UK)[1]
- OneWeb Technology Ltd (Jersey)[2]
- OneWeb Development Ltd (UK)[2]

## Excluded Assets to be Transferred to Excluded Entities

- The 49% interest in OneWeb LLC (Russia) currently held by OneWeb Network Access Holdings Ltd (UK)
- Joint Venture Agreement in relation to OneWeb Limited Liability Company between OneWeb Network Access Holdings Limited and JSC "Satellite System "Gonets" dated 1 June 2017, as amended (the "Russian JVA"), and any agreements relating to the Russian JVA or OneWeb Limited Liability Company.

---

[1]    OneWeb Global Ltd (UK) will become a Liquidating Debtor upon consummation of the Plan. All parent company guarantees provided by OneWeb Global Ltd (UK) will be assumed by OneWeb Global Ltd (UK) and assigned to the Reorganized Debtors.

[2]    OneWeb Technology Ltd (Jersey) and OneWeb Development Ltd (UK) are non-debtor subsidiaries of OneWeb Global Ltd (UK) that will not be transferred to BidCo and that will instead remain as subsidiaries of OneWeb Global Ltd (UK) upon consummation of the Plan.

## **Exhibit B**

**Blackline of Solicitation Version Disclosure Statement**

THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE DISCLOSURE STATEMENT MAY BE REVISED TO REFLECT EVENTS THAT OCCUR AFTER THE DATE HEREOF BUT PRIOR TO THE BANKRUPTCY COURT'S APPROVAL OF THE DISCLOSURE STATEMENT.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| OneWeb Global Limited, *et al.* | ) | Case No. 20-22437 (RDD) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |

---

DISCLOSURE STATEMENT RELATING TO
THE ~~FIRST~~SECOND AMENDED JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF ONEWEB GLOBAL LIMITED, ET AL.

Dennis F. Dunne, Esq.
Andrew M. Leblanc, Esq.
Tyson M. Lomazow, Esq.
Lauren C. Doyle, Esq.
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:     (212) 530-5000
Facsimile:     (212) 530-5219

*Counsel to the Debtors*
*and Debtors in Possession*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: OneWeb Global Limited (N/A); OneWeb Holdings LLC (5429); OneWeb Communications Limited (9487); WorldVu Satellites Limited (7802); WorldVu Development LLC (9067); WorldVu JV Holdings LLC (N/A); 1021823 B.C. LTD (8609); Network Access Associates Limited (8566); OneWeb Limited (8662); WorldVu South Africa (Pty) Ltd. (1867); OneWeb Chile SpA (2336); WorldVu Australia Pty Ltd. (5436); WorldVu Unipessoal Lda. (2455); OneWeb Norway AS (0209); OneWeb ApS (9191); OneWeb Network Access Holdings Limited (8580); OneWeb G.K. (1396); OneWeb Ltd (8661); WorldVu Mexico S. DE R. L. DE C.V. (1234). The Debtors' headquarters is located at 195 Wood Lane, West Works Building, 3rd Floor, London, W12 7FQ, UK.

| IMPORTANT INFORMATION FOR YOU TO READ |
|---|

**THE DEADLINE TO VOTE ON THE PLAN IS [SEPTEMBER ~~22]~~25, 2020 AT 4:00 P.M. PREVAILING EASTERN TIME, UNLESS EXTENDED BY THE DEBTORS (THE "VOTING DEADLINE").**

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE *ACTUALLY RECEIVED* BY THE SOLICITATION AGENT BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.**

**PLEASE BE ADVISED THAT SECTION XI. OF THE PLAN CONTAINS EXCULPATION, RELEASES AND INJUNCTION PROVISIONS.  YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE IT MAY AFFECT YOUR RIGHTS.**

You have received this Disclosure Statement (the "Disclosure Statement") from the above-captioned debtors in possession (the "Debtors") because you may be a creditor entitled to vote on the ~~First~~Second *Amended Joint Chapter 11 Plan of Reorganization of OneWeb Global Limited, et al.* dated as [——]**August 31**, 2020 attached hereto as **Annex A** (as it may be amended, supplemented, or otherwise modified from time to time, the "Plan").  Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Plan.

————————————

The Debtors urge each holder of a Claim to consult with its own advisors with respect to any legal, financial, securities, tax, or business advice in reviewing the Disclosure Statement and the Plan.

————————————

The Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, certain events in the Debtors' chapter 11 cases, and certain documents related to the Plan.  Although the Debtors believe that these summaries are fair and accurate, they are qualified in their entirety to the extent that they do not set forth the entire text, or every detail, of the relevant document or statutory provision.  In the event of any inconsistency or discrepancy between a description in the Disclosure Statement and the terms and provisions of the Plan or any document incorporated in the Plan by reference, the Plan or such other document will govern for all purposes.  The statements contained herein are made as of the date of this Disclosure Statement, and there can be no assurance that such statements will be correct at any time after such date.  Although the Debtors may subsequently update the information in this Disclosure Statement, they have no affirmative duty to do so, and expressly disclaim any duty to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise.  The Debtors also reserve the right to file an amended or different plan and related amended disclosure statement.

————————————

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and not necessarily in accordance with federal, state, or foreign securities laws or other non-U.S. laws. This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission, or any securities exchange or association, or foreign equivalent, nor has the SEC, any state securities commission, any securities exchange, or foreign equivalent association passed upon the accuracy or adequacy of the statements contained herein.

—————————————————

In preparing this Disclosure Statement, the Debtors relied on financial data derived from their books and records or that was otherwise been made available to them at the time of such preparation. Although the Debtors believe that the financial information contained herein and in the Plan fairly reflects the financial conditions of the Debtors as of the date hereof, no representations or warranties are made as to the accuracy of the financial information contained herein and in the Plan. Except where specifically noted, the financial information contained in the Plan, this Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States or any other jurisdiction.

—————————————————

This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver. The Debtors may object to Claims before or after the Effective Date irrespective of whether this Disclosure Statement identifies any such objection.

—————————————————

Confirmation and effectiveness of the Plan are subject to certain material conditions precedent described in Section IX of the Plan. There is no assurance that the Plan will be confirmed or, if confirmed, that the material conditions precedent to its effectiveness will be satisfied or waived. You are encouraged to read this Disclosure Statement in its entirety, including, but not limited to, Section VII hereof entitled "Risk Factors," before submitting your vote to accept or reject the Plan.

—————————————————

The Debtors have not authorized any Entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtors have not authorized any representations concerning the Debtors or the value of their property other than as set forth in this Disclosure Statement.

—————————————————

If the Plan is confirmed and the Effective Date occurs, all holders of Claims and Interests (including those holders of Claims or Interests who are not entitled to vote on the Plan) will be bound by the terms of the Plan.

## QUESTIONS AND ADDITIONAL INFORMATION

**If you would like to obtain copies of this Disclosure Statement or the Plan or have questions about the solicitation and voting process or these cases generally, please contact Omni Agent Solutions, the Claims and Noticing Agent in these cases, by either (i) visiting**

its website at http://www.omniagentsolutions.com/onewebglobal or (ii) calling (866) 680-8121.

# TABLE OF CONTENTS

Page

I.    INTRODUCTION AND OVERVIEW OF THE PLAN ................................................. 1

    A.    The Adequacy of Disclosure ................................................................. 1

    B.    The Plan ................................................................................................ 2

    C.    Voting on the Plan ............................................................................... ~~3~~4

    D.    Votes Required for Acceptance .......................................................... ~~3~~4

    E.    Certain Factors to be Considered Prior to Voting ............................. 4

    F.    Solicitation Package and Plan Supplement ........................................ 4

    G.    Voting Procedures ............................................................................... 5

    H.    Plan Objection Deadline ..................................................................... ~~5~~6

    I.    Confirmation Hearing ......................................................................... ~~5~~6

II.    DEBTORS' PREPETITION BUSINESS AND CAPITAL STRUCTURE .................. ~~6~~7

    A.    The Debtors' Business ........................................................................ ~~6~~7

        1.    Overview of OneWeb's Satellite System Licenses ................. ~~7~~8

        2.    Overview of OneWeb's Satellite Development and Deployment ...... ~~10~~11

    B.    The Debtors Prepetition Organizational Structure and Stockholders'
        Equity ................................................................................................. ~~12~~13

        1.    Organizational Structure ......................................................... ~~12~~13

        2.    Stockholders' Equity ............................................................... ~~12~~13

    C.    Prepetition Funded Indebtedness ....................................................... ~~13~~14

III.    EVENTS LEADING TO THE CHAPTER 11 CASES ............................................... ~~15~~16

    A.    Historical Financing Sources and Increasing Liquidity Needs .......... ~~15~~16

    B.    Liquidity Concerns and Discussions with Potential Lenders and Investors ...... ~~16~~17

    C.    Shift to Bankruptcy Preparation ........................................................ ~~16~~17

    D.    The Decision to File for Chapter 11 Protection ................................. ~~16~~17

IV.    EVENTS DURING THE CHAPTER 11 CASES ...................................................... ~~17~~18

    A.    First and Second Day Pleadings ......................................................... ~~17~~18

    B.    Procedural and Administrative Motions ............................................. ~~18~~19

    C.    Appointment of the Creditors' Committee ......................................... ~~18~~19

    D.    Debtors' Retention of Professionals ................................................... ~~19~~20

    E.    Postpetition Financing ........................................................................ ~~19~~20

    F.    Pending Litigation Proceedings and Claims ...................................... ~~20~~21

    G.    The Marketing and Sale Process ........................................................ ~~20~~21

    H.    The Terms of BidCo's Bid ................................................................. ~~22~~23

        1.    Acquisition of All Assets Including Retained Causes of Action &
        Avoidance Actions ................................................................... ~~22~~23

        2.    Cash Consideration and BidCo Equity Consideration ............ ~~23~~24

|     |     | 3.  | The Releases | 25**26** |
|     |     |     | a.  | Releases for the Prepetition Secured Parties | 25**26** |
|     |     |     | b.  | Releases of the Debtors' Directors & Officers | 26**27** |
|     | I.  |     | Approval of the Plan Support Agreement and Interim Funding | 28**29** |
|     | J.  |     | The Committee's Derivative Standing Motion | 29**30** |
|     |     | 1.  | The Committee's Recharacterization Claims | 30**32** |
|     |     |     | a.  | Debtors' Response | 30**32** |
|     |     |     | b.  | SoftBank's Response | 32**33** |
|     |     | 2.  | The Committee's Equitable Subordination Claims | 33**35** |
|     |     |     | a.  | Debtors' Response | 33**35** |
|     |     |     | b.  | SoftBank's Response | 34**35** |
|     |     | 3.  | **The** Plan **Contemplates** Releases 35 **for the Prepetition Secured Parties** | **36** |
|     |     |     | a.  | Debtors' Response | 35**36** |
|     |     |     | b.  | SoftBank's Response | 35**36** |
| V.  |     |     | SUMMARY OF THE PLAN | 36**37** |
|     | A.  |     | CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS | 36**37** |
|     |     | 1.  | Unclassified Claims | 36**37** |
|     |     |     | a.  | Administrative Expense Claims | 36**37** |
|     |     |     | b.  | U.S. Trustee Fees | 36**38** |
|     |     |     | c.  | Fee Claims | 36**38** |
|     |     |     | d.  | Priority Tax Claims | 37**38** |
|     |     |     | e.  | DIP Claims | 37**38** |
|     |     | 2.  | Classified Claims | 37**39** |
|     | B.  |     | MEANS OF IMPLEMENTATION | 44**45** |
|     |     | 1.  | Deemed Consolidation | 44**45** |
|     |     | 2.  | Comprehensive Settlement | 45**46** |
|     |     | 3.  | Sources of Consideration for Plan Distributions | 46**48** |
|     |     |     | a.  | Cash Consideration | 46**48** |
|     |     |     | b.  | Additional Cash Plan Funding | 47**48** |
|     |     |     | c.  | Ongoing Trade Claims Recovery Pool | 47**48** |
|     |     |     | d.  | General Unsecured Claims Settlement Distribution | 47**48** |
|     |     | 4.  | Issuance of the New Equity Interests, BidCo Equity Interests, and SoftBank Rollover BidCo Equity | 47**49** |
|     |     |     | a.  | New Equity Interests | 48**49** |
|     |     |     | b.  | BidCo Equity Interests | 48**49** |
|     |     |     | c.  | Authorization, Issuance and Delivery of the New Equity Interests | 48**50** |
|     |     |     | d.  | Authorization, Issuance and Delivery of the BidCo Equity Consideration to Class 1 | 49**50** |

5. UK Restructuring Steps 49 **Under UK Corporate Law** **50**

6. The Liquidating Debtors .................................................... 49**50**

7. Plan Administrator ........................................................... 49**51**

8. The Wind Down ............................................................... 50**52**

9. Continued Corporate Existence ........................................ 51**52**

10. Disbursing Agent ............................................................. 51**52**

11. New Board of Directors/Officers ...................................... 51**53**

12. Survival of Indemnification Obligations and D&O Liability Insurance ........................................................................ 52**53**

    a. Indemnification Obligations ...................................... 52**53**

    b. D&O Liability Insurance Policies .............................. 52**53**

13. Employee Matters ............................................................ 52**54**

14. Retained Causes of Action ............................................... 53**54**

15. Release of Avoidance Actions for Holders of Claims in Class 4 and Class 5 ........................................................... 53**55**

16. Cancellation and Surrender of Notes, Instruments, Securities and Other Documentation ................................................. 54**55**

17. Release of Liens .............................................................. 54**56**

18. Effectuating Documents; Further Transactions ................... 55**56**

19. Amended Organizational Documents .................................. 56**57**

20. FCC Communications Consents ........................................ 56**57**

21. Section 1146 Exemptions from Certain Taxes and Fees ...... 56**58**

C. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .................................................................................. 57**58**

    1. Assumption and Rejection of Executory Contracts and Unexpired Leases .............................................................. 57**58**

    2. Claims Based on Rejection of Executory Contracts and Unexpired Leases .............................................................. 57**58**

    3. Cure Claims .................................................................... 58**59**

    4. Reservation of Rights ....................................................... 59**61**

D. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ........................................... 59**61**

    1. Conditions to Confirmation .............................................. 59**61**

    2. Conditions to the Effective Date ....................................... 60**61**

        a. Confirmation Order .................................................... 60**61**

        b. Statutory Fees ........................................................... 60**61**

        c. Documentation .......................................................... 60**61**

        d. Antitrust and Foreign Investment Approvals ................ 60**62**

        e. State Aid Approval ..................................................... 61**62**

        f. DDTC Notification .................................................... 61**62**

        g. No Injunctions or Restraints ...................................... 61**62**

h.    Establishment of Professional Fee Escrow ................................ 6162

i.    Funding of the Ongoing Trade Claims Recovery Pool and
      the General Unsecured Claims Settlement Distribution ............ 6162

j.    Conditions Precedent to the Obligations of the Plan
      Sponsor .......................................................................................... 6163

      **i.    Accuracy of Representations and Warranties** .......... 63
      **ii.   Performance of Obligations** ..................................... 63
      **iii.  No Termination** .......................................................... 63
      **iv.   BidCo Equity Consideration** .................................... 63
      **v.    Officer's Certificate** ................................................. 63
      **vi.   Communications Consents** ........................................ 63
      **vii.  No Company Material Adverse Effect** .................... 63
      **viii. Principal Vendor Contracts** .................................... 64
      **ix.   Effective Date Cash Funding Cap** ........................... 64

k.    Conditions Precedent to the Debtors' Obligations ............ 6364

      **i.    Accuracy of Representations and Warranties** .......... 64
      **ii.   Performance of Obligations** ..................................... 64
      **iii.  No Termination** .......................................................... 64
      **iv.   Officer's Certificate** ................................................. 64

3.    Waiver of Conditions to the Effective Date ................................ 6364

E.    EXCULPATION, RELEASES AND INJUNCTIONS ........................... 6465

1.    Discharge of Claims Against and Interest in the Debtors .......... 6465

2.    Exculpation ................................................................................... 6465

3.    Releases ......................................................................................... 6566

      a.    Releases by the Debtors ...................................................... 6566

      b.    **Third-Party** Releases by Holders of Claims **and Interests** .. 6667

4.    Injunction ...................................................................................... 68

5.    Scope of Discharge, Release, or Injunction With Respect to the
      United States of America .............................................................. 6869

6.    Term of Injunctions or Stays ....................................................... 6970

7.    Ipso Facto and Similar Provisions Ineffective ........................... 6970

VI.   STATUTORY REQUIREMENTS FOR CONFIRMATION ....................... 6971

A.    Requirements for Confirmation .......................................................... 6971

1.    Acceptance by Impaired Classes ................................................. 7071

2.    Best Interests of Creditors ........................................................... 7071

3.    Feasibility ..................................................................................... 7172

B.    The Debtor Releases, Third Party Releases, Exculpation, and Injunction
      Provisions ............................................................................................ 7172

C.    Alternative Plans ................................................................................. 7374

D.    Confirmation Hearing ......................................................................... 7375

VII.  RISK FACTORS ................................................................................ ~~74~~**75**

    A.  Certain Bankruptcy Considerations ...................................... ~~74~~**75**

        1.  The Debtors May Not Be Able to Secure Confirmation ............... ~~74~~**75**

        2.  Releases, Injunctions and Exculpations Provisions May Not Be Approved ................................................................ ~~74~~**76**

        3.  Risks Related to Possible Objections to the Plan ...................... ~~75~~**76**

        4.  Risk of Termination of the Plan Support Agreement ................. ~~75~~**76**

        5.  Risk of Nonoccurrence of the Effective Date ........................ ~~75~~**76**

    B.  Risk Factors that May Affect Recoveries Available to Holders of Allowed Claims Under the Plan ................................................ ~~75~~**77**

        1.  Claims May Be Higher Than Projected ............................... ~~75~~**77**

        2.  The Debtors Cannot Guarantee Recoveries or the Timing of such Recoveries ....................................................... ~~75~~**77**

    C.  Disclosure Statement Disclaimer ........................................ ~~76~~**77**

        1.  The Financial Information Contained in this Disclosure Statement Has Not Been Audited ................................... ~~76~~**77**

        2.  Information Contained in this Disclosure Statement Is for Soliciting Votes ................................................. ~~76~~**77**

        3.  The Disclosure Statement May Contain Forward Looking Statements .................................................... ~~76~~**77**

        4.  No Legal or Tax Advice is Provided to You by this Disclosure Statement .................................................... ~~76~~**78**

        5.  No Admissions Made .............................................. ~~77~~**78**

        6.  Failure to Identify Objections ...................................... ~~77~~**78**

        7.  No Waiver of Right to Object or Right to Recover Transfers and Assets ....................................................... ~~77~~**78**

        8.  Information was Provided by the Debtors and was Relied Upon by the Debtors' Advisors ............................................ ~~77~~**78**

        9.  No Representations Outside this Disclosure Statement are Authorized ...................................................... ~~77~~**79**

    D.  Risks Relating to Securities to Be Issued Under the Plan .............. ~~78~~**79**

        1.  Market for Securities ............................................. ~~78~~**79**

        2.  Potential Dilution ................................................ ~~78~~**79**

        3.  Equity Interests Subordinated to Indebtedness ........................ ~~78~~**80**

        4.  Implied Value of New Equity Interests or BidCo Equity Interests Not Intended to Represent Trading Value of New Equity Interests and BidCo Equity Interests, Respectively .......................... ~~79~~**80**

        5.  No Dividends ................................................... ~~79~~**80**

    E.  Risks Related to the Debtors' Businesses ................................ ~~79~~**80**

        1.  Macroeconomic Conditions ........................................ ~~79~~**80**

        2.  Financial Results May Be Volatile and May Not Reflect Historical

|  |  |  | Trends | 79 81 |
| | 3. | | The Debtors' Substantial Liquidity Needs May Impact the Plan | 80 81 |
| | 4. | | The Debtors' Business is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business | 81 82 |
| | 5. | | The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases | 81 82 |
| | 6. | | The Loss of Key Personnel Could Adversely Affect the Debtors' Operations | 81 82 |
| | 7. | | Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Corporate Reputation or Brand Perception, Financial Condition, and Results of Operations | 81 83 |
| | 8. | | Recent Global Economic Trends Could Adversely Affect the Debtors' Business, Results of Operations and Financial Condition, Primarily Through Disruption to the Debtors' Customers' Businesses | 82 83 |
| | 9. | | Consent Required Relating to FCC and Other Communications Licenses | 82 83 |
| | 10. | | CFIUS Approval Required | 83 84 |
| | 11. | | Export Controls Notification to the DDTC | 83 84 |
| VIII. | | | CERTAIN TAX CONSEQUENCES OF THE PLAN | 84 85 |
| | A. | | Certain U.S. Federal Income Tax Consequences of the Plan | 84 85 |
| | | 1. | Certain U.S. Federal Income Tax Consequences to the Debtors | 85 86 |
| | | | a. Cancellation of Debt and Reduction of Tax Attributes | 85 86 |
| | | | b. Limitation of NOL Carryforwards and Other Tax Attributes | 86 87 |
| | | | i. General Section 382 Annual Limitation | 88 |
| | | | ii. Special Bankruptcy Exceptions | 88 |
| | | 2. | U.S. Holders of Allowed Secured Notes Claims | 88 89 |
| | | | a. Consequences of Receiving BidCo Equity Consideration | 88 89 |
| | | | b. Consequences of Owning BidCo Equity Interests | 90 91 |
| | | | i. Distributions on BidCo Equity Interests | 91 |
| | | | ii. Sale, Exchange or Other Taxable Disposition of BidCo Equity Interests | 92 |
| | | | iii. Possible Treatment of BidCo as a Passive Foreign Investment Company | 92 |
| | | 3. | U.S. Holders of Allowed General Unsecured Claims | 92 93 |
| | | 4. | U.S. Holders of Allowed Ongoing Trade Claims | 92 93 |
| | | 5. | Accrued Interest | 93 94 |
| | | 6. | Market Discount | 93 94 |
| | | 7. | Information Reporting and Backup Withholding | 94 95 |
| | B. | | Certain UK Tax Consequences for Holders of BidCo Equity Interests | 94 95 |

IX.    RECOMMENDATION AND CONCLUSION ................................................................ 9596

## I.    INTRODUCTION AND OVERVIEW OF THE PLAN[2]

OneWeb Global Limited and its affiliated Debtors submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code in connection with solicitation of votes to accept or reject the Plan, which the Debtors are asking the Bankruptcy Court to confirm.  A copy of the Plan is attached hereto as **Annex A**.

The Debtors recommend that all holders of Claims entitled to vote accept the Plan by checking the appropriate box on their Ballots and returning such Ballots so they are actually received by the Claims and Noticing Agent by the Voting Deadline, which is currently set for [September 2225, 2020], at 4:00 P.M. (prevailing Eastern Time).[3]  Assuming the requisite acceptances of the Plan are obtained, the Debtors will seek Confirmation at the Confirmation Hearing on [October 2, 2020], at 10:00 AM (prevailing Eastern Time).[4]  Should they believe it necessary or appropriate to do so, the Debtors may extend or modify one or both of the foregoing dates.

### A.    THE ADEQUACY OF DISCLOSURE

Before soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires the plan proponent to prepare a written disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan.  The Debtors submit this Disclosure Statement in accordance with such requirements.

The Disclosure Statement includes, without limitation, information about:

- the Debtors' organizational structure, business operations, prepetition indebtedness, and assets and liabilities (Section II hereof);

- the events leading to the filing of these cases (Section III hereof);

- the major events during these cases (Section IV hereof);

- the classification and treatment of Claims and Interests under the Plan, including identification of the Claims entitled to vote on the Plan, and the projected recoveries under the plan (Section V.A hereof);

---

[2]    Capitalized terms used but not defined herein have the meanings given to them in the Plan, attached hereto as Annex A.

[3]    Pursuant to the *Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement; (II) Approving Solicitation and Notice Materials; (III) Approving Forms of Ballots and Opt out Forms; (IV) Establishing Solicitation and Voting Procedures; (V) Establishing Procedures for Allowing Certain Claims for Voting Purposes; (VI) Scheduling a Confirmation Hearing and (VII) Establishing Notice and Objection Procedures* (the "Disclosure Statement Motion") [Docket No. 422] the Debtors are seeking [September 22], 2020 at 4:00 PM as the Voting Deadline.

[4]    The Debtors are seeking [October 2], 2020 at 10:00 AM as the time and date for the Confirmation Hearing.

- the means for implementation of the Plan (Section V.B hereof);

- the exculpations, releases and injunctions contemplated by the Plan (Section V.E hereof);

- the statutory requirements for confirming the Plan (Section VI hereof);

- certain risk factors that holders of Claims should consider before voting on the Plan (Section VII hereof); and

- certain tax consequences of the Plan (Section VIII hereof).

## B.    THE PLAN

In the lead up to the commencement of these cases on March 27, 2020, the Debtors engaged advisors and began evaluating potential strategic alternatives for stabilizing their businesses and maximizing value for their stakeholders.  The Debtors continued to pursue these value-maximizing strategies following the Petition Date, and accordingly obtained approval of the Bidding Procedures[53] pursuant to which they conducted a robust sale process.  This sale process culminated in the selection of BidCo 100 Limited,[64] a private limited company organized under English Law ("BidCo" or "Plan Sponsor"), as the successful bidder pursuant to the Bidding Procedures, and entry into, and Bankruptcy Court approval of that certain Plan Support Agreement, dated as of July 1, 2020 (as amended, supplemented, or otherwise modified from time to time in accordance with the terms therein, the "Plan Support Agreement"), among Company Parties and BidCo.

**Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates a settlement of, *inter alia*, the claims asserted by the Committee in the Standing Motion.  *See* Section V.B.2, *infra*.  Notwithstanding the Settlement in the Plan, the Debtors, the Committee, and SoftBank have requested mediation, which is ongoing at the time of solicitation of the Plan.  Neither the Plan nor the Settlement alter the terms of the successful bid nor do they alter the rights of the parties thereto, nor shall, pending confirmation of the Plan, anything in the Plan or Settlement alter the terms of the Plan Support Agreement Order without further Court approval.**

The Debtors view the terms of the Plan, consistent with their agreements in the Plan Support Agreement, as providing the Debtors with a framework to emerge from chapter 11 and make Distributions to creditors that provide them with a higher recovery than they would receive in a liquidation under chapter 7 of the Bankruptcy Code.  Following the Effective Date, the Reorganized Debtors' business will focus on continuing the development of the OneWeb

---

[53]    *Order (A) Approving Bidding Procedures, (B) Scheduling an Auction and Sale Hearing and Approving Form and Manner of Notice Thereof, (C) Approving Assumption and Assignment Procedures and Form and Manner of Notice Thereof; and (D) Granting Related Relief* [Docket No. 104] (the "Bidding Procedures Order") at Ex. 1 (the "Bidding Procedures").

[64]    BidCo's shareholders are the United Kingdom Secretary of State for Business, Energy and Industrial Strategy ("HMG") and Bharti Global Limited ("Bharti").

System.  Excluded Assets and Excluded Liabilities will be transferred to the Liquidating Debtors and the Liquidating Debtors will be responsible for administering the Plan post-Effective Date and effectuating the Distributions contemplated in the Plan.

The Plan designates Classes of Claims and Interests and specifies which Classes are (i) Impaired and Unimpaired by the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, or (iii) deemed to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code.

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor.  Solely for purposes of voting on, and receiving Distributions under, the Plan, the Estates are deemed to be substantively consolidated, *i.e.*, (i) all assets and liabilities of the Debtors are deemed to be assets and liabilities, respectively, of a single Estate; (ii) all guarantees by one Debtor of the obligations of any other Debtor are deemed eliminated, (iii) any joint or several liability of any of the Debtors are deemed to be one obligation of the Debtors; and (iv) Proofs of Claim filed against multiple Debtors are deemed to be one Claim against a single Estate.  This deemed consolidation will not affect (i) the legal and corporate structures of the Debtors; (ii) the rights of the holders of Allowed Claims to receive Distributions from any insurance policies or proceeds of such policies; (iii) any Liens granted or arising at any time prior to the Effective Date or the priority of those Liens; or (iv) the rights of the Debtors to contest alleged setoff or recoupment rights on the grounds of lack of mutuality under section 553 of the Bankruptcy Code and other applicable law.

This deemed consolidation is appropriate and justified under the circumstances of these chapter 11 cases because it (i) causes no harm to the Debtors' creditors because (a) the DIP Claims may be asserted against each Debtor, (b) the holders of Secured Notes Claims have Secured Claims against the majority of the Debtors, and (c) the DIP Claims and Secured Notes Claims exceed the value of the assets of each Debtor, and (ii) avoids the costs of allocating consideration and litigation-related costs among the Debtors' Estates, thereby avoiding diluting creditor recoveries as a result of increased professional fees, particularly given there has been no allocation of the consideration to be provided by BidCo amongst the various Debtors and their assets.  Therefore, all Distributions on account of Claims other than the DIP Claims are carved out from the collateral of the DIP Lenders, and in the absence of such carve-out and the deemed consolidation of the Debtors' Estates, such Claims would receive no recovery.

A summary of the Plan is contained herein at Section V.

**Although the Court has approved this Disclosure Statement for solicitation of votes to accept or reject the Plan, the positions taken by the Debtors in this Disclosure Statement are those of the Debtors and/or their advisors and have not been approved by or endorsed by the Bankruptcy Court.**

**The Committee has asserted its views and positions with respect to the Plan and certain matters described in this Disclosure Statement in a letter (the "Committee Letter") that will be enclosed in the Solicitation Package.  Among other things, the Committee disagrees with the Debtors' and SoftBank's characterization of the legal and factual issues**

**described in Sections IV.G, IV.H, IV.I, and IV.J of this Disclosure Statement, and, in this regard, the Committee refers creditors to the Committee Letter.**

### C.    VOTING ON THE PLAN

Holders of Claims in Class 1 (Secured Notes Claims), Class 4 (General Unsecured Claims) and Class 5 (Ongoing Trade Claims) are Impaired and entitled to vote on the Plan. Solicitation and tabulation of votes on the Plan will be conducted in accordance with the Disclosure Statement Order that is transmitted concurrently herewith.

Each holder of a General Unsecured Claim in Class 4 or an Ongoing Trade Claim in Class 5 will receive a Ballot that will identify the Class in which such holder is entitled to vote. Ongoing Trade Claims have been identified by the Debtors with the consent of the Plan Sponsor. Each counterparty to an Executory Contract or Unexpired Lease that has timely filed a Proof of Claim will receive a Class 4 Ballot and will be entitled to vote.  **If an Executory Contract or Unexpired Lease is assumed (whether under the Plan or otherwise), the vote of such counterparty to such Executory Contract or Unexpired Lease will not be counted with respect to any Claims thereunder.**

### D.    VOTES REQUIRED FOR ACCEPTANCE

Pursuant to section 1129(a)(8) of the Bankruptcy Code, for the Plan to be confirmed by the Bankruptcy Court, it must be accepted by at least one voting Class of Impaired Claims – in this case, by Class 1 (Secured Notes Claims), Class 4 (General Unsecured Claims) or Class 5 (Ongoing Trade Claims).  A Class accepts the Plan where: (i) the holders of at least two-thirds in dollar amount of the Claims voting in such Class vote to accept the Plan; and (ii) the holders of more than one-half in number of the Claims voting in such Class vote to accept the Plan.

### E.    CERTAIN FACTORS TO BE CONSIDERED PRIOR TO VOTING

There are a variety of factors that holders of Allowed Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan, including:

- the financial information contained in this Disclosure Statement and the Plan has not been audited and is based on an analysis of data available at the time of the preparation of this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, there is no assurance that the Bankruptcy Court will confirm the Plan; and

- any delays of either Confirmation or consummation could result in, among other things, increased Administrative Expense Claims, including Fee Claims, and jeopardize the Debtors' ability to satisfy the conditions precedent to the effectiveness of the Plan.

## F.    SOLICITATION PACKAGE AND PLAN SUPPLEMENT

In accordance with the Disclosure Statement Order, together with this Disclosure Statement, the holders of Claims entitled to vote to accept or reject the Plan will receive the package of materials (the "Solicitation Package") containing the following (as applicable):

- a cover letter;

- a notice of the Confirmation Hearing (the "Confirmation Hearing Notice");

- the Disclosure Statement Order (excluding exhibits thereto);

- a Ballot, instructions on how to complete the Ballot, and a pre-paid, pre-addressed return envelope; and

- such other materials as the Bankruptcy Court may direct to include in the Solicitation Package**, including the Committee Letter**.

The Solicitation Package (except for the Ballots) may also be obtained free of charge from the Claims and Noticing Agent by: (1) visiting http://www.omniagentsolutions.com/onewebglobal; (2) writing to the Solicitation Agent at OneWeb Global Limited, et al. Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367; or (3) calling (866) 680-8121.

**The Debtors will file the Plan Supplement on or before** [INSERT DATE]**September 18, 2020, which is** [X]**seven (7) days prior to the Voting Deadline.**

## G.    VOTING PROCEDURES

If you are entitled to vote to accept or reject the Plan, one or more Ballot(s) have been enclosed in your Solicitation Package for the purpose of voting on the Plan.

**The deadline to vote on the Plan is September 25, 2020 at 4:00p.m. (Eastern) (the "Voting Deadline").**

Please vote and return your Ballot(s) to Omni Agent Solutions in its capacity as a solicitation agent (the "Solicitation Agent"), at OneWeb Global Limited, et al.  Ballot Processing, c/o Omni Agent Solutions, 5955 De Soto Ave., Suite 100, Woodland Hills, CA 91367, or by overnight delivery or by hand courier **so as to be actually received by the Solicitation Agent by the Voting Deadline**.  Ballots should not be sent to the Debtors or the Creditors' Committee, or their respective counsel.

In addition to accepting Ballots via first class mail, overnight courier and hand delivery, the Solicitation Agent will accept Ballots via electronic, online transmission, solely through a customized online balloting portal at https://omniagentsolutions.com/OnewebBallotSubmission. Parties entitled to vote may cast an electronic Ballot and electronically sign and submit the Ballot instantly by utilizing the online balloting portal.  Instructions for electronic, online transmission of Ballots are set forth on the forms of the Ballots.  The encrypted Ballot data and audit trail created by such electronic submission shall become part of the record of any Ballot submitted in this matter, and the creditor's electronic signature will be deemed to be immediately legally valid and effective.

## H.    PLAN OBJECTION DEADLINE

**The deadline to file objections to Confirmation is September 28, 2020, at 4:00 P.M. (prevailing Eastern Time) (the "Plan Objection Deadline").**

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.  ~~The deadline to file objections to Confirmation is [September 25], 2020, at 4:00 P.M. (prevailing Eastern Time) (the "Plan Objection Deadline").[7]~~  All objections to Confirmation must be in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector.  Any such objection must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the Disclosure Statement Order so that they are actually received on or before the Plan Objection Deadline.  Parties wishing to reply to any objection to Confirmation shall ~~have until 12:00 P.M. (prevailing Eastern Time) on~~ [**do so by** September 30~~]~~, 2020~~, to file a reply.[8]~~.

## I.    CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation.  The Confirmation Hearing will commence on [October 2~~]~~, 2020, at 10:00 AM (prevailing Eastern Time), before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601.  Pursuant to the Bankruptcy Court's General Order M-543, dated March 20, 2020 ("General Order M-543"), the Confirmation Hearing will be conducted telephonically.  Parties wishing to participate in the Confirmation Hearing should review General Order M543 which can be obtained at http://www.nysb.uscourts.gov/news/general-order-m-543-court-operations-under-exigent-circumstances-created-covid-19 for further instructions on how to make a telephonic appearance.

The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the Entities that have filed objections to Confirmation, without

---

[7]  ~~Pursuant to the Disclosure Statement Motion, the Debtors are seeking [September 25], 2020, at 4:00 P.M. (prevailing Eastern Time) as the Plan Objection Deadline.~~

[8]  ~~Pursuant to the Disclosure Statement Motion, the Debtors are seeking [September 30], 2020, at 12:00 P.M. (prevailing Eastern Time) as the deadline to reply to any objection to Confirmation of the Plan.~~

further notice to other parties in interest.  The Bankruptcy Court, in its discretion and before the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to the terms of the Plan Support Agreement and the Plan Support Agreement Order, the Plan may be modified, if necessary, before, during or as a result of the Confirmation Hearing, without further notice to parties in interest.

## II.   DEBTORS' PREPETITION BUSINESS AND CAPITAL STRUCTURE

### A.   THE DEBTORS' BUSINESS

Prior to the Petition Date, the Debtors and their non-debtor subsidiaries (collectively, "OneWeb") were in the process of deploying the world's first global satellite communications network to deliver high-throughput, high-speed, low-latency internet connectivity services channeling up to 50 megabits per second, with a latency of less than 50 milliseconds.

Founded in 2012, OneWeb has spent the past eight years developing a low-Earth orbit ("LEO") satellite constellation system (the "Constellation") as well as associated ground infrastructure, including terrestrial gateways ("Satellite Network Portals" or "SNPs") and end-user terminals, to deliver communication services for use by consumers, businesses, governmental entities, and institutions, including schools, hospitals, and other end-users whether on the ground, in the air, or at sea (collectively, the "OneWeb System").  OneWeb's business consists of, first, the design, development, manufacture and integration of the various components of the OneWeb System and, second, maintenance and operation of, and the sale of broadband capacity, on a wholesale and/or retail basis, generated by the OneWeb System.

OneWeb's design, development and manufacturing activities include next generation small satellites and the mass production of these satellites through a strategic joint venture between OneWeb and certain members of the Airbus family of companies (as described below), which are major players in the European aerospace sector.  Through the joint venture, OneWeb also develops ground infrastructure associated with and used for maintaining and operating its Constellation, including operations centers, ground control facilities, SNPs, and various end-user terminals for various markets.

In order to operate the OneWeb System, OneWeb indirectly holds various authorizations and licenses, including for use of Ku-band and Ka-band radio-frequency spectrum on a global basis, and domestic market access/services authorizations necessary for operating ground infrastructure associated with the Constellation in, and for sending and receiving signals into and from, the jurisdictions in which such ground infrastructure is located.  Having already completed three successful launches of over 70 satellites between February 2019 and March 2020, OneWeb was well on its way to growing the Constellation to 648 satellites as well as beginning to identify and negotiate with customers, with the goal of commencing customer service demonstrations in late 2020 and providing global commercial coverage by late 2021 or early 2022.

Below, is an illustration of how the OneWeb System operates:



### 1.    *Overview of OneWeb's Satellite System Licenses*

OneWeb's most significant assets are its radio-frequency spectrum authorizations (the "Spectrum Licenses") issued by (a) the United Kingdom's Office of Communications ("Ofcom") to Debtor WorldVu Satellites Limited ("WSL"), a company organized under the laws of Jersey, authorizing WSL to operate certain service link radio-frequencies in the 10.7-12.7 GHz Ku-band transmit frequencies and 14.0-14.5 GHz Ku-band receive frequencies of the electromagnetic spectrum, and (b) France's Agence Nationale des Fréquences ("ANFR") to OneWeb Ltd., a company organized under the laws of Malta and affiliated with WSL, for gateway/feeder link frequencies in the 17.8-18.6 and 18.8.-19.3 and 19.7-19.8 GHz Ka-band transmit frequencies and 27.5-29.1 and 29.5-30 GHz Ka-band receive frequencies of the electromagnetic spectrum.  The Spectrum Licenses provide that Ofcom and ANFR will represent and defend the interests of WSL at the International Telecommunication Union (the "ITU"), a specialized agency of the United Nations that establishes standards for international connectivity in communications networks, including the allocation of global wireless radio-frequency spectrum, satellite orbits, and related services, among member state nations.  For example, Ofcom is obligated to represent and defend OneWeb's interests at the ITU with respect to any challenges or disputes relating to the use of the radio-frequencies allocated to OneWeb, including any potential claims of harmful radio-frequency use interference caused by or to the other satellite system operators represented at the ITU by their national telecoms regulatory authorities.

To maintain priority rights to use the radio-frequency allocations authorized under the Spectrum Licenses, OneWeb has successfully launched and operated (in its notified LEO orbit) six satellites with the confirmed capability of transmitting and receiving communications links within the radio-frequency ranges prescribed in the Spectrum Licenses for a continuous period of at least 90 days prior to the regulatory deadline.  Ofcom on October 25, 2019 submitted to the ITU the "bringing into use" notice necessary to confirm and maintain OneWeb's priority rights to use the Ku-band radio-frequencies authorized under its Spectrum License (the "BIU" notice), officially bringing the radio-frequencies into use prior to the required deadline of November 27,

2019. ANFR also submitted the BIU notice with respect to the Ka-band radio-frequencies to the ITU on October 18, 2019, before the required deadline of December 18, 2019.

OneWeb has additional Spectrum Licenses, which have a BIU regulatory deadline in 2021 or later, as follows:

(a)      Spectrum Licenses issued by Ofcom to WSL for: (i) Ka-band frequencies for a LEO system to be brought into use before June 22, 2023; (ii) Ku- and Ka-band frequencies for a LEO system to be brought into use before June 22, 2025; (iii) Ku- and Ka-band frequencies for a Medium-Earth orbit ("MEO") system to be brought into use before March 29, 2024; (iv) the 37.5-42.5 GHz V-band transmit frequencies and 42.5-43.5 GHz, 47.2-50.2 GHz and 50.4-51.4 GHz V-band receive frequencies for a LEO system to be brought into use before November 22, 2022; (v) V-band frequencies for a LEO system to be brought into use before November 23, 2026; (vi) V-band frequencies for a MEO system to be brought into use before November 22, 2022; and (vii) the 71-76 GHz and 81-86 GHz E-band transmit and receive frequencies for a MEO system to be brought into use before December 18, 2024;

(b)      Spectrum Licenses issued by ANFR to OneWeb Ltd for: (i) Ku- and Ka-band frequencies for a MEO system to be brought into use before March 22, 2024; (ii) V-band frequencies for two LEO systems to be brought into use before November 22, 2022; and (iii) V-band frequencies for a LEO system to be brought into use before November 23, 2026;

(c)      Spectrum Licenses issued by Canada's Innovation, Science and Economic Development ("ISED") agency to 1021823 BC Ltd. for Ka-band frequencies for a LEO system in Ka-band to be brought into use before May 27, 2022; and

(d)      Spectrum Licenses issued by Mexico's Instituto Federal de Telecomunicaciones ("IFT") to WorldVu Mexico, S. de R.L. de C.V. for V-band frequencies for a LEO system in V-band to be brought into use before November 23, 2026.

Prior to the Petition Date, OneWeb was also in the process of obtaining market access "landing rights" authorizations in various countries, where such are required. These authorizations are issued by individual countries and permit the licensee to send signals from satellites into the particular country, to receive uplinks from such country's territory to the satellites, and to provide services to, from, or within such country. As of the Petition Date, OneWeb has received landing rights in Argentina, Australia, the Bahamas, Canada, Colombia, Mexico, Nigeria, Paraguay, Peru and the United States. Specifically, WSL holds a landing rights license (called a "market access grant" in the United States) issued by the United States Federal Communications Commission (the "FCC") to provide services to, from, or within the United States as well as a landing rights license issued by the Bahamas. Debtor Network Access Associates Limited ("NAA"), a company organized under the laws of England and Wales, holds landing rights licenses issued by Australia, Colombia, Nigeria, Paraguay and Peru. Debtor 1021823 BC Ltd. ("1021823 BC"), a company organized under the laws of the Province of British Columbia, holds a landing rights license issued by Canada. OneWeb S.A., a company organized under the laws of Argentina, holds a landing rights license issued by Argentina.

Debtor WorldVu Mexico S. de R. L. de C.V., a company organized under the laws of Mexico, holds a landing rights license issued by Mexico. OneWeb also has landing rights for the Indonesia market via a license held by a local partner.

In addition, prior to the Petition Date, OneWeb was in the process of constructing SNPs for the purpose of transmitting and receiving customer data, as well as telemetry, tracking and control signals ("TT&C Stations") to and from the OneWeb System. OneWeb has already been granted licenses for SNPs in Italy, Portugal, the United States (Florida and Alaska), Australia, Chile and Norway. WSL holds licenses issued by the FCC for the operation of the SNPs in the United States. NAA holds a license for the operation of an SNP in Portugal. Debtor OneWeb Chile SpA ("OW Chile"), a company organized under the laws of Chile, holds a preliminary/experimental license for the operation of an SNP in Chile. Debtor WorldVu Australia Pty Ltd., a company organized under the laws of Australia, holds the preliminary/experimental licenses for the operation of SNPs in Australia. 1021823 BC holds licenses for the operation of a TT&C Station in Canada. Debtor WorldVu Development LLC ("WVD"), a company organized under the laws of Nevada, holds a license for the operation of a ground station located in Svalbard, Norway used primarily as a TT&C Station, but which can also be used as an SNP.

OneWeb has obtained experimental licenses in multiple countries to allow testing of the end-user terminals required to access and use the OneWeb System ("User Terminals"). NAA holds experimental licenses for the operation of User Terminals in Croatia, Italy, and the United Kingdom. WSL holds experimental licenses for the operation of User Terminals in Sweden and the United States. OW Chile holds an experimental license for the operation of User Terminals in Chile.

In addition, OneWeb has obtained licenses under the Outer Space Act 1986 from the United Kingdom Space Agency ("UKSA") for the procurement of launch and in-orbit operations for each of the 74 satellites on its first three launches of the OneWeb System satellites (the "OSA licenses"). The OSA licenses authorize OneWeb to procure the launch of its satellites into orbit from various launch sites located around the globe. The UKSA, as a condition to issuing the OSA Licenses, required OneWeb to set aside funds that the UKSA could use to maintain and, if necessary, deorbit, OneWeb's satellite constellation in the event of OneWeb's insolvency. GLAS Trustees Limited (the "UKSA Trustee"), in its role as trustee of an English Law governed trust established for the benefit of the UKSA, holds £3,955,050.80 (~$5,137,000.00) in a bank account. Pursuant to the Trust Deed establishing such trust, the UKSA may unilaterally direct the release of funds from the trust by sending a payment instruction to the UKSA Trustee.

OneWeb and the UKSA also entered into a Financial Security Agreement to govern the conditions upon which the UKSA may request a release of funds from the trust. The UKSA may request a release of funds following the occurrence of a OneWeb insolvency event if the UKSA considers it appropriate to release such funds to ensure compliance with the conditions of any of OneWeb's UKSA licenses or the international obligations of the United Kingdom. The UKSA is permitted to use such funds to (a) "take control of the operation of the Satellites," (b) "implement a de-orbiting or decommissioning of the Satellites, either in whole or in part" or (c)

"pay any additional insurance premiums or renewal premiums as required for third party liability insurance." The UKSA has not requested a release of the funds from the trust.

### 2.    *Overview of OneWeb's Satellite Development and Deployment*

In June of 2015, Debtor WorldVu JV Holdings LLC ("WJVH"), a Delaware limited liability company (an indirect subsidiary of OneWeb), and Airbus DS Satnet LLC ("Airbus Satnet"), a Delaware limited liability company, formed a Delaware company to house the parties' strategic joint venture, Airbus OneWeb Satellites LLC ("AOS"). AOS is owned 50/50 by WJVH and Airbus Satnet. The formation and operation of AOS was to comprise part of OneWeb's and Airbus' comprehensive plan of cooperation and joint development with respect to satellites based on the Constellation and the OneWeb System. AOS was formed in the first instance to design, develop, and manufacture a limited batch of "pilot" satellites to serve as prototypes for future work, after which AOS would incorporate the intellectual property developed in those activities into manufacturing over 600 LEO satellites for the OneWeb System (such satellites forming the OneWeb first generation constellation, the "GEN 1 Constellation"), as well as continuing work on developing and improving the relevant technologies towards next-generation satellites associated ground infrastructure for the OneWeb System and ultimately serve third-party customers with the technology developed along the way.

The satellite production process was divided into two stages. In the first stage, pursuant to a design and development contract between WSL and AOS, AOS focused on performing research, design, development, and testing to validate, confirm and upgrade the initial design of the LEO satellites, and to develop working prototypes of the satellites based on such research and development activities. As the culmination of about three years of research, development and testing, a total of twelve operational prototypes (the "Pilot Satellites") were completed at a production facility owned by AOS in Toulouse, France. The prototypes ultimately reached the required orbit and were able to send and receive the wireless signals required for OneWeb to achieve BIU with respect to the Spectrum Frequencies licensed through Ofcom.

The second, main-run stage of satellite production commenced in July 2019, when AOS completed construction of the world's first state-of-the-art, high-volume satellite manufacturing facility in Exploration Park, Florida, on the land leased to it by Space Florida. With a unique set of proprietary tooling and other high-tech manufacturing equipment, the new facility production capability was up to one satellite per day. The facility had completed production of 68 satellites in two successive batches of 34 satellites each as of the Petition Date.

The satellites in the GEN 1 Constellation were designed to use a cutting-edge technique called "Progressive Pitch™", which allows OneWeb to use its spectrum in a highly efficient manner by gradually and slightly tilting the satellites as they approach the equator to ensure that such satellites do not cause or receive interference with Ku-band satellites operating above the GEN 1 Constellation in geostationary orbit. This is necessary in order to comply with the ITU's rules and procedures protecting satellites operating in the geostationary orbit from receiving harmful interference from non-geostationary orbit satellite systems, such as the OneWeb System. OneWeb's user terminals would provide high-speed connectivity without latency during satellite handovers to ensure excellent voice quality, gaming, and web-based experience. These ground-based terminals would be capable of being self-installed and be small, affordable, and

extremely efficient, such that they would operate with optionally included solar panels, battery packs, and Wi-Fi, 2G, 3G, & 4G/LTE, potentially upgradable to 5G capabilities, to provide coverage directly to cellular phones, tablets, and laptops. OneWeb's satellites were designed to comply with the "orbital debris-mitigation" guidelines for removing satellites from orbit.

For the launch and deployment of its satellites in orbit, OneWeb entered into two significant launch services agreements with launch services provider Arianespace S.A. ("Arianespace"). Specifically, OneWeb and Arianespace entered into a launch services agreement for the performance of 21 launch missions, each using the Soyuz launch vehicle and carrying up to 36 satellites per launch mission (the "Soyuz LSA"). The Soyuz LSA contemplates use of three separate launch sites – the Soyuz launch complex at the Baikonur Cosmodrome in Baikonur, Kazakhstan, the Soyuz launch base at the Guiana Space Centre in Kourou, French Guiana, and the Soyuz launch base at the Vostochny Cosmodrome in Vostochny, Russia – in order to support the capacity needs of the OneWeb launch campaign. OneWeb and Arianespace also entered into a launch services agreement for the performance of an additional launch mission using the new (under development) heavy-lift Ariane 6 launch vehicle expected to carry at least 30 satellites per launch mission (the "Ariane 6 LSA"). The Ariane 6 LSA contemplates use of the Ariane 6 launch base at the Guiana Space Centre in Kourou, French Guiana. Certain contracts between Arianespace and certain of the Debtors are designated as Principal Vendor Contracts under the Plan Support Agreement.

On February 27, 2019, OneWeb successfully launched all six Pilot Satellites from the Guiana Space Centre on a Soyuz launch vehicle, marking successful performance of the first launch mission contemplated under the Soyuz LSA. OneWeb then successfully launched, on February 6, 2020, its first batch of 34 GEN 1 Constellation satellites and the following month, on March 21, 2020, a second batch of 34 GEN 1 Constellation satellites, in each case on a Soyuz launch vehicle from the Baikonur Cosmodrome, marking successful performance of two more launch missions under the Soyuz LSA. OneWeb currently operates a total of 74 fully functioning satellites in orbit.

In addition to AOS, OneWeb and Airbus intended to cooperate in the development and monetization of related technologies. Manufacturing the GEN 1 Constellation and, eventually, the GEN 2 Constellation, would continue to be AOS's priority business, but AOS would also pursue third-party design, development and manufacturing opportunities, thereby generating a passive return for OneWeb unrelated to its core business. In addition, OneWeb has and continues to have rights in a portfolio of certain intellectual property developed in the course of the work of AOS and would have the potential opportunity to develop further innovations based on such intellectual property. Certain contracts between AOS and certain of the Debtors are designated as Principal Vendor Contracts under the Plan Support Agreement.

OneWeb has also constructed two Satellite Operation Centers ("SOCs") and two Ground Network Operations Centers ("GNOCs") in Virginia and London. Each of the SOCs can individually manage the entire Constellation through the TT&C Antennas and are responsible for managing ground station visibility, collision avoidance, altitude maneuvers, planning contacts and payload schedules and analyzing telemetry and investigating anomalies. Each of the GNOCs is a redundant data center that can individually manage the entire SNP ground network and is responsible for determining satellite pass schedules, frequency allocations, effective

-12-

downlink power and monitoring and controlling all SNP sites, equipment and the network connections.

## B.    THE DEBTORS PREPETITION ORGANIZATIONAL STRUCTURE AND STOCKHOLDERS' EQUITY

### 1.    *Organizational Structure*

A chart showing the Debtors' organizational structure as of the Petition Date is attached as Exhibit A to the *Declaration of Thomas Whayne in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 3]. As reflected in that chart, OneWeb owns 100% of the interests in OneWeb Communications Limited ("OWC"), a company organized under the laws of England and Wales.

OWC owns 100% of the interests in WSL, which in turn owns 100% of the interests in WVD, 1021823 BC, NAA, OneWeb Asia Pte. Ltd., a company organized under the laws of Singapore, Debtor OneWeb Limited, a company organized under the laws of Jersey, and OneWeb Communications S.à.r.l., a company organized under the laws of Luxembourg. Each of the companies at this level was established as required by the local laws of the countries in which OneWeb operates to hold spectrum and landing rights, regulatory licenses and authorizations, administer sales, conduct network operations, undertake research and development, and for other corporate, finance, regulatory, contracting, administrative and employment related purposes, as applicable.

WVD owns 100% of the interests in Debtor WJVH, which owns 50% of the interests in AOS. WVD owns 100% of the interests in Debtor OneWeb Holdings LLC, a New York limited liability company, which leases office space and maintains a bank account in White Plains, New York.

NAA owns 100% of Debtor OneWeb Network Access Holdings Ltd. ("ONAH"), a company organized under the laws of England and Wales, which in turn owns 99% (and NAA owns 1%) of Debtor OneWeb Ltd., a company organized under the laws of Malta. Each of the companies owned wholly or partially by NAA was established as required by local laws to hold spectrum and landing rights, regulatory licenses and authorizations, own and operate antennas and other ground segment equipment and communication network assets, and for other corporate and regulatory purposes, as applicable, in the various countries in which OneWeb operates.

ONAH owns 49% (and a local partner owns 51%) of OneWeb LLC, a company organized under the laws of Russia. Each of the companies owned wholly or partially by ONAH were established as required by local laws to hold spectrum and landing rights licenses, own and operate antennas and other ground segment equipment and communication network assets, and for other corporate and regulatory purposes, as applicable, in the various countries in which OneWeb operates.

### 2.    *Stockholders' Equity*

In 2015, OneWeb raised approximately $500 million in equity financing primarily from strategic investors, including certain entities affiliated with Airbus Group, Inc. (collectively,

"Airbus"), Hughes Network Systems, LLC, which is producing OneWeb's ground network system and which is a subsidiary of EchoStar Corp., Indian Continent Investment Limited, an associate entity of Bharti, Qualcomm Incorporated, and Virgin Group Ltd.  In December 2016, OneWeb raised an additional $1.2 billion in equity financing, consisting of a $1 billion investment from SoftBank Group Corp. ("SoftBank"), a Japanese corporation, thereby making SoftBank OneWeb's largest shareholder, and a $200 million investment from certain of its existing investors.

As of the Petition Date, OneWeb had 6,897,734 ordinary shares and 606,061 preferred shares outstanding.  The number of ordinary shares outstanding includes restricted stock units awarded under OneWeb's employee and consultant equity incentive plans.  As of June 30, 2018, an aggregate of 417,000 ordinary shares were authorized for issuance pursuant to such plans.

### C.    PREPETITION FUNDED INDEBTEDNESS

On July 12, 2018, OWC entered into a Note Purchase Agreement (the "Original NPA") among OWC, SoftBank, as administrative and collateral agent, and each of the purchasers thereunder from time to time, for the issuance of 13% senior secured promissory notes (the "Bridge Notes").  Between July 2018 and January 2019, OWC issued Bridge Notes to SoftBank under the Original NPA in an aggregate principal amount of $408 million.  The obligations under the Original NPA were guaranteed by WSL, WVD, LLC, OneWeb Asia Pte. Ltd., OneWeb Limited, NAA, and 1021823 BC and were secured by substantially all assets of OWC and its key subsidiaries.  These assets included the frequency spectrum authorizations, which assets were considered to be valued in excess of the amounts outstanding under the Bridge Notes.  PIK interest accrued on the Bridge Notes quarterly.  SoftBank did not receive any fees or other special compensation in connection with providing the Bridge Notes.

The Original NPA was structured as a short-term 364-day bridge loan to an anticipated $3 billion export credit agency-guaranteed project financing that was being sourced from various export credit agencies, public financial institutions, lenders guaranteed or supported by export credit agencies and development finance institutions (the "ECA Financing").  Indeed, a number of potential lenders, including International Finance Corporation, part of the World Bank Group, European Bank for Reconstruction and Development and BpiFrance Assurance Credit Export were party to an agreed term sheet that was annexed to the Original NPA.  In contemplation of the ECA Financing and its eventual take out of the Bridge Notes, the Original NPA contained financing milestones and other express terms, conditions and accommodations relating to the ECA Financing.

The structuring of a multi-sourced financing such as the ECA Financing is complex, and the internal approval processes of export credit agencies and development finance institutions often require coordination among a number of different teams and, in certain circumstances, with multiple governmental institutions, which results in a time-consuming and lengthy process to get from initial due diligence to credit approval (and thereafter documentation and financial closing).  Accordingly, SoftBank agreed to enter into the Original NPA and provide bridge loans to OneWeb thereunder in order to fund the OneWeb's needs during the extended process up to the expected completion of the ECA Financing.

As noted above, the Original NPA contemplated that the Bridge Notes would be fully refinanced by the completion and funding of the ECA Financing, and OneWeb's use of proceeds drawn under the Original NPA were restricted to project costs that would be eligible for refinancing under the ECA Financing. Under a separate redeemable preferred shares purchase agreement (the "SPA") entered into in connection with the Original NPA, the Bridge Notes were automatically exchangeable for redeemable shares of OWG upon the occurrence of the initial funding of the ECA Financing. The redeemable shares were in turn either redeemable by OWG (using the ECA Financing proceeds) upon commercial completion or convertible to equity.

The financing structure contemplated by the Original NPA and the ECA Financing (*i.e.*, using bridge loans from a prominent sponsor to ensure continuity of funding for the project while the debt process is being completed) is employed in project financings generally, and has been successfully employed in numerous satellite financings including both for satellite constellations such as O3b Networks, Iridium and Globalstar and geostationary satellite projects such as PSN Enam, Asia Broadcast Satellite ABS-2 and APT Satellite APStar-2.

By the fourth quarter of 2018, it became evident that not all the lenders needed under the ECA Financing would be able to obtain necessary internal approvals prior to the maturity of the Original NPA and the related Bridge Notes. Concurrently, OneWeb decided to restructure the project to reduce the amount of capital needed to secure immediate commitments for less than the full amount of the originally contemplated ECA Financing, with the full expectation that additional senior indebtedness would be required and obtained.

While OneWeb continued to pursue project financing from typical project finance sources such as government agencies and quasi-development finance institutions, OneWeb determined to secure the immediate funding needs from existing stakeholders.

On March 18, 2019, OWC entered into an Amended and Restated Note Purchase Agreement (the "A&R NPA") among OWC, Global Loan Agency Services Limited, as administrative agent, GLAS Trust Corporation Limited ("GLAS"), as collateral agent, and SoftBank, Banco Azteca, S.A., Institución de Banca Múltiple ("Banco Azteca"), Airbus Group Proj B.V. ("Airbus"), Qualcomm Technologies, Inc. and The Government of the Republic of Rwanda as the initial purchasers (collectively, and together with their respective affiliates, the "Prepetition Lenders").

The A&R NPA amended and restated the Original NPA. SoftBank's $408 million in Bridge Notes issued under the Original NPA, together with accrued interest, were converted into a new note under the A&R NPA. Due to the size of SoftBank's existing note holdings together with the additional notes issued in exchange for additional funds it lent under the A&R NPA, SoftBank alone qualified as "Required Holders" under the A&R NPA, and, therefore, as is customary in third-party loans, had the ability to control decisions regarding the exercise of remedies and release of collateral. However, and notably, SoftBank did not have rights to unilaterally alter material terms of the Secured Notes. In addition, due to the fact that SoftBank was no longer the only lender, a third party, GLAS, was appointed to replace SoftBank as collateral agent so that the debt facility would be managed, and benefit from security held by a

-15-

third party agent with duties to all noteholders (as is customary for debt financing transactions with multiple lenders) and in contemplation of additional future senior secured financing.

Between March 2019 and October 2019, OWC issued 12.5% senior secured promissory notes (the "Secured Notes") in an aggregate principal amount of $1,560,621,949.30. Like the Bridge Notes, the Secured Notes are guaranteed by WSL, WVD, OneWeb Limited, OneWeb Asia Pte. Ltd., NAA, and 1021823 BC, and are secured by substantially all of OneWeb's assets. In order to support the additional loans, OneWeb, in connection with the A&R NPA, provided an enhanced collateral package to secure the additional Secured Notes including local law share pledges with respect to many of OWG's operating subsidiaries worldwide, and also provided a guarantee from ONAH.

The willingness of the Prepetition Lenders to provide the additional indebtedness (or in Qualcomm's case defer payment of amounts then owing) was conditioned on the success of OneWeb's initial launch of the first six prototype satellites (an important step towards successfully bringing OneWeb's radio frequency spectrum into use and thereby maintaining its priority to use the spectrum ahead of its competitors), which ~~the~~ OneWeb successfully achieved in February 2019 and which the parties believed would significantly enhance the value of OneWeb's assets.

In conjunction with entering into the A&R NPA, certain of the Prepetition Lenders also entered into a Warrant Purchase Agreement, dated as of March 18, 2019 (the "Warrant Purchase Agreement"), pursuant to which OWG issued warrants, a common equity sweetener for providers of debt financing, with an exercise price of $0.01 per voting or non-voting share of OWG at each drawdown under the A&R NPA, giving such Prepetition Lenders the right to subscribe for a number of shares of OWG in an amount equal to 100% of such Prepetition Lender's funded amount on the drawdown date divided by $300. SoftBank also received warrants at the initial closing to purchase voting and/or non-voting shares of OWG in the amount of $408 million divided by $300/share.

**The Committee does not agree with the Debtors' characterizations of the Original NPA, the Bridge Notes, the A&R NPA, or the Senior Secured Notes (collectively, the "Senior Secured Debt"), as described more fully in the Committee Letter. The Committee has asserted that the Senior Secured Debt should be recharacterized as equity or should be equitably subordinated to the Claims of general unsecured creditors, all as set forth more fully in the Standing Motion described in Section IV.J, _infra_, and in the Committee Letter.**

As of the Petition Date, there was approximately $~~1,733,121,856~~**1,733,809,254.40** (principal plus accrued interest) of Secured Notes outstanding.

## III.    EVENTS LEADING TO THE CHAPTER 11 CASES

### A.    HISTORICAL FINANCING SOURCES AND INCREASING LIQUIDITY NEEDS

As of the Petition Date, the Debtors were still in the development stage of their business and, notably, did not yet generate revenue. Historically, and throughout the various development

stages of the OneWeb System, OneWeb has looked to its key equity and debt investors to provide liquidity for the next stage of its operations.  Since 2019, OneWeb has been actively seeking investments from both its existing and new investors to fund its continuing operations and completion of the OneWeb System.  In February 2020, OneWeb completed the first launch of 34 satellites for its GEN 1 Constellation, and over the course of 2020 it was anticipated that OneWeb would continue with a monthly launch cadence to deploy the complete GEN 1 Constellation of 648 satellites.  At that time, OneWeb had anticipated raising additional capital to meet its launch and constellation implementation schedule.

### B.    LIQUIDITY CONCERNS AND DISCUSSIONS WITH POTENTIAL LENDERS AND INVESTORS

By early 2020, OneWeb continued to face a rapidly deteriorating liquidity position as the cost of building out the OneWeb System exhausted its existing equity and debt financing. OneWeb engaged Guggenheim Securities, LLC ("Guggenheim Securities") in February 2020 to serve as its investment banker and assist the Debtors in their evaluation and pursuit of strategic opportunities.

After several due diligence meetings during the first and second weeks of March 2020, OneWeb believed that it was going to be able to secure a long-term funding arrangement from existing stakeholders.  However, on March 12, 2020, as the markets began to feel the impact of COVID-19, OneWeb was notified that its current investors would not commit to a long-term solution.  Thereafter, OneWeb entered into a term sheet for bridge financing to be consummated by March 26, 2020, but OneWeb was notified on March 21, 2020 that the bridge financing offer was no longer available.  By the end of March, it had become clear that the anticipated funding opportunities OneWeb had been pursuing, as well as the prospect of locating any new sources of financing or strategic partners, were significantly and precipitously impacted by the COVID-19 pandemic and the resulting shuttering of the global economy.

### C.    SHIFT TO BANKRUPTCY PREPARATION

Following notification on March 21, 2020 that the bridge financing offer was no longer available, and due to the near exhaustion of its existing equity and debt financing and the lack of any other financing prospects, OneWeb immediately shifted to bankruptcy preparation and the preservation of its assets for a potential sale.  OneWeb, in an effort to conserve liquidity and preserve the value of its existing assets, began shutting down nonessential aspects of its business. OneWeb was forced to pursue a strategic reduction in force of approximately 90% of its workforce and maintain only its existing operations, while halting all further development.

### D.    THE DECISION TO FILE FOR CHAPTER 11 PROTECTION

Ultimately, OneWeb, in consultation with its advisors, determined that the best path forward was to commence chapter 11 cases to preserve the value of its key assets while pursuing strategic alternatives.  As such, OneWeb entered into an agreement with its largest equity and debtholder, SoftBank, with respect to the consensual use of its cash collateral to fund the chapter 11 cases.

On March 27, 2020, OWG's board of directors, and the boards of directors or managers of each of its affiliated Debtors, unanimously voted to commence voluntary cases for relief under chapter 11 of the Bankruptcy Code. The Debtors' other subsidiaries, OneWeb S.R.L., a company formed under the laws of Italy, OneWeb Capacidade Satelital Ltda., a Brazilian limited liability company, OneWeb Costa Rica Limitada, a Costa Rican limited liability company (Sociedad de Responsibilidad Limitada), OneWeb Senegal SARL, a Senegal limited liability company, One Web Angola – Serviços De Telecomunicações (SU), LDA., an Angolan limited liability company, OneWeb S.A., an Argentinian sociedad anónima, First Tech Web Company Limited, a Saudi Arabian limited liability company, OneWeb Communications S.a.r.l., a Luxembourg société à responsabilité limitée, OneWeb Asia Pte. Ltd., a Singaporean private company limited by shares, OneWeb Development Ltd., a company incorporated under the laws of England and Wales, and OneWeb Technology Ltd., a Jersey private company, did not commence chapter 11 cases.

## IV.    EVENTS DURING THE CHAPTER 11 CASES

### A.    FIRST AND SECOND DAY PLEADINGS

Immediately after commencing these cases, the Debtors filed a number of motions and other pleadings seeking relief necessary to stabilize their business and ensure a smooth transition into chapter 11. These first and second day motions were granted by the Bankruptcy Court with certain adjustments or modifications.

The Bankruptcy Court entered orders authorized the Debtors to, among other things:

- maintain their existing bank accounts and cash management system, and continue use of existing checks [Docket Nos. 30, 119, and 349];

- pay certain prepetition employee wages, salaries, other compensation, and continue certain compensation and benefits programs [Docket Nos. 37 and 108];

- pay all undisputed, liquidated, prepetition amounts owing on account of claims held by critical vendors [Docket Nos. 38 and 109];

- provide adequate assurance of payment to utility companies and establish procedures for resolving requests by utility companies for additional assurance of payment [Docket Nos. 45 and 111];

- pay certain prepetition taxes and fees and those that will become payable during the pendency of the cases [Docket Nos. 32 and 113];

- continue insurance coverage, workers' compensation programs and surety bond programs entered into prepetition and satisfy payment of those obligations, and continue performance [Docket Nos. 35 and 110];

-18-

- establish procedures relating to certain transfers of, or declarations of worthlessness with respect to, common stock or any beneficial ownership interests [Docket Nos. 36 and 112];

- utilize cash collateral [Docket Nos. 17 and 118];

- obtain postpetition financing [Docket No. 121]; and

- approving bidding procedures with respect to the sale of the Debtors' assets [Docket No. 104].

## B.    PROCEDURAL AND ADMINISTRATIVE MOTIONS

On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedule of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports* [Docket No. 7] seeking an extension of the time within which the Debtors must file their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules") up to and including 30 days after the meeting of the creditors pursuant to section 341 of the Bankruptcy Code or 44 days from the Petition Date or such later date as agreed to with the U.S. Trustee, which the Bankruptcy Court granted on April 1, 2020 [Docket No. 33]. On May 25, 2020, the Debtors filed the Schedules and their Rule 2015.3 Financial Report.

On June 23, 2020, the Bankruptcy Court entered an order approving: (1) August 11, 2020, at 5:00 p.m., prevailing Eastern Time, as the deadline for all non-governmental units (as defined in section 101(27) of the Bankruptcy Code) to file Claims in the chapter 11 cases; (2) September 24, 2020 at 5:00 p.m., prevailing Eastern Time, as the deadline for all governmental units (as defined in section 101(27) of the Bankruptcy Code) to file Claims in the chapter 11 cases; (3) procedures for filing proofs of Claim; and (4) the form and manner of notice of the applicable bar dates [Docket No. 331] (the "Bar Date Order"). Any creditor whose Claim is not scheduled in the Schedules or whose Claim is scheduled as disputed, contingent, or unliquidated must file a Proof of Claim in accordance with the Bar Date Order.

To facilitate the efficient administration of these chapter 11 cases and to reduce the administrative burden associated therewith, the Debtors also filed and received authorization to implement several further procedural and administrative motions:

- authorizing the joint administration of the chapter 11 cases [Docket No. 29];

- establishing certain notice, case management, and administrative procedures [Docket No. 44];

- allowing the Debtors to prepare a list of creditors in lieu of submitting a formatted mailing matrix and to file a consolidated list of the Debtors' 30 largest creditors [Docket No. 41];

- approving the procedures for the interim compensation and reimbursement of retained Professionals in the chapter 11 cases [Docket No. 106];

- allowing the Debtors to retain and compensate certain Professionals utilized in the ordinary course of business [Docket No. 107]; and

- approving procedures for rejecting executory contracts and unexpired leases [Docket No. 346].

### C.    APPOINTMENT OF THE CREDITORS' COMMITTEE

On April 16, 2020, the U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code [Docket No. 67]. The Committee retained (a) Paul Hastings, LLP as lead counsel; (b) Cole Schotz, P.C. as conflicts and efficiency counsel; (c) Province, Inc. as financial advisor; and (d) Jefferies LLC as investment banker.

### D.    DEBTORS' RETENTION OF PROFESSIONALS

Upon the Bankruptcy Court's approval, the Debtors retained (1) Milbank LLP as counsel; (2) Omni Agent Solutions as the Claims and Noticing Agent; (3) Guggenheim Securities as investment banker; (4) Choate, Hall & Stewart LLP as special corporate counsel; and (5) FTI Consulting, Inc., as financial advisor. The Bankruptcy Court also authorized the Debtors to retain and compensate certain Professionals utilized in the ordinary course of the Debtors' business.

### E.    POSTPETITION FINANCING

Following the Petition Date, the Debtors obtained debtor-in-possession financing pursuant to a Senior Secured Debtor-In-Possession Term Loan Credit Agreement, dated as of April 29, 2020 (the "Original DIP Credit Agreement"), among, *inter alios*, OWC as borrower, SoftBank and Grupo Elektra, S.A.B. de C.V., as lenders (the "DIP Lenders"), GLAS USA LLC, as administrative agent (the "DIP Administrative Agent") and GLAS Trust Corporation Limited, as collateral agent (the "DIP Collateral Agent", and together with the DIP Administrative Agent, the "DIP Agent").

The Original DIP Credit Agreement provided for senior secured superpriority financing consisting of (a) new money term loans of up to $75 million, consisting of a $10 million first tranche, a $20 million second tranche, a $25 million third tranche, and a $20 million fourth tranche (the "New Money DIP Loans") and (b) a "roll-up," consisting of a substitution and exchange of a portion of the Claims of the DIP Lenders or their affiliates under the A&R NPA and the Secured Notes (the "Prepetition Obligations") occurring on each borrowing date under the Original DIP Credit Agreement (except that the roll-up with respect to the New Money DIP Loans extended on the first borrowing date was deemed to occur on the second borrowing date) in an aggregate amount equal to three times the aggregate principal amount of New Money DIP

Loans made on the applicable date, up to an aggregate amount of no more than $225 million (the "DIP Facility").

To secure the obligations under the Original DIP Credit Agreement, the Debtors granted the DIP Collateral Agent, for the benefit of the DIP Lenders and the DIP Agent (collectively, the "DIP Secured Parties"), a valid, perfected first priority priming security interest and lien on all of their prepetition and postpetition tangible and intangible property and assets, whether real or personal, other than the Excluded Collateral and the Avoidance Actions (each, as defined in the Original DIP Credit Agreement).

In connection with the bid from the Plan Sponsor to acquire 100% of the equity interests of the Reorganized Company Party (the "New Equity Interests") through a chapter 11 plan of reorganization and to provide an ongoing, material funding commitment to the reorganized business (the "Transaction"), as discussed further herein, the Plan Sponsor agreed to provide $110 million of incremental DIP financing (the "Interim Funding"), by taking assignment of the approximately $45 million of unfunded new-money commitments under the Original DIP Credit Agreement and providing additional new-money commitments of approximately $65 million.

The Debtors filed a motion seeking authority to amend the DIP Facility to allow for the Interim Funding on June 6, 2020 [Docket No. 370] and increasing the size of the DIP Facility from $300 million to $410 million. The Bankruptcy Court entered an order granting the requested relief on July 10, 2020 [Docket No. 398].

## F.    PENDING LITIGATION PROCEEDINGS AND CLAIMS

In the ordinary course of business, certain of the Debtors are party to various lawsuits, legal proceedings, and claims arising out of their businesses. The Debtors cannot predict with certainty the outcome or disposition of these lawsuits, legal proceedings, and claims, although the Debtors do not believe any reasonable outcome of any currently existing proceeding, even if determined adversely, would (a) have a material adverse effect on their businesses, financial condition, or results of operations or (b) interfere with the feasibility of the Plan.

On June 6, 2019, Virgin Orbit, LLC ("Virgin") filed suit against OneWeb in the United States District Court for the Southern District of New York, alleging breach of contract related to the calculation and payment of a termination fee associated with OneWeb's termination of certain launches under a Launch Services Agreement between the parties in May 2015. Virgin is seeking $46,323,851 in damages, interest, attorney's fees and costs (the "Virgin Litigation").

On September 10, 2019, Intelsat US LLC ("Intelsat") filed suit against OneWeb and SoftBank Group Corporation in the Supreme Court of the State of New York, County of New York, alleging contract and tort claims, including breach of contract under the Amended and Restated Strategic Cooperation Agreement between Intelsat, OneWeb and SoftBank (the "Intelsat Litigation"). On November 8, 2019, OneWeb and SoftBank filed a joint motion to dismiss the complaint in its entirety. On May 13, 2020, Intelsat commenced voluntary cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia.

With certain exceptions, the filing of the chapter 11 cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the chapter 11 cases. The Debtors' liability with respect to litigation stayed by the commencement of the chapter 11 cases is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation claims against the Debtors may be subject to discharge in connection with the chapter 11 cases. This may reduce the Debtors' exposure to losses in connection with the adverse determination of such litigation.

## G.    THE MARKETING AND SALE PROCESS

The Debtors, with the assistance of Guggenheim Securities, conducted an extensive outreach effort in connection with the Debtors' marketing and sale process, including, among other things, reaching out to over ninety (90) strategic and financial investors around the world. Over half of those parties executed non-disclosure agreements and received access to a data room supplied with diligence information regarding the Debtors' businesses and operations. Such information included, among other things, a management presentation, regulatory filings, information regarding manufacturing facilities, asset details, technical specifications for SNPs, network, user terminals and satellite design, various business plans, and other commercial agreements. Moreover, the Debtors' management and their advisors participated in numerous calls to address diligence and sale related topics. Through additional information posted to the data room and written answers, the Debtors, with the assistance of their advisors, provided well over one hundred (100) written submissions in response to diligence questions submitted by prospective buyers. Throughout the sale and marketing process, the Debtors regularly informed and consulted with the Committee and SoftBank (together, the "Consultation Parties").

At the original bid deadline of June 26, 2020, the Debtors received three bids, none of which met the definition of a Qualified Bid in the Bidding Procedures Order. Consequently, after discussion with the Consultation Parties (including the Committee), the Debtors extended the bid deadline and continued discussions with the parties that submitted these bids in an attempt to turn their submissions into Qualified Bids. Three additional parties that had conducted due diligence also contacted the Debtors and expressed interest in bidding for the Debtors' assets, although each of these additional parties indicated they were yet to secure the requisite financing and internal approvals. The Debtors, with the assistance of their advisors, continued to interact with these parties following the original bid deadline.

On July 1, 2020, the Debtors received a signed bid from BidCo in the form of a Plan Support Agreement and plan term sheet attached thereto as Exhibit A (the "Plan Term Sheet").

On July 2, 2020, BidCo's bid was submitted to OWG's Board of Directors (the "Board") for consideration. Of the seven Board members, each of SoftBank, Airbus, Grupo Salinas, and Qualcomm have one designee. The other three Board members are: an independent member with no other affiliation to the Debtors or the holders of Secured Notes Claims, the Debtors' CEO, and the founder of OneWeb, who also has no affiliation with the holders of Secured Notes Claims but is a current equity holder. The Board **unanimously** voted to approve BidCo's bid, subject to obtaining certain modifications to be negotiated by the Debtors, with the assistance of their advisors, as the baseline bid. Among the Board members who voted to approve the bid

were the unaffiliated independent director and the designees of two significant unsecured creditors—Qualcomm (directly) and Airbus (indirectly through its ownership interests in the AOS joint venture and its significant ownership interest in Arianespace). In approving BidCo's bid, including the Plan Term Sheet, each member of the Board exercised its duties under applicable law, having determined that BidCo's bid preserved the going concern value of the Debtors' business, avoided imminent liquidation, and was the highest and otherwise best bid available. The Board's decision was further supported, as described below, by the Committee, which recognized that BidCo's bid was the highest and best bid and conceded that there were no issues with the sale process, stating as follows in a filing with the Bankruptcy Court:

> The Committee fully supports a going concern sale of the Debtors' business, and it agrees that the selection of BidCo as the proposed buyer in accordance with the sale process is a positive development and a critical first step towards a confirmable chapter 11 plan and a successful reorganization. The Committee is also not second-guessing the sale process run by the Debtors or the purchase price to be paid by BidCo.

*Official Committee of Unsecured Creditors' Limited Objection to (1) Debtors' (I) Supplemental Motion for Entry of an Order (A) Authorizing Debtors to Enter Into and Perform Under Plan Support Agreement With Successful Bidder in Connection With Debtors' Motion to Authorize Sale, Free and Clear of All Liens, Claims, Interests & Encumbrances and (B) Granting Related Relief and (II) Preliminary Reply to Cure, Assumption and Assignment, and Sale Objections, and (2) Debtors' Motion for Authorization to Amend Existing DIP Facility* [Docket No. 386] (the "PSA Objection") at ¶ 1; *see also*, *id*. at ¶¶ 9, 16 (the Committee "has no objection to the Debtors selecting BidCo as the Successful Bidder").

None of the other bids received were Qualified Bids, and no other interested party indicated to the Debtors that it would submit a Qualified Bid competitive with BidCo's bid. BidCo agreed to requested modifications, ~~negotiated solely by the Debtors, with the assistance of their advisors,~~ and in consultation with the Consultation Parties (including the Committee), notified BidCo that the Debtors intended to designate BidCo's bid as the highest and otherwise best bid. The Debtors, in consultation with the Consultation Parties, then cancelled the auction and BidCo was declared the successful bidder.

On July 3, 2020, the Debtors announced that BidCo was the successful bidder and that the terms of the Plan Support Agreement and the going concern sale contemplated thereby constituted the highest and otherwise best bid for the Debtors' business.

**The Committee disagrees with the Debtors' characterization of the legal and factual issues described in this Section IV.G and, in this regard, the Committee refers creditors to the Committee Letter.**

## H.    THE TERMS OF BIDCO'S BID

1. *Acquisition of All Assets Including Retained Causes of Action & Avoidance Actions*

The Plan Support Agreement and the Plan Term Sheet expressly state that BidCo's offer is for the acquisition of the New Equity Interests and includes "all the assets, properties and rights used or held for use by the Debtor entity that will act as the Reorganized Company Party (in accordance with the terms [of the Plan Support Agreement and the Plan Term Sheet]) and its subsidiaries and affiliated entities in the operation and conduct of the Business as a going concern in connection with the Chapter 11 Cases through the Transactions, subject to the ability to designate Excluded Assets in accordance with the PSA."  Plan Term Sheet at 4 (a schedule of the Excluded Assets is attached as **Annex D** hereto).  All assets necessary for the operation of the Debtors' business as a going concern, among other things, include all Causes of Action, including all Avoidance Actions, except those released pursuant to the Plan.  The Plan Support Agreement and the Plan Term Sheet do not provide for any allocation of the purchase price to specific assets.  Notably, the Committee insisted on striking from the Bidding Procedures the requirement that Proposals (as defined therein) include allocation of the purchase price as part of its comments thereto.  *See Notice of Filing of Revised Proposed Order (I)(A) Approving Bidding Procedures, (B) Scheduling an Auction and Sale Hearing and Approving Form and Manner of Notice Thereof, and (C) Approving Assumption and Assignment Procedures and Form and Manner of Notice Thereof; and (II) Authorizing (A) the Sale(s), Free and Clear of All Liens, Claims, Interests, and Encumbrances, and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases* [Docket No. 89]; *cf.* Bidding Procedures Motion, Exhibit 1, Section III.B.2.(c). [Docket No. 57]; Bidding Procedures, Section III.B.2.(c). [Docket No. 104].  The purchase and sale of the Causes of Action is a requirement of the Plan Term Sheet and is a necessary predicate to confirmation of the Plan.

Notwithstanding assertions by the Committee to the contrary, it is standard for a purchaser of a going concern business, including a reorganizing business, to retain all of its causes of action regardless of whether the purchaser is an existing creditor.  In any event, this is not a case where a buyer cherry-picks assets to operate as part of a different business and looks to acquire causes of action unrelated to the existing business.  To the contrary, because the Debtors' business is being acquired as a going concern, it is unremarkable that the Plan Sponsor seeks to acquire all rights associated therewith, including the ability to decide which Claims to pursue and which Claims to release.  To do otherwise would require the Plan Sponsor to relinquish its ability to make critical go-forward business decisions, and/or subject the reorganized business to unquantifiable risks to disruption of its business because its vendors, customers, debt and equity sources and counterparties are being subjected to litigation in the name of their business.  The acquisition of the Retained Causes of Action ensures that the Debtors' new owners will have the ability to continue to negotiate with existing or former vendors, suppliers, and contract counterparties, without the overhang of the threat of litigation (not controlled by the new owners) that could disrupt operations and management of the business.  It is a requirement of the Plan Term Sheet.

Moreover, while the Debtors have not conducted an independent review of potential Causes of Action and Avoidance Actions, the Debtors are not aware of any valuable Causes of Action or Avoidance Actions that are being retained by the Reorganized Debtors.  Notably, the Debtors believe that any potential preference claims under section 547 of the Bankruptcy Code

are likely subject to applicable defenses, including "contemporaneous exchange for value", "new value", or are for payments tied to contracts that will be assumed, and therefore the cost of litigation would far exceed the recoverable value.  Even so, the Bankruptcy Court approved BidCo's bid as the highest and otherwise best ~~and only available~~ option for the Debtors, and the terms of the BidCo bid require the Reorganized Debtors to maintain the Retained Causes of Action.

### 2. *Cash Consideration and BidCo Equity Consideration*

In exchange for the acquisition of the New Equity Interests, BidCo agreed to provide, among other things, (i) on or before the Effective Date, $150 million cash payment to satisfy Allowed DIP Claims (other than the Interim Funding DIP Claims) and such other claims that were required to be paid in cash under the Plan; and (ii) on or following the Effective Date, the Additional Cash Plan Funding.  In addition, BidCo committed to (i) provide additional DIP financing in the amount of $110 million to fund the Debtors' chapter 11 cases through the Effective Date and (ii) provide for payment of all Allowed Cure Claims.  The Plan Support Agreement and Plan Term Sheet also provides for the issuance of the BidCo Equity Consideration *pro rata* for the holders of Allowed Secured Notes Claims.

These key financial terms of the Plan Support Agreement and the Plan Term Sheet comprise the terms of BidCo's successful bid.  These terms have been in every iteration of the Plan Support Agreement and the Plan Term Sheet delivered by BidCo to the Debtors, as well as the Committee as a Consultation Party under the Bidding Procedures.  BidCo is a private joint venture between HMG and Bharti, established by them for the purpose of acquiring 100% of the equity interests of the Reorganized Company Party in consortium with each other, together with any other selected additional commercial partners that HMG and Bharti may invite to join that consortium.  As with any private consortium, HMG and Bharti will take care in the selection of any third parties that they invite to become consortium partners with them.  In addition, HMG, as a sovereign entity, has additional considerations and approval procedures in relation to the identity and ultimate ownership of any third party with which it enters a commercial partnership.  For the same reasons, HMG and Bharti will limit the transferability of both the legal and beneficial ownership of the equity in BidCo.

Because of these concerns, in deciding to offer the BidCo Equity Consideration as part of the Plan, consideration was given by HMG and Bharti to the identity of those third parties who would receive such consideration.  HMG and Bharti had identified and approved as acceptable shareholders in BidCo the holders of Allowed Secured Notes Claims to whom it is proposed the BidCo Equity Consideration will be issued.  HMG and Bharti have not undertaken, and do not believe it is appropriate or reasonable to expect them to undertake, this exercise in respect of the much larger pool of holders of General Unsecured Claims.  BidCo, as the Plan Sponsor and DIP Lender and the party funding payment of administrative expenses of these cases, has every incentive ~~and right~~ to seek to reduce, not increase, the cost of administering these cases.

In addition to any considerations that HMG and Bharti may have over the identity of those third parties unknown to them, HMG and Bharti would also have concerns about any increase in the number of shareholders in BidCo given the private company nature of BidCo and its governance.  HMG and Bharti would also be concerned about any proposed arrangement

where a single trustee acts as shareholder for all of the New Equity Interests, given that similar concerns would arise in relation the identity and number of underlying beneficiaries, and where in addition HMG and Bharti would have less visibility into those underlying beneficiaries and less ability to control any transfer or other dealings in BidCo equity.

The Debtors, through their advisors, requested that the BidCo Equity Consideration, like the Cash Consideration, be made available to the Estate generally. However, the Plan Sponsor would not agree.

Contrary to the Committee's assertions, in the Debtors' view, the Bankruptcy Court has been clear that BidCo would (1) have a reasonable basis for terminating the Plan Support Agreement if the BidCo Equity Consideration was required to be distributed to any party other than the holders of Secured Notes Claims (s*ee* Tr. of July 10, 2020, Hearing to Approve Plan Support Agreement and DIP Amendment at 67:7-13 ("[T]he point you made about the equity, to me, I understand completely. That would be, certainly, a [case] where consent would be reasonably withheld, if it affects your very ability to do the transaction, get regulatory approval, *et. cetera*.")) and (2) that any challenge brought by the Committee to recharacterize or equitably subordinate the Secured Notes Claims in a manner that could trigger termination rights under the Plan Support Agreement and jeopardize the sale should not be a risk that should be allowed to exist. *See* Tr. of July 28, 2020 hearing at 111:1-20 ("I believe the committee should ***not*** be permitted to [] pursue litigation that would, by its plain terms, cause a breach of the purchase agreement if the committee succeeded [in its recharacterization and equitable subordination claims] and the order would have to be drafted to preclude that relief and the pursuit of that relief from taking place, which in all likelihood would mean that the remedies that the committee would see would be limited to the other aspect of the consideration provided by BidCo, which is ninety million dollars.") (emphasis added). And, again, BidCo's successful bid was determined to be the highest and best available to the Debtors.

Contrary to the Committee's assertions, these are critical components to the Plan Support Agreement and Plan Term Sheet, which are further clarified in Sections IV and IX of the Plan.

3.    *The Releases*

a.    **Releases for the Prepetition Secured Parties**

As part of the Debtors' negotiations to obtain the consensual use of cash collateral and ultimately, DIP financing, the Prepetition Secured Parties insisted, among other things, that the Debtors agree that the Secured Notes Claims be allowed in the full outstanding amount and that a release will be granted of all claims and Causes of Action against the Prepetition Secured Parties, subject only to the limited challenge rights of other parties in interest. While the Debtors did not conduct an independent investigation of claims potentially held by them or their estates against the Prepetition Secured Parties at the time of granting the release (the Debtors neither had the time nor the liquidity to do so), the Debtors were not aware of any potential Claims they held against the Prepetition Secured Parties nor did they have any reasonable basis to believe such claims existed. Ultimately, the Debtors, in the reasonable exercise of their business judgement, agreed to grant the requested releases in exchange for the consensual use of cash collateral and DIP financing, both of which were necessary to allow the Debtors to use chapter 11 to pursue a value maximizing going concern sale for the benefit of all of the Debtors' stakeholders. Absent the ability to use cash collateral and obtain postpetition financing (which was only available from SoftBank and an affiliate of Banco Azteca), the Debtors would not have been able to pursue the sale process, secure a going concern bid, or otherwise maximize value for their Estates. Rather, the Debtors would have been forced to liquidate under U.S. or English Law.

After further review of the facts surrounding the Original NPA and the A&R NPA, as detailed more fully above, the Debtors believe that the claims and causes of action alleged by the Committee against the Prepetition Secured Parties are without any merit (as discussed more fully below). Accordingly, the treatment provided to the Prepetition Secured Parties under the Plan is consistent with the current *status quo* waivers and releases contained in the DIP Order and the Cash Collateral Order. Until such time as there is a successful challenge of the Secured Notes Claims, there is no basis to treat such claims differently.

The Debtors' decision to agree to the releases in the Plan Term Sheet and the Plan is similarly justified by the Debtors' business judgment as, in connection with finalizing the terms of the Plan Support Agreement and the Plan Term Sheet, the Debtors were required to obtain the consent of the existing DIP Lenders and the largest prepetition secured lenders to the transactions contemplated by BidCo's bid. They did so for two valid reasons (neither of which is remotely improper). First, because the Plan proposes to provide the holders of Secured Notes Claims with equity – a treatment that cannot be crammed down on secured debt (and the Secured Notes Claims are presumptively valid secured claims), SoftBank's consent to the Plan was necessary.

Second, it is a "Termination Event" under the Debtors' DIP financing for the Debtors to file or support a plan that is not in form and substance acceptable to SoftBank. Pursuant to paragraph 24 of the DIP Order, it is a Termination Event (as defined in the DIP Order) with respect to the Debtors' right to use proceeds of any DIP Loans if, among other things, "the Debtors file, propose, or support confirmation of a chapter 11 plan that is not in form and substance acceptable to [SoftBank, as] the Lead Lender." Similarly, pursuant to paragraph 8 of the Cash Collateral Order, it is a Termination Event (as defined in the Cash Collateral Order)

with respect to the Debtors' right to use cash collateral if "the Debtors shall create, incur, or suffer any other claim which is *pari passu* or **senior to** the Notes Superpriority Claim, other than a claim granted in connection with a postpetition financing facility consented to by [SoftBank, as] the Required Holders or under this Final Order."

Whatever rights the Committee may have to challenge the Secured Notes Claims under the Cash Collateral Order, the Committee expressly consented to the foregoing provisions. *Statement of Official Committee of Unsecured Creditors in Support of Debtors' Motions for Orders (A) Authorizing Use of Cash Collateral, (B) Authorizing Postpetition Financing, and (C) Approving Bidding Procedures, Each as Modified*, at ¶ 3 [Docket No. 96].

To obtain SoftBank's consent to the Plan Support Agreement and the Plan Term Sheet, SoftBank required the Debtors to release claims against SoftBank as a DIP Secured Party and Prepetition Secured Party. On July 9, 2020, SoftBank executed a joinder to the Plan Support Agreement which provides that SoftBank's support is contingent on no change in its treatment or the releases to be granted under the Plan Support Agreement and Plan Term Sheet.

In addition, pursuant to the terms of the Settlement embodied in the Plan, SoftBank has agreed to contribute its cash recovery on account of the Allowed SoftBank DIP Claims (approximately $91 million before the consideration of accrued interest) in exchange for the issuance of $87.9 million of equity in BidCo calculated on the same basis as the ~~BidCo~~**BidCo** Equity Consideration (the "Additional SoftBank Consideration"). In turn, and as a result thereof, and a reduction in the amount of BidCo Equity Consideration distributed to holders of Allowed Senior Secured Claims, BidCo has agreed to fund the General Unsecured Claims Settlement Distribution to provide a recovery to holders of Allowed Claims in Class 4 and holders of Allowed Claims in Class 5 with their *pro rata* share of $6.1 million (which ~~approximates,~~**depending on the ultimate size of the unsecured claims pool, could yield a percentage of recovery the Debtors believe will be greater than, and the Committee asserts may be less than,** the percentage of recovery originally contemplated under the Plan Term Sheet for holders of Allowed Secured Notes Claims under the Plan).

### b.    Releases of the Debtors' Directors & Officers

The Plan and the Plan Term Sheet also contemplate the Debtors' and third-party releases of the Debtors' directors and officers ("Directors and Officers") serving in such capacity on and after the Petition Date to the fullest extent permitted by law, including under English Law. Notwithstanding the Committee's entirely baseless accusations, the Debtors are not aware of any valid claims or Causes of Action against any of their Directors and Officers. Leading up to the filing of these cases, the Directors and Officers were faced with extremely challenging circumstances. The Directors and Officers have shepherded these Debtors through extraordinary circumstances, least of which is a global pandemic.

As described more fully above, just weeks before the commencement of these cases, the Debtors believed that they had secured an out-of-court financing transaction that would have funded the build-out of the Debtors' constellation to completion. On the same day the Debtors expected to get the go-ahead with respect to this anticipated financing, the World Health Organization declared COVID-19 a global pandemic, the world financial markets suffered one of

the worst days in trading history, and the Debtors were informed that the possibility of a fully funded transaction was no longer available. The Directors and Officers pivoted quickly toward pursuit of an out-of-court bridge financing, which was hoped to bridge the Debtors to a value maximizing sale once the financial markets rebounded. However, just one hour before the Debtors' scheduled launch of their third batch of satellites into orbit, they were informed that the bridge financing was no longer available.

The Directors and Officers had no choice but to turn quickly to preparing for a chapter 11 filing – a process (unlike an insolvency process under English insolvency law) that would give the Debtors the necessary breathing space to pursue a value maximizing sale. The Directors and Officers had to make the difficult decisions to preserve cash, shut down non-essential operations, and implement a significant reduction in work force, all the while managing continuing business operations, maintaining vendor and supplier relationships, and retaining essential and specially skilled employees. In addition, the Debtors had to navigate a 'free fall" chapter 11 case, obtain and agree to conditional postpetition financing at a fraction of the Debtors' operating requirements, and pursue a value maximizing sale of their business as a going concern on a shoe-string budget and extremely short timeline – which they have successfully done. Had the Directors and Officers opted to shut down operations and pursue an insolvency process under English Law, the Debtors would have ended up in liquidation with no value available for hundreds of stakeholders.

The Committee intimates that there may be potential claims against the Directors and Officers that are being released but it asserts no basis for these allegations. To the contrary, the Directors and Officers have achieved a home-run going concern sale of the Debtors' business, pursuant to which current employees will keep their jobs, many terminated employees may be rehired, and hundreds of contract counterparties will have their contracts assumed by the Reorganized Debtors. Moreover, even with respect to those contract counterparties whose contracts may be rejected, an opportunity for future engagement with the Reorganized Debtors remains as the Debtors' business will continue as a going concern. The Plan contemplates the retention of Current Employees in their current positions, including Officers. To allow parties to bring meritless claims against these individuals would cause enormous disruption to the Reorganized Debtors' business, would force the Reorganized Debtors to have to expend resources in defending and indemnifying the Directors and Officers, and would risk losing the very same employees who have been so critical to the Debtors' survival and these chapter 11 cases.

Among the baseless allegations made by the Committee is that certain retention payments made to the Debtors' Officers and other remaining employees prior to the commencement of these cases may have been improperly made or improperly approved by the Board. However, as the Committee is well aware from its review of the Debtors' KEIP and KERP, discussions with the Debtors' advisors, informal and formal document production, and voluntary interviews of the Debtors' management, there was absolutely nothing improper about the retention payments made in the week prior to the commencement of these cases. Those payments were made upon the review and advice of outside employment advisors and were considered and unanimously approved by the Board (excluding the Debtors' CEO), including the Debtors' independent director. The Board determined that, in order to successfully operate the Debtors' assets while managing chapter 11 and conducting a sale process, the prepetition retention payments were

necessary to retain the Debtors' essential management team and remaining employees in the face of extreme uncertainty. The Board was also informed at that time that the Debtors would likely seek approval of a key employee incentive program tied to the sale process at a future date. Contrary to the Committee's baseless accusations, these payments were approved by the Board before the Debtors received any draft form of order from holders of the Secured Notes Claims authorizing consensual use of cash collateral. Indeed, the Debtors had only a matter of days to pivot from a fully operational satellite venture to "mothballing" their operations. The Directors and Officers have been and continue to be critical to the success of the sale process and these chapter 11 cases. This was also recognized by the Bankruptcy Court when it approved the Debtors' KEIP. Thus, the releases are appropriate.

**The Committee disagrees with the Debtors' characterization of the legal and factual issues described in this Section IV.H, and, in this regard, the Committee refers creditors to the Committee Letter.**

## I.    APPROVAL OF THE PLAN SUPPORT AGREEMENT AND INTERIM FUNDING

On July 6, 2020, the Debtors filed a motion seeking authority to enter into the Plan Support Agreement [Docket No. 369] (the "PSA Motion") and a motion seeking authority to amend the existing DIP Facility [Docket No. 370] (the "DIP Amendment Motion"). The Committee filed its PSA Objection (which included an objection to the Interim Funding) on July 9, 2020.

Principally, the PSA Objection raised concerns with: (1) the Plan Support Agreement's allocation of the purchase price; (2) the proposed releases; (3) a $5.5 million exit fee, up to $25 million in expense reimbursements, and automatic acceleration of the Interim Funding if the Plan Support Agreement is terminated; and (4) the Plan Sponsor's right to determine the treatment of General Unsecured Claims under the Plan. *See* PSA Objection at ¶¶ 1, 2, 8, 10. The Debtors, Plan Sponsor, DIP Secured Parties, and the Committee were able to resolve many of these issues consensually, and their agreement was memorialized in the Plan Support Agreement Order and DIP Amendment Order.

As described above, the Committee stated in the PSA Objection that it "fully supports a going concern sale of the Debtors' business, and that it agrees that the selection of BidCo as the proposed buyer in accordance with the sale process is a positive development and a critical first step towards a confirmable chapter 11 plan and a successful reorganization." PSA Objection at ¶ 1; *see also*, *id*. at ¶¶ 9, 16 (the Committee "has no objection to the Debtors selecting BidCo as the Successful Bidder"). The Committee also made clear that it was not second-guessing the sale process run by the Debtors or the purchase price to be paid by BidCo. *Id*.

However, the Debtors, the Plan Sponsor, and the Committee were unable to resolve their disputes over the proposed releases and the allocation of the BidCo Equity Consideration in advance of the hearing on July 10, 2020. The Bankruptcy Court acknowledged on the record of that hearing that it would not be unreasonable for the Plan Sponsor to decline to modify its obligations under the Plan Support Agreement and Plan Term Sheet to allow the BidCo Equity Consideration to be made available to the Estate generally and not just to the holders of the

Allowed Secured Notes Claims, as agreed to by the Debtors in the Plan Support Agreement and Plan Term Sheet. *See* Tr. of July 10, 2020, Plan Support Agreement and DIP Amendment hearing at 67:7-13 ("[T]he point you made about the equity, to me, I understand completely. That would be, certainly, a [case] where consent would be reasonably withheld, if it affects your very ability to do the transaction, get regulatory approval, *et. cetera*.").[95]

The Bankruptcy Court entered the Plan Support Agreement Order and DIP Amendment Order, as modified, on July 13, 2020 [Docket No. 400] and July 10, 2020 [Docket No. 398], respectively.

**The Committee disagrees with the Debtors' characterization of the legal and factual issues described in this Section IV.I, and, in this regard, the Committee refers creditors to the Committee Letter.**

## J.    THE COMMITTEE'S DERIVATIVE STANDING MOTION

On July 13, 2020, the Committee filed a motion seeking (a) derivative standing to pursue recharacterization and equitable subordination claims against the holders of Secured Notes Claims and (b) disallowance of the Secured Notes Claims under section 502(b) of the Bankruptcy Code. *See Official Committee of Unsecured Creditors' (I) Motion for Order Granting Derivative Standing to Pursue and, if Appropriate, Settle Claims for Recharacterization and Equitable Subordination against Certain Purported Secured Creditors, and (II) Objection to such Creditors' Claims* [Docket No. 402] (the "Standing Motion").

In the Standing Motion, the Committee alleged that some factors from *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726 (6th Cir. 2001), support recharacterizing the Secured Notes Claims as equity. Standing Motion at ¶ 105. In addition, the Committee alleged the Secured Notes Claims should be equitably subordinated because the holders of Secured Notes Claims used their "insider" position with the Debtors to "engage[] in inequitable conduct for their benefit that harmed the Company's other creditors" while the Debtors were undercapitalized. *Id.* at ¶ 108.

On July 21, 2020, the Debtors filed an objection to the Standing Motion. *Debtors' Objection to the Official Committee of Unsecured Creditors' (I) Motion for Order Granting Committee Derivative Standing to Pursue, and if Appropriate, Settle Claims for Recharacterization and Equitable Subordination Against Certain Purported Secured Creditors,*

---

[95]    At a subsequent hearing, the Bankruptcy Court further noted that the "risk that equity goes to other parties because of a recharacterization win by the committee, BidCo could walk from its transaction or at least renegotiate it. I don't believe that that risk should be allowed to even exist." Tr. of July 28, 2020 hearing at 111:1-20; *see also id.* ("I believe the committee should ***not*** be permitted to [] pursue litigation that would, by its plain terms, cause a breach of the purchase agreement if the committee succeeded [in its recharacterization and equitable subordination claims] and the order would have to be drafted to preclude that relief and the pursuit of that relief from taking place, which in all likelihood would mean that the remedies that the committee would see would be limited to the other aspect of the consideration provided by BidCo, which is ninety million dollars") (emphasis added).

*and (II) Objection to Such Creditors' Claims* [Docket No. 430] (the "Debtors' Objection").  The Debtors' Objection argues, among other things, that the Committee's request for derivative standing was improper because (i) such standing would cause more harm than benefit to the Estates and creditors, (ii) the Debtors are justified in not pursuing the alleged claims, and (iii) the Committee's claims are not colorable.  *Id.* at ¶¶ 18-49.  Other parties, such as SoftBank, Banco Azteca, Airbus Group Proj B.V., Qualcomm Technologies, Inc., and Qualcomm Global Trading Pte. Ltd. also objected to the Standing Motion.  *See SoftBank Group Corp.'s Objection to the Official Committee of Unsecured Creditors' (I) Motion for Order Granting Committee Derivative Standing to Pursue, and if Appropriate, Settle Claims for Recharacterization and Equitable Subordination Against Certain Purported Secured Creditors, and (II) Objection to Such Creditors' Claims* [Docket No. 427] ("SoftBank's Objection"); *Joinder and Supplemental Memorandum of Law in Opposition to the Official Committee of Unsecured Creditors' (I) Motion for Order Granting Committee Derivative Standing to Pursue and, if Appropriate, Settle Claims for Recharacterization and Equitable Subordination Against Certain Purported Secured Creditors and (II) Objection to such Creditors' Claims* [Docket No. 428]; *Joinder of Airbus Group Proj B.V. to the SoftBank Group Corp.'s Objection to the Official Committee of Unsecured Creditors' (I) Motion for Order Granting Committee Derivative Standing to Pursue and, if Appropriate, Settle Claims for Recharacterization and Equitable Subordination Against Certain Purported Secured Creditors, and (II) Objection to Such Creditors' Claims* [Docket No. 429]; *Joinder of Qualcomm Technologies, Inc. and Qualcomm Global Trading Pte. Ltd. to the Debtors' and SoftBank Group Corp.'s Objections to the Official Committee of Unsecured Creditors' Motion for Derivative Standing to Pursue Recharacterization and Subordination of Certain Secured Creditors' Claims and Objections Thereto* [Docket No. 440].

On July 24, 2020, the Committee filed its reply to all of the foregoing objections.  *Official Committee of Unsecured Creditors' Reply in Support of Motion for Order Granting Committee Derivative Standing to Pursue and, if Appropriate, Settle Claims for Recharacterization and Equitable Subordination Against Certain Purported Secured Creditors* [Docket No. 445].

On July 28, 2020, the Bankruptcy Court held a hearing on the Standing Motion.  Following oral argument, the Bankruptcy Court adjourned the matter to the next omnibus hearing date.

The Debtors believe the claims identified in the Standing Motion are meritless and unlikely to succeed.  Moreover, the costs of pursuing the causes of action the Committee identified in the Standing Motion will likely be significant.  Even if the Committee was permitted to pursue its baseless claims, there is simply no source of funding available to support it, as failure to confirm the Plan could result in both the termination of the Debtors' right to use the proceeds of the DIP Facility and give rise to a termination event under the Plan Support Agreement and Plan Term Sheet, a risk the Bankruptcy Court has acknowledged should not be allowed to exist.[106]

---

[106]  *See* Tr. of July 28, 2020 hearing at 111:1-20 ("I believe the committee should ***not*** be permitted to [] pursue litigation that would, by its plain terms, cause a breach of the purchase agreement if the committee succeeded [in its recharacterization and equitable subordination claims] and the order would have to be drafted to preclude

**Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates a settlement of the claims asserted by the Committee in the Standing Motion.** *See* **Section V.B.2,** *infra***. Notwithstanding the Settlement in the Plan, the Debtors, the Committee, and SoftBank have requested mediation, which is ongoing at the time of solicitation of the Plan. Neither the Plan nor the Settlement alter the terms of the successful bid nor do they alter the rights of the parties thereto, nor shall, pending confirmation of the Plan, anything in the Plan or Settlement alter the terms of the Plan Support Agreement Order without further Court approval.**

### 1.      *The Committee's Recharacterization Claims*

#### a.      Debtors' Response

In the Standing Motion, the Committee contends that recharacterization of the Secured Notes Claims is warranted primarily because the Debtors were undercapitalized at the time the Secured Notes were issued and because the holders of the Secured Notes Claims also held equity in the Debtors. As discussed in the Debtors' Objection, the Debtors believe that these facts alone are insufficient to warrant recharacterization.

The Committee has used its Standing Motion to rewrite history, including a version of the facts that are simply not based in reality. The fact that the Debtors were undercapitalized is unremarkable for companies still in the process of capital development; investments made as debt in similar companies are not uncommon. A project the size of the Debtors' contemplated business plan requires years to be fully funded, given the significant capital contributions required, lengthy regulatory approval processes in numerous countries, the time necessary to manufacture and launch satellites, and the challenges in securing presales of capacity on reasonable terms.

It is clear that the version of facts that the Committee relies on to support its claims for recharacterization bear no resemblance to the facts as they actually occurred. Contrary to the Committee's allegations, at the time the Secured Notes were issued, the Debtors were not a moribund start-up company unlikely to generate sufficient revenue to satisfy its debt obligations. To the contrary, by the time the Debtors entered into the A&R NPA, they had already successfully launched the first six prototype satellites into orbit (an important step in bringing its radio frequency spectrum into use and thereby maintaining its priority right to use the spectrum ahead of its competitors). By the time of the filing of these cases, the Debtors, through their joint venture with Airbus, were capable of producing a satellite a day, and the Debtors had commenced a monthly launch cadence of 34 satellites per month.

The Bridge Notes and the Secured Notes were issued pursuant to the agreements clearly evidencing indebtedness in contemplation of additional third-party financing and weighing against recharacterization. In particular, the Debtors believe that if the facts were further examined, the *AutoStyle* factors weigh heavily against the Committee because the Secured Notes

_____

that relief and the pursuit of that relief from taking place, which in all likelihood would mean that the remedies that the committee would see would be limited to the other aspect of the consideration provided by BidCo, which is ninety million dollars.") (emphasis added).

contain an explicit fixed maturity date and schedule of payments which are hallmarks of debt and weigh against recharacterization. Further, the Secured Notes have a fixed rate of interest ~~and interest payments~~ **paid in kind ("PIK")** and were secured by valuable collateral which are quintessential debt features.

As discussed in Section II.C, *supra*, the Bridge Notes in particular were intended to function as a short-term bridge loan (364 days) to allow for full funding of the contemplated ECA Financing. And the Bridge Notes were expressly tied to replacement financing milestones. In addition, contrary to the Committee's assertions repayment of the Secured Notes was not contingent on the Debtors' success in generating revenues and signing up customers, instead the Secured Notes were used to fund obligations to vendors and suppliers and in particular were designed to attract additional project financing, consistent with the nature of a bridge loan and thus further evidencing characteristics of debt.

The overlap between the Debtors' equity-holders and debt holders is likewise unremarkable in the project finance space. As noted in the Debtors' Objection, it is common for a start up's existing stakeholders to make loans where third-party financing may not be readily available – especially in the context of bridge loans. Here, contrary to the Committee's bald allegations, the loans were not used by the Debtors' equity holders to "leap frog" the Debtors' unsecured creditors in advance of a chapter 11 filing. Nothing could be further from the truth. The funds were used to fund obligations to the very same unsecured creditors whose official representative now asserts that the loans should be recharacterized. The Debtors' vendors directly benefitted from the issuance of the Secured Notes as they received hundreds of millions of dollars from their proceeds.

Thus, for these reasons, among others, the Debtors believe that the Committee's claims asserted in its Standing Motion have little possibility of success and serve only to imperil the Debtors' ability to confirm the Plan and pursue the value-maximizing transaction contemplated thereby. The Debtors believe that they have justifiably refused to bring the meritless claims that the Committee is seeking to pursue here, with minimal benefit and likely significant expense to the Estates.

### b.    SoftBank's Response

SoftBank believes that the plain terms of the Original NPA and the A&R NPA demonstrate that the Secured Notes were intended, in all respects, to be debt instruments and not equity investments. The Secured Notes and the financing documents themselves have all the hallmarks of debt in that they provided for the issuance of promissory notes with fixed interest rates, maturity dates, repayment terms, events of default, and collateral in the event of default. SoftBank is of the opinion that a trier of fact is unlikely to recharacterize the Secured Notes as equity because the documents themselves clearly evidence an intent to create a creditor-debtor relationship and the economic terms reflected the substantial credit risk of loaning new money to the Debtors. For example, the high interest rates under both Original NPA and the A&R NPA, as well as the consideration provided under the Warrant Purchase Agreement, accounted for the significant risks involved.

In addition, SoftBank is not aware of any case where a bankruptcy court has

recharacterized debt that was secured by a valid lien (not to mention a lien on substantially all of a borrower's assets). Nor has the Committee identified any such case in its pleadings before the bankruptcy court. SoftBank believes that it is highly unlikely that the Committee will be able to convince a finder of fact to take unprecedented action and hold that SoftBank (and the other Senior Noteholders) never intended to be paid back on the Secured Notes issued under the A&R NPA (or, as to SoftBank, under the Original NPA).

Furthermore, SoftBank notes that bankruptcy courts in this district look to a number of factors when assessing recharacterization claims.[11] The [7] **SoftBank asserts the** Committee has acknowledged, however, that only two out of the eleven recharacterization factors could conceivably weigh in favor of recharacterization in this case. SoftBank is of the opinion this clearly demonstrates that the Committee's recharacterization arguments are weak. In any event, the factors that the Committee believes weigh in favor of recharacterization are that (i) the Debtors were allegedly undercapitalized and (ii) that SoftBank was an insider that allegedly controlled the other Senior Noteholders.

But even assuming that the Committee could meet its burden of demonstrating the presence of these two factors (SoftBank submits that the Committee cannot), SoftBank believes that recharacterization would otherwise be inappropriate under the facts and circumstances of this case. This is because courts have overwhelmingly held that undercapitalization is not sufficient, on its own, to justify recharacterization particularly where, as here, a debtor is a startup company rather than a revenue-generating (but distressed) company.[12][8] Similarly, courts have recognized that insiders are often the only entities that have both the means and the incentive to lend money to undercapitalized companies and have refused to recharacterize debt in such circumstances.[13][9]

Finally, SoftBank believes that pursuing claims for recharacterization is not in the best interest of the Debtors' estates because even if successful they are not likely to generate meaningful value for general unsecured creditors. That is because regardless of the outcome of any challenge against SoftBank for recharacterization (which owns approximately 60% of the Secured Notes), it is unlikely that the Committee could ever prevail in recharacterizing or subordinating the claims of Banco Azteca and Qualcomm. As the bankruptcy court noted at the July 28, 2020 hearing to consider the Committee's motion for derivative standing, Qualcomm's Secured Notes claims were "rolled over from legitimate debt," while Banco Azteca "is a bank subject to regulation by the Mexican banking authorities" and is "precluded from making an equity investment" in the Debtors.[14][10] SoftBank is of the opinion that, putting aside the logical dissonance that would be required for a trier of fact to conclude that Banco Azteca and

---

[11] See Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.), 269 F.3d 726 (6th Cir. 2001).

[7] *See Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.),* 269 F.3d 726 (6th Cir. 2001).

[12][8] *See, e.g.*, *In re USDigital, Inc.*, 443 B.R. 22, 51–53 (Bankr. D. Del. 2011) (dismissing a recharacterization claim in the context of multiple startups that shared similar management and sources of capital).

[13][9] *See, e.g.*, *See In re Rockville Orthopedic Assocs., P.C.*, 377 B.R. 438, 442–43 (Bankr. D. Conn. 2007) ("[I]t [is] important to note that a claimant's insider status and a debtor's undercapitalization alone will normally be insufficient to support the recharacterization of a claim. In many cases, an insider will be the only party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good-faith loans.") (quoting *In re Dornier Aviation, (N. Am.), Inc.*, 453 F.3d 225, 234 (4th Cir. 2006)).

[14][10] *See* Tr. of Hr'g. at 104:21-105:7 (Jul. 28, 2020).

-35-

Qualcomm hold valid debt while the other parties to the exact same instrument somehow invested in equity, the claims of Banco Azteca and Qualcomm alone make the Committee's claims pointless.  Specifically, Banco Azteca and Qualcomm hold over $400 million of Secured Notes Claims so a successful recharacterization challenge against every other holder of the Secured Notes Claims would leave no prospect of any "money [left] over for the unsecured creditors."[~~15~~11]

### 2.     *The Committee's Equitable Subordination Claims*

#### a.     **Debtors' Response**

The Committee also seeks to equitably subordinate the Secured Notes Claims, alleging the holders of the Secured Notes Claims, primarily through SoftBank, controlled the Debtors prepetition and used this control for their own parochial benefit at the expense of other creditors. The Debtors believe this theory to be unfounded.

As with the Committee's recharacterization claims, the Debtors believe that the Committee has failed (and will not be able) to allege a colorable claim for equitable subordination because the Committee has failed to show that holders of the Secured Notes Claims engaged in inequitable conduct, that any such conduct caused injury to the Debtors' creditors or conferred an unfair advantage to the holders of the Secured Notes Claims, or that equitable subordination is consistent with the provisions of the Bankruptcy Code.  Importantly, the Debtors believe that the Committee has failed in its Standing Motion to allege that the holders of the Secured Notes Claims are all insiders that collectively exercised the requisite control over the Debtors or that SoftBank, alone, exercised the requisite control over the Debtors, such that holders of the Secured Notes Claims could orchestrate a complex financing arrangement simply to "leap frog" unsecured creditors who, it should be noted, benefitted from the proceeds of the very same loans.  Further, the Debtors do not believe that the Committee has alleged or can allege any harm to unsecured creditors or any unwarranted benefit to the holders of the Secured Notes Claims.

Specifically, the Committee has alleged that the fact that SoftBank had the right to appoint *one* designee of the Board amounts to control of both the holders of Secured Notes Claims and the Debtors. There are six other members of the Board, three of whom are not affiliated with any of the holders of Secured Notes Claims, including a completely independent and unaffiliated director. Furthermore, not only does the Standing Motion fail to articulate any specific harm that flowed from this alleged control, the ability to designate board members is a common right that lenders bargain for and is not evidence of inequitable conduct.  Nor does SoftBank exert control over the other holders of Secured Notes Claims.  Each lender viewed its investment into the Secured Notes based on its own interest and potential benefits. *See, e.g.*, Banco Azteca Objection at ¶ 15 ("Banco Azteca made its own lending decisions and did not

---

[~~15~~11] *See id.*, at 105:23-24.  Although the Committee has suggested that any liens in favor of holder of the Secured Notes Claims whose claims are successfully recharacterized could be preserved for the benefit of the Debtors' estates—*i.e.*, unsecured creditors would be *pari passu* with Qualcomm and Banco Azteca—the Committee has provided no support for this novel theory, nor has SoftBank identified any.

delegate these decisions to any third party.").

Thus, the Debtors do not believe equitable subordination of the Secured Notes Claims is warranted.  Aside from asserting that SoftBank is an insider, the Committee has failed to establish any other basis for the equitable subordination of the Secured Notes Claims.  As noted above, unsecured creditors only benefitted from the issuance of the Secured Notes. Moreover, none of the holders of Secured Notes Claims received any special advantage or benefit as a result of the loans.  The terms of the Bridge Notes and the Secured Notes were market for loans of their type and included terms intended to make additional financings more "bankable."  The Debtors do not believe that there is a legitimate basis to equitably subordinate the Secured Notes Claims.

### b.    SoftBank's Response

SoftBank also believes that the Committee has not demonstrated that it is likely to succeed on a claim for equitable subordination under section 510(c) of the Bankruptcy Code because the facts and circumstances of this case do not warrant it.  As a threshold matter, SoftBank believes it is telling that the Committee has not identified any misconduct that would justify the subordination of claims of either SoftBank or the other Senior Noteholders.  Instead, the Committee appears to rely upon vague and formulaic allegations of undercapitalization and control.    SoftBank  believes  that  these  allegations  are  insufficient  to  justify  equitable subordination, and courts have held that undercapitalization, on its own, is an insufficient justification for subordination.[~~16~~12]  Finally, SoftBank is of the opinion that the Committee has cited no evidence of inequitable conduct on the part of SoftBank despite have received tens of thousands of pages of documents in these chapter 11 cases, including communications between SoftBank and the other holders of the Secured Notes and after having spent a significant amount of professional fees in these cases.

### 3.    *The* Plan *Contemplates* Releases *for the Prepetition Secured Parties*

### a.    Debtors' Response

**The  Plan  contemplates  releases  for  the  holders  of  the  Prepetition  Secured ~~Creditors~~Parties, as discussed in Section V.E. below.**  As detailed below, the Debtors believe that the releases in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Second Circuit.  The Debtors have determined, in their business judgment, that all of the Released Parties have made substantial and valuable contributions to the Debtors' restructuring (as described more fully herein) through efforts including providing (i) consensual use to cash collateral; (ii) DIP financing; (iii) standstill agreements, amendments, and accommodations with respect to various executory contracts and other arrangements; (iv) consent to the incurrence of additional *pari passu* Interim Funding; (v) the equitization of the Secured Notes Claims, and (vi) the Additional SoftBank Consideration to facilitate  the  Settlement  and  the  funding  of  the  General  Unsecured  Claims  Settlement Distribution.

Accordingly, the holders of Secured Notes Claims are entitled to the benefit of the

---

[~~16~~12] *Matter of Lifschultz Fast Freight*, 132 F.3d 339, 345 (7th Cir. 1997).

releases contained in the Plan. The Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the release and exculpation provisions.

### b.    SoftBank's Response

SoftBank believes that the releases contained in the Plan are entirely consistent with and justified under Second Circuit law, which permits a debtor to release claims in a Plan where doing so is in the best interests of the estate and constitutes a reasonable exercise of the debtor's business judgment.  Since the beginning of these chapter 11 cases, SoftBank (along with certain other of the holders of the Secured Notes Claims) has provided significant consideration to the estates, including funding the Debtors' sales and marketing process with tens of millions of dollars in new-money investments; agreeing to subordinate a portion of its recovery under the DIP Facility to facilitate additional funding by the Plan Sponsor; agreeing to contribute a portion of its recoveries on account of its claims to provide a distribution to unsecured creditors; supporting the Debtors' efforts to prosecute and confirm a plan of reorganization, as opposed to the liquidation of its collateral; committing to further support the Plan process by signing a joinder to the Plan Support Agreement; and consenting to receive equity in the reorganized Debtors rather than a cash payment, which it is entitled to as a secured lender under the Bankruptcy Code.  This is particularly relevant where, as here, the proposed release was a substantial inducement and ongoing condition for SoftBank to execute the Plan Support Agreement and support the Plan, respectively.

Taken alone, SoftBank is of the opinion that any one of the foregoing would be sufficient to justify the proposed release of claims in favor of SoftBank.  But when viewed together, it is clear that SoftBank's contributions to these cases have been substantial and they easily support a finding that the releases are in the best interests of the Debtors' estate and a reasonable exercise of the Debtors' business judgment.

**The Committee disagrees with the Debtors' and SoftBank's characterization of the legal and factual issues described in this Section IV.J and, in this regard, the Committee refers creditors to the Committee Letter.**

## V.    SUMMARY OF THE PLAN

**THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN SUBSTANTIVE PROVISIONS OF THE PLAN, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN.  THE DEBTORS URGE ALL HOLDERS OF CLAIMS AND INTERESTS TO READ AND STUDY CAREFULLY THE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS ANNEX A.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.**

## A.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### 1.    *Unclassified Claims*

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims and DIP Claims are not classified in the Plan.  Such Claims will be satisfied as set forth in the Plan and as summarized herein.

#### a.    Administrative Expense Claims

Except to the extent otherwise expressly provided in the Plan, other than Fee Claims, U.S. Trustee Fee Claims, DIP Claims and Administrative Expense Claims that have already been paid by the Debtors during the chapter 11 cases, and except to the extent that a holder of an Allowed Administrative Expense Claim and the applicable Debtor, with the consent of the Plan Sponsor (such consent to not be unreasonably withheld), Reorganized Debtor or Liquidating Debtor, as applicable, agree to less favorable treatment, each holder of an Allowed Administrative Expense Claim shall be paid 100% of the unpaid Allowed amount of such Claim in Cash by the Reorganized Debtors from the proceeds of the DIP Facility, Cash on hand and/or Cash funded by BidCo on the date that is the later of: (a) the Effective Date; (b) the date such Claim would ordinarily be due and payable in accordance with ordinary business terms; or (c) the date that is fifteen (15) days (or, if such date is not a Business Day, on the next Business Day) after such Claim becomes an Allowed Administrative Expense Claim.

#### b.    U.S. Trustee Fees

All fees payable pursuant to 28 U.S.C. § 1930 on or before the Effective Date, shall be paid in full by the Debtors.  Fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date shall be paid by the Liquidating Debtors until the closing of the applicable case pursuant to section 350(a) of the Bankruptcy Code.

#### c.    Fee Claims

Professionals asserting Fee Claims for services rendered before the Effective Date must file and serve on the Notice Parties and such other Entities as are designated by the order establishing procedures for compensation and reimbursement of expenses of Professionals entered by the Bankruptcy Court an application for final allowance of such Fee Claims no later than 60 days after the Effective Date; provided, however, that any Professional whose compensation or reimbursement of expenses is authorized pursuant to the Ordinary Course Professionals Order may continue to receive such compensation and reimbursement of expenses pursuant to the Ordinary Course Professionals Order.  Objections to any Fee Claim must be filed and served on the Notice Parties and the requesting party not later than 90 days after the Effective Date or such other period of limitation as may be established by a Bankruptcy Court's Order.

Allowed Fee Claims shall be satisfied from the Professional Fee Escrow.  If the amount in the Professional Fee Escrow is insufficient to pay in full of all Allowed Fee Claims, the

deficiency shall be promptly funded by the Reorganized Debtors, without any further action or order of the Bankruptcy Court.

### d.      Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim, each holder of an Allowed Priority Tax Claim, to the extent not previously paid, shall receive, in full and final satisfaction of its Allowed Priority Tax Claim (a) that is due and payable on or before the Effective Date, Cash in an amount equal to the Allowed amount of such Claim, at the option of the Liquidating Debtors and/or the Plan Administrator, (i) on the Effective Date or (ii) in installments over a period of time not to exceed five years after the Petition Date; and (b) that is not due and payable on or before the Effective Date, as it becomes due in the ordinary course; provided, however, that if an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall be treated as an Other Secured Claim.

### e.      DIP Claims

On the Effective Date, except with respect to Interim Funding DIP Claims, each holder of an Allowed DIP Claim shall receive payment in full in cash.  As part of the Settlement set forth in the Plan and described herein, SoftBank shall contribute to BidCo its entitlement to the Cash Distribution on account of SoftBank's Allowed DIP Claims (approximately $91 million before the consideration of accrued interest) in exchange for the issuance of the SoftBank Rollover BidCo Equity.

With respect to the Interim Funding DIP Claims, each holder of an allowed Interim Funding DIP Claim under the DIP Facility shall have such Claims converted into BidCo Equity Interests at the same valuation as the BidCo Equity Consideration.

### 2.      *Classified Claims*

The following table (i) designates the Classes of Claims and Interests for the purposes of voting on the Plan and receiving Distributions thereunder and (ii) specifies which Classes are (a) Impaired and Unimpaired by the Plan and (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (iii) specifies projected recoveries (if any) of all classified Claims and Interests under the Plan.  **Projected recoveries are estimates and actual recoveries may differ based on, among other things, realizable value of the Debtors' remaining assets and the amount of Claims that are actually Allowed.**

| Class | Designation | Voting Status | Treatment | Projected Amount of Claims ($USMM) | Projected Recoveries |
|---|---|---|---|---|---|
| 1 | Secured Notes Claims | Impaired<br><br>Entitled to Vote | On the Effective Date or as soon as practicable thereafter, except to the extent that a holder of an Allowed Secured Notes Claim, and the Debtors, with the consent of the Plan Sponsor, agree to a less favorable treatment, each such holder, in full and final satisfaction, settlement, release and discharge of each Allowed Secured Notes Claim, shall receive its *pro rata* share of the BidCo Equity Consideration for Allowed Secured Notes Claims, and that portion of the Allowed Secured Notes Claims not satisfied with the *pro rata* portion of the BidCo Equity Consideration will be considered as uncollectible accounts, and the obligations of the Debtors thereunder or in any way related thereto will be deemed extinguished and cancelled in full. | $~~1,639.27~~[17]**1,643. 8**[13] | ~~5.92~~**5.9**% |

---

[17]  ~~This calculation excludes amounts "rolled up" from the $1,733,121,856 of Secured Notes outstanding as of the Petition Date.~~

[13]  This calculation excludes amounts "rolled up" from the **$1,733,809,254 40** of Secured Notes outstanding as of the Petition Date.

| Class | Designation | Voting Status | Treatment | Projected Amount of Claims ($USMM) | Projected Recoveries |
|---|---|---|---|---|---|
| 2 | Other Secured Claims | Unimpaired<br><br>Deemed to Accept | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, at the option of the Debtors, with the consent of the Plan Sponsor, or the Reorganized Debtors, as applicable, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Other Secured Claim, as applicable: (i) such holder shall receive Cash in an amount equal to the allowed amount of such Claim on the later of the Effective Date and the date that is ten (10) business days after the date such Other Secured Claim becomes an Allowed Claim; (ii) such holder's Allowed Other Secured Claim shall be Reinstated; (iii) such holder shall receive the collateral securing such Claim and payment of interest required under section 506(b) of the Bankruptcy Code; or (iv) such holder shall receive such other treatment as will render | $0.05 - $0.10 | 100.0% |

| Class | Designation | Voting Status | Treatment | Projected Amount of Claims ($USMM) | Projected Recoveries |
|-------|-------------|---------------|-----------|------------------------------------|----------------------|
| | | | its Allowed Other Secured Claim Unimpaired. | | |
| 3 | Priority Non-Tax Claims | Unimpaired<br><br>Deemed to Accept | Except to the extent that a holder of an allowed Priority Non-Tax Claim against the Debtors agrees to a less favorable treatment of such Claim, at the option of the Debtors, with the consent of the Plan Sponsor: (i) such holder shall receive Cash in an amount equal to the allowed amount of such Priority Non-Tax Claim on the later of the Effective Date and the date that is ten (10) business days after the date such Priority Non-Tax Claim becomes an Allowed Claim; or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. | $0.00 | 100.0% |
| 4 | General Unsecured Claims | Impaired<br><br>Entitled to Vote | Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, on or as | $66.00 - $79.00[14] | 7.6% - 9.1% |

---

[14]  **The projected amount of claims for Class 4 is based on the Debtors' and FTI's review of the scheduled liabilities, filed proofs of claim, and the Debtors' preliminary list of Executory Contracts and Unexpired Leases to be rejected as agreed to by the Plan Sponsor.**

-43-

| Class | Designation | Voting Status | Treatment | Projected Amount of Claims ($USMM) | Projected Recoveries |
|---|---|---|---|---|---|
| | | | soon as is reasonably practicable after the Effective Date, each holder thereof, in exchange for full and final satisfaction shall receive its *pro rata* share of the General Unsecured Claims Settlement Distribution. Each holder of an Allowed General Unsecured Claim that votes to accept the Plan shall also receive an Avoidance Action Release. | | |
| 5 | Ongoing Trade Claims | Impaired Entitled to Vote | Except to the extent that a holder of an Allowed Ongoing Trade Claim agrees to less favorable treatment, on or as soon as is reasonably practicable after the Effective Date, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Ongoing Trade Claim, each holder of a Claim in Class 5 shall receive the following | $0.72 - $0.82[15] | 50.3% - 57.8% |

---

[15]    **The projected amount of claims for Class 5 is based on the list of holders of Ongoing Trade Claims as agreed to by the Debtors and the Plan Sponsor and based on the Debtors' and FTI's review of the scheduled liabilities and filed proofs of claims related thereto.**

| Class | Designation | Voting Status | Treatment | Projected Amount of Claims ($USMM) | Projected Recoveries |
|---|---|---|---|---|---|
| | | | treatment:<br><br>(ii) **If Class 5 votes to accept the Plan**, each holder of an Allowed Ongoing Trade Claim shall receive its *pro rata* share of both the General Unsecured Claims Settlement Distribution and the Ongoing Trade Claims Recovery Pool. For the avoidance of doubt, a vote in favor of the Plan shall constitute an agreement by each holder of an Allowed Ongoing Trade Claim to continue to provide goods and services to the Reorganized Debtors on terms and conditions no less favorable than currently provided.<br><br>(iii) **If Class 5 votes to reject the Plan**, each holder of an Allowed Claim in Class 5 shall receive its *pro rata* share of the General Unsecured Claims Settlement Distribution.<br><br>(iv) Each holder of an Allowed Ongoing Trade Claim that votes to accept the Plan shall also receive an | | |

| Class | Designation | Voting Status | Treatment | Projected Amount of Claims ($USMM) | Projected Recoveries |
|---|---|---|---|---|---|
| | | | Avoidance Action Release. | | |
| 6 | Intercompany Claims | Impaired OR Unimpaired<br><br>Deemed to Reject OR Accept | On the Effective Date, all Intercompany Claims will be adjusted, continued, settled, Reinstated, discharged, or eliminated, as determined by the Debtors with the consent of the Plan Sponsor. For the avoidance of doubt, the treatment provided for in this paragraph shall extend to all Intercompany Claims as between the Debtors (including any Liquidating Debtor) or between any of the Debtors and any of their non-Debtor affiliates. | N/A | 0% to 100% |
| 7 | Intercompany Interests | Impaired OR Unimpaired<br><br>Deemed to Reject OR Accept | On the Effective Date, all Intercompany Interests will be adjusted, continued, settled, Reinstated, discharged, or eliminated, as determined by the Debtors, with the consent of the Plan Sponsor, or the Plan Administrator, as applicable. | N/A | 0% to 100% |

| Class | Designation | Voting Status | Treatment | Projected Amount of Claims ($USMM) | Projected Recoveries |
|-------|-------------|---------------|-----------|-----------------------------------|---------------------|
| 8 | Section 510(b) Claims | Impaired<br><br>Deemed to Reject | On the Effective Date, all section 510(b) Claims shall be discharged without any Distribution. | $0.00 | 0.0% |
| 9 | OneWeb Interests | Impaired<br><br>Deemed to Reject | On the Effective Date, all OneWeb Interests shall be deemed cancelled and extinguished and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no Distribution under the Plan to the holders of OneWeb Interests on account of such Interests. | N/A | 0.0% |

## B.    MEANS OF IMPLEMENTATION

### 1.    *Deemed Consolidation*

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor.  Solely for purposes of voting on, and receiving Distributions under, the Plan, the Estates are deemed to be substantively consolidated, *i.e.*, (a) all assets and liabilities of the Debtors are deemed to be assets and liabilities, respectively, of a single Estate; (b) all guarantees by one Debtor of the obligations of any other Debtor are deemed eliminated, (iii) any joint or several liability of any of the Debtors are deemed to be one obligation of the Debtors; and (d) Proofs of Claim filed against multiple Debtors are deemed to be one Claim against a single Estate.  This deemed consolidation will not affect (x) the legal and corporate structures of the Debtors; (y) the rights of the holders of Allowed Claims to receive Distributions from any insurance policies or proceeds of such policies; (z) any Liens granted or arising at any time prior to the Effective Date or the priority of those Liens; or (iv) the rights of the Debtors to contest alleged setoff or recoupment rights on the grounds of lack of mutuality under section 553 of the Bankruptcy Code and other applicable law.

This deemed consolidation is appropriate and justified under the circumstances of these chapter 11 cases because it (i) causes no harm to the Debtors' creditors because (a) the DIP Claims may be asserted against each Debtor, (b) the holders of Secured Notes Claims have Secured Claims against the majority of the Debtors, and (c) the DIP Claims and Secured Notes Claims exceed the value of the assets of each Debtor, and (ii) avoids the costs of allocating consideration and litigation-related costs among the Debtors' Estates, thereby avoiding diluting creditor recoveries as a result of increased professional fees, particularly given there has been no allocation of the consideration to be provided by BidCo amongst the various Debtors and their assets.  Indeed, the Liquidation Analysis demonstrates that, in a liquidation, even the DIP Claims would be massively undersecured, and no junior creditor would be entitled to any recovery. Therefore, all Distributions on account of Claims other than the DIP Claims are carved out from the collateral of the DIP Lenders, and in the absence of such carve-out and the deemed consolidation of the Debtors' Estates, such Claims would receive no recovery.

### 2.    *Comprehensive Settlement*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration of the Distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases set forth in Section XI.E of the Plan, shall constitute a good-faith compromise and settlement of all Claims, Interests, disputes and controversies relating to the rights of holders of Claims and Interests, including with respect to the claims asserted in the Standing Motion in exchange for, among other things, the Additional SoftBank Consideration and the reduction of BidCo Equity Consideration to be distributed to the holders of Senior Secured Claims which is facilitating the cash funding of the General Unsecured Claims Settlement Distribution (the "Settlement").

The Debtors believe that the Settlement will comply with the requirements that courts in the Second Circuit demand in determining whether a settlement is within the range of reasonableness.¹⁶  First, the Debtors are of the opinion that the possibility of success of the Committee's Challenge is extremely low for the reasons set forth in ~~section~~**Section** IV.J.

Second, the Debtors believe that the likelihood of complex and protracted litigation and the expense and delay associated with litigation will weigh in favor of the Settlement.  The Debtors believe that, even if the Committee were successful in pursuing its claims against the

---

¹⁶ *In re NII Holdings*, 536 B.R. 61, 100 (Bankr. S.D.N.Y. 2015) ("When courts in this Circuit consider whether a settlement is within the range of reasonableness, they apply the following factors:
   (1) the balance between the litigation's possibility of success and the settlement's future benefits;
   (2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay;
   (3) the paramount interests of creditors;
   (4) whether other parties in interest support the settlement;
   (5) the nature and breadth of releases to be obtained by officers and directors;
   (6) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement; and
   (7) the extent to which the settlement is the product of arm's-length bargaining.")
(citing, *In re Iridium Operating LLC*, 478 F.3d 452, 462 (2d Cir. 2007)).

Prepetition Secured Parties, any benefit to the Estates would almost certainly be drastically offset by the expense of pursuing protracted litigation.

Third, the paramount interest of creditors is to achieve confirmation of the Plan which offers the Debtors a chance to survive as a going concern, preserving employees' jobs and maintaining prepetition vendor relationships (not to mention hundreds of millions of dollars of cure payments made and hundreds of contracts assumed).

Fourth, the Debtors, the Plan Sponsor, and SoftBank~~,~~ support the Settlement as an efficient means to achieve the Debtors' successful reorganization.

Fifth, the Debtors believe that the releases to be obtained by the Officers and Directors are similar to those in other large, complex, chapter 11 cases and as detailed herein and will be demonstrated at the Confirmation Hearing are justified and appropriate under the facts of these cases.

The Debtors believe the sixth *Iridium* factor is neutral.

The Debtors believe the last *Iridium* factor will weigh heavily in favor of the Settlement because the Settlement was the result of arm's length bargaining among the Debtors, the Plan Sponsor, and SoftBank.  None of the Prepetition Secured Parties or DIP Secured Parties independently controls the Debtors or the Debtors' management.

Thus, the Debtors believe, in their business judgment, that the Settlement is reasonable and in the best interests of the Debtors' Estates and will maximize and preserve the going-concern value of the Debtors for all parties in interest.  Based on the foregoing, the Debtors believe that they will be able to demonstrate at the Confirmation Hearing that the Settlement is far above the lowest possible point of reasonableness.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of such compromise and settlement and the Bankruptcy Court's determination that such compromise and settlement is in the best interests of the Debtors, their Estates, their creditors, and all other parties in interest, and is fair, equitable and within the range of reasonableness.  If **Confirmation of the Plan and/or** the Effective Date ~~does~~**do** not occur, the settlements set forth in the Plan shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

Subject to Section VII, all Distributions Made to Holders of Allowed Claims and Interests in any Class are Intended to be and ~~Shall~~**shall** be Final.

### 3.    *Sources of Consideration for Plan Distributions*

Prior to the Effective Date, the Plan Sponsor will be capitalized with cash and commitments sufficient to satisfy the Additional Cash Plan Funding. The Reorganized Debtors shall fund Distributions under the Plan from the proceeds of the (i) DIP Facility including the Interim Funding, (ii) Cash Consideration, (iii) Additional Cash Plan Funding and Cash funded by BidCo to fund (iv) the Ongoing Trade Claims Recovery Pool and (v) as the result of the

Settlement to fund the General Unsecured Claims Settlement Distribution, and (vi) BidCo Equity Consideration.

### a.      Cash Consideration

On the Effective Date, the Plan Sponsor shall pay the Cash Consideration (less the amount of the Deposit) to the Debtors by wire transfer of immediately available funds to an account or accounts designated in writing by the Debtors before the Effective Date. The Cash Consideration shall be used to pay Allowed DIP Claims (other than the Interim Funding DIP Claims, as set forth above), but subject to the Settlement, as well as other claims to be satisfied in cash hereunder.

### b.      Additional Cash Plan Funding

On and following the Effective Date, the Plan Sponsor will provide the Reorganized Debtors with the Additional Cash Plan Funding to fund, as and when due: (i) all Allowed Cure Claims; (ii) all Allowed Administrative Expense Claims, including the Wind-Down Reserve (but excluding Allowed Cure Claims), all Allowed Priority Tax Claims, all Allowed Other Secured Claims required to receive cash payment, and all Allowed Priority Non-Tax Claims required to receive Cash payment, up to an aggregate maximum of $25.9 million (it being agreed that such aggregate maximum excludes any amounts used to satisfy Allowed Administrative Expense Claims that are paid with the Cash Consideration or the Interim Funding) or such greater amount as the Plan Sponsor agrees in its sole discretion; and (iii) the Reorganized Debtors' business going forward.

### c.      Ongoing Trade Claims Recovery Pool

On the Effective Date, provided that Class 5 votes to accept the Plan, Cash in **the** amount of ~~up to~~ $350,000 shall be funded by BidCo by wire transfer in immediately available funds to an account or accounts designated in writing by the Debtors before the Effective Date to fund the Ongoing Trade Claims Recovery Pool.  For the avoidance of doubt, the Ongoing Trade Claims Recovery Pool shall be funded from the Additional SoftBank Consideration and shall not be included in the calculation of, or subject to the Effective Date Cash Funding Cap.

### d.      General Unsecured Claims Settlement Distribution

On the Effective Date, cash in the amount of $6.1 million shall be funded by BidCo by wire transfer in immediately available funds to an account or accounts designated in writing by the Debtors before the Effective Date to fund the General Unsecured Claims Settlement Distribution. For the avoidance of doubt, the General Unsecured Claims Settlement Distribution shall be funded from the Additional SoftBank Consideration and shall not be included in the calculation of, or subject to, the Effective Date Cash Funding Cap.

**4.** ~~3.~~ *Issuance of the New Equity Interests, BidCo Equity Interests, and SoftBank Rollover BidCo Equity*

On the Effective Date, the Plan Sponsor shall be issued one hundred percent (100%) of the New Equity Interests in Reorganized Company Party in exchange for the consideration set forth herein ~~and~~**, SoftBank shall receive the SoftBank Rollover BidCo Equity,** each holder of an Allowed Secured Notes Claim shall receive its *pro rata* share of the BidCo Equity Consideration, and that portion of the Allowed Secured Notes Claims not satisfied with the *pro rata* portion of the BidCo Equity Consideration will be considered as uncollectible accounts, and the obligations of the Debtors thereunder or in any way related thereto will be deemed extinguished and cancelled in full.

### a.    New Equity Interests

The offering, issuance, and distribution of the New Equity Interests shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities pursuant to section 4(a)(2) of the Securities Act; provided that, to the extent that such exemption is unavailable, such securities shall be issued pursuant to any other available exemptions from registration.  With respect to the New Equity Interests issued pursuant to section 4(a)(2) of the Securities Act and Regulation D thereunder, such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.  The ability to transfer New Equity Interests will be subject to any restrictions in any applicable securities laws as well as any restrictions in the Reorganized Debtors' Amended Organizational Documents or BidCo's organizational documents, as applicable.   On the Effective Date, the New Equity Interests shall not be registered under the Securities Act, and shall not be listed for public trading on any securities exchange.

### b.    BidCo Equity Interests

Except as otherwise set forth herein, the offering, issuance, and distribution of the BidCo Equity Interests (including the SoftBank Rollover BidCo Equity) shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities in accordance with section 1145 of the Bankruptcy Code, provided that, to the extent that such exemption is unavailable, such securities shall be issued pursuant to any other available exemptions from registration. In addition, under section 1145 of the Bankruptcy Code, such BidCo Equity Consideration and the SoftBank Rollover BidCo Equity will be freely tradable in the U.S. by the recipients thereof, subject to the provisions of (i) section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, (ii) compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments, and (iii) any restrictions in the Reorganized Debtors' Amended Organizational Documents or BidCo's organizational documents, as applicable. On the Effective Date, the BidCo Equity Consideration and the SoftBank Rollover BidCo Equity shall not be registered under the Securities Act, and shall not be listed for public trading on any securities

exchange.

### c. Authorization, Issuance and Delivery of the New Equity Interests

On the Effective Date, the Reorganized Company Party shall be authorized to issue or cause to be issued and deliver to the Plan Sponsor the New Equity Interests in accordance with the terms of the Amended Organizational Documents without the need for any further corporate or shareholder action subject to Section IV.V of the Plan. The New Equity Interests, when so issued and delivered, shall be duly authorized, validly issued, fully paid and non-assessable.

### d. Authorization, Issuance and Delivery of the BidCo Equity Consideration to Class 1

On the Effective Date, BidCo shall issue or cause to be issued and distributed to holders of Allowed Secured Notes Claims pursuant to Section II.C.1 of the Plan the BidCo Equity Consideration without the need for any further corporate or shareholder action provided that BidCo shall take such actions as may be required under English Law to effectuate the foregoing. The BidCo Equity Consideration when so issued and distributed, shall be duly authorized, validly issued, fully paid and non-assessable. Effective as of the Effective Date, such holders will be subject to transfer restrictions and, in addition to statutory protections for minority shareholders, will receive preemptive rights to purchase ordinary shares of BidCo on a *pro rata* basis in respect of their existing ownership percentage in BidCo in the event of a new issuance of ordinary shares by BidCo, subject to customary exceptions.

### 5. ~~4. UK~~ *Restructuring Steps Under UK Corporate Law*

The Transaction contemplated in the Plan shall be effectuated through certain steps and provisions set forth on __Exhibit 1__ thereto, or such other steps and provisions as may be agreed to by the Debtors and the Plan Sponsor.

The Debtors and the Plan Sponsor agree that OWC will be the Reorganized Company Party and will implement the transactions contemplated by the Plan. The Debtors and the Plan Sponsor do not believe that it is legally necessary to implement an English Law Scheme of Arrangement (or any alternative process) to effect the acquisition of the New Equity Interests in compliance with English Law.

### 6. ~~5.~~ *The Liquidating Debtors*

In order to transfer the Excluded Assets to the Liquidating Debtors, the Debtors may implement one or more restructuring steps to effectuate such transfers, which such steps shall be set for on a schedule to be filed with the Plan Supplement. The Liquidating Debtors shall continue to exist after the Effective Date for the purposes of making Distributions to the holders of Allowed Claims under the Plan other than those Claims to be satisfied by the Reorganized Debtors and to take any other steps in furtherance thereof or as may be reasonably necessary or appropriate to wind-down the affairs of their Estates. The principal purposes of the Liquidating Debtors shall be to liquidate, collect and maximize the Cash value of the Excluded Assets, which shall be transferred to the Liquidating Debtors on, or immediately prior to, the Effective Date and

make Distributions in respect of Allowed Claims in accordance with the terms of the Plan. The Plan Administrator shall be authorized to merge, consolidate, or dissolve any of the Liquidating Debtors, as the Plan Administrator deems appropriate.

### 7.  6. *Plan Administrator*

On the Effective Date, the Plan Administrator shall be appointed for the purpose of (and shall have the authority to) (i) conducting the wind down of the Estates of the Liquidating Debtors as expeditiously as reasonably possible; (ii) administering the liquidation or dissolution of the Liquidating Debtors and their Estates; (iii) selling, abandoning (or effecting a similar disposition) of the Excluded Assets; (iv) making Distributions to the holders of Allowed Claims in accordance with the Plan; (v) except to the extent Claims have been previously Allowed, conducting the Claims reconciliation process, including objecting to, seeking to subordinate, compromise or settle any and all Disputed Claims; (vi) retaining professionals to assist in performing its duties under the Plan; (vii) maintaining the books, records, and accounts of the Liquidating Debtors; (viii) completing and filing, as necessary, all final or otherwise required federal, state, local and foreign tax returns for the Liquidating Debtors; (ix) creating and funding reserves provided for in the Plan; (x) investing Cash of the Liquidating Debtors, including any Cash proceeds realized from the liquidation of the Excluded Assets, if any; (xi) obtaining commercially reasonable liability, errors and omissions, directors and officers, or other insurance coverage as the Plan Administrator deems necessary and appropriate; (xii) performing other duties and functions that are consistent with the implementation of the Plan; (xiii) filing the final monthly operating report (for the month in which the Effective Date occurs) and all subsequent quarterly reports, and (xiv) cooperating with the Plan Sponsor in any way necessary to fully effectuate the purposes and the benefit of the bargain of the Transaction; provided, that the Liquidating Debtors and the Plan Administrator shall not take any actions that could reasonably be expected to prejudice or would otherwise be adverse to the Reorganized Debtors.

The Plan Administrator shall act for the Liquidating Debtors in the same capacity and shall have the same rights and powers as are applicable to a manager, managing member, board of managers, board of directors or equivalent governing body, as applicable, and to officers, subject to the provisions hereof (and all certificates of formation and limited liability company agreements and certificates of incorporation or by-laws, or equivalent governing documents and all other related documents (including membership agreements, stockholders agreements or other similar instruments), as applicable, are deemed amended pursuant to the Plan to permit and authorize the same).

From and after the Effective Date, the Plan Administrator shall be the sole representative of and shall act for the Liquidating Debtors with the authority set forth in Section IV of the Plan and in the Plan Supplement.

Each of the Liquidating Debtors shall indemnify and hold harmless the Plan Administrator solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's fraud, gross negligence, willful misconduct, or criminal conduct.

### 8. 7. *The Wind Down*

On and after the Effective Date, the Plan Sponsor shall fund the Wind-Down Reserve and the Liquidating Debtors and the Plan Administrator shall be authorized to implement the Plan and shall have the power and authority to take any reasonable action necessary to implement the wind down of the Estates.

The activities and operations of the Liquidating Debtors and the Plan Administrator are**shall be** funded from the Wind-Down Reserve. Upon the closing of the chapter 11 cases and the dissolution of the Liquidating Debtors, or such earlier time as it appears, in the reasonable view of the Plan Administrator, that the Wind-Down Reserve is overfunded, the Plan Administrator shall make any excess funds available for Distribution and funding of the other reserves and Distributions in accordance with the terms of the Plan.

Except to the extent necessary to (i) complete the wind down and (ii) effectuate the Transaction, from and after the Effective Date, the Liquidating Debtors (a) for all purposes, shall be deemed to have withdrawn the Debtors' business operations from any state or province or foreign jurisdiction in which the Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action to effectuate such withdrawal and (b) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date; provided, that the above shall not preclude the Plan Administrator from taking any action necessary to dissolve or wind down any Liquidating Debtor pursuant to any dissolution, winding down or similar proceeding.

### 9. 8. *Continued Corporate Existence*

Except as otherwise provided in the Plan, the Reorganized Debtors and the Liquidating Debtors shall continue to exist after the Effective Date. At any time after the Effective Date, each Liquidating Debtor or Reorganized Debtor, in its sole and exclusive discretion, may take such action as permitted by applicable law as such Liquidating Debtor or Reorganized Debtor may determine is reasonable and appropriate, including, but not limited to, (i) merging into another Liquidating Debtor or Reorganized Debtor, or a Subsidiary and/or Affiliate of the foregoing, (ii) causing a Liquidating Debtor or Reorganized Debtor to be liquidated and/or dissolved, (iii) changing the legal name of a Liquidating Debtor or Reorganized Debtor, (iv) converting a Liquidating Debtor or Reorganized Debtor to another form of Entity, including from a corporation to a limited liability company, or (v) closing a Liquidating Debtor's or Reorganized Debtor's chapter 11 case.

### 10. 9. *Disbursing Agent*

The Debtors, the Reorganized Debtors and the Liquidating Debtors, as applicable, shall designate one or more Entities (which may be the Reorganized Debtors in the case of the Reorganized Debtors and the Plan Administrator in the case of the Liquidating Debtors) to effectuate the Distributions. If the Disbursing Agent is a third party, the reasonable fees and expenses of the Disbursing Agent shall be paid by the Liquidating Debtors upon submission of statements. The payment of the reasonable fees and expenses of the Disbursing Agent shall be

made in the ordinary course of business without any further notice to any party or action, order or approval of the Bankruptcy Court. The Disbursing Agent shall be deemed exculpated and indemnified by the Estates, except for fraud, *ultra vires* actions, willful misconduct, criminal conduct or gross negligence.

### 11.    ~~10.~~ *New Board of Directors/Officers*

The member(s) of the boards of directors and the officers of the Reorganized Debtors and the Liquidating Debtors will be identified in the Plan Supplement. The Reorganized Debtors and the Liquidating Debtors shall purchase an insurance policy (including any "tail policy") for the Reorganized Debtors' and Liquidating Debtors', as applicable, directors and officers that is acceptable to the Reorganized Debtors and Liquidating Debtors, as applicable. For the avoidance of doubt, the Debtors may extend any or obtain new insurance policies during the chapter 11 cases without the consent of the Plan Sponsor for any period prior to consummation of the Transaction subject to Section IV.~~U~~**T** of the Plan.

On the Effective Date, all persons acting as directors, and/or managers of the Debtors that have not been selected as directors and/or managers of the Reorganized Debtors or the Liquidating Debtors shall be deemed to have resigned, their appointments shall be rescinded for all purposes, and their respective authority and power, in their capacities as such, shall be revoked, in each case, without the necessity of taking any further action in connection therewith subject to Section IV.~~U~~**T** of the Plan**.**

### 12.    ~~11.~~ *Survival of Indemnification Obligations and D&O Liability Insurance*

#### a.    **Indemnification Obligations**.

Each of the Debtors' Indemnification Obligations shall be reinstated, assumed by the Reorganized Debtors and ~~the Liquidating Debtors, as applicable, and~~ remain intact and irrevocable, as applicable, and shall not be discharged, impaired, or otherwise affected by the Plan.

#### b.    **D&O Liability Insurance Policies**.

The D&O Liability Insurance Policies shall be deemed executory contracts and shall be assumed by the Reorganized Debtors ~~or Liquidating Debtors, as applicable~~, on behalf of the ~~applicable Debtor~~**Debtors** effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code. For the avoidance of doubt, coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in the D&O Liability Insurance Policies. In addition, after the Effective Date, all officers, directors, agents or employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies (including any "tail" policy) in effect or purchased as of the Effective Date for the full term of such policy regardless of whether such officers, directors, agents and/or employees remain in such positions after the Effective Date, in each case, to the extent such individuals are covered under the D&O Liability Insurance Policies.

### 13.    12. *Employee Matters*

On the Effective Date, all Current Employees of the Reorganized Debtors shall be retained by the Reorganized Debtors in their existing positions. Each Benefit Plan and all other wage, compensation, employee expense reimbursement, and other benefit obligations solely relating to the Current Employees, including without limitation the KEIP and the KERP, shall be assumed by the Reorganized Debtors as of the Effective Date.

For the avoidance of doubt, (i) neither the KEIP nor the KERP shall be included on the Rejection Schedule and such programs will be honored in accordance with their terms, (ii) the consummation of the Plan will constitute a "Sale" under the KEIP and [(iii) any Benefit Plan included on the Rejection Schedule shall be replaced by a comparable Benefit Plan that is no less favorable to Current Employees for the benefit of the Current Employees.][19]

**The 2018 Equity Incentive Plan of OneWeb Global Limited, the Consultant Equity Incentive Plan of OneWeb Global Limited and any predecessor plans thereof (the "Liquidated Incentive Plans") shall remain with the Liquidating Debtors and wound down by the Plan Administrator. Notwithstanding the foregoing, none of the Plan Sponsor, the Debtors, the Reorganized Debtors or their subsidiaries shall have any payment or other obligation under the Liquidated Incentive Plans or any Awards (as defined therein) issued thereunder upon or following the Effective Date, regardless of whether such Awards or obligations were issued or incurred before or after the Petition Date.**

Without limiting or altering any employee's rights under the KEIP or the KERP, execution of the Plan Support Agreement and consummation of the Plan will not constitute a change of control under any other Benefit Plan.

### 14.    13. *Retained Causes of Action*

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain the Retained Causes of Action that the Debtors or the Estates may hold against any Entity to the extent included on the Retained Causes of Action Schedule and not released under Section XI.E of the Plan or otherwise, including the Avoidance Actions (and all Privilege Rights with respect to any of the foregoing) and may, in their sole discretion, pursue or settle any such Retained Causes of Action, as appropriate, in accordance with the best interests of the Estates. The Retained Causes of Action Schedule shall be included as part of the Plan Supplement. The inclusion or failure to include any Retained Cause of Action in the Plan Supplement shall not be deemed an admission, denial or waiver of any claims, rights or causes of action that any Reorganized Debtor may hold against any Entity. For the avoidance of doubt, the Retained Causes of Action shall not include any claims or Causes of Action against any Released Party or any Avoidance Action released against a holder of a General Unsecured Claim or Ongoing Trade Claim in accordance with Sections II.C.4.b. and II.C.5.b. of the Plan.

---

[19]    [NTD—subject to certain continuing discussion]

On the Effective Date, the applicable Reorganized Debtors shall be deemed to be substituted as a party to any Retained Causes of Action litigation in which any Debtor is a party, including (but not limited to):  (a) pending contested matters or adversary proceedings in the Bankruptcy Court; (b) any appeals of orders of the Bankruptcy Court; and (c) any state court or federal or state administrative proceedings pending as of the Petition Date.  The Reorganized Debtors are not required to, but may, take such steps as are appropriate to provide notice of such substitution.

### 15.  14. *Release of Avoidance Actions for Holders of Claims in Class 4 and Class 5*

On the Effective Date, in connection with the Distributions to the holders of Allowed General Unsecured Claims in accordance with Section II.C of the Plan, the Debtors and the Reorganized Debtors shall grant each holder of an Allowed General Unsecured Claim that individually votes to accept the Plan an Avoidance Action Release.  Also, on the Effective Date, in connection with the Distributions to holders of Allowed Ongoing Trade Claims in accordance with Section II.C of the Plan, the Debtors and the Reorganized Debtors shall grant each holder of an Allowed Ongoing Trade Claim that individually votes to accept the Plan an Avoidance Action Release.

### 16.    ~~15.~~ Cancellation and Surrender of Notes, Instruments, Securities and Other Documentation

Except as provided in the Plan Support Agreement, or as otherwise agreed to by the Plan Sponsor, on the Effective Date, all notes, instruments, certificates and other documents evidencing Claims or Interests, that are not otherwise being satisfied by the *pro rata* portion of the BidCo Equity Consideration (collectively, the "Cancelled Agreements") shall be deemed cancelled and will be considered uncollectible accounts and surrendered and of no further force and effect against the Debtors, the Reorganized Debtors or the Liquidating Debtors without any further action on the part of the Debtors, the Reorganized Debtors or the Liquidating Debtors; provided, however, that each of the Cancelled Agreements shall continue in effect solely for the purposes of, (x) allowing holders of Claims or Interests to receive distributions under the Plan on account of such Claims or Interests and (y) allowing and preserving the rights of the DIP Agent and Secured Notes Agent, as applicable, to (1) make distributions on account of such Claims or Interests; (2) maintain, enforce, and exercise their respective Liens, including their charging liens, as applicable, under the terms of the applicable agreements, or any related or ancillary document, instrument, agreement, or principle of law, against any money or property distributed or allocable on account of such Claims under the Plan, as applicable; (3) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in connection with the implementation of the Plan; (4) maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement that the DIP Agent or Secured Notes Agent may have under the applicable credit agreement, note purchase agreement, collateral agreements, or pledge agreements, in each case solely as against the holders of the Secured Notes Claims; (5) appear and raise issues in these chapter 11 cases or in any proceeding in the Bankruptcy Court or any other court after the Effective Date on matters relating to the Plan or the applicable credit agreements or note purchase agreement; and (6) execute documents pursuant to Section IV.V of the Plan; provided, further, that the DIP Agent and Secured Notes Agent may take such further action to implement the terms of the Plan as agreed to with the Debtors or the Reorganized Debtors, as applicable, to the extent not inconsistent with the Confirmation Order or the Plan.  Nothing herein shall affect the discharge pursuant to section 1141 of the Bankruptcy Code.

### 17.    ~~16.~~ Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan or the Transaction, on the Effective Date, subject to receipt of the applicable Distributions, if applicable, all Liens on the property of any Estate, including the New Equity Interests, shall be fully released and discharged.

The DIP Agent and the Secured Notes Agent shall execute and deliver all documents reasonably requested by the Debtors or the Reorganized Debtors to evidence the release of such Liens and shall authorize the Reorganized Debtors and their designees to file UCC-3 termination statements and other release documentation (to the extent applicable) with respect thereto, at the sole expense of the Debtors or the Reorganized Debtors, as applicable.

### 18.    17. *Effectuating Documents; Further Transactions*

Following entry of the Confirmation Order, but subject to the occurrence of the Effective Date, and subject to any consents of the Plan Sponsor required by the Plan Support Agreement, in each instance, the Reorganized Debtors and the Liquidating Debtors, as applicable, shall take all actions as may be necessary or appropriate to effectuate, implement and evidence the terms and conditions of the Plan and the restructuring Transaction contemplated thereby, including (i) implementation of any restructuring steps; (ii) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, cancellation, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, (iii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, (iv) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, cancellation, or dissolution pursuant to applicable foreign, state, territorial, provincial, or federal law, (v) the issuance of securities in accordance with the Plan, all of which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule, (vi) taking necessary steps under applicable local law to effectuate the Plan; and (vii) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law or the Plan Support Agreement and the term sheet annexed thereto, as applicable, to fully effectuate the Plan.

Each officer, legal representative or member of the board of directors of the Debtors is authorized to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Plan Documents and the securities issued pursuant to the Plan in the name of and on behalf of the Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including any action by the directors or managers of the Debtors) except for those expressly required pursuant to the Plan.

Each officer, legal representative or member of the board of directors of the Reorganized Debtors is authorized to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the Plan Documents and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including any action by the directors or managers of the Debtors) except for those expressly required pursuant to the Plan.

Unless otherwise agreed to by the Debtors and the Plan Sponsor, all matters provided for in the Plan involving the corporate structure of the Debtors or Reorganized Debtors, or any

corporate, limited liability company, or related action required by the Debtors or Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect as of the Effective Date, without any requirement of further action by the stockholders, members, board, or directors of the Debtors or Reorganized Debtors, and with like effect as though such action had been taken unanimously by the stockholders, members, directors, or officers, as applicable, of the Debtors or Reorganized Debtors.

### 19. 18. *Amended Organizational Documents*

On or prior to the Effective Date, the Amended Organizational Documents shall be filed with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation or organization, if necessary under the corporate laws of the respective states, provinces, or countries of incorporation or organization, in accordance with such corporate laws as determined by the Plan Sponsor and the Reorganized Debtors.  The Amended Organizational Documents shall prohibit the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, the Amended Organizational Documents may be amended and restated as permitted by such documents and the laws of their respective states, provinces, or countries of incorporation or organization.

### 20. 19. *FCC Communications Consents*

No provision in the Plan relieves any Debtor or Reorganized Debtor from its obligation to comply with the Communications Act of 1934, as amended, and the rules, regulations and orders promulgated thereunder by the FCC.  No transfer of any FCC license or authorization held by any Debtor or transfer of control of an FCC licensee controlled by any Debtor shall take place prior to the issuance of any necessary FCC Communications Consents for such transfer pursuant to applicable FCC regulations.  The FCC's rights and powers to take any action pursuant to its regulatory authority, including but not limited to imposing any regulatory conditions on any of the above-described transfers, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority to the extent provided by law.

### 21. 20. *Section 1146 Exemptions from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by the Plan; or (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including, without limitation: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; or

(d) assignments executed in connection with any transaction occurring under or pursuant to the Plan.

### C.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

#### 1.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

As of and subject to the occurrence of the Effective Date, all Executory Contracts and Unexpired Leases shall be deemed assumed, together with all amendments agreed to in writing between the Debtor(s) and the Executory Contract or Unexpired Lease counterparty and consented to by the Plan Sponsor, unless such Executory Contract or Unexpired Lease (i) was previously assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (ii) is listed on the Rejection Schedule or (iii) is the subject of a separate motion filed by a Debtor for assumption or rejection under section 365 of the Bankruptcy Code.

The Debtors or Reorganized Debtors, as applicable, shall use reasonable best efforts to obtain all necessary consents required under any Executory Contract or Unexpired Lease assumed as a result of the Transactions.  To the extent the foregoing shall require any action by any Debtor that would, or would continue to, have an adverse effect on the business of the Plan Sponsor or any of its Affiliates after the Effective Date, such action shall require the prior written consent of the Plan Sponsor. These reasonable best efforts shall not require any material payment or other material consideration from the Debtors or the Plan Sponsor (other than the payment of the Cure Claims, by the Plan Sponsor), or any action reasonably likely to delay the Debtors' emergence from these chapter 11 cases, and any such consent shall contain terms and conditions reasonably acceptable to the Debtors and the Plan Sponsor. For the avoidance of doubt, the term "material" in the prior sentence means material in the context of the relevant assumed Executory Contract or Unexpired Lease.

#### 2.    *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by a Bankruptcy Court's order, any Proof of Claim arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan must be filed with the Claims and Noticing Agent by the Rejection Damages Deadline.  Any Claim arising from the rejection of an Executory Contract or Unexpired Lease, with respect to which no Proof of Claim is timely filed, shall be automatically disallowed without the need for any objection or further notice to or action or approval of the Bankruptcy Court.

Holders of Claims arising from the rejection of Executory Contracts or Unexpired Leases with respect to which no Proof of Claim is timely filed shall be forever barred, estopped, and enjoined from asserting a Claim based on such rejection against the Debtors, the Reorganized Debtors, the Liquidating Debtors, the Estates or the respective property of any of the foregoing, and such Claims shall be discharged as of the Effective Date unless otherwise expressly allowed by the Bankruptcy Court.

The Liquidating Debtors and/or Plan Administrator shall have the right to object to, settle, compromise or otherwise resolve any Claim asserted on account of a rejected Executory Contract or Unexpired Lease.

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of the obligations owed by the counterparty to the applicable Debtor(s) under such Executory Contracts or Unexpired Leases.  Notwithstanding any applicable non-bankruptcy law to the contrary, the Liquidating Debtors and the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnifications or continued maintenance obligations from the counterparties to the rejected Executory Contracts or Unexpired Leases.

### 3.    *Cure Claims*

Any Cure Claims under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, by the Reorganized Debtors or the Plan Sponsor, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Debtors' Estates or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall be satisfied following the entry of a Final Order or Orders resolving the dispute and approving the assumption.  Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Claims whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment. **Any liabilities reflected in the Schedules with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

For the avoidance of doubt, the Debtors served the First and Second Cure Notices to applicable counterparties to the Executory Contracts and Unexpired Leases listed on Schedule I attached to the respective notice.  Pursuant to the First and Second Cure Notices, the deadline to file an objection to the proposed assumption of any Executory Contract or Unexpired Lease, including any objection relating to a Cure Claim, other than an objection based solely on the adequate assurance of future performance under such Executory Contract or Unexpired Lease was fourteen days following service of the applicable notice. Prior to the expiration of the First Cure Notice's objection deadline, the Debtors received twenty-five (25) objections asserting Cure Claims [Docket Nos. 250, 254, 256, 259-263, 265, 267-271, 274, 284, 286, 288, 296, 297, 303, 311, 312, 319 and 321].  After the expiration of the objection deadline of the First Cure Notice the Debtors received one objection asserting a Cure Claim [Docket No. 360].  The

Debtors received an amended objection asserting Cure Claims after the expiration of the objection deadline to the First Cure Notice [Docket No. 505]. Prior to the expiration of the objection deadline of the Second Cure Notice, the Debtors received one more objection asserting a Cure Claim [Docket No. 377]. Furthermore, five parties filed timely objections regarding the First and Second Cure Notices requesting additional adequate assurance [Docket Nos. 258, 267, 268, 297 and 377].

With respect to Executory Contracts or Unexpired Leases for which no objection was filed or for which no informal comments were received, the amount of the applicable Cure Claim set forth in the First and Second Cure Notices, as applicable is now binding. Upon entry of the Plan Support Agreement Order, all of the objections in connection with the First Cure Notice and the Second Cure Notice not previously consensually resolved were adjourned to the Confirmation Hearing or such other hearing date and time scheduled by the Debtors or Reorganized Debtors with the Bankruptcy Court.

Unless otherwise provided by an order of the Bankruptcy Court, at least seven (7) calendar days before the Voting Deadline, the Debtors shall cause notice of any proposed assumption to the extent of any proposed Cure Claim regarding any Executory Contracts and Unexpired Leases not reflected in the First and Second Cure Notices or otherwise not previously noticed to be sent to the applicable counterparties. Such notice shall contain the proposed Cure Claim and the deadline by which the counterparty may dispute the proposed Cure Claim. Any objection by such newly noticed counterparty must be filed and served on the Debtors no later than the deadline for objecting to Confirmation of the Plan. Any counterparty to an Executory Contract or Unexpired Lease that previously failed or fails to timely object to the proposed assumption or cure amount will be deemed to have assented to such assumption and Cure Claim. Notwithstanding the foregoing, except to the extent an Executory Contract or Unexpired Lease is set forth on the Rejection Schedule, all Executory Contracts and Unexpired Leases shall be assumed by the Reorganized Debtors on the Effective Date.

To the extent the Debtors or the Reorganized Debtors, as applicable, and the objecting counterparty cannot resolve their dispute consensually, the Bankruptcy Court shall retain jurisdiction to resolve such dispute. Upon the Bankruptcy Court's resolution of the dispute, the Plan Sponsor shall have three (3) business days to determine whether it wishes to assume the applicable Executory Contract or Unexpired Lease. If the Plan Sponsor determines not to assume the applicable Executory Contract or Unexpired Lease, it shall direct the applicable Reorganized Debtor to reject same, and such Executory Contract or Unexpired Lease shall be deemed rejected under the Plan as of the Effective Date, and all procedures set forth in ~~section~~**Section** VI.B of the Plan shall apply.

**4.      *Reservation of Rights***

Neither the listing of any contract or lease on the Rejection Schedule, nor the Debtors' delivery of a Notice of Cure and Assumption to the applicable counterparty shall constitute an admission by the Debtors that such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

D. **CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

1. *Conditions to Confirmation*

The Bankruptcy Court shall not be requested to enter the Confirmation Order unless and until the following conditions have been satisfied:

- The Bankruptcy Court shall have entered the Disclosure Statement Order.

- The Plan and the Confirmation Order shall be in form and substance acceptable to the Debtors and the Plan Sponsor.

2. *Conditions to the Effective Date*

The Effective Date will not occur, and the Plan will not be consummated unless and until the conditions set forth in Section IX.B of the Plan have been satisfied or duly waived pursuant to Section IX.C of the Plan.

a. **Confirmation Order**

The Confirmation Order shall be in full force and effect, and shall not have been stayed, stayed pending appeal or vacated; provided, however, that even if an appeal, notice of appeal, motion to amend, or make additional findings of fact or motion for a new trial is timely filed, or the Confirmation Order is otherwise challenged in any respect, such Confirmation Order will be deemed a Final Order if it provides that it is effective immediately upon entry on the Bankruptcy Court's docket and not subject to any stay notwithstanding Bankruptcy Rules 6004(h), 6006(d), or 7062 or Rule 62 of the Federal Rules of Civil Procedure.

b. **Statutory Fees**

All statutory fees and obligations then due and payable to the U.S. Trustee shall have been paid in full.

c. **Documentation**

All documents and agreements necessary to implement the Plan and the Transaction, including such agreements and documents set forth in Section 4 of the Plan Support Agreement, shall have been executed and delivered to the required parties and, to the extent required, filed with the applicable government unit in accordance with applicable laws, and all other actions required to be taken in connection with the Effective Date shall have occurred;

d. **Antitrust and Foreign Investment Approvals**

All (A) applicable waiting periods, and any extensions thereof, under the HSR Act and the Antitrust and Foreign Investment Laws, and any commitments by the parties to the Plan Support Agreement not to close before a certain date under a timing agreement entered into with applicable Antitrust and Foreign Investment Authorities, shall have expired or otherwise been

terminated and (B) authorizations, consents, orders or approvals under the Antitrust and Foreign Investment Laws, including but not limited to the CFIUS Approval and those authorizations, consents, orders or approvals set forth on Section 9(c)(i) of the disclosures schedules to the Plan Support Agreement, shall have been obtained and shall remain in full force and effect.

### e.    State Aid Approval

If required by applicable law, a decision of the European Commission pursuant to Article 4 or Article 9 of Council Regulation (EU) 2015/1589 of 13 July 2015 that the transaction notified to it does not constitute aid or is compatible with the internal market, or such other similar consents or approvals as may be required from the European Commission after December 31, 2020 shall have been obtained.

### f.    DDTC Notification

WVD shall have provided to the U.S. Directorate of Defense Trade Controls of the U.S. Department of State the DDTC Notification.

### g.    No Injunctions or Restraints

No Governmental Entity (as defined in the Plan Support Agreement) shall have issued, enacted, entered, promulgated, or enforced any Restraint.

### h.    Establishment of Professional Fee Escrow

The Professional Fee Escrow shall have been established and fully funded in the amount of the Professional Fee Reserve Amount.

### i.    Funding of the Ongoing Trade Claims Recovery Pool and the General Unsecured Claims Settlement Distribution

Each of the Ongoing Trade Claims Recovery Pool and the General Unsecured Claims Settlement Distribution shall have been funded by BidCo in the respective amounts required by the Settlement.

### j.    Conditions Precedent to the Obligations of the Plan Sponsor

### i.    Accuracy of Representations and Warranties

The representations and warranties of the Company Parties as set forth in the Plan Support Agreement in (i) Sections 11(a)(i)-(iv), (b), (e)(i) and (u) shall be true and correct in all material respects and (ii) set forth in Section 11 (other than those described in clause (i)) shall be true and correct (disregarding all qualifications or limitations as to "materiality" or "Company Material Adverse Effect" and words of similar import set forth therein), except where the failure of such representations or warranties to be true and correct has not had and would not reasonably be expected to have a Company Material Adverse Effect (as defined in the Plan Support Agreement), in the case of each of clauses (i) and (ii), at and as of the Effective Date as though made at and as of the Effective Date (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

### ii.    Performance of Obligations

The Debtors shall have performed in all material respects all obligations and agreements contained in Plan Support Agreement required to be performed by them on or prior to the Effective Date.

### iii.    No Termination

The Plan Sponsor shall not have terminated the Plan Support Agreement, in accordance with its terms prior to the occurrence of the Effective Date.

### iv.    BidCo Equity Consideration

The Entities to receive any share of the BidCo Equity Consideration are acceptable to the Plan Sponsor, in its sole discretion, provided that for the avoidance of doubt the holders of Allowed Secured Notes Claims receiving such BidCo Equity Consideration in the term sheet annexed to the Plan Support Agreement are acceptable to the Plan Sponsor.

### v.    Officer's Certificate

The Plan Sponsor shall have received a certificate, dated the Effective Date, of the chief executive officer or the chief financial officer of OneWeb, on behalf of the Debtors, to the effect that the conditions specified in Section 9(a)(i) and Section 9(a)(ii) of the Plan Support Agreement have been fulfilled and/or waived.

### vi.    Communications Consents

All Communications Consents shall have been obtained.

### vii.    No Company Material Adverse Effect

Since the Agreement Date of the Plan Support Agreement (as defined therein), no Company Material Adverse Effect (as defined therein) shall have occurred and be continuing.

### viii.    Principal Vendor Contracts

The applicable Company Parties shall have executed the Amended Principal Vendor Contracts (in accordance with Section 6(c) of the Plan Support Agreement) and such Amended Principal Vendor Contracts shall remain in full force and effect.

### ix.    Effective Date Cash Funding Cap

The Effective Date Cash Funding Reserve Amount, as determined in good faith by the Debtors and delivered to the Plan Sponsor no later than five days before the Effective Date, shall not exceed the Effective Date Cash Funding Cap, unless otherwise agreed to by the Plan Sponsor.

### k.    Conditions Precedent to the Debtors' Obligations

### i.    Accuracy of Representations and Warranties

The representations and warranties of the Plan Sponsor (i) set forth in Sections 12(a), (b) and (e) of the Plan Support Agreement shall be true and correct in all material respects and (ii) set forth in Section 12 of the Plan Support Agreement (other than those described in clause (i)) shall be true and correct (disregarding all qualifications or limitations as to "materiality" or "Plan Sponsor Material Adverse Effect" and words of similar import set forth therein), except where the failure of such representations or warranties to be true and correct has not had and would not reasonably be expected to have a Plan Sponsor Material Adverse Effect (as defined in the Plan Support Agreement), in the case of each of clauses (i) and (ii), at and as of the Effective Date as though made at and as of the Effective Date (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

### ii.    Performance of Obligations

The Plan Sponsor shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it on or prior to the Effective Date.

### iii.    No Termination

The Company Parties shall not have terminated the Plan Support Agreement in accordance with its terms prior to the occurrence of the Effective Date.

### iv.    Officer's Certificate

The Company Parties shall have received a certificate, dated the Effective Date, of a chief executive officer of the Plan Sponsor to the effect that the conditions specified in Section 9(b)(i) and Section 9(b)(ii) of the Plan Support Agreement have been fulfilled and/or waived.

### 3. *Waiver of Conditions to the Effective Date*

The conditions to consummation of the Plan set forth in Section IX therein may be waived as follows: the conditions set forth in Section IX.B.10 of the Plan may only be waived by the Plan Sponsor; the conditions set forth in Section IX.B.111 of the Plan may be waived by the Debtors; and the conditions set forth in Section IX.B.4-7 of the Plan may be mutually waived by both the Plan Sponsor and the Debtors, as applicable, in their sole discretion, respectively, without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.  For the avoidance of doubt, Sections IX.B.8-9 may not be waived by the Plan Sponsor.

## E.   EXCULPATION, RELEASES AND INJUNCTIONS

### 1. *Discharge of Claims Against and Interest in the Debtors*

Upon the Effective Date and in consideration of the Distributions to be made hereunder, to the fullest extent permitted by applicable law, except as expressly provided herein or in the Confirmation Order, each holder (as well as any trustee and agents on behalf of such holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, Liens, rights, and liabilities that arose prior to the Effective Date, and will ~~consider this~~**be considered** waived, released, or discharged as an uncollectible account for tax purposes.  Except as otherwise expressly provided herein, upon the Effective Date, all such holders of Claims, Interests, rights and liabilities and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any Claim, Interest, Lien, right or liability in or against the Estates, Debtors, Liquidating Debtors or the Reorganized Debtors or any of their assets or property, whether or not such holder has filed a Proof of Claim and whether or not the facts or legal bases thereof were known or existed prior to or on the Effective Date.

### 2. *Exculpation*

**EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS RELEASED AND EXCULPATED FROM, ANY LIABILITY FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO OR ARISING OUT OF THE DEBTORS' CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE PLAN SUPPORT AGREEMENT, THE PLAN SUPPORT AGREEMENT ORDER, THE DISCLOSURE STATEMENT, THE PLAN, THE DIP FACILITY, THE DIP AGREEMENT, THE DIP AMENDMENT, THE DIP ORDER, THE DIP AMENDMENT ORDER, THE TRANSACTION OR ANY TRANSACTION, CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE FOREGOING, THE FILING OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES PURSUANT TO THE PLAN, THE DISTRIBUTION**

OF PROPERTY UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, EXCEPT FOR CLAIMS RELATED TO ANY ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED ACTUAL FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; IN ALL RESPECTS THE EXCULPATED PARTIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES. THE EXCULPATED PARTIES HAVE, AND UPON COMPLETION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN THE SOLICITATION OF VOTES AND DISTRIBUTIONS PURSUANT TO THE PLAN IN GOOD FAITH AND IN COMPLIANCE WITH APPLICABLE LAWS AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH ACTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR DISTRIBUTIONS MADE PURSUANT TO THE PLAN.

**NOTWITHSTANDING THE FOREGOING, SOLELY WITH RESPECT TO EXCULPATED PARTIES THAT ARE NOT (A) FIDUCIARY EXCULPATED PARTIES OR (B) THE PLAN SPONSOR AND ITS REPRESENTATIVES, PLAN SECTION XI.D. WILL BIND ONLY ENTITIES THAT ARE RELEASING PARTIES. FOR THE AVOIDANCE OF DOUBT, THIS PARAGRAPH IS NOT INTENDED TO, AND SHALL NOT, IMPAIR OR OTHERWISE LIMIT (I) ANY EXCULPATION RIGHTS OF ANY PERSONS THAT ARE PROVIDED FOR UNDER ANY AGREEMENTS TO WHICH SUCH PERSONS ARE PARTIES OR BENEFICIARIES OR (II) PLAN SECTION XI.D. OR ANY OTHER EXCULPATION RIGHTS (INCLUDING UNDER 11 U.S.C. § 1125(E)) AS APPLIED TO (A) FIDUCIARY EXCULPATED PARTIES OR (B) THE PLAN SPONSOR AND ITS REPRESENTATIVES.**

    **3.**    *Releases*

        **a.**    **Releases by the Debtors**

PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION AND FOR THE CONCESSIONS MADE AS SET FORTH IN THE PLAN AND THE OTHER CONTRACTS, INSTRUMENTS, RELEASES, AGREEMENTS, OR DOCUMENTS TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH THE PLAN, AND THE SERVICE OF THE RELEASED PARTIES IN FACILITATING THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, ON AND AFTER THE EFFECTIVE DATE, EACH RELEASED PARTY IS DEEMED RELEASED AND DISCHARGED BY THE DEBTORS, THEIR ESTATES, THE REORGANIZED DEBTORS, THE LIQUIDATING DEBTORS AND ANY OTHER PERSON OR ENTITY SEEKING TO EXERCISE THE RIGHTS OF THE ESTATES FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, LIENS, LOSSES, REMEDIES, CONTRIBUTIONS, INDEMNITIES, COSTS, CAUSES OF ACTION OR LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS OR CAUSES OF ACTION,  THAT THE DEBTORS, THEIR ESTATES, THE REORGANIZED DEBTORS OR THE LIQUIDATING DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR ANOTHER ENTITY, WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE, BY STATUTE, VIOLATIONS OF FEDERAL, STATE, PROVINCIAL, FOREIGN, OR TERRITORIAL SECURITIES LAWS, OR OTHERWISE THAT THE DEBTORS, THE REORGANIZED DEBTORS, THE LIQUIDATING OR THE ESTATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF A CLAIM OR INTEREST OR OTHER PERSON OR ENTITY, BASED ON, RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS, THE DEBTORS' CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE PLAN SUPPORT AGREEMENT, THE PLAN SUPPORT AGREEMENT ORDER, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE DIP ORDER, THE DIP AMENDMENT ORDER, THE PLAN, THE SECURED NOTE PURCHASE AGREEMENT, THE TRANSACTION AND ANY CONTRACT, INSTRUMENT, RELEASE, OR ANOTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE FOREGOING, AND ANY EXHIBITS OR DOCUMENTS RELATED THERETO, THE FILING OF THESE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, INCLUDING THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE PURCHASE, SALE, ISSUANCE, DISTRIBUTION, OR CANCELLATION OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTIONS UNDER THE PLAN OR ANY OTHER

RELATED AGREEMENT, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.  FOR THE AVOIDANCE OF DOUBT, NO RELEASE IN PLAN SECTION XI.E. SHALL BE GIVEN FOR: (I) THE DEBTORS' COUNTERCLAIMS, SETOFFS, OR DEFENSES TO CLAIMS OR (II) ANY OBLIGATIONS OF ANY NON-DEBTOR COUNTERPARTY UNDER ASSUMED CONTRACTS.

    b.  **Third-Party Releases by Holders of Claims and Interests**

  AS OF THE EFFECTIVE DATE, EACH RELEASING PARTY IS DEEMED TO HAVE RELEASED AND DISCHARGED EACH DEBTOR, EACH LIQUIDATING DEBTOR, EACH REORGANIZED DEBTOR, AND EACH RELEASED PARTY FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY, INCLUDING ANY DERIVATIVE CLAIMS), BASED ON OR RELATING TO OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' IN- OR OUT-OF-COURT RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS, THE DEBTORS' CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, NEGOTIATION, OR FILING OF THE PLAN SUPPORT AGREEMENT, THE PLAN SUPPORT AGREEMENT ORDER, THE DISCLOSURE STATEMENT, THE DIP FACILITY, THE DIP ORDER, THE DIP AMENDMENT ORDER, THE PLAN, THE SECURED NOTE PURCHASE AGREEMENT, THE TRANSACTION AND ANY CONTRACT, INSTRUMENT, RELEASE, OR ANOTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE FOREGOING, AND ANY EXHIBITS OR DOCUMENTS RELATED THERETO, THE FILING OF THESE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION, INCLUDING THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, THE PURSUIT OF CONSUMMATION, THE ADMINISTRATION AND IMPLEMENTATION OF THE PLAN, INCLUDING THE PURCHASE, SALE, ISSUANCE, DISTRIBUTION, OR CANCELLATION OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITIES PURSUANT TO THE PLAN, OR THE DISTRIBUTIONS UNDER THE PLAN OR ANY OTHER RELATED AGREEMENT, OR UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

  **The Debtors intend to obtain Bankruptcy Court approval of the foregoing third party releases under two alternative bases.  First, that the releases are consensual for all those parties who do not opt-out of the third party releases as described in the following paragraph.  Consequently, if you do not want to grant a release, you must opt out as described in the following paragraphs.  Second, the Debtors may seek to demonstrate at the Confirmation Hearing that such third-party releases is warranted on a non-consensual basis as described *infra* in Section VI.B.**

FOR THE AVOIDANCE OF DOUBT, THE ONLY PARTIES THAT ARE BOUND BY THE RELEASE SET FORTH IN SECTION XI.E.2 OF THE PLAN ARE: (A) THE RELEASED PARTIES; (B) PARTIES WHO VOTE IN FAVOR OF THE PLAN AND DO NOT OPT OUT OF THE RELEASE PROVIDED IN SECTION XI.E.2 OF THE PLAN IN A TIMELY AND PROPERLY SUBMITTED BALLOT; (C) PARTIES WHO ~~VOTE TO REJECT THE PLAN AND DO NOT OPT OUT OF THE RELEASE PROVIDED IN SECTION XI.E.2 OF THE PLAN IN A TIMELY AND PROPERLY SUBMITTED BALLOT; (D) PARTIES WHO~~ ARE ENTITLED TO VOTE BUT DO NOT VOTE AND DO NOT OPT OUT OF THE RELEASE PROVIDED IN SECTION XI.E.2 OF THE PLAN IN A TIMELY AND PROPERLY SUBMITTED BALLOT; ~~(E) PARTIES WHO ARE DEEMED TO REJECT THE PLAN~~ AND DO NOT OPT OUT OF THE RELEASE PROVIDED IN SECTION XI.E.2 OF THE PLAN BY SUBMITTING A DULY COMPLETED OPT-OUT FORM; ~~(F~~AND (D) PARTIES WHO ARE DEEMED TO ACCEPT THE PLAN AND DO NOT OPT OUT OF THE RELEASE PROVIDED IN SECTION XI.E.2 OF THE PLAN BY SUBMITTING A DULY COMPLETED OPT-OUT FORM~~; AND (G) PARTIES WHO HOLD ALLOWED ADMINISTRATIVE EXPENSE CLAIMS OR ARE OTHERWISE NOT ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN AND DO NOT OPT OUT OF THE RELEASE PROVIDED IN SECTION XI.E.2 OF THE PLAN BY SUBMITTING A DULY COMPLETED OPT-OUT FORM.~~.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE RELEASES SET FORTH ABOVE DO NOT RELEASE ANY INDIVIDUAL FROM ANY CLAIM OR CAUSES OF ACTION RELATED TO AN ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE CONSTITUTED ACTUAL FRAUD, WILLFUL MISCONDUCT, OR GROSS NEGLIGENCE.

4.      *Injunction*

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS OR CAUSES OF ACTION THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION UNDER THE PLAN ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE LIQUIDATING DEBTORS, THE EXCULPATED PARTIES, OR THE RELEASED PARTIES: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH ANY SUCH CLAIMS OR INTERESTS OR CAUSES OF ACTION; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH ANY SUCH CLAIMS OR INTERESTS OR CAUSES OF ACTION; (C) CREATING, PERFECTING, OR ENFORCING AN ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THEIR PROPERTIES ON ACCOUNT OF OR IN CONNECTION WITH SUCH CLAIMS OR INTERESTS OR CAUSES OF ACTION; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH SUCH CLAIMS OR INTERESTS OR CAUSES OF ACTION UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF, NOTWITHSTANDING AN INDICATION IN ANY PROOF OF CLAIM OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS, OR INTENDS TO PRESERVE THE RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (E) COMMENCING OR CONTINUING ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH SUCH CLAIMS OR INTERESTS OR CAUSES OF ACTION.**

**NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, THE INJUNCTION SET FORTH ABOVE SHALL NOT ENJOIN THE PLAN SPONSOR FROM EXERCISING ANY OF ITS RIGHTS UNDER THE PLAN SUPPORT AGREEMENT PRIOR TO THE EFFECTIVE DATE.**

**5.**     *Scope of Discharge, Release, or Injunction With Respect to the United States of America*

As to the United States of America, its agencies, departments, or agents (collectively, the "United States"), nothing in this Plan or the Confirmation Order shall limit or expand the scope of discharge, release or injunction to which the Debtors or Reorganized Debtors are entitled to under the Bankruptcy Code, if any. The discharge, release, and injunction provisions contained in this Plan and the Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Confirmation Order, pursuing any police or regulatory action except to the extent the applicable Bar Date or the discharge, release, exculpation or injunction provisions of the Plan bar a Governmental Unit from pursuing prepetition Claims against the Debtors or Reorganized Debtors.

Accordingly, notwithstanding anything contained herein or in the Confirmation Order to the contrary, nothing herein or the Confirmation Order shall discharge, release, impair or otherwise preclude: (1) any liability to the United States that is not a "claim" within the meaning of section 101(5) of the Bankruptcy Code; (2) any Claim of the United States arising on or after the Effective Date; or (3) any valid right of setoff or recoupment of the United States against any of the Debtors. Nothing herein or in the Confirmation Order shall: (i) enjoin or otherwise bar the United States from asserting or enforcing, outside the Bankruptcy Court, any liability described in the preceding sentence; or (ii) divest any court, commission, or tribunal of jurisdiction to determine whether any liabilities asserted by the United States are discharged or otherwise barred by this Plan, the Confirmation Order or the Bankruptcy Code.

Moreover, nothing herein or in the Confirmation Order shall release or exculpate any non-Debtor, including any Released Parties and/or Exculpated Parties that are not Debtors, from any liability to the United States, including but not limited to any liabilities arising under the Internal Revenue Code, the environmental laws, or the criminal laws against the Released Parties and/or Exculpated Parties, nor shall anything herein or in the Confirmation Order enjoin the United States from bringing any claim, suit, action or other proceeding against any non-Debtor for any liability whatsoever; provided, that the foregoing sentence shall not (x) limit the scope of discharge granted to the Debtors and the Reorganized Debtors under sections 524 and 1141 of the Bankruptcy Code, or (y) diminish the scope of any exculpation to which any party is entitled under section 1125(e) of the Bankruptcy Code.

Without limiting the application of section 1145 of the Bankruptcy Code, nothing contained herein or in the Confirmation Order shall be deemed to determine the tax liability of any person or entity, including but not limited to the Debtors and the Reorganized Debtors, nor shall this Plan or the Confirmation Order be deemed to have determined the federal tax treatment of any item, distribution, or entity, including the federal tax consequences of this Plan, nor shall anything in this Plan or Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.

## 6.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays arising under or entered during the pendency of these cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay; provided, however, that in no event shall the Plan or the Confirmation Order be construed as enjoining the Plan Sponsor from exercising any of its rights under the Plan Support Agreement prior to the Effective Date.

## 7.    *Ipso Facto and Similar Provisions Ineffective*

Any term of any prepetition policy, contract, or other obligation applicable to a Debtor shall be void and of no further force or effect to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation as a result of, or gives rise to a right of any Entity based on (i) the insolvency or financial condition of a Debtor, (ii) the commencement of

these chapter 11 cases, (iii) the confirmation or consummation of the Plan, or (iv) the Transaction.

## VI.    STATUTORY REQUIREMENTS FOR CONFIRMATION

The following is a brief summary of the requirements for Confirmation.  Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors with respect to the summary provided in this Disclosure Statement.

### A.    REQUIREMENTS FOR CONFIRMATION

For the Plan to be confirmed, the Plan (and the Debtors as proponents of the Plan) must comply with section 1129 of the Bankruptcy Code.  Among the requirements for Confirmation pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims, or if rejected by any Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to such rejecting Impaired Class; (2) the Plan is feasible; (3) the Plan is in the "best interests" of holders of Claims and Interests, and (4) the Plan has been proposed in good faith.

The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the requirements of section 1129 of the Bankruptcy Code; and (2) the Debtors have complied, or will have complied, with all of the requirements of section 1129 of the Bankruptcy Code.

### 1.    *Acceptance by Impaired Classes*

For a plan to be confirmable, section 1129(a)(8) of the Bankruptcy Code requires that each "impaired" class of claims and interests accepts the plan.  Any class that is "unimpaired" under a plan is presumed to have accepted the plan.  Pursuant to section 1124 of the Bankruptcy Code, a class is "impaired" unless, with respect to each claim or interest in such class, the plan: (1) leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder of such claim; or (2) cures any default, reinstates the maturity of such claim or interest as such maturity existed before such default and compensates the holder of such claim or interest for any damages incurred.

Under the Plan, the only Classes that are both Impaired and may be entitled to receive a Distribution under the Plan are Classes 1, 4 and 5.  Accordingly, only Class 1, 4 and 5 are entitled to vote to accept or reject the Plan.

### 2.    *Best Interests of Creditors*

Pursuant to section 1129(a)(7), notwithstanding acceptance of the Plan by a voting Impaired Class, to confirm the Plan, the Bankruptcy Court must still independently determine that the Plan is in the best interests of each holder of a Claim in such Class that has not voted to accept the Plan.  The Plan will be deemed to be in the best interests of such claimants if it provides to each such claimant a recovery that is at least equal in value to the recovery that such claimant would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.  Accordingly, if the holders of Claims in Class 1, Class 4 or Class 5 do not

unanimously vote to accept the Plan, the Bankruptcy Court will need to determine whether the Plan provides to each rejecting holder a recovery on account of its Claim that has a value, as of the Effective Date, at least equal to the value that each such holder would receive if the Debtors were liquidated under chapter 7 on the Effective Date.  Based on the liquidation analysis attached hereto as **Annex B** (the "Liquidation Analysis"), the Debtors believe that the Plan satisfies the best interests of creditors test.

Recoveries in a chapter 7 case, as compared to the Distribution provided under the Plan, would be further reduced by (i) the delay necessarily resulting from the appointment of a chapter 7 trustee with no familiarity with the Debtors' assets and business, (ii) the fees and expenses of such trustee and any professionals he or she will retain, and (iii) additional Administrative Expense Claims.

Additionally, sales organized under a chapter 7 liquidations will often yield depressed values because the sale is conducted under more or less "fire sale" conditions.  In particular, it is unlikely that a chapter 7 trustee appointed by the Bankruptcy Court and overseen by the United States Trustee's office in the Southern District of New York will continue to operate the Debtors' assets.  Besides logistical concerns, the chapter 7 trustee would not likely be familiar with the intricacies of Debtors' assets, the Debtors' business nor would the chapter 7 trustee be familiar with various regulatory laws related thereto.  Thus, an additional layer of advisors and experts would need to be retained by the chapter 7 trustee, giving rise to additional administrative expenses that would be entitled to priority.

Because recoveries under the Plan exceed those in a hypothetical chapter 7 case, the Plan satisfies the best interests of creditors test.

### 3. *Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that, to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor, unless contemplated by the plan.

To determine whether the Plan meets the feasibility requirement, the Debtors analyzed their ability to meet their respective obligations under the Plan.  As part of this analysis, the Debtors prepared financial projections, attached hereto as **Annex C** (the "Financial Projections").  Based on the Financial Projections, the Debtors believe that the Plan satisfies the feasibility requirement.

### B. THE DEBTOR RELEASES, THIRD PARTY RELEASES, EXCULPATION, AND INJUNCTION PROVISIONS

It is well-settled that debtors are authorized to settle or release their claims in a chapter 11 plan.[20][17]  Debtor releases are granted by courts in the Second Circuit where the debtors establish

---

[20][17] *See In re Adelphia Commc'ns Corp.,* 368 B.R. 140, 263 n.289, 269 (Bankr. S.D.N.Y. 2007) (debtor may release its own claims); *In re Oneida Ltd.*, 351 B.R. 79, 94 n. 21 (Bankr. S.D.N.Y. 2006) (noting that a debtor's release of its own claims does not raise third party release issues).

that such releases are in the "best interests of the estate."[18] Courts often find that releases pursuant to a settlement are appropriate.[19] Additionally, in the Second Circuit, third party releases are permissible when they are consensual or where "truly unusual circumstances" render the release terms integral to the success of the plan.[20]

"Unusual circumstances" include: (a) the estate received a substantial contribution; (b) the enjoined claims were "channeled" to a settlement fund rather than extinguished; (c) the enjoined claims would indirectly impact the debtors' reorganization by way of indemnity or contribution; (d) the plan otherwise provided for the full payment of the enjoined claims; and (e) the affected creditors consent.[21] Courts typically allow releases of third party claims against non-debtors where there is the express consent (including pursuant to an opt-out) of the party giving the release or where other circumstances in the case justify giving the release.[22] Finally, exculpation provisions that extend to prepetition conduct and cover non-estate fiduciaries are regularly approved.[23] In approving these provisions, courts consider a number of factors, including whether the beneficiaries of the exculpation have participated in good faith in negotiating the plan and bringing it to fruition, and whether the provision is integral to the plan.[24]

---

[18] *See In re Charter Commc'ns*, 419 B.R. 221, 257 (Bankr. S.D.N.Y. 2009) ("When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate.").

[19] *See, e.g., In re Spiegel*, 2005 WL 1278094, at *11 (Bankr. S.D.N.Y. May 25, 2005) (approving releases pursuant to section 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a)); *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Oct. 22, 2013) (confirming chapter 11 plan containing releases of members, directors, officers and employees of the debtors as well as prepetition lenders that were party to a restructuring support agreement); *see also In re Bally Total Fitness Holding Corp.*, 2007 WL 2779438, at *12 ("To the extent that a release or other provision in the Plan constitutes a compromise of a controversy, this Confirmation Order shall constitute an order under Bankruptcy Rule 9019 approving such compromise."); *accord In re Adelphia Communications Corp.*, 368 B.R. 140, 263 n. 289 (Bankr. S.D.N.Y. 2007) ("The Debtors have considerable leeway in issuing releases of any claims the Debtors themselves own.").

[20] *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142-43 (2d Cir. 2005).

[21] *Id*. at 141.

[22] *Id*. at 142-43.

[23] *See, e.g., Oneida*, 351 B.R. at 94 & n.22 (considering an exculpation provision covering a number of prepetition actors with respect to certain prepetition actions, as well as postpetition activity).

[24] *See In re Bearing Point, Inc.*, 435 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("Exculpation provisions are included so frequently in chapter 11 plans because stakeholders all too often blame others for failures to get recoveries they desire; seek vengeance against other parties, or simply wish to second guess the decision makers."); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (same), *aff'd, In re DBSD N. Am., Inc.*, No. 09-10156, 2010 WL 1223109 (S.D.N.Y. May 24, 2010), *aff'd in part, rev'd in part*, 634 F.3d 79 (2d Cir. 2011); *In re Bally Total Fitness*, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *In re WorldCom, Inc.*, No. 02-13533, 2003 WL 23861928, at *28 (Bankr. S.D.N.Y. Oct. 31, 2003) (approving an exculpation provision where it "was an essential element of the [p]lan formulation process and negotiations"); *Enron*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").

"Most courts allow consensual [third party] releases to be included in a plan."[28][25] Courts in this district have found that parties consent to give releases when they vote in favor of the plan or when they abstain from voting but do not opt out of releases.[29][26] Third party releases may also be deemed consensual for unimpaired creditors who are deemed to accept the plan.[30][27] Here, the third party releases are consensual with respect to all of the Released Parties. Importantly, the Ballots to be distributed to holders of Claims entitled to vote on the Plan quote the entirety of the Releases and related provisions and definitions of the Plan, clearly informing holders of Claims entitled to vote of the steps they should take if they disagree with the scope of the Release.[31][28] Thus, affected parties are on notice of the third party release and given the express opportunity to opt-out of the third party releases. As a result, the third party releases are consensual under the majority of precedent in this jurisdiction, and the Bankruptcy Court need not consider the other *Metromedia* factors with respect to such aspects.

The Debtors believe that the Releases contained in the Plan meet the Second Circuit's well established criteria for when such provisions are "important to a debtor's plan" and "where the released party provides substantial consideration" which are present here as more fully described above and as will be demonstrated at the Confirmation Hearing. Contrary to the assertions made by the Committee, the Releases are an integral component of the Plan and the DIP Secured Parties, the Prepetition Secured Parties, the Debtors' Directors and Officers and all Released Parties have made substantial contributions to these cases to justify the releases.

Moreover, the Debtors are of the view that the Claims that are subject to Release are of, at best, minimal value when compared to the certain value achieved to the Estates through the Plan. Absent the Releases contemplated in the Plan, the Debtors believe that the parties in interest that both negotiated for, and relied upon, the prospect of the Releases in negotiations would not have otherwise committed to the result reflected in the Plan Support Agreement and the Plan. In this regard, too, the Releases are an integral part of the Plan. The Debtors believe

---

[28][25] *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007); *see also Indianapolis Downs*, 486 B.R. 286, 305 (Bankr. Del. 2013) ("Courts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected.").

[29][26] *See In re Metromedia Fiber Network, Inc.*, 416 F.3d at 142 ("Nondebtor releases may also be tolerated if the affected creditors consent."); *In re Calpine Corp.*, No. 05-60200 BRL, 2007 WL 4565223, at *10 (Bankr. S.D.N.Y. Dec. 19, 2007) ("Such releases by Holders of Claims and Interests provide for the release by Holders of Claims and Interests that vote in favor of the Plan, who abstain from voting and choose not to opt out of the releases, or who have otherwise consented to give a release, and are consensual."); *DBSD N. Am.*, 419 B.R. at 218–19 ("Except for those who voted against the Plan, or who abstained and then opted out, I find the Third Party Release provision consensual and within the scope of releases permitted in the Second Circuit."); *Adelphia*, 368 B.R. at 268 (upholding non-debtor releases for creditors who voted to accept the plan because creditors consented to the releases through their vote to support the plan); *In re Lear Corp.*, No. 09–14326, 2009 WL 6677955, at *7 (Bankr. S.D.N.Y. Nov. 5, 2009) (finding that non-debtor releases for creditors who voted to accept the plan were permissible).

[30][27] *See Indianapolis Downs*, 486 B.R. at 306 (finding that the releases, which included releases of unimpaired creditors who were deemed to accept the plan, "may be properly characterized as consensual").

[31][28] *See, e.g.*, *In re Crabtree & Evelyn, Ltd.*, No. 09-14267 (BRL), 2010 WL 3638369, at *7 (Bankr. S.D.N.Y. Jan 14. 2010) (finding that where creditors have accepted the plan and the non-debtor releases were appropriately disclosed by the debtors in both the disclosure statement and the ballot, the creditors have expressly consented to the non-debtor releases and therefore, the non-debtor releases satisfy the standards set forth in *Metromedia* for granting non-debtor releases and are fair to the releasing parties).

that the Releases are narrowly tailored and should be approved as an essential part of the Plan.

### C.    ALTERNATIVE PLANS

The Debtors do not believe that there are any alternative plans for their reorganization. The Debtors believe that the Plan, as described therein, enables holders of Claims to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

### D.    CONFIRMATION HEARING

**As set forth in the Disclosure Statement Order, the Bankruptcy Court has scheduled the Confirmation Hearing for [October 2], 2020 at 10:00 A.M. (prevailing Eastern Time).**   The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or the filing of a notice of such adjournment served in accordance with the Disclosure Statement Order.  **Unless an objection to the Plan is timely served and filed, it may not be considered by the Bankruptcy Court.**

## VII.    RISK FACTORS

Holders of Claims should read and carefully consider the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together with this Disclosure Statement, referred to or incorporated by reference in this Disclosure Statement, before reaching their own views prior to voting to accept or reject the Plan.  These factors should not be regarded as constituting the only risks present in connection with the Debtors' business or the Plan and its implementation.   All of these factors are contingencies which may or may not occur and the Debtors are not in a position to express a view on the likelihood of any such contingency occurring.

### A.    CERTAIN BANKRUPTCY CONSIDERATIONS

#### 1.    *The Debtors May Not Be Able to Secure Confirmation*

Although section 1129(b) of the Bankruptcy Code allows, under certain circumstances, confirmation of a plan even where not all Impaired Classes accept the Plan, section 1129(a)(10) requires that at least one Impaired Class has accepted the Plan.  There can be no assurance that the requisite acceptances to confirm the Plan will be received.  As discussed above, Class 1, 4 or 5 are the only Impaired Classes entitled to vote on the Plan.  If none of Class 1, Class 4 and Class 5 vote to accept the Plan, the Plan will not comply with the confirmation requirements of section 1129.

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  The Bankruptcy Court may find that the statutory requirements for Confirmation have not been met, including the best interest of creditors test.

The Debtors, subject to the terms and conditions of the Plan and the Plan Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for

Confirmation. Any such modifications may result in a less favorable treatment of any Class than the treatment currently provided in the Plan. Such a less favorable treatment may include a Distribution of a lesser value than currently provided in the Plan.

In the event the Plan is not confirmed, the Debtors may seek to pursue another strategy to reorganize the Debtors, such as an alternative chapter 11 plan (which, as described above the, Debtor does not believe is available), a dismissal of these cases and an out-of-court dissolution, an assignment for the benefit of creditors, a conversion to a chapter 7 cases or other strategies. There can be no assurance that the terms of any such alternative strategies would be similar or as favorable to the holders of Allowed Claims as those proposed in the Plan.

### 2. *Releases, Injunctions and Exculpations Provisions May Not Be Approved*

Section XI of the Plan provides for certain releases, injunctions, and exculpations, for claims and Causes of Action that may otherwise be asserted against the Debtors, the Reorganized Debtors, the exculpated parties, or the Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or exculpated parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

### 3. *Risks Related to Possible Objections to the Plan*

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan. Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection. An objection that is sustained and is contrary to the terms of the Plan Support Agreement could lead to a failure of a condition to effectiveness of the Plan.

### 4. *Risk of Termination of the Plan Support Agreement*

The Plan Support Agreement contains certain provisions that give the Plan Sponsor the ability to terminate the Plan Support Agreement if various conditions are satisfied or not satisfied (as applicable), including, among others, (i) if the Debtors lose the exclusive right to file a plan or plans of reorganization or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code, (ii) a trustee or an examiner with expanded powers is appointed in any of these chapter 11 cases, (iii) any of these chapter 11 cases are dismissed or converted to a case under chapter 7 of the Bankruptcy Code, (iv) failure of the Debtors to meet certain milestones, and (v) the Debtors' pursuit of a Plan inconsistent with the terms of the Plan Support Agreement and Plan Term Sheet. Termination of the Plan Support Agreement could result in protracted chapter 11 cases, have a negative impact on the Debtors' ability to consummate the Transaction and implement the Plan, and could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and major customers.

### 5. *Risk of Nonoccurrence of the Effective Date*

The Plan Support Agreement contains numerous conditions that must be met by the Effective Date. There can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur as there can be no assurance of the satisfaction of certain conditions precedent to the Effective Date, including consummation of the Transaction.

### B. RISK FACTORS THAT MAY AFFECT RECOVERIES AVAILABLE TO HOLDERS OF ALLOWED CLAIMS UNDER THE PLAN

#### 1. *Claims May Be Higher Than Projected*

There can be no assurance that the estimated Allowed number of certain Claims will not be significantly more than projected, which could cause the value of *pro rata* Distributions to be reduced substantially. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.

#### 2. *The Debtors Cannot Guarantee Recoveries or the Timing of such Recoveries*

Although the Debtors have made commercially reasonable efforts to project recoveries to the holders of Allowed Claims, it is possible that the amount of Allowed Claims will be materially higher than any range the Debtors have considered to date, and thus recoveries could be materially reduced or eliminated. In addition, the timing of actual Distributions to holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guarantee the timing of any recovery on an Allowed Claim.

### C. DISCLOSURE STATEMENT DISCLAIMER

#### 1. *The Financial Information Contained in this Disclosure Statement Has Not Been Audited*

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from the Debtors' books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from such financial information, and although the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to represent or warrant that the financial information contained herein and in the Plan, or any such conclusions or estimates drawn therefrom, is without inaccuracies.

#### 2. *Information Contained in this Disclosure Statement Is for Soliciting Votes*

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

#### 3. *The Disclosure Statement May Contain Forward Looking Statements*

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "will," "might," "expect," "believe," "anticipate," "could," "would," "estimate," "continue," "pursue" or the negative thereof or comparable terminology. All forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein and in the Plan is an estimate only, based upon information currently available to the Debtors.

### 4.  *No Legal or Tax Advice is Provided to You by this Disclosure Statement*

**This Disclosure Statement is not legal advice to you**.  The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each holder of a Claim or an Interest should consult his or her own legal counsel, accountant or other applicable advisor with regard to any legal, tax and other matters concerning his, her or its Claim or Interest.  This Disclosure Statement may not be relied upon for any purpose other than to determine (i) how to vote on the Plan, (ii) whether or not to opt-out of the Releases as set forth in Section XI.E of the Plan, and (iii) whether or not object to Confirmation.

### 5.  *No Admissions Made*

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Allowed Interests or any other parties in interest.

### 6.  *Failure to Identify Objections*

No reliance should be placed on the fact that a projected objection to a particular Claim is, or is not, identified in this Disclosure Statement.  The Reorganized Debtors and/or Liquidating Debtors, as applicable, may object to Claims after the Effective Date irrespective of whether this Disclosure Statement identifies objections to such Claims.

### 7.  *No Waiver of Right to Object or Right to Recover Transfers and Assets*

The vote by a holder of a Claim for or against the Plan does not constitute a waiver or release of any claims, causes of action or rights of the Debtors (or any other Entity, as the case may be) to object to that holder's Claim, or recover any preferential, fraudulent or other voidable transfer, regardless of whether any Claims or Causes of Action of the Debtors or their Estates are specifically or generally identified in this Disclosure Statement.

### 8.  *Information was Provided by the Debtors and was Relied Upon by the Debtors' Advisors*

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement.  Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this

Disclosure Statement, they have not independently verified the information contained in the Plan and in this Disclosure Statement.

### 9. *No Representations Outside this Disclosure Statement are Authorized*

No representations concerning or relating to the Debtors, these cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement **and the Committee Letter**. Any representations or inducements made to secure your acceptance or rejection of the Plan other than as contained in this Disclosure Statement **and the Committee Letter** should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to counsel to the Debtors and the U.S. Trustee.

### D.    RISKS RELATING TO SECURITIES TO BE ISSUED UNDER THE PLAN

#### 1. *Market for Securities*

There is currently no market for the New Equity Interests or BidCo Equity Consideration, and the Reorganized Debtors are under no obligation to list any securities on any securities exchange. Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date. If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in the Disclosure Statement depending upon many factors including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for the Reorganized Debtors and BidCo. Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

#### 2. *Potential Dilution*

The ownership percentage represented by the New Equity Interests or BidCo Equity Consideration distributed on the Effective Date under the Plan may be subject to dilution from the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued postemergence, including, as a result of the conversion of the Interim Funding Claims into BidCo Equity Interests on the Effective Date. In the future, similar to all companies, additional equity financings or other share issuances by the Reorganized Debtors or BidCo could adversely affect the value of the New Equity Interests and the BidCo Equity Interests. The amount and dilutive effect of any of the foregoing could be material.

The ownership percentage represented by the New Equity Interests or BidCo Equity Consideration distributed on the Effective Date under the Plan may be subject to dilution from the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued postemergence, including, as a result of the conversion of the Interim Funding Claims into BidCo Equity Interests on the Effective Date. In the future, similar to all companies, additional equity financings or other share issuances by the Reorganized

Debtors or BidCo could adversely affect the value of the New Equity Interests and the BidCo Equity Interests. The amount and dilutive effect of any of the foregoing could be material

### 3. *Equity Interests Subordinated to Indebtedness*

In any subsequent liquidation, dissolution, or winding down of the Reorganized Debtors, the New Equity Interests would rank below all debt claims against the Reorganized Debtors.  As a result, holders of the New Equity Interests will not be entitled to receive any payment or other Distribution of assets upon the liquidation, dissolution, or winding down of the Reorganized Debtors until after all the applicable entity's obligations to their debt holders have been satisfied.

### 4. *Implied Value of New Equity Interests or BidCo Equity Interests Not Intended to Represent Trading Value of New Equity Interests and BidCo Equity Interests, Respectively*

The implied value of the Reorganized Debtors is not intended to represent the trading value of New Equity Interests or BidCo Equity Interests in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things:  (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities of creditors receiving New Equity Interests or BidCo Equity Interests under the Plan, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities.  The actual market price of the New Equity Interests and BidCo Equity Interests are likely to be volatile.  Many factors, including factors unrelated to the actual operating performance of the Reorganized Debtors and BidCo, and other factors not possible to predict, could cause the market price of the New Equity Interests or BidCo Equity Interests to rise and fall.  Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Equity Interests or BidCo Equity Interests in the public or private markets.

### 5. *No Dividends*

The Reorganized Debtors may not pay any dividends on the New Equity Interests and may instead retain any future cash flows for debt reduction and to support operations.  Similarly, BidCo may not pay any dividends on the BidCo Equity Interests and may instead retain any future cash flows for debt reduction and to support its operations.  As a result, the success of an investment in the New Equity Interests or BidCo Equity Interests may depend entirely upon any future appreciation in the value of the New Equity Interests or BidCo Equity Interests, as applicable.  There is no guarantee that the New Equity Interests or BidCo Equity Interests will appreciate in value or even maintain their initial value.

### E. **RISKS RELATED TO THE DEBTORS' BUSINESSES**

### 1. *Macroeconomic Conditions*

On March 11, 2020, the spread of COVID-19 (also known as coronavirus) was declared a "pandemic" by the World Health Organization.  The situation with respect to COVID-19

continues to evolve rapidly.   The extent to which COVID-19 may impact the Debtors' operational and financial performance is uncertain.

### 2.    *Financial Results May Be Volatile and May Not Reflect Historical Trends*

The Financial Projections attached hereto as **<u>Annex C</u>** are based on assumptions that are an integral part of the projections, including Confirmation and implementation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtors, industry performance, general business and economic conditions, and other matters, many of which are beyond the control of the Reorganized Debtors and some or all of which may not materialize.

In addition, unanticipated events and circumstances occurring after the date hereof may affect the actual financial results of the Debtors' operations.  These variations may be material and may adversely affect the value of the New Equity Interests and the ability of the Debtors to make payments with respect to their indebtedness.  Because the actual results achieved may vary from projected results, perhaps significantly, the Financial Projections should not be relied upon as a guarantee or other assurance of the actual results that will occur.

Further, during the chapter 11 cases, the Debtors' financial results may be volatile as restructuring activities and expenses, contract terminations and rejections, and claims assessments significantly impact the Debtors' consolidated financial statements.  As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.  In addition, if the Debtors emerge from the chapter 11 cases, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Debtors also may be required to adopt fresh start accounting, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

Lastly, the business plan was developed by the Debtors with the assistance of their advisors.  There can be no assurances that the Debtors' business plan will not change, perhaps materially, as a result of decisions that the board of directors may make after fully evaluating the strategic direction of the Debtors and their business plan.  Any deviations from the Debtors' existing business plan would necessarily cause a deviation in the Financial Projections.

### 3.    *The Debtors' Substantial Liquidity Needs May Impact the Plan*

The Debtors operate in a capital-intensive industry.   The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources.  In addition to the cash necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with preparing for the chapter 11 cases and expect to continue to incur significant professional fees and costs throughout the chapter 11 cases.  The Debtors cannot

guarantee that Cash on hand, Cash paid provided by the Plan Sponsor and Cash provided by the DIP Agreement will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the chapter 11 cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to comply with the terms and condition of the DIP Agreement, the DIP Order, the DIP Amendment Order, and the Cash Collateral Order in connection with the chapter 11 cases; (b) their ability to maintain adequate cash on hand; (c) their ability to develop, confirm, and consummate the Plan; and (d) the cost, duration, and outcome of the chapter 11 cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that Cash on hand, Cash provided by the sale of the New Equity Interests, and Cash provided under the DIP Agreement are not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all.

4. ***The Debtors' Business is Subject to Complex Laws and Regulations That Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business***

The Debtors' operations are subject to extensive foreign, federal, state and local laws and regulations, including complex telecommunication and satellite laws and regulations. The Debtors may be required to make large expenditures to comply with such laws and regulations. Failure to comply with these laws and regulations may result in the suspension or termination of operations and subject the Reorganized Debtors to administrative, civil and criminal penalties. These liabilities and costs could have a material adverse effect on the business, financial condition, results of operations and cash flows of the Reorganized Debtors.

5. ***The Reorganized Debtors May Be Adversely Affected by Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases***

The Reorganized Debtors may become parties to future litigation. Litigation can be expensive and time consuming to prosecute or defend. Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan. It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation. The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

6. ***The Loss of Key Personnel Could Adversely Affect the Debtors' Operations***

The Debtors' operations are dependent on a relatively small group of key management personnel and a highly skilled employee base. The Debtors' recent liquidity issues and the chapter 11 cases have created distractions and uncertainty for key management personnel and employees. Because competition for experienced personnel can be significant, the Debtors may be unable to find adequate replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses. In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations, thereby adversely affecting the Debtors' businesses and the results of operations.

### 7.     *Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Corporate Reputation or Brand Perception, Financial Condition, and Results of Operations*

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arose prior to the Petition Date or before Confirmation (a) would be subject to compromise and/or treatment under the Plan and/or (b) would be discharged in accordance with the terms of the Plan. Any Claims not ultimately discharged through the Plan could be asserted against the Reorganized Debtors and harm the Reorganized Debtors' reputations and/or damage their brands, which may have an adverse effect on the Reorganized Debtors' financial condition and results of operations.

### 8.     *Recent Global Economic Trends Could Adversely Affect the Debtors' Business, Results of Operations and Financial Condition, Primarily Through Disruption to the Debtors' Customers' Businesses*

Recent global economic conditions, including disruption of financial markets, could adversely affect the Debtors' business, results of operations and financial condition, primarily through disrupting their customers' businesses. Higher rates of unemployment and lower levels of business activity generally adversely affect the level of demand for certain of the Debtors' products and services. In addition, continuation or worsening of general market conditions in the U.S. economy, the departure of the U.K. from the EU single market and customs union or other national economies important to the Debtors' businesses may adversely affect the Debtors' customers' level of spending, ability to obtain financing for purchases and ability to make timely payments to the Debtors for their products and services.

### 9.     *Consent Required Relating to FCC and Other Communications Licenses*

A change in control of the OneWeb entities that hold Spectrum Licenses, market access "landing rights" licenses or authorizations, SNP and/or TT&C Station licenses or authorizations, User Terminal experimental licenses or authorizations for launch and in-orbit operations of satellites will, depending on the type of license, permit, consent or authorization, involve either a notification requirement to, or alternatively a requirement to obtain consent from, the relevant national regulatory authority.

FCC approval will be required to assign the Debtors' FCC SNP and experimental licenses to the Reorganized Debtors pursuant to the Plan. Applications requesting such FCC approval will have to detail the change in control of the Reorganized Debtors in order to account for the New Equity Interests acquired by the Plan Sponsor. Similarly, certain of Debtors' other radio-frequency spectrum authorizations, market access licenses and other communications services related authorizations or licenses may also require disclosure of details associated with the change in control the Reorganized Debtors. Timing of FCC and other communications regulatory authority approvals associated with emergence will be difficult to predict.

The Debtors can provide no assurance that the required regulatory and governmental consents in connection with the Transaction under the Plan will be obtained. In addition, even if all required regulatory and other governmental consents are obtained and the closing conditions are satisfied, no assurance can be given as to the terms, conditions, and timing of the approvals or clearances.

### 10.    *CFIUS Approval Required*

The Committee on Foreign Investment in the United States, through powers conferred by legislation and delegated by the President of the United States, is authorized to conduct investigations of any investment, acquisition, merger, takeover or other transaction that could result in a foreign person acquiring (A) control of a U.S. business or (B) with respect to U.S. businesses that deal with "critical technology," "critical infrastructure" or "sensitive personal data" of U.S. citizens, rights to hold or obtain a board of directors voting seat or observer seat, rights to access certain information or rights to participate in substantive decision-making relating to critical technology, critical infrastructure, or sensitive personal data of U.S. citizens. If CFIUS determines that such a transaction could threaten to impair the national security of the United States, it may work with the transaction parties to mitigate the perceived national security risk.  If CFIUS determines that risk mitigation is not possible and the parties decline to abandon the transaction voluntarily, then CFIUS may refer the matter to the President for a decision whether to suspend or prohibit the transaction.  In 2016, OneWeb and SoftBank voluntarily notified CFIUS of SoftBank's indirect acquisition of a 38.11% voting interest in OneWeb. CFIUS concluded its review of the transaction in 2017 with a finding that it had no outstanding concerns of risk to U.S. national security.  As a condition to reaching that conclusion, CFIUS required OneWeb and SoftBank to enter into a National Security Agreement with the U.S. Department of Defense to address and mitigate concerns relating to U.S. national security. Given that the Transaction contemplated by the Plan involves non-U.S. parties acquiring control of OneWeb, and given that OneWeb's business involves "critical technologies" as defined in the CFIUS regulations utilized in connection with activities of OneWeb of a kind enumerated in those regulations, it will be necessary for OneWeb and the acquirer(s) of the New Equity Interests to formally notify the transaction to CFIUS.  It is highly recommended that the Parties make conclusion of review by CFIUS with an affirmative finding of no national security concerns a precondition to emergence from chapter 11.  When CFIUS formally accepts a notice for review, it has 45 days in which to complete a first-stage "review."  This may be followed by an additional 45-day period for second-stage "investigation."  But even before a notice is accepted, time is required for CFIUS staff to examine a draft notice and verify its completeness, and more often than not parties are required to revise a draft notice to address comments from CFIUS staff.  These additional steps before a notice is accepted make it difficult to assess the length of the CFIUS review process.  From the date the parties begin drafting a notice to the date CFIUS concludes its review ordinarily will be four to six months.  As a condition to approving the notified transaction, CFIUS or its member agencies may require OneWeb and BidCo to enter into mitigation measures to address concerns relating to U.S. national security.

### 11.    *Export Controls Notification to the DDTC*

WVD is registered with the Directorate of Defense Trade Controls of the U.S. Department of State ("DDTC") as an exporter of defense articles and defense services.  Under the International Traffic in Arms Regulations administered by DDTC, WVD is required to provide notification to DDTC of any change in the ownership or control of WVD and any change in the information provided in WVD's annual DDTC registration statement, including changes in WVD's senior management or board of directors.  In connection with implementation of the Plan, WVD will have to provide a notification to DDTC detailing any such changes that would result from such implementation.  As the purchaser(s) of the New Equity Interests include

foreign persons, and implementation of the Plan will result in foreign ownership or control of WVD, then WVD will have to submit such notification to DDTC no later than 60 days prior to implementation of the Plan.

## VIII.   CERTAIN TAX CONSEQUENCES OF THE PLAN

### A.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a general discussion based upon present law of certain U.S. federal income tax consequences relevant to the implementation of the Plan to the Debtors, the Reorganized Debtors and U.S. Holders (as defined below) of Allowed Secured Notes Claims, Allowed General Unsecured Claims, Allowed Ongoing Trade Claims and BidCo Equity Interests.  This summary is limited to U.S. Holders of Allowed Secured Notes Claims, Allowed General Unsecured Claims, Allowed Ongoing Trade Claims and BidCo Equity Interests who hold their Claims or BidCo Equity Interests, as applicable, as capital assets for purposes of the Internal Revenue Code of 1986, as amended (the "Code").  This discussion does not address rules relating to special categories of holders, including financial institutions, insurance companies, regulated investment companies, real estate investment trusts, broker-dealers, tax-exempt organizations, traders in securities that elect to mark-to-market, persons subject to special accounting rules under section 451(b) of the Code, U.S. expatriates, investors that hold Claims or BidCo Equity Interests as part of a straddle, hedging, constructive sale or conversion transaction, holders whose functional currency is not the U.S. dollar or holders who will actually or constructively own 5% or more of the BidCo Equity Interests (by either vote or value).  The discussion does not address any state, local or foreign taxes, the Medicare tax on net investment income, the federal alternative minimum tax or any other federal tax other than the federal income tax.  The discussion of U.S. federal income tax consequences below is based on the Code, Treasury Regulations, judicial authorities, published positions of the U.S. Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect).  The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties.  Holders should note that no rulings from the IRS have been sought with respect to any of the U.S. federal income tax consequences discussed below, and no assurance can be given that the IRS or a court will not take contrary positions.  This discussion does not address the U.S. federal income tax consequences to holders of Claims or Interests who are Unimpaired, or who are not entitled to vote because they are deemed to accept or reject the Plan.

This summary is not a comprehensive description of all of the U.S. federal tax consequences that may be relevant with respect to the Plan.  U.S Holders are urged to consult their own tax advisors regarding their particular circumstances and the U.S. federal tax consequences with respect to the Plan, as well as any tax consequences arising under the laws of any state, local or foreign tax jurisdiction and the possible effects of changes in U.S. federal or other tax laws.

As used herein, the term "U.S. Holder" means a beneficial owner of Allowed Secured Notes Claims, Allowed General Unsecured Claims, Allowed Ongoing Trade Claims, or BidCo Equity Interests, as applicable, that for U.S. federal income tax purposes is any of the following:

- an individual citizen or resident of the United States;

- a corporation or any other entity treated as a corporation for U.S. federal income tax purposes created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if it (1) is subject to the primary supervision of a court within the United States and one or more U.S. persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If an entity or arrangement treated as a partnership for U.S. federal income tax purposes holds Allowed Secured Notes Claims, Allowed General Unsecured Claims, Allowed Ongoing Trade Claims, or BidCo Equity Interests, the U.S. federal income tax treatment of a partner therein generally will depend upon the status of the partner and the activities of the partnership and accordingly, this summary does not apply to partnerships. A partner of a partnership exchanging Allowed Secured Notes Claims, Allowed General Unsecured Claims or Allowed Ongoing Trade Claims pursuant to the Plan should consult its own tax advisor regarding the U.S. federal income tax consequences to the partner of exchanging Allowed Secured Notes Claims, Allowed General Unsecured Claims or Allowed Ongoing Trade Claims

### 1. *Certain U.S. Federal Income Tax Consequences to the Debtors*

Only one of the Debtors, WVD, which has elected to be treated as a corporation for U.S. federal income tax purposes, is required to file a U.S. federal income tax return. WJVH and OneWeb Holdings LLC are each treated as disregarded entities of WVD for U.S. federal income tax purposes. As of January 1, 2020, WVD estimates that it has net operating loss ("NOL") carryforwards in excess of $45 million and certain other favorable tax attributes, including general business credit carryforwards, in excess of $28 million. As discussed below, if WVD is one of the Reorganized Debtors, any NOLs and other tax attributes may be reduced or otherwise subject to limitation as a result of or following the implementation of the Plan.

### a. **Cancellation of Debt and Reduction of Tax Attributes**

In general, absent an exception, a debtor that is a U.S. taxpayer will realize and recognize cancellation of debt income ("CODI") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied over (b) the sum of (x) the adjusted issue price of any new indebtedness of the taxpayer issued and (y) the fair market value of any stock or other consideration given in satisfaction of such indebtedness at the time of the

exchange.  The amount of CODI for WVD, if any, arising in connection with the implementation of the Plan and the amount of WVD's tax attributes potentially subject to reduction (as described below), will generally depend on the amount of any Cash and the fair market value of any other consideration received (or treated as received) by holders of General Unsecured Claims and Ongoing Trade Claims under the Plan and the amount of General Unsecured Claims and Ongoing Trade Claims against WVD and its subsidiaries, and may also be impacted by the manner in which the Plan is implemented.  These factors are not known at this time and may not be known with certainty until after the Effective Date and, as a result, the total amount of CODI for WVD arising as a result of the implementation of the Plan cannot be determined until after the Effective Date.

A debtor generally will not, however, be required to include any amount of CODI in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding, as would be the case if the Plan were approved.  Instead, as a consequence of such exclusion, a debtor generally must reduce certain of its tax attributes by the amount of CODI that it excluded from gross income pursuant to section 108 of the Code.  In general, tax attributes are reduced in the following order:   (a) NOLs and NOL carryforwards;  (b) most tax credits;  (c) capital loss carryovers;  (d) tax basis in assets (but not below the amount of liabilities to which the reorganized company remains subject immediately after the discharge); (e) passive activity loss and credit carryovers; and (f) foreign tax credits.  Alternatively, a debtor with CODI may elect first to reduce the basis of its depreciable assets pursuant to section 108(b)(5) of the Code.  Although not free from doubt, it is expected that carryovers of disallowed business interest expense are not tax attributes subject to such reduction.  If the amount of excluded CODI exceeds available tax attributes, the excess generally is not subject to U.S. federal income tax and has no other U.S. federal income tax impact.

WVD may realize CODI as a result of the implementation of the Plan.  As noted above, the amount of CODI will not be determinable until after the Effective Date.  Any such amount, however, is expected to be excluded from WVD's gross income and reduce WVD's NOLs and/or other tax attributes.   In addition, as discussed below under "Limitation of NOL Carryforwards and Other Tax Attributes," WVD's ability to utilize those reduced NOLs and/or other tax attributes is expected to be subject to limitation as a result of the implementation of the Plan.  Any changes in the direct or indirect ownership of equity interests in WVD following the Effective Date may further limit WVD's ability to utilize any NOLs and/or other tax attributes.

### b.      Limitation of NOL Carryforwards and Other Tax Attributes

Under sections 382 and 383 of the Code, if a corporation undergoes an "ownership change," the amount of any NOLs, interest expense carryforwards, tax credit carryforwards, net unrealized built-in losses, and possibly certain other tax attributes of the corporation allocable to periods prior to the ownership change (collectively, "Pre-Change Losses") that may be utilized to offset future taxable income generally are subject to an annual limitation.  For purposes of this discussion, it is assumed that WVD has not already undergone an "ownership change" during the pendency of these chapter 11 cases.  The implementation of the Plan is expected to result in an "ownership change" of WVD for these purposes if WVD is one of the Reorganized Debtors.  As a result, if WVD is one of the Reorganized Debtors, WVD's use of its Pre-Change Losses will be subject to limitation unless an exception to the general rules of section 382 of the Code applies.  For this purpose, if a corporation has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deductions), then generally built-in losses (including amortization or depreciation deductions attributable to such built-in losses) recognized during the following five years (up to the amount of the original net unrealized built-in loss) will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a corporation's net unrealized built-in loss will be deemed to be zero unless it is greater than the lesser of (a) $10,000,000 or (b) 15% of the fair market value of its assets (with certain adjustments) before the ownership change.  On September 9, 2019, the IRS issued proposed regulations that would significantly modify the calculation and treatment of net unrealized built-in gains and losses; however, the IRS recently amended the proposed effective date provision of those regulations to exempt from the new regulations ownership changes pursuant to chapter 11 cases filed prior to the regulations becoming effective.  Thus, if the proposed regulations are finalized in their current form, the proposed regulations are not expected to apply to WVD and the remainder of this discussion assumes they will not apply.

### i.      General Section 382 Annual Limitation

In general, the amount of the annual limitation to which a corporation that undergoes an "ownership change" would be subject is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the three-calendar-month period ending with the calendar month in which the ownership change occurs, *e.g.* 0.89% for ownership changes occurring in July 2020).  The section 382 limitation may be increased if the company has a net unrealized built-in gain in its assets as of the ownership change date and the company recognizes certain built-in gains in their assets during the five-year period following the ownership change or are treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65.  Section 383 of the Code applies a similar limitation to capital loss carryforwards and tax credits.  Any portion of the annual limitation that is not used in a given year may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  As discussed below, however, special rules may apply in the case of a corporation that experiences an ownership change as the result of a bankruptcy proceeding.

-94-

If the corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the 'corporation's Pre-Change Losses (absent any increases due to recognized built-in gains).

### ii.    Special Bankruptcy Exceptions

An exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" and/or shareholders of a debtor corporation in chapter 11 receive, in respect of their claims or equity interests, respectively, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "382(l)(5) Exception").  Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, the amount of the debtor's Pre-Change Losses is re-determined as if no interest deductions were allowable during the three taxable years preceding the ownership change, and during the part of the taxable year prior to and including the ownership change, in respect of all debt converted into stock in the reorganization.  If the 382(l)(5) Exception applies and the company undergoes another "ownership change" within two years after the first change, then the company's Pre-Change Losses thereafter would be effectively eliminated in their entirety unless there is a net unrealized built-in gain in the company's assets.  Any future ownership change after such two-year period would subject WVD to the general limitations under sections 382 and 383 of the Code.  Where the 382(l)(5) Exception is not applicable to a corporation in bankruptcy (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule will generally apply (the "382(l)(6) Exception").  Under the 382(l)(6) Exception, the annual limitation will be calculated by reference to the lesser of (a) the value of the debtor corporation's stock (with certain adjustments) immediately after the ownership change and (b) the value of such debtor corporation's assets (determined without regard to liabilities) immediately before the ownership change.  This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an "ownership change" to be determined before the events giving rise to the change.  The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that under it the debtor corporation is not required to re-determine the amount of its Pre-Change Losses as if no interest deductions were allowable with respect to the debt exchanged for stock in the manner described above, and the debtor may undergo a change of ownership within two years without automatically triggering the elimination of its Pre-Change Losses.  The resulting limitation would be determined under the regular rules for ownership changes.

WVD is not expected to qualify for the 382(l)(5) Exception under the Plan.

### 2.    *U.S. Holders of Allowed Secured Notes Claims*

### a.    Consequences of Receiving BidCo Equity Consideration

Pursuant to the Plan, each holder of Allowed Secured Notes Claims will receive its *pro rata* share of the BidCo Equity Consideration in satisfaction of its Allowed Secured Notes Claims.  The U.S. federal income tax consequences of the Plan to U.S. Holders of Allowed

Secured Notes Claims will depend on whether the exchange of the Allowed Secured Notes Claims pursuant to the Plan constitutes a taxable transaction or a tax-deferred transaction, such as an exchange governed by section 351 of the Code and/or section 368 of the Code. Whether the exchange constitutes a taxable transaction or a tax-deferred transaction will depend on the manner in which the transactions undertaken pursuant to the Plan (including the transaction steps set forth in **Exhibit 1** of the Plan) are consummated and may also depend on whether the Allowed Secured Notes Claims are treated as "securities" for U.S. federal income tax purposes.

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for U.S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. The A&R NPA under which the Secured Notes were issued was entered into on March 18, 2019, which was five years before the stated maturity date for the Secured Notes. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor at the time of issuance, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current or accrued basis. A U.S. Holder of Allowed Secured Notes Claims should consult its own tax advisor to determine whether its Allowed Secured Notes Claims should be treated as securities for U.S. federal income tax purposes.

If the exchange of Allowed Secured Notes Claims for the BidCo Equity Consideration constitutes a taxable transaction, each U.S. Holder of an Allowed Secured Notes Claim generally will recognize gain or loss in an amount equal to the difference between (i) the fair market value of the BidCo Equity Interests received (other than any BidCo Equity Interests treated as received for accrued but unpaid interest and accrued original issue discount ("OID"), if any) and (ii) the U.S. Holder's adjusted tax basis in its Allowed Secured Notes Claim immediately prior to the exchange (other than any tax basis attributable to accrued but unpaid interest and accrued OID, if any). The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Allowed Secured Notes Claim in such U.S. Holder's hands, whether the Allowed Secured Notes Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Allowed Secured Notes Claim. If recognized gain is capital gain, it generally would be long-term capital gain if the U.S. Holder held its Allowed Secured Notes Claim for more than one year at the time of the exchange. The deductibility of capital losses is subject to certain limitations. To the extent that a portion of the BidCo Equity Interests received is allocable to accrued but unpaid interest or OID, the U.S. Holder may recognize ordinary income. *See* "Accrued Interest" and "Market Discount" below. A U.S. Holder's tax basis in the BidCo Equity Interests received should be equal to the fair market value of such BidCo Equity Interests. A U.S. Holder's holding period in such BidCo Equity Interests received should begin on the day following the Effective Date.

If the exchange of Allowed Secured Notes Claims for the BidCo Equity Consideration constitutes a tax-deferred transaction, subject to the discussion below under "Accrued Interest," U.S. Holders of Allowed Secured Notes Claims could be required to recognize gain, but not loss, upon the exchange.  In such case, a U.S. Holder's tax basis in the BidCo Equity Interests received (other than any BidCo Equity Interests treated as received in satisfaction of accrued but unpaid interest and accrued OID, if any) should be equal to the tax basis in the Allowed Secured Notes Claims exchanged therefor increased by the amount of any gain recognized upon the exchange, and the holding period for such BidCo Equity Interests should include the holding period for the exchanged Allowed Secured Notes Claims.

Regardless of whether the exchange is treated as a taxable transaction or a tax-deferred transaction, a U.S. Holder will have taxable interest income to the extent of any consideration allocable to accrued but unpaid interest or OID not previously included in income, as more fully described below under "Accrued Interest," which amounts will not be included in the amount realized with respect to a U.S. Holder's Allowed Secured Notes Claim.

### b.    Consequences of Owning BidCo Equity Interests

### i.    Distributions on BidCo Equity Interests

Subject to the discussion below under "Possible Treatment of BidCo as a Passive Foreign Investment Company," any distributions with respect to the BidCo Equity Interests (including any amounts withheld in respect of taxes thereon) generally will be treated as taxable dividends to the extent paid out of BidCo's current or accumulated earnings and profits (as determined under U.S. federal income tax principles).  To the extent the amount of any distribution exceeds BidCo's current and accumulated earnings and profits for a taxable year (as determined under U.S. federal income tax principles), the distribution will first be treated as a tax-free return of capital to the extent of the U.S. Holder's adjusted tax basis in the BidCo Equity Interests, and thereafter as capital gain, subject to the discussion below under "Market Discount."  The Debtors do not know whether BidCo will keep record of its earnings and profits in accordance with U.S. federal income tax principles.  Therefore, U.S. Holders should expect that any distribution on the BidCo Equity Interests generally will be treated as a dividend unless otherwise noted.

Any such taxable dividends received by a corporate U.S. Holder will not be eligible for the "dividends received deduction."  Any such taxable dividends will be eligible for reduced rates of taxation as "qualified dividend income" for non-corporate U.S. Holders if the following conditions are met:  (i) either (1) BidCo is eligible for the benefits of a comprehensive income tax treaty with the United States that the Secretary of the U.S. Treasury has determined is satisfactory and that includes an exchange of information program (which includes, as of the date hereof, the Convention between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income and Capital Gains) or (2) the BidCo Equity Interests are readily tradable on an established securities market in the United States (including, *e.g.*, the NYSE or NASDAQ); (ii) the U.S. Holder meets the holding period requirement for the BidCo Equity Interests (generally more than 60 days during the 121-day period that begins 60 days before the ex-dividend date); and (iii) BidCo was not in the year prior to the year in which the dividend was paid (with respect to a U.S. Holder

that held BidCo Equity Interests), and is not in the year in which the dividend is paid, a passive foreign investment company ("PFIC").  Otherwise, such taxable dividends will not be eligible for reduced rates of taxation as "qualified dividend income."

No assurance can be given that BidCo will qualify for the benefits of a comprehensive income tax treaty, and it is not expected that the BidCo Equity Interests will be considered readily tradable on an established securities market in the United States as described above.  In addition, as discussed below under "Possible Treatment of BidCo as a Passive Foreign Investment Company," no assurance can be given that BidCo will not be treated as a PFIC. Accordingly, each non-corporate U.S. Holder is urged to consult its tax advisor regarding whether taxable dividends received by such U.S. Holder will be eligible for qualified dividend income treatment.

### ii.    Sale, Exchange or Other Taxable Disposition of BidCo Equity Interests

Subject to the discussion below under "Possible Treatment of BidCo as a Passive Foreign Investment Company," a U.S. Holder generally will recognize gain or loss on a sale, exchange or other taxable disposition of BidCo Equity Interests equal to the difference between the amount realized on the disposition and the U.S. Holder's adjusted tax basis in the BidCo Equity Interests. Subject to the discussion below under "Market Discount" and the following sentence, this gain or loss generally will be capital gain or loss and generally will be long-term capital gain or loss if the U.S. Holder has held the BidCo Equity Interests for more than one year.  A U.S. Holder that previously claimed a bad debt deduction with respect to its Allowed Secured Notes Claims or that is a cash-method taxpayer may be required to treat some or all of this gain as ordinary income.  Generally, for U.S. Holders who are individuals, long-term capital gains are subject to U.S. federal income tax at a maximum rate of 20%.  For foreign tax credit limitation purposes, gain or loss recognized upon a disposition generally will be treated as from sources within the United States.  The deductibility of capital losses is subject to limitations for U.S. federal income tax purposes.

### iii.    Possible Treatment of BidCo as a Passive Foreign Investment Company

BidCo may be classified as a PFIC for U.S. federal income tax purposes.  In general, a foreign corporation will be classified as a PFIC if (i) 75% or more of its gross income in a taxable year is passive income, or (ii) 50% or more of its assets in a taxable year, averaged quarterly over the year, produce, or are held for the production of, passive income.  Passive income for this purpose generally includes, among other items, interest, dividends, royalties, rents and annuities.  For purposes of these PFIC tests, if BidCo directly or indirectly owns at least 25% (by value) of the stock of another corporation, BidCo will be treated as owning its proportionate share of such other corporation's gross assets and receiving its proportionate share of such other corporation's gross income.  The Debtors cannot provide any assurances that BidCo will not be treated as a PFIC in the current or future taxable years, especially in light of the fact that the Debtors are still in the development stage of their business.

Under the PFIC rules, if BidCo is a PFIC for any taxable year during which a U.S. Holder holds BidCo Equity Interests, BidCo will continue to be treated as a PFIC with respect to such U.S. Holder for all succeeding years during which the U.S. Holder holds the BidCo Equity Interests unless (i) BidCo ceases to be a PFIC and (ii) the U.S. Holder makes a "deemed sale" election under the PFIC rules.  In general, if BidCo is a PFIC for any taxable year during which a U.S. Holder holds BidCo Equity Interests, any gain recognized by the U.S. Holder on a sale or other taxable disposition of BidCo Equity Interests, as well as the amount of any "excess distribution" (defined below) received by such U.S. Holder, would be allocated ratably over the U.S. Holder's holding period for the BidCo Equity Interests.  The amounts allocated to the taxable year of the sale or other disposition (or the taxable year of receipt, in the case of an excess distribution) and to any year before BidCo became a PFIC would be taxed as ordinary income.  The amounts allocated to each other taxable year would be subject to tax at the highest rate in effect for that taxable year, and an interest charge would be imposed.  For purposes of these rules, an excess distribution is the amount by which any distribution received by a U.S. Holder on its BidCo Equity Interests in a taxable year exceeds 125% of the average of the annual distributions on the BidCo Equity Interests received during the preceding three years or the U.S. Holder's holding period, whichever is shorter.  Certain elections may be available that would result in alternative treatments (such as mark-to-market treatment or "qualified electing fund" treatment) of the BidCo Equity Interests.  It is not known whether BidCo will make available the information necessary for U.S. Holders to make a "qualified electing fund" election with respect to their BidCo Equity Interests.

The rules relating to PFICs are complex.  Each U.S. Holder is urged to consult its tax advisor regarding whether BidCo will constitute a PFIC and, if so, the U.S. federal income tax consequences of holding the BidCo Equity Interests.

### 3. *U.S. Holders of Allowed General Unsecured Claims*

In general, a U.S. Holder of an Allowed General Unsecured Claim will recognize gain or loss in an amount equal to the difference between (i) the sum of any Cash and the fair market value of any other consideration received in satisfaction of its Claim (other than any Cash or other consideration received in respect of a Claim for accrued but unpaid interest and accrued OID, if any), and (ii) the U.S. Holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest and accrued OID, if any).  A U.S. Holder will have ordinary interest income to the extent of any Cash or other consideration received that is allocable to accrued but unpaid interest or OID not previously included in income, as described under "Accrued Interest."  In the event of the subsequent disallowance of any General Unsecured Claims, a U.S. Holder of a previously Allowed General Unsecured Claim may receive additional post-Effective Date Distributions.  Accordingly, it is possible that any loss, or a portion of any gain, realized by a U.S. Holder may be deferred until all General Unsecured Claims are Allowed or disallowed.  In addition, a U.S. Holder may have imputed interest income with respect to any such post-Effective Date Distributions. U.S. Holders are urged to consult their own tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting any gain that may be recognized by them in respect of their General Unsecured Claims due to the receipt of consideration in a taxable year subsequent to the taxable year in which the

Effective Date occurs. The discussion herein assumes that the installment method does not apply.

### 4.    *U.S. Holders of Allowed Ongoing Trade Claims*

In general, a U.S. Holder of an Allowed Ongoing Trade Claim will recognize gain or loss in an amount equal to the difference between (i) the sum of any Cash and the fair market value of any other consideration received in satisfaction of its Claim (other than any Cash or other consideration received in respect of a Claim for accrued but unpaid interest and accrued OID, if any), and (ii) the U.S. Holder's adjusted tax basis in its Claim (other than any tax basis attributable to accrued but unpaid interest and accrued OID, if any). A U.S. Holder will have ordinary interest income to the extent of any Cash or other consideration received that is allocable to accrued but unpaid interest or accrued OID not previously included in income, as described under section "Accrued Interest." In the event of the subsequent disallowance of any Ongoing Trade Claims, a U.S. Holder of a previously Allowed Ongoing Trade Claim may receive additional post-Effective Date Distributions subject to the treatment discussed above. *See* Section VIII.A.3., "U.S. Holders of Allowed General Unsecured Claims", *supra*.

### 5.    *Accrued Interest*

To the extent that any amount received by a U.S. Holder of a surrendered Allowed Secured Notes Claim, Allowed General Unsecured Claim or Allowed Ongoing Trade Claim is attributable to accrued but unpaid interest or OID, the receipt of such amount should be taxable to the U.S. Holder as ordinary interest income (to the extent not already taken into income by the U.S. Holder, and subject to a special exception that may be available to cash-method U.S. Holders in certain circumstances). Conversely, a U.S. Holder of an Allowed Secured Notes Claim, Allowed General Unsecured Claim or Allowed Ongoing Trade Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest or OID was previously included in the U.S. Holder's gross income but was not paid in full. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on an Allowed Secured Notes Claim, Allowed General Unsecured Claim or Allowed Ongoing Trade Claim, the extent to which such consideration will be attributable to accrued interest is unclear. Under the Plan, the aggregate consideration received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid interest, if any, that accrued on such Claims before the Petition Date. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by a U.S. Holder should be allocated in some way other than as provided in the Plan. U.S. Holders of Allowed Secured Notes Claims, Allowed General Unsecured Claims and Allowed Ongoing Trade Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

### 6. *Market Discount*

Under the "market discount" provisions of the Code, some or all of any gain realized by a U.S. Holder of an Allowed Secured Notes Claim, Allowed General Unsecured Claim or Allowed Ongoing Trade Claim who receives consideration pursuant to the Plan in satisfaction of its Allowed Secured Notes Claim, Allowed General Unsecured Claim or Allowed Ongoing Trade Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of market discount on the Claim. In general, a debt instrument is considered to have been acquired with market discount if the U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in either case, by at least a statutorily defined de minimis amount.

Any gain recognized by a U.S. Holder on the taxable disposition of an Allowed Secured Notes Claim, Allowed General Unsecured Claim or Allowed Ongoing Trade Claim acquired with market discount should generally be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Secured Notes Claim, Allowed General Unsecured Claim or Allowed Ongoing Trade Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

To the extent that Allowed Secured Notes Claims acquired with market discount are exchanged in a tax-deferred transaction, any market discount that accrued on the Allowed Secured Notes Claims (*i.e.*, up to the time of the exchange) but was not recognized by the U.S. Holder may carry over to the BidCo Equity Interests received in exchange therefor, in which case any gain recognized on the subsequent sale or other taxable disposition of the BidCo Equity Interests shall be treated as ordinary income to the extent of the accrued, but not recognized, market discount with respect to the Allowed Secured Notes Claims.

U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of the exchange of Allowed Secured Notes Claims, Allowed General Unsecured Claims or Allowed Ongoing Trade Claims acquired with market discount pursuant to the Plan.

### 7. *Information Reporting and Backup Withholding*

The Debtors and the Reorganized Debtors will withhold all amounts required by law to be withheld and will comply with all applicable reporting requirements of the Code. In general, information reporting requirements may apply to Distributions or payments made to a holder under the Plan or with respect to their BidCo Equity Interests. In addition, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%) if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax but is, instead, an advance payment that may entitle the holder to a refund from the IRS to the extent it results in an overpayment of tax, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a U.S. taxpayer on its U.S. federal income tax return of certain

types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds.  U.S. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**The U.S. federal income tax consequences of the Plan are complex.  The foregoing summary does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular U.S. Holder in light of such U.S. Holder's circumstances and income tax situation.  All holders of Claims and Interests should consult with their tax advisors as to the particular tax consequences to them of the transactions contemplated by the Plan, including the applicability and effect of any state, local, or foreign tax laws, and of any change in applicable tax laws.**

## B.    CERTAIN UK TAX CONSEQUENCES FOR HOLDERS OF BIDCO EQUITY INTERESTS

The mere subscription of new share capital in BidCo will have no immediate UK taxation consequence for the new shareholder.  A shareholder acquiring existing shares by transfer (as opposed to new shares by subscription) will be liable for UK stamp duty at the rate of 0.5% on the consideration paid for those shares.  The acquisition of shares in the Reorganized Company Party should not result in any UK tax consequences for the holders of shares in BidCo.

The holder of shares in BidCo receiving dividends on those shares will not, under current UK law, suffer any withholding on account of UK tax on such dividends.

Indebtedness of the Reorganized Debtors which is released under the Plan in a way that gives rise, prima facie, to a taxable credit in the hands of the Reorganized Debtors, should not, of itself, result in a shareholder of BidCo incurring any charge to UK taxation.  A ruling has been obtained from HM Revenue and Customs which confirms that any income so arising shall be treated as statutorily exempt from UK tax in the Reorganized Debtors' hands.

**Shareholders should consult their own tax advisers of any non-UK taxation consequences to them arising as a result of the conversion or exchange of any indebtedness of the Debtors and/or the holding of the share capital of BidCo (or any affiliate thereof).**

**This analysis may not apply to a shareholder who holds its investment in BidCo as a trading or dealing asset of a financial trade or business carried on in the United Kingdom or through a branch or permanent establishment there, and such persons are advised to seek their own professional tax and accounting advice on the consequences of any exchange of indebtedness for equity under the Plan.**

## IX.    RECOMMENDATION AND CONCLUSION

The Debtors believe that the Confirmation and consummation of the Plan is preferable to all other alternatives.  Consequently, the Debtors urge all parties entitled to vote to accept the

Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline established by the Disclosure Statement Order.

Dated:  August [   ]31, 2020                    Respectfully submitted,

                                                OneWeb Global Limited,
                                                on behalf of itself and each of the other Debtors

                                                By:  ___/s/ *[DRAFT]*    ***Thomas Whayne***_____
                                                     Name:  Thomas Whayne
                                                     Title:   Chief Financial Officer
                                                               OneWeb Global Limited

Prepared by:

Dated:  [DATE], 2020                  —/s/ [DRAFT]
New York, New York                    Dennis F. Dunne, Esq.
                                      Andrew M. Leblanc, Esq.
                                      Tyson M. Lomazow, Esq.
                                      Lauren C. Doyle, Esq
                                      MILBANK LLP
                                      55 Hudson Yards
                                      New York, NY 10001
                                      Telephone:    (212) 530-5000
                                      Facsimile:    (212) 530-5219
                                      Email:        ddunne@milbank.com
                                                    aleblanc@milbank.com
                                                    tlomazow@milbank.com
                                                    ldoyle@milbank.com

                                      *Counsel to the Debtors
                                      and Debtors in Possession*

## ANNEX A

**Plan**

## <u>ANNEX B</u>

**Liquidation Analysis**

**OneWeb Global Ltd. et. al.**
**Summary Table - Best Interests Test**

Below is a summary, prepared by the Debtors and their professionals, of the proposed recoveries by Holders of Allowed Claims against, and Allowed Interests in, the Debtors pursuant to the Joint Chapter 11 Plan of Reorganization of OneWeb Global Limited et. al. (the "Plan") as compared to potential recoveries in a hypothetical Chapter 7 liquidation.

Because recoveries under the Plan exceed those in a hypothetical chapter 7 case, the Plan satisfies the best interests of creditors test.

| Class | Claim Type | Plan Consideration | Plan Recovery | Chapter 7 Recovery |
|---|---|---|---|---|
| Unclassified | New Money DIP Loan Claims[1] | Cash[2] | 100.0% | 0% to 21.0% |
| Unclassified | Roll-up Loan Claims | Cash | 100.0% | 0.0% |
| Unclassified | Ch. 11 Administrative Expense Claims | Cash | 100.0% | 0.0% |
| 1 | Secured Notes Claims[3] | Equity | 6.1% | 0.0% |
| 2 | Other Secured Claims | Cash | 100.0% | 0.0% |
| 3 | Priority Non-Tax Claims | Cash | 100.0% | 0.0% |
| 4 | General Unsecured Claims | N/A | 0.0% | 0.0% |
| 5 | Ongoing Trade Claims | [  ] | [  ] | 0.0% |
| 6 | Intercompany Claims | N/A | 0% to 100% | 0.0% |
| 7 | Intercompany Interests | N/A | 0% to 100% | 0.0% |
| 8 | Section 510(b) Claims | N/A | 0.0% | 0.0% |
| 9 | OneWeb Interests | N/A | 0.0% | 0.0% |

[1] New money DIP Claims represent $30 million of initial new money DIP loans provided by the initial DIP Lenders and $110 million of additional new money DIP loans provided by the Plan Sponsor (the "New Money DIP Loan Claims"). Chapter 7 recovery percentage reflects the range of the high-case and low-case recovery scenarios.

[2] On the Effective Date, except with respect to Interim Funding DIP Claims, each holder of an Allowed DIP Claim shall receive payment in full in cash under the Plan. With respect to the Interim Funding DIP Claims under the Plan, each holder of an allowed Interim Funding DIP Claim under the DIP Facility shall have such claims converted into BidCo Equity Interests at the same valuation as the BidCo Equity Consideration. In a Chapter 7 liquidation, all New Money DIP Loan Claims will receive payment, if any, in cash.

[3] Plan percentage recovery reflects equity distribution value of $100 million.

1

**OneWeb Global Ltd. et. al.**
**Liquidation Analysis Assumptions**

*Introduction*

Section 1129(a)(7) of the Bankruptcy Code₁ requires that each holder of an impaired Allowed Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors' assets were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. To demonstrate that the Plan satisfies this standard, the Debtors, in consultation with their legal and financial advisors, have prepared the Liquidation Analysis, which (a) estimates the realizable value of the Debtors (the "**Chapter 7 Debtors**") under a hypothetical Chapter 7 liquidation (the "**Liquidation Analysis**") and (b) estimates the distribution to creditors resulting from the liquidation.

The Liquidation Analysis is a hypothetical exercise based on a number of estimates and assumptions that are subject to significant uncertainties and contingencies. Proceeds generated in a hypothetical Chapter 7 liquidation are likely to be significantly discounted due to the distressed nature of the sale. Further, Allowed Claims against the Chapter 7 Debtors' estates could vary materially from the estimates set forth in the Liquidation Analysis. Accordingly, while the information contained in the Liquidation Analysis is presented with numerical specificity, the Debtors make no assurances that the asset values and Claim amounts presented in the Liquidation Analysis would not vary materially from actual amounts in the event of an actual Chapter 7 liquidation.

Following is a summary of certain assumptions used in the Liquidation Analysis. The notes to the Liquidation Analysis provide additional assumptions and should be read in conjunction with the Liquidation Analysis. Additional factors not enumerated herein were also considered in connection with the formulation of the Liquidation Analysis.

*General Assumptions*

The Liquidation Analysis assumes that the Debtors' Chapter 11 cases are converted to liquidation cases under Chapter 7 of the Bankruptcy Code effective October 1, 2020. The Bankruptcy Court-appointed Chapter 7 trustee would proceed to liquidate as soon as possible all assets of the Chapter 7 Debtors in both the high recovery and low recovery scenarios.

In the high-recovery scenario, assets are assumed liquidated over a nine-month liquidation period and the Chapter 7 cases would conclude on June 30, 2021. The assumed nine-month wind-down period reflects the requirement for regulatory approvals for a sale transaction. The high-recovery scenario assumes that the Debtors' spectrum rights, seventy-four (74) in-orbit satellites, satellite control equipment and certain related contracts and other operating assets located at its UK-based satellite operations center and its $5 million cash fund pledged to the United Kingdom Space Agency (the "**Spectrum Asset Package**") would be sold in the aggregate as a pool of assets to maximize liquidation value. The hypothetical sales assume that the Debtors' existing business

2

would not be sold as a going concern, which severely limits the potential value to be derived from the spectrum and other assets.

In the low-recovery scenario, assets are assumed liquidated over a twelve-month liquidation period and the Chapter 7 cases would conclude on September 30, 2021. A twelve-month liquidation period is estimated based on the assumption that the spectrum is not able to be sold given the distressed nature of the sale and the limited time to market the assets in a hypothetical Chapter 7 liquidation and, therefore, a period of time would be required to de-orbit the satellites currently in operation within the necessary regulatory guidelines and requirements.

This Liquidation Analysis incorporates, *inter alia*, (a) information included in the Debtors' Plan, (b) amounts presented in the Debtors' books and records and (c) analyses performed by the Debtors.

The Liquidation Analysis reflects the possibility that the applicable liquidation period may not provide sufficient time to maximize value during the sale of assets of the Chapter 7 Debtors and that the Chapter 7 Debtors' negotiation position will be very weak. The assets would likely be valued and, if sold, sold at "deeply distressed" price levels. Liquidation values were derived by estimating proceeds from a "deeply distressed" sale of assets that a Chapter 7 trustee might achieve.

The Liquidation Analysis assumes that liquidation proceeds (net of the expenses incurred by the Chapter 7 trustee) will be distributed in accordance with the Bankruptcy Code and that no distributions will be made to junior creditors or equity holders until all senior creditors are paid in full.

The Liquidation Analysis assumes an Ongoing Trade Claims class is not established and that the Ongoing Trade Claims are treated as General Unsecured Claims.

Upon conversion of the Chapter 11 cases to Chapter 7 liquidation, it is assumed that the Chapter 7 trustee will be permitted the use of Cash Collateral (as defined in the DIP Order)[1] and sale proceeds for solely the purposes of managing a wind-down and liquidation of assets, however, there is no guarantee that funding beyond the Carve-Out (as defined in the DIP Order) will be available to a Chapter 7 trustee absent consent of the DIP Lenders to use Cash Collateral.

While the Liquidation Analysis assumes liquidation over a nine- to twelve-month period due to the time required obtain regulatory approval in the high-recovery scenario or to de-orbit the satellites in the low-recovery scenario or it is possible that the disposition and recovery from certain assets could take longer and cost more to realize. The potential impact of litigation and actions by other creditors could increase the amount of time required to realize recoveries assumed in this analysis. Such events, including if the Chapter 7 trustee were not granted consensual use of Cash Collateral and could not obtain alternate financing for costs incurred to realize on assets,

---

[1] *Order (I) Authorizing Debtors to Obtain Postpetition Secured Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 121] (the "DIP Order").

could add costs to the liquidation in the form of higher legal and professional fees to resolve these potential events or shorten the time available to realize on the assets.

The table herein summarizes the estimated proceeds that would be available for distribution to the Debtors' creditors in a hypothetical liquidation of the Debtors' estates under Chapter 7 of the Bankruptcy Code. Additional assumptions with respect to the Liquidation Analysis are provided below.

### Cash and Equivalents

The "Cash and Equivalents" balances are the projected unrestricted Debtor cash balances as of October 1, 2020 based on the Debtors' consolidated cash forecast. OneWeb Communications Limited is projected to hold the majority of the cash as of October 1, 2020. Cash balances at each entity are projected based on allocation of the consolidated cash balance projected at October 1, 2020 and expected cash needs for wind-down and other administrative expenses. It is assumed that the Chapter 7 Debtors maintain the existing cash management system currently in place. The Liquidation Analysis assumes that, to the extent necessary to fund operations, the Debtors will first use cash currently reflected on the books of OneWeb Communications Limited.

The Liquidation Analysis assumes zero cash balance at each of the non-debtor entities as of October 1, 2020. Existing cash balances at June 30, 2020 are projected to be utilized to partly fund liabilities at the non-debtor entities. Non-debtor liabilities are projected to exceed the existing cash-on-hand.

Restricted cash includes cash held by third parties, including approximately $5 million held by the United Kingdom Space Agency as collateral in the event that the Debtors are no longer able to operate or safely de-orbit the satellites in operation. The low-recovery scenario assumes this cash collateral is returned to the Debtors in full at the conclusion of the de-orbiting process. The high-recovery scenario assumes the collateral remains in place and is transferred to the buyer as part of the Spectrum Asset Package.

### Intercompany Receivables

For purposes of this analysis, intercompany receivables have not been included. In both scenarios, gross proceeds available are insufficient to cover the projected administrative expenses and carve-out expense at most of the Debtor entities. Local, third-party liabilities of non-US debtors may have to be paid in priority to intercompany payables to other OneWeb-related entities. As a result, the intercompany receivables are assumed to have no realizable value.

### Prepaid Expenses and Other Current Assets

Prepaid and other current assets consist mainly of prepaid rent, prepaid insurance, advances to suppliers, and security deposits. The Liquidation Analysis assumes these assets will either be consumed during the liquidation period or are not realizable and therefore no proceeds will be realized from prepaid expenses.

4

*Income Tax Receivable*

The Liquidation Analysis assumes no proceeds are realized from any income tax receivable.

*Satellites, Ground, and Other Property and Equipment*

The Company's property and equipment includes costs for the design, development, manufacture, test, and launch of a constellation of LEO satellites (referred to as the "**Space Component**") and the acquisition, installation, and activation of primary and backup control centers, gateway, and other ground facilities (referred to as the "**Ground Component**").

The Liquidation Analysis assumes in the high-recovery scenario that the Space Component and Ground Component assets are included in the Spectrum Asset Package and are sold together as a pool of assets at deeply distressed values. See the "Spectrum Rights" section below for discussion of the estimated gross proceeds.

*Intangible Assets*

Intangible assets consist of intangibles with determinable or indefinite lives, website and computer software costs. A portion of the Company's intangible assets are spectrum licenses, priority rights, and trademarks, which are indefinite-lived intangible assets.

The Liquidation Analysis assumes no proceeds are realized from the intangible assets except for the spectrum rights included in the Spectrum Asset Package.

*Spectrum Rights*

OneWeb has various spectrum authorizations and licenses, including for the use of Ku-band and Ka-band radio-frequency spectrum on a global basis, and domestic market access/services authorizations in jurisdictions in which its ground infrastructure is located.

The global Ku-band and Ka-band authorizations are issued by the ITU for a specific set of satellites, frequencies, and orbits to be used in a planned constellation and contain certain milestones for the number of in-orbit satellites, which are assumed to be at risk in a hypothetical liquidation sale. The high-recovery scenario assumes that the Debtors' Spectrum Asset Package would be sold as a pool of assets at deeply distressed value for gross proceeds of no more than $50 million.

In the low-recovery scenario, assets are assumed liquidated over a twelve (12) month period based on the assumption that the spectrum is not able to be sold during the hypothetical liquidation sale period, thus the satellites currently in operation must be de-orbited within the necessary regulatory guidelines and requirements. It is assumed that the Debtors' remaining assets in the Spectrum Asset Package, separate and independent from the spectrum rights, are not able to be sold in either scenario.

The assumption of a range of zero to $50 million in gross proceeds for the Spectrum Asset Package reflects the bids, indications of interest, and other information regarding value received during the Debtors' sale process (as adjusted to account for the both the significant risk of getting regulatory approval of such sales and the additional risks associated with an asset sale in a liquidation environment) as well as key characteristics of the spectrum assets, namely that the majority of its value is derived from the operation of a LEO constellation as contemplated under the Debtors' authorizations and licenses. These authorizations and licenses include certain future milestone dates regarding the deployment of satellites. The hypothetical liquidation analysis assumes that the Spectrum Asset Package is sold as assets separate and apart from a going concern business.

The Liquidation Analysis assumes that 80% of the gross liquidation value would be attributable to the spectrum rights and 20% attributable to the other assets comprising the Spectrum Asset Package. OneWeb's Ku-band authorization is the forward channel and provides higher priority use than its Ka-band authorization and, therefore, comprises most of the estimated spectrum rights liquidation value. The Liquidation Analysis assumes 90% allocation of the estimated spectrum rights liquidation value to the Ku-band and 10% allocation to the Ka-band.

While there may be some hypothetical value in the domestic market access licenses the realizable value for any particular market is highly uncertain. There would also be significant costs to negotiate with governments for approval of the transfer of such licenses. Accordingly, the Liquidation Analysis assumes that any value realized from sales of the domestic market access licenses is included in the gross liquidation value.

*Other Non-Current Assets*

The Liquidation Analysis assumes no proceeds are realized from the other non-current assets.

*Investment in Affiliates*

Assets at non-debtor subsidiaries have limited to no realizable value on a standalone basis. Certain non-debtors have liabilities, including the potential obligations under long-term site leases. The Liquidation Analysis assumes cash available in aggregate at the non-debtor entities is used to pay the non-debtors' obligations and that cash at non-debtor entities is insufficient to fund all existing and projected liabilities as of October 1, 2020. As a result, the Liquidation Analysis assumes no proceeds are available to provide any realization on the Debtors' investment in affiliates.

*Deferred Tax Assets*

The Liquidation Analysis assumes no proceeds are realized from the other deferred tax assets.

*Costs Associated with Liquidation*

Estimated amounts for corporate payroll and certain operating costs during the nine-month liquidation period are based upon the assumption that certain corporate functions would be retained to oversee the liquidation process. Some staff would also be needed to maintain and

close the accounting records and to complete certain administrative tasks, including payroll, tax forms, and records. Certain minimum staff would be required at the physical locations to complete the closure of the facilities, disassemble the equipment, and oversee the sale process of the spectrum and equipment.

Operating costs are expected to include staff and facilities costs to maintain and manage the fleet of satellites during the nine-month liquidation period in the high-recovery scenario where the Spectrum Asset Package is sold. In the low-recovery scenario where a buyer for the Spectrum Asset Package is not found, costs will be required to de-orbit the seventy-four (74) in-orbit satellites. This is expected to take twelve (12) months. The Liquidation Analysis assumes the $5 million of restricted cash held by the United Kingdom Space Agency is returned to the Debtors at the end of this period.

Chapter 7 trustee fees include those fees associated with the appointment of a Chapter 7 trustee in accordance with section 326 of the Bankruptcy Code. Chapter 7 professional fees include legal, appraisal, broker and accounting fees expected to be incurred during the liquidation period and not already deducted from liquidation values.

### Carve-Out for US Trustee, Chapter 7 Trustee and Estate Professional Fees

The Carve-Out represents proceeds of the secured lenders' collateral allocated under the DIP Order to pay certain US Trustee fees, Chapter 7 trustee fees, and fees and expenses of the Debtors' and the Creditors' Committee's professionals.  The estimates incorporated in the Liquidation Analysis include: (i) estimated accrued and unpaid professional fees associated with the Chapter 11 Cases as of October 1, 2020, (ii) estimated US Trustee fees owing as of October 1, 2020, (iii) all reasonable fees and expenses up to $100,000 incurred by a Chapter 7 trustee, and (iv) up to $3,000,000 of fees and expenses of the Debtors' and the Creditors' Committee's professionals incurred after October 1, 2020.

### New Money DIP Loan Claims

New Money DIP Loan Claims in the Liquidation Analysis are comprised of the $30 million aggregate amount of the first two tranches of the initial DIP funding and $110 million of Interim Funding DIP Claims, plus interest accrued on each principal balance.

### Senior Secured Prepetition Claims

The Liquidation Analysis assumes $94 million of the Secured Notes Claims, which includes accrued interest, and is reflected as Roll-up Loan Claims.

### Other Secured Claims

Other Secured Claims are estimated for purposes of this Liquidation Analysis at zero based on the Debtors' books and records as of the Petition Date. The final amount of Other Secured Claims is subject to change based on continued reconciliation of proofs of claim filed through the bar date of August 11, 2020. The debtors have not analyzed potential Other Secured Claims

7

in detail and this estimate is not an admission that any asserted Claim qualifies for secured treatment. No assurance can be given that the total amount of actual Allowed Other Secured Claims will ultimately be in the estimated amount and actual results could be greater or less than this estimate.

### 503(b)(9) Claims

The 503(b)(9) Claims reflect estimated amounts based on the Debtors' preliminary review of proof of claims filed through July 15, 2020 as well as the Debtors' books and records. The final amount of 503(b)(9) is subject to change based on potential additional proofs of claims filed through the bar date of August 11, 2020 and upon the debtors' full legal review of filed claims. The debtors have not analyzed potential 503(b)(9) Claims in detail and this estimate is not an admission that any asserted claim qualifies for 503(b)(9) treatment.  No assurance can be given that actual allowed 503(b)(9) Claims will ultimately be in the estimated amount and actual results could be greater or less than this estimate.

### Priority Tax Claims

Priority Tax Claims are estimated for purposes of this Liquidation Analysis at zero based on the Debtors' books and records. The final amount of Priority Tax Claims is subject to change based on continued reconciliation against proof of claims and potential additional proofs of claims filed through the governmental bar date of September 24, 2020 and upon the debtors' full legal review of filed claims.  The debtors have not analyzed potential priority tax Claims in detail and this estimate is not an admission that any asserted Claim qualifies for priority tax treatment. No assurance can be given that the total actual amount of Allowed Priority Tax Claims will ultimately be in the estimated amount and actual results could be greater or less than this estimate.

In Re:  OneWeb Global Limited, et al. (the "Debtors")
**Liquidation Analysis - Conversion Effective October 1, 2020**
$ USD
*Analysis Current as of August 10, 2020*

| | OneWeb Global Limited | | OneWeb Communications Limited | | WorldVu Satellites Limited | |
|---|---|---|---|---|---|---|
| | Low Recovery | High Recovery | Low Recovery | High Recovery | Low Recovery | High Recovery |
| Unrestricted Cash on Hand [1] | 1,576 | 1,576 | 702,572 | 702,572 | - | - |
| Restricted Cash | - | - | - | - | - | - |
| Gross Proceeds from Sale [2] [3] | - | - | - | - | - | 36,797,329 |
| **Total Gross Proceeds Available** | **1,576** | **1,576** | **702,572** | **702,572** | **-** | **36,797,329** |
| **Ch. 7 Administrative Expenses** | | | | | | |
| Chapter 7 Trustee Fees [4] | 35 | 35 | 15,808 | 15,808 | - | 827,940 |
| Chapter 7 Professional Fees [5] | 16 | 16 | 7,026 | 7,026 | - | 367,973 |
| Transaction Fee - Spectrum Sale | - | - | - | - | - | 1,500,000 |
| Estate Wind-down Expenses [6] | 2,137 | 1,503 | 952,919 | 670,368 | 253,460 | 178,306 |
| **Total Priority Administrative Costs** | **2,188** | **1,555** | **975,753** | **693,202** | **253,460** | **2,874,219** |
| **Carve-out [7]** | | | | | | |
| Ch. 11 US Trustee Fees (Q3 2020) | 21 | 21 | 9,371 | 9,371 | 2,492 | 2,492 |
| Accrued Professional Fees at Conversion Date | - | - | - | - | - | 10,069,500 |
| Post-Conversion Ch. 11 Prof Fees @ Carve Out Cap | - | - | - | - | - | 3,100,000 |
| **Total Carve-Out** | **21** | **21** | **9,371** | **9,371** | **2,492** | **13,171,992** |
| **Net Estimated Proceeds Available (by Entity)** | (634) | 0 | (282,551) | 0 | (255,952) | 20,751,118 |
| **Proceeds Available for Distribution to Creditors** | **-** | **0** | **-** | **0** | **-** | **20,751,118** |
| **Less New Money DIP Loan Claims** | | | | | | |
| Total New Money DIP Loan Claims | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 |
| Hypothetical Recovery to Holders of New Money DIP Loan Claims | - | 0 | - | 0 | - | 20,751,118 |
| **Net Proceeds Available after Distributions to New Money DIP Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Roll-up Loan Claims** | | | | | | |
| Total Roll-up Loan Claims | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 |
| Hypothetical Recovery to Holders of Roll-up Loan Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Roll-up Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Ch. 11 Administrative Expenses** | | | | | | |
| 503(b)(9) | 3,720 | 3,720 | - | - | - | - |
| Priority Tax Claims | - | - | - | - | 2,000 | 2,000 |
| Hypothetical Recovery to Holders of Ch. 11 Administrative Expenses | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Ch. 11 Administrative Expenses** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Secured Notes Claims** | | | | | | |
| Total Secured Debt [8] | - | - | 1,639,267,588 | 1,639,267,588 | 1,639,267,588 | 1,639,267,588 |
| Hypothetical Recovery to Holders of Secured Notes Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Secured Notes Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Other Secured Claims** | | | | | | |
| Other Secured Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Other Secured Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Other Secured Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Priority Non-Tax Claims** | | | | | | |
| Priority Non-Tax Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Priority Non-Tax Claims | - | - | - | - | - | - |
| **Net Proceeds Available for General Unsecured Creditors and OneWeb Interests** | **-** | **-** | **-** | **-** | **-** | **-** |

In Re:  OneWeb Global Limited, et al. (the "Debtors")
**Liquidation Analysis - Conversion Effective October 1, 2020**
*$ USD*
*Analysis Current as of August 10, 2020*

| | OneWeb Holdings LLC | | WorldVu Development LLC | | 1021823 BC Ltd. | |
|---|---|---|---|---|---|---|
| | Low Recovery | High Recovery | Low Recovery | High Recovery | Low Recovery | High Recovery |
| Unrestricted Cash on Hand [1] | 672 | 672 | 14,231,706 | 14,231,706 | 16,176 | 16,176 |
| Restricted Cash | - | - | - | - | - | - |
| Gross Proceeds from Sale [2] [3] | - | - | - | - | - | - |
| **Total Gross Proceeds Available** | **672** | **672** | **14,231,706** | **14,231,706** | **16,176** | **16,176** |
| **Ch. 7 Administrative Expenses** | | | | | | |
| Chapter 7 Trustee Fees [4] | 15 | 15 | 320,213 | 320,213 | 364 | 364 |
| Chapter 7 Professional Fees [5] | 7 | 7 | 142,317 | 142,317 | 162 | 162 |
| Transaction Fee - Spectrum Sale | - | - | - | - | - | - |
| Estate Wind-down Expenses [6] | 912 | 641 | 19,302,867 | 13,579,360 | 21,940 | 15,435 |
| **Total Priority Administrative Costs** | **933** | **663** | **19,765,398** | **14,041,891** | **22,466** | **15,960** |
| **Carve-out [7]** | | | | | | |
| Ch. 11 US Trustee Fees (Q3 2020) | 9 | 9 | 189,815 | 189,815 | 216 | 216 |
| Accrued Professional Fees at Conversion Date | - | - | - | - | - | - |
| Post-Conversion Ch. 11 Prof Fees @ Carve Out Cap | - | - | - | - | - | - |
| **Total Carve-Out** | **9** | **9** | **189,815** | **189,815** | **216** | **216** |
| **Net Estimated Proceeds Available (by Entity)** | **(270)** | **(0)** | **(5,723,507)** | **(0)** | **(6,505)** | **0** |
| **Proceeds Available for Distribution to Creditors** | **-** | **-** | **-** | **-** | **-** | **0** |
| **Less New Money DIP Loan Claims** | | | | | | |
| Total New Money DIP Loan Claims | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 |
| Hypothetical Recovery to Holders of New Money DIP Loan Claims | - | - | - | - | - | 0 |
| **Net Proceeds Available after Distributions to New Money DIP Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Roll-up Loan Claims** | | | | | | |
| Total Roll-up Loan Claims | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 |
| Hypothetical Recovery to Holders of Roll-up Loan Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Roll-up Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Ch. 11 Administrative Expenses** | | | | | | |
| 503(b)(9) | - | - | 63,362 | 63,362 | 960,000 | 960,000 |
| Priority Tax Claims | - | - | 60,154 | 60,154 | - | - |
| Hypothetical Recovery to Holders of Ch. 11 Administrative Expenses | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Ch. 11 Administrative Expenses** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Secured Notes Claims** | | | | | | |
| Total Secured Debt [8] | - | - | 1,639,267,588 | 1,639,267,588 | 1,639,267,588 | 1,639,267,588 |
| Hypothetical Recovery to Holders of Secured Notes Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Secured Notes Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Other Secured Claims** | | | | | | |
| Other Secured Claims | | | | | | |
| Hypothetical Recovery to Holders of Other Secured Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Other Secured Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Priority Non-Tax Claims** | | | | | | |
| Priority Non-Tax Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Priority Non-Tax Claims | - | - | - | - | - | - |
| **Net Proceeds Available for General Unsecured Creditors and OneWeb Interests** | **-** | **-** | **-** | **-** | **-** | **-** |

10

In Re:  OneWeb Global Limited, et al. (the "Debtors")
**Liquidation Analysis - Conversion Effective October 1, 2020**
*$ USD*
*Analysis Current as of August 10, 2020*

| | OneWeb Ltd | | Network Access Associates Limited | | OneWeb Norway AS | |
|---|---|---|---|---|---|---|
| | Low Recovery | High Recovery | Low Recovery | High Recovery | Low Recovery | High Recovery |
| Unrestricted Cash on Hand [1] | - | - | 30,837 | 30,837 | - | - |
| Restricted Cash | - | - | 5,000,000 | - | - | - |
| Gross Proceeds from Sale [2] [3] | - | - | - | 9,202,671 | - | - |
| **Total Gross Proceeds Available** | **-** | **-** | **5,030,837** | **9,233,507** | **-** | **-** |
| **Ch. 7 Administrative Expenses** | | | | | | |
| Chapter 7 Trustee Fees [4] | - | - | 113,194 | 207,754 | - | - |
| Chapter 7 Professional Fees [5] | - | - | 50,308 | 92,335 | - | - |
| Transaction Fee - Spectrum Sale | - | - | - | - | - | - |
| Estate Wind-down Expenses [6] | - | - | 4,748,587 | 3,340,580 | - | - |
| **Total Priority Administrative Costs** | **-** | **-** | **4,912,089** | **3,640,669** | **-** | **-** |
| **Carve-out [7]** | | | | | | |
| Ch. 11 US Trustee Fees (Q3 2020) | - | - | 46,695 | 46,695 | - | - |
| Accrued Professional Fees at Conversion Date | - | - | 10,069,500 | - | - | - |
| Post-Conversion Ch. 11 Prof Fees @ Carve Out Cap | - | - | 3,100,000 | - | - | - |
| **Total Carve-Out** | **-** | **-** | **13,216,195** | **46,695** | **-** | **-** |
| **Net Estimated Proceeds Available (by Entity)** | **-** | **-** | **(13,097,448)** | **5,546,143** | **-** | **-** |
| **Proceeds Available for Distribution to Creditors** | **-** | **-** | **-** | **5,546,143** | **-** | **-** |
| **Less New Money DIP Loan Claims** | | | | | | |
| Total New Money DIP Loan Claims | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 |
| Hypothetical Recovery to Holders of New Money DIP Loan Claims | - | - | - | 5,546,143 | - | - |
| **Net Proceeds Available after Distributions to New Money DIP Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Roll-up Loan Claims** | | | | | | |
| Total Roll-up Loan Claims | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 |
| Hypothetical Recovery to Holders of Roll-up Loan Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Roll-up Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Ch. 11 Administrative Expenses** | | | | | | |
| 503(b)(9) | - | - | - | - | - | - |
| Priority Tax Claims | - | - | 300 | 300 | 200 | 200 |
| Hypothetical Recovery to Holders of Ch. 11 Administrative Expenses | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Ch. 11 Administrative Expenses** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Secured Notes Claims** | | | | | | |
| Total Secured Debt [8] | 1,639,267,588 | 1,639,267,588 | 1,639,267,588 | 1,639,267,588 | - | - |
| Hypothetical Recovery to Holders of Secured Notes Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Secured Notes Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Other Secured Claims** | | | | | | |
| Other Secured Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Other Secured Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Other Secured Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Priority Non-Tax Claims** | | | | | | |
| Priority Non-Tax Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Priority Non-Tax Claims | - | - | - | - | - | - |
| **Net Proceeds Available for General Unsecured Creditors and OneWeb Interests** | **-** | **-** | **-** | **-** | **-** | **-** |

11

In Re:  OneWeb Global Limited, et al. (the "Debtors")
**Liquidation Analysis - Conversion Effective October 1, 2020**
*$ USD*
*Analysis Current as of August 10, 2020*

| | OneWeb ApS | | WorldVu Australia Pty Ltd | | OneWeb Network Access Holdings Limited | |
|---|---|---|---|---|---|---|
| | Low Recovery | High Recovery | Low Recovery | High Recovery | Low Recovery | High Recovery |
| Unrestricted Cash on Hand [1] | 1,088 | 1,088 | 470,425 | 470,425 | 3,240 | 3,240 |
| Restricted Cash | - | - | - | - | - | - |
| Gross Proceeds from Sale [2] [3] | - | - | - | - | - | - |
| **Total Gross Proceeds Available** | **1,088** | **1,088** | **470,425** | **470,425** | **3,240** | **3,240** |
| | | | | | | |
| **Ch. 7 Administrative Expenses** | | | | | | |
| Chapter 7 Trustee Fees [4] | 24 | 24 | 10,585 | 10,585 | 73 | 73 |
| Chapter 7 Professional Fees [5] | 11 | 11 | 4,704 | 4,704 | 32 | 32 |
| Transaction Fee - Spectrum Sale | - | - | - | - | - | - |
| Estate Wind-down Expenses [6] | 1,475 | 1,038 | 638,051 | 448,862 | 4,394 | 3,091 |
| **Total Priority Administrative Costs** | **1,510** | **1,073** | **653,339** | **464,151** | **4,500** | **3,197** |
| | | | | | | |
| **Carve-out [7]** | | | | | | |
| Ch. 11 US Trustee Fees (Q3 2020) | 15 | 15 | 6,274 | 6,274 | 43 | 43 |
| Accrued Professional Fees at Conversion Date | - | - | - | - | - | - |
| Post-Conversion Ch. 11 Prof Fees @ Carve Out Cap | - | - | - | - | - | - |
| **Total Carve-Out** | **15** | **15** | **6,274** | **6,274** | **43** | **43** |
| | | | | | | |
| **Net Estimated Proceeds Available (by Entity)** | **(437)** | **-** | **(189,189)** | **0** | **(1,303)** | **(0)** |
| | | | | | | |
| **Proceeds Available for Distribution to Creditors** | **-** | **-** | **-** | **0** | **-** | **-** |
| | | | | | | |
| **Less New Money DIP Loan Claims** | | | | | | |
| Total New Money DIP Loan Claims | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 |
| Hypothetical Recovery to Holders of New Money DIP Loan Claims | - | - | - | 0 | - | - |
| **Net Proceeds Available after Distributions to New Money DIP Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Roll-up Loan Claims** | | | | | | |
| Total Roll-up Loan Claims | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 |
| Hypothetical Recovery to Holders of Roll-up Loan Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Roll-up Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Ch. 11 Administrative Expenses** | | | | | | |
| 503(b)(9) | - | - | - | - | - | - |
| Priority Tax Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Ch. 11 Administrative Expenses | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Ch. 11 Administrative Expenses** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Secured Notes Claims** | | | | | | |
| Total Secured Debt [8] | - | - | - | - | 1,639,267,588 | 1,639,267,588 |
| Hypothetical Recovery to Holders of Secured Notes Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Secured Notes Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Other Secured Claims** | | | | | | |
| Other Secured Claims | | | | | | |
| Hypothetical Recovery to Holders of Other Secured Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Other Secured Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| | | | | | | |
| **Less Priority Non-Tax Claims** | | | | | | |
| Priority Non-Tax Claims | | | | | | |
| Hypothetical Recovery to Holders of Priority Non-Tax Claims | - | - | - | - | - | - |
| **Net Proceeds Available for General Unsecured Creditors and OneWeb Interests** | **-** | **-** | **-** | **-** | **-** | **-** |

12

In Re:  OneWeb Global Limited, et al. (the "Debtors")
**Liquidation Analysis - Conversion Effective October 1, 2020**
*$ USD*
*Analysis Current as of August 10, 2020*

| | OneWeb Limited | | WorldVu Unipessoal Lda | | OneWeb GK | |
|---|---|---|---|---|---|---|
| | Low Recovery | High Recovery | Low Recovery | High Recovery | Low Recovery | High Recovery |
| Unrestricted Cash on Hand [1] | - | - | - | - | 21,903 | 21,903 |
| Restricted Cash | - | - | - | - | - | - |
| Gross Proceeds from Sale [2] [3] | - | 4,000,000 | - | - | - | - |
| **Total Gross Proceeds Available** | **-** | **4,000,000** | **-** | **-** | **21,903** | **21,903** |
| **Ch. 7 Administrative Expenses** | | | | | | |
| Chapter 7 Trustee Fees [4] | - | 90,000 | - | - | 493 | 493 |
| Chapter 7 Professional Fees [5] | - | 40,000 | - | - | 219 | 219 |
| Transaction Fee - Spectrum Sale | - | - | - | - | - | - |
| Estate Wind-down Expenses [6] | - | - | - | - | 29,707 | 20,899 |
| **Total Priority Administrative Costs** | **-** | **130,000** | **-** | **-** | **30,419** | **21,610** |
| **Carve-out [7]** | | | | | | |
| Ch. 11 US Trustee Fees (Q3 2020) | - | - | - | - | 292 | 292 |
| Accrued Professional Fees at Conversion Date | - | - | - | - | - | - |
| Post-Conversion Ch. 11 Prof Fees @ Carve Out Cap | - | - | - | - | - | - |
| **Total Carve-Out** | **-** | **-** | **-** | **-** | **292** | **292** |
| **Net Estimated Proceeds Available (by Entity)** | **-** | **3,870,000** | **-** | **-** | **(8,808)** | **-** |
| **Proceeds Available for Distribution to Creditors** | **-** | **3,870,000** | **-** | **-** | **-** | **-** |
| **Less New Money DIP Loan Claims** | | | | | | |
| Total New Money DIP Loan Claims | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 |
| Hypothetical Recovery to Holders of New Money DIP Loan Claims | - | 3,870,000 | - | - | - | - |
| **Net Proceeds Available after Distributions to New Money DIP Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Roll-up Loan Claims** | | | | | | |
| Total Roll-up Loan Claims | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 |
| Hypothetical Recovery to Holders of Roll-up Loan Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Roll-up Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Ch. 11 Administrative Expenses** | | | | | | |
| 503(b)(9) | 9,090 | 9,090 | - | - | - | - |
| Priority Tax Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Ch. 11 Administrative Expenses | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Ch. 11 Administrative Expenses** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Secured Notes Claims** | | | | | | |
| Total Secured Debt [8] | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Secured Notes Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Secured Notes Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Other Secured Claims** | | | | | | |
| Other Secured Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Other Secured Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Other Secured Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Priority Non-Tax Claims** | | | | | | |
| Priority Non-Tax Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Priority Non-Tax Claims | - | - | - | - | - | - |
| **Net Proceeds Available for General Unsecured Creditors and OneWeb Interests** | **-** | **-** | **-** | **-** | **-** | **-** |

13

In Re:  OneWeb Global Limited, et al. (the "Debtors")
Liquidation Analysis - Conversion Effective October 1, 2020
$ USD
*Analysis Current as of August 10, 2020*

| | WorldVu South Africa (Pty) Ltd | | WorldVu Mexico S. De R.L. de CV | | OneWeb Chile SpA | |
|---|---|---|---|---|---|---|
| | Low Recovery | High Recovery | Low Recovery | High Recovery | Low Recovery | High Recovery |
| Unrestricted Cash on Hand [1] | 27,780 | 27,780 | 1,530 | 1,530 | 40,556 | 40,556 |
| Restricted Cash | - | - | - | - | - | - |
| Gross Proceeds from Sale [2] [3] | - | - | - | - | - | - |
| **Total Gross Proceeds Available** | **27,780** | **27,780** | **1,530** | **1,530** | **40,556** | **40,556** |
| **Ch. 7 Administrative Expenses** | | | | | | |
| Chapter 7 Trustee Fees [4] | 625 | 625 | 34 | 34 | 913 | 913 |
| Chapter 7 Professional Fees [5] | 278 | 278 | 15 | 15 | 406 | 406 |
| Transaction Fee - Spectrum Sale | - | - | - | - | - | - |
| Estate Wind-down Expenses [6] | 37,679 | 26,507 | 2,075 | 1,460 | 55,008 | 38,697 |
| **Total Priority Administrative Costs** | **38,582** | **27,410** | **2,125** | **1,510** | **56,326** | **40,015** |
| **Carve-out [7]** | | | | | | |
| Ch. 11 US Trustee Fees (Q3 2020) | 371 | 371 | 20 | 20 | 541 | 541 |
| Accrued Professional Fees at Conversion Date | - | - | - | - | - | - |
| Post-Conversion Ch. 11 Prof Fees @ Carve Out Cap | - | - | - | - | - | - |
| **Total Carve-Out** | **371** | **371** | **20** | **20** | **541** | **541** |
| **Net Estimated Proceeds Available (by Entity)** | **(11,172)** | **0** | **(615)** | **-** | **(16,310)** | **0** |
| **Proceeds Available for Distribution to Creditors** | **-** | **0** | **-** | **-** | **-** | **0** |
| **Less New Money DIP Loan Claims** | | | | | | |
| Total New Money DIP Loan Claims | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 |
| Hypothetical Recovery to Holders of New Money DIP Loan Claims | - | 0 | - | - | - | 0 |
| **Net Proceeds Available after Distributions to New Money DIP Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Roll-up Loan Claims** | | | | | | |
| Total Roll-up Loan Claims | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 |
| Hypothetical Recovery to Holders of Roll-up Loan Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Roll-up Loan Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Ch. 11 Administrative Expenses** | | | | | | |
| 503(b)(9) | - | - | - | - | - | - |
| Priority Tax Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Ch. 11 Administrative Expenses | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Ch. 11 Administrative Expenses** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Secured Notes Claims** | | | | | | |
| Total Secured Debt [8] | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Secured Notes Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Secured Notes Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Other Secured Claims** | | | | | | |
| Other Secured Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Other Secured Claims | - | - | - | - | - | - |
| **Net Proceeds Available after Distributions to Other Secured Claims** | **-** | **-** | **-** | **-** | **-** | **-** |
| **Less Priority Non-Tax Claims** | | | | | | |
| Priority Non-Tax Claims | - | - | - | - | - | - |
| Hypothetical Recovery to Holders of Priority Non-Tax Claims | - | - | - | - | - | - |
| **Net Proceeds Available for General Unsecured Creditors and OneWeb Interests** | **-** | **-** | **-** | **-** | **-** | **-** |

14

**In Re: OneWeb Global Limited, et al. (the "Debtors")**
**Liquidation Analysis - Conversion Effective October 1, 2020**
*$ USD*
*Analysis Current as of August 10, 2020*

| | WorldVu JV Holdings LLC | | Total | |
|---|---|---|---|---|
| | Low Recovery | High Recovery | Low Recovery | High Recovery |
| Unrestricted Cash on Hand [1] | - | - | 15,550,060 | 15,550,060 |
| Restricted Cash | - | - | 5,000,000 | - |
| Gross Proceeds from Sale [2] [3] | - | - | - | 50,000,000 |
| **Total Gross Proceeds Available** | **-** | **-** | **20,550,060** | **65,550,060** |
| | | | | |
| **Ch. 7 Administrative Expenses** | | | | |
| Chapter 7 Trustee Fees [4] | - | - | 462,376 | 1,474,876 |
| Chapter 7 Professional Fees [5] | - | - | 205,501 | 655,501 |
| Transaction Fee - Spectrum Sale | - | - | - | 1,500,000 |
| Estate Wind-down Expenses [6] | - | - | 26,051,211 | 18,326,748 |
| **Total Priority Administrative Costs** | **-** | **-** | **26,719,088** | **21,957,125** |
| | | | | |
| **Carve-out [7]** | | | | |
| Ch. 11 US Trustee Fees (Q3 2020) | - | - | 256,175 | 256,175 |
| Accrued Professional Fees at Conversion Date | - | - | 10,069,500 | 10,069,500 |
| Post-Conversion Ch. 11 Prof Fees @ Carve Out Cap | - | - | 3,100,000 | 3,100,000 |
| **Total Carve-Out** | **-** | **-** | **13,425,675** | **13,425,675** |
| | | | | |
| **Net Estimated Proceeds Available (by Entity)** | **-** | **-** | **(19,594,702)** | **30,167,261** |
| | | | | |
| **Proceeds Available for Distribution to Creditors** | **-** | **-** | **-** | **30,167,261** |
| | | | | |
| **Less New Money DIP Loan Claims** | | | | |
| Total New Money DIP Loan Claims | 143,802,083 | 143,802,083 | 143,802,083 | 143,802,083 |
| | | | | |
| Hypothetical Recovery to Holders of New Money DIP Loan Claims | - | - | - | 30,167,261 |
| **Net Proceeds Available after Distributions to New Money DIP Loan Claims** | **-** | **-** | **-** | **-** |
| | | | | |
| **Less Roll-up Loan Claims** | | | | |
| Total Roll-up Loan Claims | 94,541,667 | 94,541,667 | 94,541,667 | 94,541,667 |
| | | | | |
| Hypothetical Recovery to Holders of Roll-up Loan Claims | - | - | - | - |
| **Net Proceeds Available after Distributions to Roll-up Loan Claims** | **-** | **-** | **-** | **-** |
| | | | | |
| **Less Ch. 11 Administrative Expenses** | | | | |
| 503(b)(9) | - | - | 1,036,172 | 1,036,172 |
| Priority Tax Claims | - | - | 62,654 | 62,654 |
| | | | | |
| Hypothetical Recovery to Holders of Ch. 11 Administrative Expenses | - | - | - | - |
| **Net Proceeds Available after Distributions to Ch. 11 Administrative Expenses** | **-** | **-** | **-** | **-** |
| | | | | |
| **Less Secured Notes Claims** | | | | |
| Total Secured Debt [8] | - | - | 1,639,267,588 | 1,639,267,588 |
| | | | | |
| Hypothetical Recovery to Holders of Secured Notes Claims | - | - | - | - |
| **Net Proceeds Available after Distributions to Secured Notes Claims** | **-** | **-** | **-** | **-** |
| | | | | |
| **Less Other Secured Claims** | | | | |
| Other Secured Claims | - | - | - | - |
| | | | | |
| Hypothetical Recovery to Holders of Other Secured Claims | - | - | - | - |
| **Net Proceeds Available after Distributions to Other Secured Claims** | **-** | **-** | **-** | **-** |
| | | | | |
| **Less Priority Non-Tax Claims** | | | | |
| Priority Non-Tax Claims | - | - | - | - |
| | | | | |
| Hypothetical Recovery to Holders of Priority Non-Tax Claims | - | - | - | - |
| **Net Proceeds Available for General Unsecured Creditors and OneWeb Interests** | **-** | **-** | **-** | **-** |

**Liquidation Analysis Footnotes**

1. Projected Unrestricted Cash on Hand balance of $15.5M reflects the DIP forecast as at October 1, 2020.

2. Gross estimated proceeds from liquidation do not include any potential recovery from lawsuits that the Debtors have filed or could file or any value related to Net Operating Losses at any of the Debtor entities.

3. Spectrum Asset Package proceeds estimated at $0 to $50 million. See "*Spectrum Rights.*"

4. The Chapter 7 trustee's fees are calculated at 2.25% of distributable assets as a proxy for 11 U.S.C. § 326(a).

5. Chapter 7 professional fees are assumed to be 1% of distributable assets.

6. Wind-down costs include operating expense required to keep satellites in-orbit for nine (9) months under the high-recovery scenario or to de-orbit the satellites over a twelve (12) month period in the low-recovery scenario as well as payroll costs for reduced staff to shutter all other operations.

7. Carve-out amount includes (i) estimated unpaid professional fees projected in the DIP Budget to be incurred through to September 30, 2020, (ii) $0.26 million for Q3-2020 accrued US Trustee fees, (iii) $100,000 for fees and expenses of a trustee appointed in the Debtors' cases under section 726(b) of the Bankruptcy Code, and (iv) $3 million capped amount of professional fees of the Debtors' and the Creditors' Committee professionals after conversion to a Chapter 7 proceeding. In the high-recovery scenario, the carve-out amount also includes an assumed $1.5 million transaction fee earned for the sale of the Spectrum Asset Package.

8. Secured Notes Claims are reflected in full at each Debtor that is an obligor under the prepetition loan agreement.

## **ANNEX C**

**Financial Projections**

## **Financial Projections**

THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH THEIR BUSINESS PLANS, BUDGETS OR STRATEGIES OR MAKE EXTERNAL PROJECTIONS OR FORECASTS OF THEIR ANTICIPATED FINANCIAL POSITIONS OR RESULTS OF OPERATIONS. ACCORDINGLY, THE DEBTORS DO NOT ANTICIPATE THAT THEY WILL, AND DISCLAIM ANY OBLIGATION TO, FURNISH UPDATED BUSINESS PLANS, BUDGETS OR PROJECTIONS PRIOR TO THE EFFECTIVE DATE OR OTHERWISE MAKE SUCH INFORMATION PUBLICLY AVAILABLE.

The Debtors prepared the financial projections set forth herein (the "Financial Projections") based on, among other things, the anticipated future financial condition and results of operations of the Debtors in the Transaction. The following forecast was not prepared with a view toward compliance with published guidelines of the SEC or the American Institute of Certified Public Accountants regarding forecasts. The Debtors' independent auditor has not audited, reviewed, compiled or otherwise applied procedures to the forecast and consequently, does not express an opinion or any other form of assurance with respect to the forecast. The forecast data are not measured on a basis consistent with generally accepted accounting principles ("GAAP") or International Financial Reporting Standards ("IFRS") as applied to the Debtors' historical financial statements and should not be relied upon as such.

THE FINANCIAL PROJECTIONS HEREIN HAVE BEEN PREPARED BY THE DEBTORS' MANAGEMENT. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE ACCURACY OF THESE FINANCIAL PROJECTIONS OR AS TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

Risks Associated with Forward-Looking Statements

The Financial Projections are, by their nature, forward-looking and are necessarily based on certain assumptions and estimates. Should any or all of these assumptions or estimates ultimately prove to be incorrect, the actual future results of the Reorganized Debtors may differ from those set forth from the Financial Projections. The Financial Projections reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, some of which may

not materialize, including, without limitation, assumptions concerning: (a) the timing of confirmation and consummation of the Plan in accordance with its terms; (b) the anticipated future performance of the Reorganized Debtors, including, without limitation, the Debtors' ability to maintain or increase revenue and gross margins, control future operating expenses or make necessary capital expenditures; (c) general business and economic conditions; (d) overall industry performance and trends; and (e) the Debtors' ability to receive vendor support.

|  | Q4 2020E[1] | 2021E | 2022E | 2023E |
|---|---|---|---|---|
| **EBITDA** | **($45)** | **($144)** | **$20** | **$232** |
| Less: Capex | (373) | (1,215) | (200) | (74) |
| Less: Working Capital & Other | -- | (27) | (26) | (8) |
| **Unlevered Free Cash Flow** | **($419)** | **($1,386)** | **($206)** | **$149** |
| Plus: New Financing (BidCo Emergence)[2] | 740 | -- | -- | -- |
| Plus: New Financing (New Offering / Commitments)[3] | -- | 1,300 | -- | -- |
| **Net Cash Flow** | **$321** | **($86)** | **($206)** | **$149** |
| **Ending Cash Balance** | **$344** | **$258** | **$52** | **$201** |

**Notes:**

Figures may not tie due to rounding.

1 The Financial Projections assume an effective date of October 2, 2020 and this column includes pre-emergence expenses.

2 Represents $850 million of Additional Cash Plan Funding less $110 million of Interim Funding. Approximately $83 million of the $740 million of new financing will be used to fund administrative claims, cure costs and other expenses prior to emergence and are included in the EBITDA and capex figures above.

3 Per the table above, the Debtors' business plan contemplates post-close financing of $1.3BN in order to fund operational and capital expenditure needs. With a de-leveraged balance sheet as a result of the emergence from chapter 11 cases; the already existing commitment to fund up to $850 million to fund expenses and operations on and after the Effective Date; and the rebound in financial markets since the inception of COVID-19, the Debtors believe that they will be able to raise additional funding and that the Plan is feasible.

## **ANNEX D**

**Excluded Assets**

**Excluded Entities**

- OneWeb Global Ltd (UK)[32][1]
- OneWeb Technology Ltd (Jersey)[33][2]
- OneWeb Development Ltd (UK)[2]

**Excluded Assets to be Transferred to Excluded Entities**

- The 49% interest in OneWeb LLC (Russia) currently held by OneWeb Network Access Holdings Ltd (UK)
- Joint Venture Agreement in relation to OneWeb Limited Liability Company between OneWeb Network Access Holdings Limited and JSC "Satellite System "Gonets" dated 1 June 2017, as amended (the "Russian JVA"), and any agreements relating to the Russian JVA or OneWeb Limited Liability Company.

---

[32][1]  OneWeb Global Ltd (UK) will become a Liquidating Debtor upon consummation of the Plan. All parent company guarantees provided by OneWeb Global Ltd (UK) will be assumed by OneWeb Global Ltd (UK) and assigned to the Reorganized Debtors.

[33][2]  OneWeb Technology Ltd (Jersey) and OneWeb Development Ltd (UK) are non-debtor subsidiaries of OneWeb Global Ltd (UK) that will not be transferred to BidCo and that will instead remain as subsidiaries of OneWeb Global Ltd (UK) upon consummation of the Plan.